No. 26-1899

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NATIONAL WILDLIFE FEDERATION, et al.,

*Plaintiffs-Appellees,*

and

STATE OF OREGON,

*Intervenor-Plaintiff,*

v.

NATIONAL MARINE FISHERIES SERVICE, et al.,

*Defendants-Appellants.*

On Appeal from the U.S. District Court, District of Oregon
No. 3:01-cv-00640, Honorable Michael H. Simon, District Judge

## MOTION FOR A STAY PENDING APPEAL

ADAM R.F. GUSTAFSON
  *Principal Deputy Assistant Attorney General*
ROBERT STANDER
  *Deputy Assistant Attorney General*
FREDERICK H. TURNER
JACOB D. ECKER
EMILY A. POLACHEK
  *Attorneys, U.S. Department of Justice*
  *Environment & Natural Resources Division*
  *Post Office Box 7415*
  *Washington, D.C. 20044*
  *(202) 532-3045*
  *jacob.ecker@usdoj.gov*

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................ii

TABLE OF AUTHORITIES.........................................................................................iii

INTRODUCTION ..........................................................................................................1

BACKGROUND.............................................................................................................3

     I.     The Columbia River System.............................................................................3

     II.    Endangered Species Act ....................................................................................4

     III.   Litigation History and Past Agency Actions...................................................5

     IV.   2020 BiOp and Preliminary Injunction .........................................................6

STANDARD .....................................................................................................................9

ARGUMENT ...................................................................................................................9

     I.     A stay is required to avoid irreparable harm to the electric grid
          and the public. ....................................................................................................9

     II.    The government is likely to succeed on the merits. ...................................13

          A.     The district court lacked jurisdiction because it is vested
                exclusively in the court of appeals. ...................................................13

          B.     The district court substituted its own prior views for agency
                expertise. ................................................................................................16

          C.     The court exceeded its equitable authority. ....................................20

     III.   Plaintiffs will not suffer irreparable harm before the district court
          decides the merits..............................................................................................21

     IV.   The balance of equities and the public interest favor a stay.....................23

CONCLUSION ..............................................................................................................23

## TABLE OF AUTHORITIES

### Cases

*Aluminum Co. of Am. v. BPA,*
175 F.3d 1156 (9th Cir. 1999) ................................................................................16

*Arizona Mining Reform Coal. v. USFS,*
--- F.4th ----, 2026 WL 711200 (9th Cir. Mar. 13, 2026) ...............................19

*Ass'n of Pub. Agency Customers v. BPA,*
126 F.3d 1158 (9th Cir. 1997) ................................................................................14

*Boardman v. Pac. Seafood Grp.,*
822 F.3d 1011 (9th Cir. 2016) .......................................................................... 21, 22

*Calif. Save Our Streams Council, Inc. v. Yeutter,*
887 F.2d 908 (9th Cir. 1989) ..................................................................................15

*California Pharmacists Ass'n v. Maxwell-Jolly,*
563 F.3d 847 (9th Cir. 2009) ..................................................................................11

*Cent. Montana Elec. Power Co-op. v. Adm'r of BPA,*
840 F.2d 1472 (9th Cir. 1988) ................................................................................13

*Center for Biological Diversity v. Bernhardt,*
982 F.3d 723 (2020) ...................................................................................................15

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.,*
789 F.3d 1075 (9th Cir. 2015) ................................................................................21

*Douglas v. Indep. Living Ctr.,*
565 U.S. 606 (2012) ...................................................................................................12

*Food & Drug Admin. v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) ...................................................................................................20

*Garcia v. Google,*
786 F.3d 733 (9th Cir. 2015) .........................................................2, 3, 9, 16, 18, 20

*Idaho Dep't of Fish & Game v. NMFS,*
 56 F.3d 1071 (9th Cir. 1995) ...............................................................................4

*INS v. Pangilinan,*
 486 U.S. 875 (1988) .................................................................................. 20, 21

*Manrique v. Kolc,*
 65 F.4th 1037 (9th Cir. 2023)...............................................................................9

*Minority Television Project v. FCC,*
 736 F.3d 1192 (9th Cir. 2013)............................................................................16

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.,*
 422 F.3d 782 (9th Cir. 2005) ................................................................................5

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS I),*
 254 F. Supp. 2d 1196 (D. Or. 2003) .....................................................................5

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS II),*
 2005 WL 1278878 (D. Or. May 26, 2005) ............................................................5

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS III),*
 524 F.3d 917 (9th Cir. 2008) ....................................................................5, 17, 19

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS V),*
 184 F. Supp. 3d 861 (D. Or. 2016) .......................................................................5

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS VII),*
 2017 WL 1829588 (D. Or. Apr. 3, 2017)...............................................................5

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS IX),*
 886 F.3d 803 (9th Cir. 2018) ......................................................................... 6, 22

*Nken v. Holder,*
 556 U.S. 418 (2009) ..............................................................................................9

*Northwest Resource Information Center v. NMFS,*
 25 F.3d 872 (9th Cir. 1994) ................................................................................16

*Pac. Power & Light Co. v. BPA,*
    795 F.2d 810 (9th Cir. 1986)............................................................................16

*Puget Sound Energy v. United States,*
    310 F.3d 613 (9th Cir. 2002)............................................................................15

*Raines v. Byrd,*
    521 U.S. 811 (1997)............................................................................................20

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
    747 F.3d 581 (9th Cir. 2014)............................................................................20

*San Luis & Delta-Mendota Water Auth. v. Locke,*
    776 F.3d 971 (9th Cir. 2014)............................................................................19

*San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo,*
    161 F.4th 590 (9th Cir. 2025)..........................................................................23

*Seven Cnty. Infrastructure Coal. v. Eagle Co.,*
    605 U.S. 168 (2025) ..........................................................................15, 16, 19

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
    438 F.3d 937 (9th Cir. 2006)............................................................................15

*USFWS v. Sierra Club,*
    592 U.S. 261 (2021)............................................................................................18

*Winter v. NRDC,*
    555 U.S. 7 (2008) ....................................................................................... 11, 23

**Statutes**

16 U.S.C. § 832a.....................................................................................................13

16 U.S.C. § 838b(d) ..................................................................................................4

16 U.S.C. § 839(2)...................................................................................................14

16 U.S.C. § 839b(h)(11)(A)-(B)...........................................................................14

16 U.S.C. § 839d-1 .................................................................................13

16 U.S.C. § 839f(e)(5) ....................................................................... 13, 16

16 U.S.C. § 1536(a)(2) ......................................................................... 4, 5

Pub. L. No. 74-409 (1935) ......................................................................4

Pub. L. No. 81-516 (1950) ......................................................................4

## Rules

Fed. R. Civ. P. 65(d)(1)(A) ..................................................................22

## Regulations

50 C.F.R. § 402.02 ........................................................................... 17, 19

50 C.F.R. § 402.14(a) ..............................................................................5

50 C.F.R. § 402.14(g)(2) ..........................................................................5

50 C.F.R. § 402.14(g)(3) ..........................................................................5

50 C.F.R. § 402.14(h) ..............................................................................5

85 Fed. Reg. 63834 (Oct. 8, 2020) .................................................7, 13, 14

## INTRODUCTION

The district court in this 25-year-old Endangered Species Act (ESA) case has effectively designated itself superintendent of the 14 federal multi-purpose dams of the Columbia River System (CRS) that generate substantial hydroelectric power. Despite incalculable federal resources spent conforming CRS to the needs of fish, agriculture, businesses, tribes, and residents, the court continues to issue injunction after injunction, specifying the details of dam operations and water flow, which in turn control energy generation for much of the Pacific Northwest. The region is already at high risk of an energy shortage, and the district court's current injunction substantially increases the risk of catastrophic harm to the public through blackouts. This judicial overreach must stop.

Plaintiffs' current complaint attacks a joint decision for operating the dams issued by the Bonneville Power Administration (BPA), the Bureau of Reclamation, and the U.S. Army Corps of Engineers. These agencies' joint decision concurred with a searching analysis conducted by the National Marine Fisheries Service (NMFS) finding that dam operations were not likely to jeopardize fish. Leveraging these agencies' extensive expertise and predictive scientific judgments, the ultimate decision on how to operate CRS going forward strikes a careful balance to protect fish while providing critically important hydropower for communities, hospitals, and military installations from Montana to Oregon, among other important services.

Plaintiffs primarily complain that insufficient "spill" from the dams will harm fish. Spill is water released from a dam through the spillway instead of through powerhouses. In 2023, the parties entered an agreement stipulating to spill levels for the next 10 years that included less spill than Plaintiffs sought in their injunction motion. After the change of Administrations, the government rescinded that agreement and litigation resumed. Plaintiffs now insist that substantially higher spill—particularly in August, when the agreement allowed reduced spill—is crucial to avoid imminent harm to fish, despite agreeing until 10 months ago that less spill protected the fish just fine.

The district court took Plaintiffs' bait: hook, line, and sinker. The court entered a "particularly disfavored" "mandatory" preliminary injunction that blindly adopted Plaintiffs' newly preferred spill levels. *Garcia v. Google*, 786 F.3d 733, 740 (9th Cir. 2015) (en banc). Once again asserting itself as overseer of operations, the court mandated high, continuous spill at 8 dams on the Columbia and Snake Rivers including—most problematically—elevated spill through August and September.

A stay pending appeal is warranted. Absent a stay, the elevated spill levels will cause irreparable harm to the public by increasing the cost of electricity, reducing grid stability, and substantially increasing the risk of blackouts. Blackouts in neighborhoods disrupt communities, blackouts in hospitals cost lives, and blackouts in military installations threaten national security.

The government easily shows serious questions on the merits and, indeed, is likely to succeed on appeal. To begin, the district court lacked jurisdiction because the Northwest Power Act vests jurisdiction exclusively in this Court. Next, the government fully complied with the ESA. NMFS prepared a 1,400-page biological opinion (BiOp) that considers in detail each of the district court's concerns. The district court seems to have simply ignored the agency's reasoning, improperly substituted its own views for the agencies' predictive scientific judgments, and plainly failed to apply the "doubly demanding" standard for a mandatory injunction, which requires Plaintiffs to "establish that the law and facts clearly favor" their position. *Google*, 786 F.3d at 740.[1]

## BACKGROUND

### I. The Columbia River System

CRS consists of 14 multi-purpose dams and related facilities constructed between 1938 and 1975 along the Snake and Columbia Rivers in the Pacific Northwest. Eight of these dams are the subject of the preliminary injunction. Congress explicitly directed the Corps and Reclamation to construct and operate these dams and reservoirs for multiple purposes, including flood risk management; commercial navigation; generation of renewable energy for millions of residents; conservation of fish and wildlife resources; irrigation of nearly 1.4 million acres of

---

[1] Plaintiff environmental groups and Intervenor-Plaintiff Oregon oppose this motion while intervenor defendants either take no position or support it. *See* Cir. R. 27-1(2).

land; recreation; and water supply. *See, e.g.*, Pub. L. No. 81-516, § 204 (1950); Pub. L. No. 74-409, §§ 1, 2 (1935).

The Corps, Reclamation, and BPA (the Action Agencies) "jointly manage the dams, reservoirs, and other facilities in the Columbia and Snake River Basin." *Idaho Dep't of Fish & Game v. NMFS*, 56 F.3d 1071, 1072 (9th Cir. 1995). BPA is also responsible for transmitting and marketing CRS-generated hydropower and transmitting power on the West Coast. *See* 16 U.S.C. § 838b(d); APP.187, 766.

Salmon and steelhead that spawn in the upper reaches of the lower Columbia and lower Snake Rivers travel through the basin to the ocean and back to their spawning ground. APP.504-11. Juvenile fish utilize multiple passage routes at the dams, including collection and transport. *Id.*

At the same time, CRS supplies power to millions of Pacific Northwest residents and businesses, providing one-third of the power generated in the region. APP.191-92, 228. BPA's transmission system interconnects with systems in Canada, Mexico, the Rockies, and the Great Plains. *See id.* Preserving electrical reliability is therefore critical for the entire western region. *See id.*

## II. Endangered Species Act

Section 7 of the ESA requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered or threatened species." 16 U.S.C. § 1536(a)(2). Federal agencies (action agencies) consult with NMFS or the U.S. Fish and Wildlife Service (consulting agencies) whenever the

agency's action "may affect" a listed species. *Id.*; 50 C.F.R. § 402.14(a). If the proposed action is "likely to adversely affect" listed species or critical habitat, the action agencies must engage in formal consultation, culminating in the consulting agency issuing a biological opinion (BiOp). *Id.* § 402.14(h). A BiOp includes the consulting agency's opinion on whether the proposed action is likely to jeopardize the continued existence of the species. *Id.* § 402.14(g)(2), (g)(3).

## III.   Litigation History and Past Agency Actions

This case was filed in 2001 to challenge a 2000 BiOp assessing the effects of CRS operations on ESA-listed species of salmon and steelhead. In the quarter-century since the case began, Plaintiffs have challenged nearly every subsequent BiOp and, more recently, the Action Agencies' reviews under the National Environmental Policy Act (NEPA).

In phase one of this case, the district court rejected NMFS's 2000 and 2004 BiOps, and this Court reviewed the orders relating to the 2004 BiOp. *See NMFS I*, 254 F. Supp. 2d 1196 (D. Or. 2003); *NMFS II*, 2005 WL 1278878 (D. Or. May 26, 2005); *Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782 (9th Cir. 2005); *NMFS III*, 524 F.3d 917 (9th Cir. 2008).

In phase two, Plaintiffs challenged a 2008 BiOp, as supplemented in 2010 and 2014. The district court found certain deficiencies in the 2008 BiOp and its supplements. *See NMFS V*, 184 F. Supp. 3d 861 (D. Or. 2016). During the remand, the district court partially granted a preliminary injunction. *NMFS VII*, 2017 WL

1829588 (D. Or. Apr. 3, 2017), *aff'd in part, appeal dism. in part, NMFS IX*, 886 F.3d 803 (9th Cir. 2018).

## IV.    2020 BiOp and Preliminary Injunction

The case has now entered a third phase, challenging the Action Agencies' 2020 environmental impact statement and Record of Decision, and centering on NMFS's 2020 BiOp. In the 2020 BiOp, NMFS concluded that the proposed action—"to continue operating and maintaining" CRS for flood risk management, navigation, irrigation, conservation, and all the other purposes established by Congress, APP765-86, along with extensive conservation measures, APP.786-808—was not likely to jeopardize the continued existence of ESA-listed species. NMFS reached this conclusion after conducting an exhaustive, 1400-page analysis. *See* APP.743-61. NMFS evaluated the status of each species, the environmental baseline for the species and their habitat, the effects of the proposed action and cumulative effects, and the effects of the action and cumulative effects when added to the baseline to determine whether jeopardy would result from the proposed action. *See, e.g.*, APP.813. NMFS dedicated between 25 and 195 pages of species-specific analyses. *See* APP.747-61.

The proposed action adopts a flexible spill program. This program included 16 hours per day of spill up to a limit set by state water-quality standards and 8 hours per day of reduced spill that would allow for higher power generation and promote passage for some adult fish who have difficulty passing structures during higher spill

6

levels. APP.774. The 2020 Record of Decision formally adopted the proposed action. 85 Fed. Reg. 63834 (Oct. 8, 2020).

Plaintiffs challenged these actions through supplemental complaints in 2021, APP.670-742, 1061-1119, but the district court stayed the case during negotiations that resulted in agreed-upon operations in 2023, APP.561-66. In their injunction motions, Plaintiffs requested substantially greater spill than what they accepted as part of the 2023 agreement, which, among other provisions, provided for operations for CRS expected to last 10 years. *See* APP.206-08, 216-23 (charting CRS operating parameters from 2017 through the proposed 2026 plans and highlighting the increase required in the injunction); APP.633-51. The court issued the preliminary injunction on review here on March 2, 2026, after the government withdrew from the agreement. APP.31-131.

Relying on previous decisions evaluating different agency actions, the district court concluded that Plaintiffs were likely to succeed on the merits. For example, without evaluating the BiOp itself, the court determined that NMFS's analysis "does not provide a discernable path for the Court to review whether NMFS" accurately defined the baseline and proposed action in evaluating jeopardy. APP.105. Then, relying on an earlier decision of this Court about a different agency action, the district court incorrectly opined that the agency had "silently includ[ed] existing operations as part of the baseline" and, in doing so, failed to address *all* future operations as effects of the proposed action. *Id.* The district court also concluded that the BiOp's

discussion of mitigation was too vague, that the BiOp did not adequately consider climate change, and that it did not sufficiently discuss species recovery. APP.105-14. Finally, in a separate order, the court rejected the government's argument that the Ninth Circuit has exclusive jurisdiction under the Northwest Power Act. APP.7-29.

On irreparable harm, the court stated that general threats to salmonids were "dire and immediate," despite Plaintiffs' 2024 stipulation to lesser spill for 10 years. APP.116. The court also agreed with Plaintiffs that the public interest favored the injunction, ignoring dozens of agency expert declarations that the injunction would harm other endangered species like bull trout. APP.118-22. Finally, the court stated that "the public interest always weighs in favor of protecting endangered species," ignoring "power system reliability, flood risk, transportation, irrigation, and the availability of water supplies and clean drinking water." APP.122, 131.

The court's preliminary injunction adopted Plaintiffs' request for expanded spill operations. The court mandated longer durations of spill at all eight dams (24 hours, versus 16 hours contemplated in the 2020 Record of Decision); reduced operational flexibilities (including fish transport at one dam, which results in more returning adults annually than spill); and, despite a lack of evidence that it would meaningfully benefit listed species, extended spill through the entire month of August, when water levels will be at their lowest and air temperatures at their highest. *See* APP.33-37. The court also denied the government's request for a stay pending appeal. APP.129-31.

## STANDARD

A stay pending appeal is warranted when the movant shows serious questions or likelihood of success on the merits, will suffer irreparable harm while the appeal is pending absent a stay, and the balance of the equities and public interest favor the stay. *Manrique v. Kolc*, 65 F.4th 1037, 1041 (9th Cir. 2023); *Nken v. Holder*, 556 U.S. 418, 434 (2009).

To obtain an injunction, Plaintiffs were required to meet the "doubly demanding" standard for a mandatory injunction because such injunctions go "well beyond simply maintaining the status quo" and are "particularly disfavored." *Google*, 786 F.3d at 740. Plaintiffs "must establish that the law and facts clearly favor [their] position, not simply that [they are] likely to succeed." *Id.*

Taken together, the government need only show there are serious questions whether Plaintiffs met their burden to show "that the law and facts clearly favor" them. *Id.*

## ARGUMENT

### I. A stay is required to avoid irreparable harm to the electric grid and the public.

Absent a stay, irreparable harm will occur during the pendency of this appeal because the injunction substantially increases the risk of blackouts—which cause death, human suffering, and substantial economic damage—and increases the cost of electricity.

CRS supplies power to millions of Pacific Northwest residents and businesses. BPA is "the anchor supplier of electricity in [the] region, providing one-third of the electric power generated in the Northwest, primarily from reliable, dispatchable and flexible hydroelectric resources." App.190-91. The customers of this power include military bases, hospitals, airports, tribal nations, and rural communities. *Id.* These communities rely on a dependable source of power from CRS for their health and safety. APP.229-30.

The district court's injunction threatens this safety by ordering increased spill from the dams. Increasing spill reduces power generation because water that is spilled does not go through turbines to produce power. Over the last several years, CRS had reduced spill in August to account for high energy demands and low water flow, and because there are few downstream-migrating fish then. *See* APP.198-99. The district court thinks it knows better.

BPA expects the court's newly ordered spill levels to result in a loss of generation capacity of 1,000 average Megawatts in August and 500 average Megawatts in September. APP.206. This will cause a significantly greater risk of blackouts in August and September: in August, the risk increases from 1.3-1.6% to 6.0-6.2% and, in September, the risk increases to about 13%. APP.193-96. During extreme heat, generation capacity could dip by up to 1,600 Megawatts. App.229-30. Unpredictable weather patterns mean that high air temperatures and blackouts could strike in other months as well. *See, e.g., Astounding heat obliterates all-time records across the*

*Pacific Northwest and Western Canada in June 2021*, https://www.climate.gov/news-features/event-tracker/astounding-heat-obliterates-all-time-records-across-pacific-northwest ("Over a four-day period, June 26-29, daytime high temperatures skyrocketed to well over 100 degrees Fahrenheit, setting all-time records at dozens of locations.").

Blackouts present an extreme threat to public safety and security. A blackout in the areas served by CRS could shut off power to hospitals, military bases, schools, and communities. Hospitals systems would depend on questionable back-up power. Indoor cooling would stop. APP.190, 229-30, 234-35. Blackouts can cause deaths, as blackouts in Texas following winter storm Uri in 2021 demonstrate. APP.229. That kind of harm is plainly irreparable. *See Winter v. NRDC*, 555 U.S. 7, 26 (2008) (weighing safety of naval fleet against harm to marine mammals).

Separately, absent a stay, BPA will need to adjust rates to respond to increased costs created by decreased power generation and diminished system reliability. APP.209-10. BPA would begin the complicated rate-adjustment process in April to allow for rate impacts to begin in October. *Id.* Estimates indicate that the injunction's financial impact would be between $95 million and $100 million annually. APP.209. This translates to more than a 6% increase over current rates. *Id.* Because BPA's utility customers are not-for-profit, this rate increase will be passed onto regional consumers, many of whom are low-income, and are already "experiencing already precarious economic conditions." APP.210 (cleaned up). This monetary harm is

11

irreparable because once BPA incurs these costs and passes them on to its customers, future refunds are impossible. APP.210-11; *see also California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009), *vacated for other reasons by Douglas v. Indep. Living Ctr.*, 565 U.S. 606 (2012) (monetary harm irreparable if unrecoverable).

The emergency protocols in the amended preliminary injunction do not eliminate these public safety and cost concerns. BPA cannot rely on emergency procedures to replace prudent operation because it must plan further in advance than those emergency procedures allow to ensure adequate power generation. APP.196-201. Grid stability depends on adequate power generation at multiple points across the region, including CRS as a whole and between CRS facilities. APP.202-03. If power generation is insufficient because of spill, declaring an emergency may not immediately fix the problem; at that point, system stability could already be compromised, making transmission line outages more likely and potentially causing cascading system failures. *See* APP.231-35. Finally, if the system needs to declare an emergency, purchasing power from other producers to stabilize the system could be impossible if water is unavailable to increase generation. APP.191-92, 201.

Ultimately, these impacts will be borne by the public in the form of heightened blackout risk and higher energy rates. That irreparable harm warrants a stay pending appeal.

12

## II.     The government is likely to succeed on the merits.

### A.     The district court lacked jurisdiction because it is vested exclusively in the court of appeals.

The district court's first error is jurisdictional. The Northwest Power Act vests exclusive jurisdiction in this Court over "suits to challenge . . . final actions and decisions taken pursuant to this [Act] by the Administrator . . . or the implementation of such final actions." 16 U.S.C. § 839f(e)(5). This Court has "consistently interpreted this judicial review provision with a broad view of" its original jurisdiction "and a narrow definition of district court jurisdiction." *Cent. Montana Elec. Power Co-op. v. Adm'r of BPA*, 840 F.2d 1472, 1475 (9th Cir. 1988).

Plaintiffs challenge a *joint* decision by BPA, the Corps, and Reclamation under the Northwest Power Act. 85 Fed. Reg. 63834. That joint decision determines how the three agencies will carry out their shared responsibility for the dams under the Act. *Id.* Because the three agencies coordinate their responsibilities, a challenge to the joint decision regarding dam operations is necessarily and inextricably a challenge to BPA's decision, with exclusive jurisdiction in the court of appeals. 16 U.S.C. § 839f(e)(5).

The Act makes clear that the agencies jointly operate the dams. The Corps is required to "schedule the operations of [Bonneville Dam] in accordance with the requirements of the [BPA,]" *id.* § 832a, and Congress designated BPA as an integral decisionmaker at all eight dams, *id.* § 839d-1 (authorizing BPA to directly fund the planning, designing, construction, and ongoing operation and maintenance of the

13

eight Projects when both BPA and respective Secretary determine that such work and expenditures are necessary and appropriate). Congress directed that *all three agencies* manage and operate CRS "consistent with the purposes" of the Northwest Power Act, *id.* § 839b(h)(11)(A)-(B), which includes balancing the interests of the environment against "an adequate, efficient, economical, and reliable power supply," *id.* § 839(2); *see also Ass'n of Pub. Agency Customers v. BPA*, 126 F.3d 1158, 1163 (9th Cir. 1997) (discussing BPA's expanded mandate). The record confirms this interdependence, with each agency making decisions in part to satisfy the other agencies' objectives or based on their determinations. *See* 85 Fed. Reg. at 63835 (Corps' operations to meet needs of all three agencies); *id.* at 63850 (BPA reliability decisions based on Corps operational decisions).

By challenging Bonneville Dam operations and integrated decisionmaking at all eight Projects, Plaintiffs mount a direct attack on BPA's final action and decision under the Act, including by expressly seeking to vacate BPA's joint decision. *See* APP.741 (seeking to vacate joint decision); APP.1174 (same).[2] The injunction motions confirm this challenge to BPA because Plaintiffs expressly sought to remove "BPA's power purposes," enjoin critical operations needed "to benefit power generation,"

---

[2] Indeed, Plaintiffs filed a petition for review against BPA in the Ninth Circuit under the Northwest Power Act challenging the *same* decision they challenged in the district court, effectively conceding that *the joint decision* is subject to exclusive review in the court of appeals. *Pac. Coast Fed'n of Fishermen's Ass'ns v. BPA*, No. 20-73761. Likely for this reason, Plaintiffs are currently trying to revive that petition, which was dismissed.

14

and eliminate the "power-cost objective." ECF 2530 at 48, 52, 54; ECF 2526 at 53-55, 59-60. The district court obliged, entering an injunction that guts BPA's ability to meet its statutory mandates. *See* APP.190-201 (summarizing injunction's impacts on BPA operations); *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 945-46 (9th Cir. 2006) (injunction requests show "real objective" of a lawsuit for evaluating jurisdiction).

Plaintiffs cannot evade this jurisdictional bar by omitting BPA as a named defendant. *First*, the jurisdictional inquiry turns not on the named defendants, but on "the true nature" of the challenge—"the agency being attacked and whether the factual basis for that attack is an agency action authorized by the Act." *Puget Sound Energy v. United States*, 310 F.3d 613, 621-22 (9th Cir. 2002); *see Calif. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 912 (9th Cir. 1989) (challenge to Forest Service decision subject to FERC review provision because suit sought to constrain FERC procedures).

*Second*, it does not matter that Plaintiffs' suit focuses on ESA compliance. Like an agency's NEPA analysis, the 2020 BiOp is a "component of" the agencies' final decision. *Seven Cnty. Infrastructure Coal. v. Eagle Co.*, 605 U.S. 168, 185 (2025). As in *Center for Biological Diversity v. Bernhardt*, 982 F.3d 723, 733 (2020), BPA's "lawful approval under [the Northwest Power Act] is contingent on whether it properly complies with the ESA," so challenges to the 2020 BiOp must proceed under the Act's exclusive review provision.

15

*Northwest Resource Information Center v. NMFS*, 25 F.3d 872 (9th Cir. 1994), is not

to the contrary. Only BPA there moved to dismiss. Neither the parties nor the Court

thus addressed whether the district court had jurisdiction over the remaining

defendants. *NRIC*, 25 F.3d at 875. Courts "are not bound by a prior exercise of

jurisdiction in a case where it was not questioned and it was passed sub silentio."

*Minority Television Project v. FCC*, 736 F.3d 1192, 1211 (9th Cir. 2013) (en banc). And

this Court's other Northwest Power Act decisions do not address a joint decision like

the one here. *See, e.g.*, *Pac. Power & Light Co. v. BPA*, 795 F.2d 810, 816 (9th Cir. 1986);

*Aluminum Co. of Am. v. BPA*, 175 F.3d 1156, 1160 (9th Cir. 1999).

In short, the challenged joint decision *is* necessarily and inextricably a decision

"by the Administrator" under the Northwest Power Act, with jurisdiction vested

exclusively in the court of appeals. 16 U.S.C. § 839f(e)(5).

### B. The district court substituted its own prior views for agency expertise.

On the merits of the agencies' ESA Section 7 analysis, the district court failed

to apply the "doubly demanding" standard for a mandatory preliminary injunction,

which requires Plaintiffs to "establish that the law and facts clearly favor" their

position. *Google*, 786 F.3d at 740. The court then failed to apply the deferential review

required under the APA for decisions involving an agency's scientific expertise. *See*

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 182 (2025) ("Black-

16

letter administrative law instructs" that courts are "most deferential" to "predictive or scientific judgments").

One egregious example of the district court's willingness to substitute its judgment for agency expertise is its conclusion that the BiOp considered only changes to past operations as part of the proposed action and treated continuations of past practice as part of the environmental baseline. APP.105. That is simply incorrect. Consistent with applicable regulations, NMFS's BiOp explicitly included future operations, maintenance, and management of the system as effects of the proposed action, not part of the baseline. APP.765-86; *see* 50 C.F.R. § 402.02. NMFS correctly classified *all* future operations of those dams—including continuing operations—as part of the proposed action. *Id.*

NMFS's approach here is fully consistent with *NMFS III*, where this Court held that while "the existence of the dams must be included in the environmental baseline, the operation of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act" and is thus part of the "proposed agency action." 524 F.3d at 930-31. Over the course of its 20-page catalogue of the operational aspects of the proposed action (to say nothing of the BiOp's extensive discussion of conservation measures), NMFS summarized the Action Agencies' proposal "to continue operating and maintaining the 14 Federal CRS projects." APP.766. Critically, that catalogue includes *both* continuations of past practice *and* changes from past practices. APP.765-86. In concluding otherwise, the district court

ignored this discussion and likewise ignored the "doubly demanding" standard for a mandatory injunction. *Google*, 786 F.3d at 740.

The district court's other merits determinations suffer similar flaws. To conclude that the benefits of the proposed action were "uncertain and ill-defined," APP.106, the district court ignored that the mitigation measures NMFS considered include programs with dedicated budgets, selection criteria, research, monitoring, and evaluation processes, reporting requirements, and a long history of success. APP.793-806, *e.g.*, APP.834-35. Plus, ESA consultation ensures habitat improvement measures will occur because they are part of the proposed action the BiOp analyzed. *See UFWS v. Sierra Club*, 592 U.S. 261, 271 (2021).

Likewise, NMFS adequately discussed climate change. *See* APP.825-32, 855-58, 911-17, 931-37, 951-58, 972-78, 993-99, 1017-23, 1034-36, 1050-53, 1066-68, 1082-84, 1093-95, 1105-07, 1112-15. Yet the district court blindly accepted Plaintiffs' argument, divorced from the available science on the issue, that the BiOp did not consider the possibility that the system could kill more fish if "they are weakened by the effects of climate change" or that the system's effects could be worse if climate change is worse. APP.111. That ignores the BiOp's climate-sensitivity modeling for certain species, which predicts fish survival from egg to spawning adult (*see* APP.815-817) against the backdrop both of "a stationary climate" and a worsening climate. APP.855; *see also* APP.836-55. And NMFS qualitatively evaluated the climate change effects on each species in part because there was not enough data for a quantitative model (string

18

cited above). *See San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) (the ESA does not compel an agency to "conduct new tests or make decisions on data that does not yet exist"). These predictive and scientific judgments were entitled to substantial deference. *Seven Cnty.*, 605 U.S. at 182.

Finally, NMFS adequately considered species recovery. In determining whether an agency action is likely to jeopardize the continued existence of a species, NMFS considers whether the proposed action will "reduce appreciably the likelihood of both the survival and recovery" of the listed species. 50 C.F.R. § 402.02. Survival and recovery are two parts of a "joint analysis" for jeopardy, but that analysis need only "provide[] some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning." *NMFS III*, 524 F.3d at 936. Unlike the biological opinion in *NMFS III*, the 2020 BiOp explicitly considered recovery in detail. Recovery requires improvements to species abundance, productivity, spatial structure, and diversity, and the BiOp considered each of these factors qualitatively and, where available, based on quantitative models. *See* APP.816, *e.g.*, APP.822-24. The district court erred in adopting Plaintiffs' preferred methodology instead of affording NMFS's "chosen method of analysis" the "substantial deference" it is owed. *Arizona Mining Reform Coal. v. USFS*, --- F.4th ----, 2026 WL 711200, at *8 (9th Cir. Mar. 13, 2026).

In sum, fundamental errors pervade the district court's merits analysis: (1) rather than engage with the agencies' substantial administrative record and detailed

explanations, the court relied on past rulings involving different decisions, different rationales, and different evidence; (2) the court improperly substituted its own judgment for agency expertise; and (3) the court nowhere legitimately applied the "doubly demanding" standard for a mandatory injunction. *Google*, 786 F.3d at 740.

## C. The court exceeded its equitable authority.

Finally, the district court's injunction violates even a broad conception of equitable authority because the agencies cannot comply with the injunction here without violating the ESA. Courts lack authority for "amorphous general supervision of the operations of government." *Raines v. Byrd*, 521 U.S. 811, 828-29 (1997); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383-84 (2024). And courts cannot grant an injunction under one statutory provision "if doing so would cause a violation of Section 7 of the ESA." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 645 n.49 (9th Cir. 2014); *see also INS v. Pangilinan*, 486 U.S. 875, 883 (1988).

ESA Section 7(a)(2) mandates consultation to ensure that the substantive requirement of avoiding jeopardy is met. *See San Luis & Delta Mendota Water Auth. v. Jewell*, 747 F.3d at 596. The best available science suggests that the levels of spill required by the injunction will likely *worsen* conditions for ESA-threatened bull trout in ways that require further ESA consultation to ensure they are not jeopardized. *See* APP.264-68, 364-69. The district court abused its discretion by discounting the importance of "the lone bull trout" versus species that may benefit from additional

20

spill.[3] APP.119. Congress carefully set out the procedures that the government must follow to meet its substantive duty to avoid jeopardizing listed species, and the injunction forces the agencies to violate those requirements. That is beyond the court's equitable authority. *See Pangilinan*, 486 U.S. at 883.

### III. Plaintiffs will not suffer irreparable harm before the district court decides the merits.

The district court erred in finding that Plaintiffs are "likely to suffer irreparable harm before a decision on the merits can be rendered." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016) (cleaned up). The court incorrectly presumed irreparable harm to Plaintiffs based only on the prospect of generalized harms to fish based on past dam operations and far-removed future operations, rather than imminent harm likely to occur during this litigation. This put an impermissible "thumb on the scales" in favor of irreparable harm. *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1090 (9th Cir. 2015).

The district court relied primarily on existing problems not attributable to the less-than-one-year of operations that would occur during merits litigation. Opining that "[t]he [p]roposed [a]ction is largely a continuation of previous [CRS] operations," the court assumed "that the listed species' prognosis is as bad as—or worse than—it has ever been." APP.114. The court rejected the government's argument that recent

---

[3] The district court weighed the bull trout against "the 14 listed species" it thought its injunction would benefit, but there are only thirteen species of fish at issue here, and increased spill is unlikely to benefit at least two of them. *See* APP.514-18.

21

improvements "mean the species are improving or on the road to recovery." *Id.* And the court credited evidence that CRS "operations are harmful to the species" without specifying the timeframe for that harm. APP.115.

None of these findings specify that the alleged harms will occur before a merits ruling. Though this Court has said that "irreparable harm to listed salmonids from the operation of the [CRS] dam as a whole" is fair game, *NMFS IX*, 886 F.3d 803, 821 (9th Cir. 2018), those harms must still be likely "before a decision on the merits can be rendered," *Boardman*, 822 F.3d at 1023 (cleaned up).

The court also got basic facts wrong. It mistakenly believed that August spill was necessary to "preserve maximum genetic biodiversity of summer migrating juveniles."APP.1176 (explaining injunction reasoning in denying reconsideration motion). It is Snake River fall chinook—a population whose abundance has increased and risk of extinction decreased—that migrate in the summer months. APP.277-78.

Relatedly, the district court offered no explanation whatsoever for its decision to eliminate juvenile fish transportation at Lower Monumental Dam, which would normally begin in late April. APP.525. That is per se error. Fed. R. Civ. P. 65(d)(1)(A). NMFS's experts explained below that juvenile fish transportation is often more beneficial for juvenile survival and adult returns than bypass or spill. APP.341-50, 441, 511-32.

Finally, the district court ignored that Plaintiffs agreed—until just 10 months ago—that 10 years of less spill would not harm fish. Yet they now suddenly assert that

higher spill levels are crucial to avoid imminent harm. Plaintiffs' newfound claim of imminent catastrophe is a false alarm that should be rejected.

## IV.    The balance of equities and the public interest favor a stay.

As noted above, the district court's injunction forces a violation of the ESA with respect to several listed populations of bull trout and will likely worsen conditions for those populations. APP.388-400. The extent of that harm is unknown without consultation under Section 7, but the injunction precludes consultation. When properly balanced against NMFS's determination that proposed operations under the decision would not jeopardize listed salmon and steelhead populations, *see* APP.745-46, the district court abused its discretion, *see San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 600 (9th Cir. 2025) (district courts have discretion to consider harms to other species).

Further, contrary to *San Luis*, where this Court limited consideration of harms to species, a preliminary injunction is "never awarded as of right," and courts must "pay particular regard for the public consequences" of an injunction. *Winter*, 555 U.S. at 24. Here, the preliminary injunction will substantially increase the risk of deadly blackouts and will increase utility rates.

## CONCLUSION

The Court should stay the preliminary injunction pending appeal.

23

Respectfully submitted,

s/ Jacob D. Ecker

ADAM R.F. GUSTAFSON
    *Principal Deputy Assistant Attorney General*
ROBERT STANDER
    *Deputy Assistant Attorney General*
FREDERICK H. TURNER
JACOB D. ECKER
EMILY A. POLACHEK
    *Attorneys, U.S. Department of Justice*
    *Environment & Natural Resources Division*
    *Post Office Box 7415*
    *Washington, D.C. 20044*
    *(202) 532-3045*
    *jacob.ecker@usdoj.gov*

April 7, 2026
DJ # 90-8-6-05111

24

## CERTIFICATE OF COMPLIANCE

This motion complied with the length limits permitted by Ninth Circuit Rules 27-1 and 32-3, which together establish a word-limit of 5,600 words. The motion contains 5,512 words, excluding the items exempted by Cir. R. 27-1(1)(d). The type size and typeface comply with Fed. R. App. P. 27(d)(1)(E), because this document has been prepared in a proportionally spaced typeface using Microsoft Word 360 in 14-point Garamond font.

/s/ *Jacob D. Ecker*
JACOB D. ECKER
U.S. Department of Justice
Environment & Natural Resources
Division
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3045
jacob.ecker@usdoj.gov

25

## CERTIFICATE OF SERVICE

I hereby certify that on April 7, 2026, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. The participants in the case are registered CM/ECF users and service will be accomplished by the appellate CM/ECF system.

*s/ Jacob D. Ecker*
JACOB D. ECKER
U.S. Department of Justice
Environment & Natural Resources
Division
Post Office Box 7415
Washington, D.C. 20044
(202) 532-3045
jacob.ecker@usdoj.gov