Nos. 26-1899, 26-1997, 26-2139, 26-2232, 26-2240

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

NATIONAL WILDLIFE FEDERATION, et al.,
Plaintiffs-Appellees,
and
STATE OF OREGON,
Intervenor-Plaintiff-Appellee,

v.

NATIONAL MARINE FISHERIES SERVICE, et. al.,
Defendants-Appellants,
and
PUBLIC POWER COUNCIL, et al.,
Intervenors-Defendants-Appellants.

Appeal from the United States District Court for the District of Oregon
No. 3:01-cv-00640-SI (Hon. Michael Simon)

## FEDERAL APPELLANTS' OPENING BRIEF

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

ROBERT LUNDMAN
JACOB D. ECKER
FREDERICK H. TURNER
EMILY A. POLACHEK
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
5600 American Blvd. W, Suite 650
Bloomington, MN 55437
(202) 598-9344
emily.polachek3@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..............................................................................iii

GLOSSARY ...............................................................................................viii

INTRODUCTION .........................................................................................1

STATEMENT OF JURISDICTION ...................................................................2

STATEMENT OF THE ISSUES.......................................................................3

PERTINENT STATUTES AND REGULATIONS ................................................4

STATEMENT OF THE CASE..........................................................................4

    I.     Legal and Factual Background........................................................4

         A.     ESA Section 7........................................................................4

         B.     The Columbia River System..................................................5

         C.     Spill effects on fish..............................................................6

    II.    Procedural Background..................................................................8

         A.     Agency actions and litigation history. ..................................8

         B.     Agency actions at issue here and decisions on appeal......................9

SUMMARY OF ARGUMENT.........................................................................13

STANDARD OF REVIEW .............................................................................16

ARGUMENT ..............................................................................................16

    I.     Plaintiffs are not likely to succeed on the merits. ......................17

         A.     The district court lacked jurisdiction over this challenge to BPA action...................................................17

         B.     The 2020 BiOp is not arbitrary and capricious. ..............26

1. The BiOp properly analyzed all the effects of the proposed action......................................................26

2. The BiOp appropriately evaluated mitigation measures included in the Proposed Action..........................31

3. The BiOp adequately discussed climate change................................................................................36

4. The BiOp reasonably considered species recovery...............................................................................39

C. The district court's injunction violates bedrock limits on equitable authority. ........................................42

II. Plaintiffs will not suffer irreparable harm. .....................................46

A. Plaintiffs presented only generalized and past harms that the district court erred in accepting............................46

B. The district court clearly erred in evaluating salmon and steelhead abundance and the effects of spill. ...........................48

III. The district court abused its discretion in balancing the equities in Plaintiffs' favor. ...........................................................51

A. The district court erroneously discounted potential harm to bull trout from the injunction. ...........................52

B. Harm to public health and safety outweighs the speculative risk to the listed salmon and steelhead........................55

CONCLUSION ...............................................................................................58

STATEMENT OF RELATED CASES.............................................................59

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

## Cases

*Alto v. Black*,
738 F.3d 1111 (9th Cir. 2013) .......................................................... 12

*Aluminum Co. of Am. v. BPA*,
175 F.3d 1156 (9th Cir. 1999) ......................................................... 25

*Ass'n of Pub. Agency Customers v. BPA*,
126 F.3d 1158 (9th Cir. 1997) ......................................................... 18

*Bowen v. Massachusetts*,
487 U.S. 879 (1988) ...................................................................... 20

*Calif. Save Our Streams Council, Inc. v. Yeutter*,
887 F.2d 908 (9th Cir. 1989) ...................................... 19, 20, 21, 22, 23, 25

*Cent. Montana Elec. Power Co-op. v. BPA*,
840 F.2d 1472 (9th Cir. 1988) ......................................................... 17

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983) ...................................................................... 46

*City of Sausalito v. O'Neill*,
386 F.3d 1186 (9th Cir. 2004) ......................................................... 31

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ......................................................... 16

*Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*,
789 F.3d 1075 (9th Cir. 2015) ..................................................... 47, 56

*Court. Am. Bird Conservancy v. F.C.C.*,
545 F.3d 1190 (9th Cir. 2008) ............................................. 19, 20, 23, 25

*Ctr. for Biological Diversity v. Bernhardt*,
982 F.3d 723 (9th Cir. 2020) ....................................................... 31, 34

*Ctr. for Biological Diversity v. Haaland*,
87 F.4th 980 (9th Cir. 2023) .......................................................... 31

*Ctr. for Biological Diversity v. U.S. BLM*,
698 F.3d 1101 (9th Cir. 2012) ......................................................... 34

*Ctr. for Biological Diversity v. U.S. Dep't of the Interior,*
2026 WL 898264 (N.D. Cal. Mar. 30, 2026) ......................................31

*Coeur Alaska, Inc. v. Southeast Conservation Council,*
557 U.S. 261 (2009) .............................................................. 24

*Defs. of Wildlife v. U.S. EPA,*
420 F.3d 946 (9th Cir. 2005) ......................................... 20, 25

*Doe v. Snyder,*
28 F.4th 103 (9th Cir. 2022) ............................................ 16

*Food & Drug Admin. v. All. for Hippocratic Med.,*
602 U.S. 367 (2024) .............................................................. 42

*Friends of the Wild Swan v. Weber,*
767 F.3d 936 (9th Cir. 2014) ............................................ 16

*Garcia v. Google, Inc.,*
786 F.3d 733 (9th Cir. 2015) ......................... 16, 46, 48, 49

*Idaho Dep't of Fish & Game v. NMFS,*
56 F.3d 1071 (9th Cir. 1995) ............................................. 5

*INS v. Pangilinan,*
486 U.S. 875 (1988) ..................................................... 42, 43

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.,*
725 F.3d 940 (9th Cir. 2013) ............................................ 49

*Maine Council of Atl. Salmon Fed'n v. NMFS,*
858 F.3d 690 (1st Cir. 2017) ........................................ 23, 25

*Miller v. Gammie,*
335 F.3d 889 (9th Cir.2003) ............................................. 51

*Minority Television Project v. FCC,*
736 F.3d 1192 (9th Cir. 2013) .......................................... 24

*Nat'l Wildlife Fed'n v. Burlington N. R.R.,*
23 F.3d 1508 (9th Cir. 1994) ............................................ 48

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS I),*
254 F. Supp. 2d 1196 (D. Or. 2003) ................................... 8

iv

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv (NMFS II),*
2005 WL 1278878 (D. Or. May 26, 2005) ........................................ 8

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS III),*
524 F.3d 917 (9th Cir. 2008) ........................ 8, 26, 29, 30, 36, 40, 41

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS V),*
184 F. Supp. 3d 861 (D. Or. 2016) ................................................ 9

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.,*
2017 WL 1829588 (D. Or. Apr. 3, 2017) ...................................... 9

*Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv. (NMFS IX),*
886 F.3d 803 (9th Cir. 2018) .................................................. 9, 56

*Northwest Resource Information Center v. NMFS,*
25 F.3d 872 (9th Cir. 1994) ...................................................... 24

*Pac. Power & Light Co. v. BPA,*
795 F.2d 810 (9th Cir. 1986) .................................................... 25

*Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.,*
810 F.3d 631 (9th Cir. 2015) .................................................... 45

*Raines v. Byrd,*
521 U.S. 811 (1997) .............................................................. 42

*Rock Creek All. v. U.S. Fish & Wildlife Serv.,*
663 F.3d 439 (9th Cir. 2011) .................................................... 34

*San Luis & Delta-Mendota Water Auth. v. Jewell,*
747 F.3d 581 (9th Cir. 2014) ....................... 30, 38, 39, 42, 43

*San Luis & Delta-Mendota Water Auth. v. Locke,*
776 F.3d 971 (9th Cir. 2014) ............................................. 14, 43

*San Luis Obispo Coastkeeperv. Cnty. of San Luis Obispo,*
161 F.4th 590 (9th Cir. 2025) ...................................... 52, 55, 56

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.,*
605 U.S. 168 (2025) .......................................................... 26, 39

*Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation,*
143 F.3d 515 (9th Cir. 1998) .................................................... 35

*Tacoma v. FERC,*
  460 F.3d 53 (D.C. Cir. 2006) ............................................................ 20, 23, 25

*Tennessee Valley Authority v. Hill,*
  437 U.S. 153 (1978) ................................................................ 43, 44, 53, 56

*Turtle Island Restoration Network v. U.S. Dep't of Com.,*
  438 F.3d 937 (9th Cir. 2006) ........................................................................ 19

*United States v. AMC Entm't, Inc.,*
  549 F.3d 760 (9th Cir. 2008) ........................................................................ 16

*Winter v. Natural Resources Def. Council,*
  555 U.S. 7 (2008) ................................................................................ 46, 55

## Statutes

5 U.S.C. §§ 701-706 ............................................................................... 2
5 U.S.C. § 706 ...................................................................................31

16 U.S.C. § 832a ............................................................................ 18, 21
16 U.S.C. § 838b ................................................................................ 22
16 U.S.C. § 838f ................................................................................ 22
16 U.S.C. § 839.................................................................................24
16 U.S.C. § 839b(h)(11) ....................................................... 14, 17, 21, 24
16 U.S.C. § 839d-1.........................................................................14, 18
16 U.S.C. § 839f(e)(5).................................................................. 14, 17, 21

16 U.S.C. §§ 1531 et seq. ....................................................................... 2
16 U.S.C. § 1536(a)(2).................................................................... 4, 53

28 U.S.C. § 1292 ............................................................................. 2, 12
28 U.S.C. § 1331 ................................................................................ 2

Pub. L. No. 81-516, § 204, 64 Stat. 170 ...............................................................5
Pub. L. No. 74-409, § 1, 49 Stat. 1028 (1935).......................................................5

## Regulations

50 C.F.R. § 402.02 .......................................................................... 39
50 C.F.R. § 402.14(a)......................................................................... 4
50 C.F.R. § 402.14(c)(1)(i)(D)............................................................ 34, 35

50 C.F.R. § 402.14(g)(2) ............................................................................................ 4
50 C.F.R. § 402.14(g)(3) ............................................................................................ 4
50 C.F.R. § 402.14(h) ................................................................................................ 4

85 Fed. Reg. 63834 (Oct. 8, 2020) ................................................... 8, 9, 10, 17, 18, 23, 45

## GLOSSARY

| | |
|---|---|
| BiOp | Biological opinion |
| BPA | Bonneville Power Administration |
| CEERP | Columbia Estuary Ecosystem Restoration Program |
| CRS | Columbia River System |
| EIS | Environmental Impact Statement |
| ESA | Endangered Species Act |
| NEPA | National Environmental Policy Act |
| ROD | Record of decision |

**INTRODUCTION**

For more than a quarter-century, the district court has wrested control of the Columbia River System (CRS) from the federal agencies that Congress tasked with operating the CRS's 14 federal dams. The agencies have expended incalculable resources improving dam structures and operations to carefully balance the needs of salmon and steelhead listed under the Endangered Species Act (ESA) with the congressionally mandated duties to support navigation, flood-risk management, agriculture, and hydroelectric power production. Contravening the well-established principle that courts may not substitute their own judgments for that of administrative agencies, this district court has once again issued a mandatory injunction without properly considering the government's expert evidence or carefully reviewing the agency's environmental analyses. In doing so, the court placed the region at risk of severe harm to public health and safety from blackouts. This judicial overreach must stop.

Plaintiffs' current complaint attacks a joint decision for CRS operations that was issued by the Bonneville Power Administration (BPA), the Bureau of Reclamation, and the U.S. Army Corps of Engineers (Action Agencies). The joint decision was supported by biological opinions (BiOps) from the National Marine Fisheries Service (NMFS) and the U.S. Fish & Wildlife Service (FWS) finding that CRS operations are not likely to jeopardize the continued existence of any species listed under the ESA. Plaintiffs primarily complain that insufficient "spill" from the

dams—the water released through a spillway rather than through a dam's powerhouse—will harm ESA-listed salmon and steelhead.

After a cursory review of NMFS's extensive BiOp, the district court issued a mandatory injunction that dictates CRS operations. Appointing itself the System's superintendent, the court adopted Plaintiffs' request for high-volume, continuous spill at eight dams along the Columbia and Snake Rivers for most of the year, including when energy demands in the area surge. The court relied on non-expert evidence, misunderstood or ignored NMFS's analyses and modeling, and repeated the same false refrain that has failed these listed populations in the past: the more spill, the better. In light of data proving otherwise, it is past time to recognize that high spill does not always benefit the listed salmon and steelhead. This Court should reverse and restore control of the CRS to the federal agencies that Congress charged with its management.

## STATEMENT OF JURISDICTION

(a)     As explained below in Part I.A. of the Argument, the district court lacked jurisdiction. The district court purported to exercise subject matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arose under the ESA, 16 U.S.C. §§ 1531 et seq., and the Administrative Procedure Act, 5 U.S.C. §§ 701-706. 4-ER-917, 990.

(b)     This Court has jurisdiction under 28 U.S.C. § 1292(a)(1) because this is an appeal from the grant of a preliminary injunction. 11-ER-3088.

(c)     The district court entered the preliminary injunction on February 25, 2026, 1-ER-185, and an amended preliminary injunction on March 2, 2026. 1-ER-30. The district court entered a separate order denying the government's motion to dismiss for lack of jurisdiction on March 26, 2026. 1-ER-2. Federal Defendants filed their notice of appeal on March 27, 2026. 11-ER-3087. The appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(B).

## STATEMENT OF THE ISSUES

1.     Whether the law and facts clearly favor Plaintiffs on three merits issues:

    a.     Does the Northwest Power Act's exclusive review provision deprive the district court of jurisdiction over the Action Agencies' joint decision concerning CRS operation and management and NMFS's BiOp evaluating the effects of that action?

    b.     Was NMFS's approach in the 2020 BiOp rational in (i) defining and analyzing all ongoing CRS operations as part of the proposed action, (ii) considering mitigation measures as part of the proposed action, (iii) quantitatively and qualitatively evaluating climate change's effects on the species at stake, and (iv) extensively reviewing the species' recovery in its jeopardy analysis?

    c.     Did the district court exceed its equitable authority by ordering a violation of the ESA and by disregarding the Action Agencies' independent review of the question of jeopardy?

3

2.      Whether the district court abused its discretion in concluding Plaintiffs would suffer irreparable harm.

3.      Whether the district court abused its discretion in balancing the equities in Plaintiffs' favor.

## PERTINENT STATUTES AND REGULATIONS

All pertinent statutes and regulations are set forth in the Addendum following this brief.

## STATEMENT OF THE CASE

### I.      LEGAL AND FACTUAL BACKGROUND

#### A.      ESA Section 7.

Section 7 of the ESA requires federal agencies to ensure that their actions are "not likely to jeopardize the continued existence of any endangered species or threatened species." 16 U.S.C. § 1536(a)(2). Federal agencies (action agencies) consult with NMFS or the FWS (consulting agencies) whenever the agency's action "may affect" a listed species. *Id.*; 50 C.F.R. § 402.14(a). If the proposed action is "likely to adversely affect" listed species or critical habitat, the action agencies must engage in formal consultation, culminating in the consulting agency issuing a BiOp. *Id.* § 402.14(h). A BiOp includes the consulting agency's opinion on whether the proposed action is likely to jeopardize the continued existence of the species. *Id.* § 402.14(g)(2), (g)(3).

### B.    The Columbia River System.

The CRS consists of 14 dams and related facilities operated as a coordinated system, 5-ER-1219, eight of which are now controlled by the preliminary injunction. Congress explicitly directed the Corps and Reclamation to construct and operate these dams and reservoirs for many purposes: flood-risk management throughout the Columbia River basin; generation of renewable energy for millions of Pacific Northwest residents; conservation of fish and wildlife resources affected by operation and maintenance of the dams; irrigation of nearly 1.4 million acres of land; commercial navigation to bring products to market; recreation; municipal and industrial water supply; and several other purposes. *See, e.g.*, Flood Control Act of 1950, Pub. L. No. 81-516, § 204, 64 Stat. 170; Rivers and Harbors Improvement Act, Pub. L. No. 74-409, §§ 1, 2, 49 Stat. 1028, 1038, 1040 (1935). The dams were constructed between 1938 and 1975, and the Action Agencies "jointly manage the dams, reservoirs, and other facilities in the Columbia and Snake River Basin that constitute the [CRS]." *Idaho Dep't of Fish & Game v. NMFS*, 56 F.3d 1071, 1072 (9th Cir. 1995). The Action Agencies operate and maintain the CRS, with BPA responsible for the transmission and marketing of CRS-generated hydropower. 3-ER-590.

The CRS supplies power to millions of Pacific Northwest residents and businesses, providing one-third of the power generated in the region. 2-ER-292, 329. BPA's transmission system interconnects with systems in Canada, Mexico, the Rockies, and the Great Plains. *See id.* It is therefore critical to preserve the CRS's

electric generation, as it is interconnected to the infrastructure of the entire western region. *See id.*

Fourteen salmonid species (including bull trout) that are found in the Columbia River basin are listed as threatened or endangered species under the ESA. Salmon and steelhead are anadromous, meaning they hatch in freshwater in the upper reaches of the Columbia and Snake River systems, migrate as juveniles to the salt water of the Pacific Ocean where they mature for several years, and return as adults to freshwater to spawn. 4-ER-1146. Bull trout are not anadromous in the basin but do migrate between spawning and foraging areas within the Columbia and Snake Rivers. 4-ER-1084; 2-ER-424-25. During migration, the fish must pass through the CRS dams in one of several ways, including through spillways, turbines, bypass systems designed for juvenile fish migrating out to the Pacific, or fish ladders around the dams for returning adults going upstream. 7-ER-2027. Bypass systems for juvenile fish traveling to the ocean include large, submerged screens that guide fish away from the turbines into collection channels that go past the dam. *Id.* Juvenile fish may be released into the tailrace of the dam or, at some dams, diverted to collection facilities for downstream transportation in barges or trucks. *Id.*

### C.    Spill effects on fish.

The core dispute here concerns "spill": water that goes through dams' spillways instead of the powerhouses. Spill presents both benefits and challenges for fish passage and survival. On the one hand, greater spill increases the likelihood of fish

passing through spillways, which usually provide a safer route of passage and reduce turbine encounter rates. 5-ER-1171. And spill can increase the speed of juvenile fish migrating through the CRS, which means the fish do not expend as much energy and have less exposure to predators during migration. 5-ER-1233. But increasing spill also has negative effects on fish. For example, increased spill can make it harder for adult fish migrating upstream to spawn. It can cause "fallback," where a fish swimming upstream instead moves downstream (i.e., ascending a dam's fish ladder only to pass back downstream), and delay, where tailrace eddies from high spill interfere with the ability of migrating fish to locate fish ladder entrances. 5-ER-1315; 3-ER-642-43, 660.

Additionally, higher spill levels can elevate the rivers' total dissolved gas concentration, a known pollutant under the Clean Water Act. 5-ER-1249. The water's movement through the spillways forces air into the river, causing it to become supersaturated with atmospheric gases in the tailrace and for miles downstream of the dam. *Id.* This supersaturation can cause the fatal condition of gas bubble trauma in salmon, steelhead, and other aquatic species. *Id.* Increased spill can degrade the tailrace in other ways, i.e., creating eddies and turbulence, that lead to direct risk of mortality, increased exposure to predation, and tailrace delay for juveniles. 2-ER-482-85.

## II.  PROCEDURAL BACKGROUND

### A.  Agency actions and litigation history.

The Action Agencies began consulting with NMFS about the CRS in the early 1990s. 4-ER-1157. Plaintiffs initiated this lawsuit in 2001, initially challenging NMFS's 2000 BiOp assessing the effects of CRS operations on ESA-listed species of salmon and steelhead. In the quarter-century since the case began, Plaintiffs have challenged nearly every subsequent BiOp and, more recently, the Action Agencies' reviews under the National Environmental Policy Act (NEPA).

This case can be divided into three phases. In the first phase, the district court rejected both NMFS's 2000 BiOp and the supplement it produced on remand in 2004. *See Nat'l Wildlife Federation v. Nat'l Marine Fisheries Serv.* (*NMFS I*), 254 F. Supp. 2d 1196 (D. Or. 2003); *NMFS II*, No. CV 01-640-RE, 2005 WL 1278878 (D. Or. May 26, 2005). This Court reviewed and largely affirmed both orders. *See NMFS III*, 524 F.3d 917 (9th Cir. 2008).

The federal agencies went back to the drawing board for phase two and engaged in extensive collaboration with state and tribal entities. 4-ER-1158. NMFS prepared a BiOp in 2008, which it supplemented in 2010 and 2014, and the agencies negotiated agreements with Tribes and states, securing their support for the CRS operations analyzed in the new BiOp. *Id.* Those agreements also provided millions in BPA funding, over a 10-year period, for various conservation measures to directly benefit affected species. 85 Fed. Reg. 63834, 63848 (Oct. 8, 2020). But the district

court again found the BiOp's analysis insufficient. *NMFS V*, 184 F. Supp. 3d 861 (D. Or. 2016). The court remanded the BiOp without vacatur and directed NMFS to complete a new BiOp by the end of 2018. *Id.* at 933, 949.

During the remand, the district court granted an "interim" injunction. *NMFS VIII*, No. 3:01-CV-0640-SI, 2017 WL 1829588 (D. Or. Apr. 3, 2017), *aff'd in part, appeal dismissed in part,* 886 F.3d 803 (9th Cir. 2018) (*NMFS IX*). While prior injunctions involving spill required the Action Agencies to continue spill operations longer than planned, the 2017 injunction was a marked departure in that the court, for the first time, ordered the agencies to *increase* spill. *Id.*

## B. Agency actions at issue here and decisions on appeal.

The case has now entered a third phase, challenging the Action Agencies' 2020 EIS and Record of Decision (ROD), and NMFS's 2020 BiOp. The 2020 ROD adopted a suite of both operational and non-operational mitigation measures designed to address adverse impacts. 85 Fed. Reg. at 63843-44, 63865-67; 4-ER-1054-67. These measures include improvements to hundreds of acres of riparian lands, improvements to spawning habitat, and funding for increased monitoring. *Id.*

In the 2020 BiOp, NMFS concluded that the proposed action—"to continue operating and maintaining" CRS for flood risk management, navigation, irrigation, conservation, and all the other purposes established by Congress, 4-ER-1161–5-ER-1173—was not likely to jeopardize the continued existence of ESA-listed species under NMFS's jurisdiction. NMFS reached this conclusion after conducting an

exhaustive, 1400-page analysis, *see* 4-ER-1112-29. NMFS evaluated the status of each listed species, the environmental baseline for the species and their habitat, the effects of the proposed action and cumulative effects, and the effects of the action and cumulative effects when added to the baseline to determine whether jeopardy would result from the proposed action. *See, e.g.*, 5-ER-1210. NMFS dedicated between 25 and 195 pages to species-specific analyses for each affected species. *See* 4-ER-1112-29.

The proposed action adopts a flexible-spill program for the spring when many juvenile salmon and steelhead migrate. 5-ER-1170 This program included 16 hours per day of spill up to a limit set by state water-quality standards and 8 hours per day of reduced spill that would allow for higher power generation and promote passage for some adult fish who have difficulty passing structures during higher spill levels. 5-ER-1171. The 2020 ROD formally adopted the proposed action, which was the preferred alternative identified in the EIS, along with the terms and conditions resulting from the ESA consultation with NMFS. 85 Fed. Reg. at 63834.

Plaintiffs challenged these actions through supplemental complaints in 2021, 4-ER-914-1045, but the district court stayed the case during negotiations that resulted, in 2023, in agreed-upon operations for up to ten years, 3-ER-760-868. After the government withdrew from the agreement, Plaintiffs filed motions for a preliminary injunction. 3-ER-694, 709. They requested substantially greater spill than they had accepted as part of the 2023 agreement. *See* 2-ER-307-09, 314-24 (charting CRS

10

operating parameters from 2017 through the proposed 2026 plans and highlighting the increase required in the injunction); 3-ER-777-94.

The court issued a preliminary injunction on February 25, 2026. 1-ER-185, 239. After Plaintiffs and an intervenor requested changes to the order, the court entered an amended opinion and preliminary injunction order on March 2, 2026. 1-ER-30, 84.

Relying on previous decisions evaluating different, outdated agency actions, the district court concluded that Plaintiffs were likely to succeed on the merits. The court briefly addressed the government's jurisdictional arguments, stating that a further opinion would follow. 1-ER-95. On the merits, without evaluating the BiOp itself, the court determined that NMFS's analysis "does not provide a discernable path for the Court to review whether NMFS" accurately defined the baseline and proposed action in evaluating jeopardy. 1-ER-104. The district court also concluded that the BiOp's discussion of mitigation was too vague, that the BiOp did not adequately consider climate change, and that it did not sufficiently discuss species recovery. 1-ER-104-13.

On irreparable harm, the court stated that general threats to salmon and steelhead were "dire and immediate," despite Plaintiffs' 2023 stipulation to lesser spill for ten years. 1-ER-115. The court also agreed with Plaintiffs that the public interest favored the injunction, ignoring agency expert declarations warning that the injunction may increase harm to other ESA-listed bull trout and other resident fish species. 1-ER-117-21. Finally, the court stated that "the public interest always weighs in favor of protecting endangered species," ignoring "power system reliability, flood

11

risk, transportation, irrigation, and the availability of water supplies and clean drinking water." 1-ER-121, 130.

The court's preliminary injunction adopted Plaintiffs' request for expanded spill operations. The court mandated longer durations of spill at the CRS dams (i.e., 24 hours, versus 16 hours contemplated in the 2020 ROD for spring spill); reduced operational flexibilities (including eliminating fish transport at Lower Monumental Dam, despite transport resulting in *more* returning adults than spill); and, without evidence that it would meaningfully benefit listed species, extended spill through the entire month of August, when water levels will be at their lowest and air temperatures at their highest, thereby increasing the risk of blackouts. *See* 1-ER-32-36.

In a separate order issued after the preliminary injunction, the court explained its rejection of the government's motion to dismiss, which argued the Ninth Circuit has exclusive jurisdiction under the Northwest Power Act. 1-ER-6-28. The court concluded that there was no conflict between the jurisdictional boundaries of the APA, NEPA, and the ESA on the one hand and the Northwest Power Act on the other hand. 1-ER-28.

Federal Defendants timely appealed both the district court's preliminary injunction and its order denying the government's motion to dismiss.[1] 11-ER-3087.

---

[1] Appellate jurisdiction in this interlocutory appeal extends to the district court's denial of the government's motion to dismiss because the district court's injunction was premised on its conclusion that it had jurisdiction. 1-ER-95; *see Alto v. Black*, 738 F.3d 1111, 1122 (9th Cir. 2013) (appeal under 28 U.S.C. § 1292

12

## SUMMARY OF ARGUMENT

The district court erred in granting a mandatory injunction that terminated part of the CRS's juvenile transport program and increased and extended spill levels, including through the driest months of the year, placing the region in jeopardy of blackouts. This court should reverse because (1) Plaintiffs did not show that the law and facts clearly favor their position on the merits, (2) Plaintiffs did not show imminent, irreparable harm will occur during litigation, and (3) the Court did not properly weigh the potential harm to bull trout—not to mention human health and safety—posed by the injunction.

The district court's first error was a failure to faithfully apply the heightened standard for a mandatory preliminary injunction. Under that standard, a plaintiff must establish that the law and facts *clearly favor* their position. The injunction here is plainly mandatory because it orders the Action Agencies to take action, not just to maintain the status quo.

The court then erred in assessing the preliminary injunction factors.

1.     As to the merits and *first*, the court erred in finding that it had subject-matter jurisdiction. CRS planning, decisions, and operations are a joint venture between the Corps, Reclamation, and BPA. The agencies conduct that joint venture,

---

encompasses concurrent ruling on motion to dismiss for lack of jurisdiction). And if the district court lacked jurisdiction to enter the injunction, then it must be reversed and dissolved.

in part, by carrying out authority found in the Northwest Power Act, among other statutes, as to funding, management, and operations, and that Act has a provision vesting exclusive jurisdiction over legal challenges in this Court. *See* 16 U.S.C. §§ 839b(h)(11)(A); 839d-1, 839f(e)(5). This Court and other circuits have held that claims that are inextricably intertwined with statutes that assign exclusive jurisdiction in courts of appeals should be brought there.

*Second*, the district court's review of NMFS's 2020 BiOp was flawed. The court focused on prior judicial decisions in this case rather than the new record before it. The court violated long-standing principles of deference to agency expertise in matters concerning the best available scientific data under the ESA. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014) ("[W]hat constitutes the best scientific and commercial data available is itself a scientific determination deserving of deference."). Had the district court evaluated the BiOp itself, it would have discovered that Plaintiffs' concerns are unfounded. The court's conclusory rationale certainly fails to meet the heightened standard for a mandatory injunction.

*Third*, the district court's injunction exceeds its equitable authority because the court directed the agencies to take action that may adversely affect bull trout without the requisite ESA Section 7 consultation. The court cannot direct the agencies to violate the law. Courts separately exceed their equitable authority when they order relief that does not bear a close nexus to the claims at stake—here, the district court's

14

order requiring the Action Agencies to undertake specific spill operations is not sufficiently tied to its evaluation of NMFS's BiOp.

2.      The district court erred in finding that Plaintiffs would suffer imminent, irreparable harm in the time it takes to litigate the merits of this case. The court clearly erred in rejecting evidence that fish abundance has generally increased for most stocks in recent years; that increased spill reduces the proportion of juveniles destined for transportation, which can result in fewer returning adults; and that some of the lowest recent survival of yearling Chinook occurred under high spill. After a quarter-century of court-ordered spill, the data does not support the court's opinion that more spill always equals greater adult returns.

3.      Finally, the court abused its discretion when it weighed the harms and equities. The court did not engage with any of the expert biological data concerning the effects of spill on listed bull trout, and glossed over the fact that any uncertainty regarding those effects will only be exacerbated by the lack of Section 7 consultation under the court's injunction. Moreover, the Ninth Circuit's prohibition on considering the public's interest in ESA cases is based on an erroneous reading of precedent that is not applicable here. The district court should have considered the safety concerns posed by increased and extended spill throughout the summer when power generation is needed most.

## STANDARD OF REVIEW

This Court reviews legal conclusions underlying the grant of an injunction *de novo*, factual determinations for clear error, and the decision to grant an injunction (as well as its scope) for an abuse of discretion. *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1030 (9th Cir. 2013); *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014); *United States v. AMC Entm't, Inc.*, 549 F.3d 760, 768 (9th Cir. 2008).

## ARGUMENT

The court made a fundamental error that infected its entire preliminary injunction analysis: it failed to faithfully apply the heightened standard for a mandatory preliminary injunction. "The standard for issuing a mandatory preliminary injunction is high." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022). Plaintiffs "must establish that the law and facts *clearly favor* [their] position, not simply that [they are] likely to succeed." *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (emphasis added). The injunction here is plainly mandatory because it "goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits." *Snyder*, 28 F.4th at 111. The district court recited these fundamental principles but failed to follow them. If the court had, it would have had to conclude that the law and facts do not clearly favor Plaintiffs, as explained below.

16

I. **PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.**

   A. **The district court lacked jurisdiction over this challenge to BPA action.**

The district court's first error is jurisdictional. The Northwest Power Act vests exclusive jurisdiction in this Court over "suits to challenge . . . final actions and decisions taken pursuant to this [Act] by the Administrator . . . or the implementation of such final actions." 16 U.S.C. § 839f(e)(5). This Court has "consistently interpreted this judicial review provision with a broad view of" its original jurisdiction "and a narrow definition of district court jurisdiction." *Cent. Montana Elec. Power Co-op. v. BPA*, 840 F.2d 1472, 1475 (9th Cir. 1988) (citation omitted). The Action Agencies' joint decision and NMFS's biological opinion fall within this provision.

Plaintiffs challenge a *joint*, interdependent decision by BPA, the Corps, and Reclamation. 85 Fed. Reg. at 63834. That joint decision determines how the three agencies will carry out their shared responsibility for the system under the Northwest Power Act and the agencies' other authorities. *Id.* A challenge to the joint decision regarding system operations is necessarily and inextricably a challenge to BPA's decision, with exclusive jurisdiction in the court of appeals. 16 U.S.C. § 839f(e)(5).

The Act makes clear that the agencies jointly operate and manage the system. Congress directed *all three agencies* to undertake coordinated management and operation of the CRS "consistent with the purposes" of the Northwest Power Act, *id.* § 839b(h)(11)(A)-(B), which includes balancing the interests of the environment

17

against "an adequate, efficient, economical, and reliable power supply," *id.* § 839(2). Congress also designated BPA as an integral decisionmaker at all eight dams. *See id.* § 839d-1 (authorizing BPA to directly fund the operation and maintenance of the eight Projects when such work and expenditures are jointly deemed necessary and appropriate); *see also Ass'n of Pub. Agency Customers v. BPA*, 126 F.3d 1158, 1165 (9th Cir. 1997) (discussing BPA's expanded mandate). The record confirms the agencies' interdependence. Each agency made decisions in part to satisfy the other agencies' objectives or based on their determinations. *See* 85 Fed. Reg. at 63835 (Corps' operations to meet needs of all three agencies); *id.* at 63850 (BPA reliability decisions based on Corps operational decisions); *id.* at 63859 (discussing equitable treatment between the CRS's multiple purposes).

The Corps is also required to "schedule the operations of [Bonneville Dam] in accordance with the requirements of the [BPA]," and "install and maintain additional machinery, equipment, and facilities for the generation of electric energy" whenever BPA determines that the additions are necessary "to meet actual or potential market requirements for such electric energy." *Id.* § 832a. By challenging Bonneville Dam operations and seeking to vacate integrated decisionmaking for the system, Plaintiffs mount a direct attack on BPA's final action and decision under the Act. *See* 4-ER-985, 1045 (both seeking to vacate ROD's joint decision).[2]

---

[2] Indeed, that Plaintiffs previously petitioned for review against BPA in the Ninth Circuit under the Northwest Power Act to challenge the *same* decision they

The injunction motions confirm that Plaintiffs challenged BPA actions—Plaintiffs' motions *expressly* sought to remove "BPA's power purposes" and "economic interests," enjoin critical operations needed "to benefit power production," and eliminate the "power-cost objective." 3-ER-696, 699, 703, 705, 706, 748. The district court obliged, entering an injunction that guts BPA's ability to meet its statutory mandates. *See* 2-ER-291-302 (summarizing injunction's impacts on BPA operations). The "motions for preliminary injunctive relief" and the district court's ultimate injunction show the "real objective" of this suit, *Turtle Island Restoration Network v. U.S. Dep't of Com.*, 438 F.3d 937, 945-46 (9th Cir. 2006)—to constrain operational final decisions of not just the Corps and Reclamation, but BPA as well.

Additionally, the claims in this case are "inextricably intertwined" with BPA's decision, vesting exclusive review in this Court. *Am. Bird Conservancy v. F.C.C.*, 545 F.3d 1190, 1193 (9th Cir. 2008). The district court and Plaintiffs agree that challenges to BPA's reliance on other agencies' analyses must be litigated before this Court. 1-ER-13. So too must the other agencies' reliance on those documents.[3]

---

challenged in the district court effectively concedes that *the joint decision* is subject to exclusive review in the court of appeals. *Pacific Coast Fed'n of Fishermen's Ass'ns v. BPA*, Case No. 20-73761.

[3] The court's preliminary injunction addressed only ESA issues. We maintain, however, that all of Plaintiffs' claims, including their NEPA claims, should have been brought in this Court. *See Calif. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989).

Starting with the ESA claim against NMFS, BPA's reliance on the BiOp divests the district court of jurisdiction over a claim against NMFS directly challenging the BiOp as arbitrary and capricious under the APA. After all, the APA only applies when there is no other review provision available. *See Bowen v. Massachusetts*, 487 U.S. 879, 903-04 (1988). And this Court and others have repeatedly held that a BiOp can be reviewed as part of a petition for review in the court of appeals. *See Am. Bird*, 545 F.3d at 1193 (Section 7 consultation subject to exclusive review provision); *Defs. of Wildlife v. U.S. EPA*, 420 F.3d 946, 956 (9th Cir. 2005), *rev'd and remanded on other grounds sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007) (holding that exclusive review provision applies to review of BiOp that informed agency action); *Tacoma v. FERC*, 460 F.3d 53, 76 (D.C. Cir. 2006) (challenge to a NMFS BiOp that FERC relied upon must be brought in the circuit court under the Federal Power Act).

*California Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908 (9th Cir. 1989), is instructive. There, this Court held that a challenge "against the Forest Service . . . under the provisions of NEPA and" the American Indian Religious Freedom Act belonged in the court of appeals under the Federal Power Act's exclusive jurisdiction provision. *Id.* at 911-12. The Forest Service had issued conditions on a FERC license, and the Federal Power Act required FERC to solicit and accept those conditions because the Forest Service is "the agency responsible for the protection and utilization of the land" at issue. *Id.* at 911.

Exclusive review of the Forest Service's conditions vested in this Court for three basic reasons. "First, when two jurisdictional statutes draw different routes of appeal, the well-established rule is to apply only the more specific legislation." *Id.* Second, though framed "as an attack on the Forest Service's actions," "the practical effect of the action in the district court is an assault on an important ingredient of the FERC license." *Id.* at 912. Third, allowing the claims to proceed in the district court would "resurrect the very problems that Congress sought to eliminate" through the exclusive review provision. *Id.* And nothing in the statute would "deny an effective forum to challenge an agency decision" because the court of appeals' jurisdiction under the exclusive review provision extended to reviewing the Forest Service's conditions alongside the FERC license. *Id.*

This case is on all fours. The Northwest Power Act's review provision is far more specific and displaces the APA. The "practical effect" of Plaintiffs' challenge is an assault on a joint action, including important ingredients from all the Action Agencies—BPA, the Corps, and Reclamation—and NMFS's BiOp evaluating that joint action. *Yeutter*, 887 F.2d at 912. Allowing dual-track suits would undermine the uniform process Congress designed in the Northwest Power Act, and in consultation with NMFS. 16 U.S.C. §§ 839b(h)(11)(B), 839f(e)(5).

The critical fact here is that all three agencies are acting in concert. For example, the Corps *must* act on and coordinate with BPA on generation additions and power operations, 16 U.S.C. § 832a, and BPA's action cannot proceed without them.

21

BPA's actions are also intertwined with those of the other two agencies in other ways—for example, BPA has long been the designated marketing agent for all Corps and Reclamation projects making up the CRS. *See* 16 U.S.C. § 838f ("The Administrator is hereby designated as the marketing agent for all electric power generated by Federal generating plants in the Pacific Northwest . . . ."). In carrying out this authority, BPA collaborates with the Corps and Reclamation to modify electricity output as available and needed to support grid stability and reliability. 16 U.S.C. § 838b (directing BPA to operate and maintain a transmission system to "maintain the electrical stability and electrical reliability of the Federal system"). It does not matter that the Northwest Power Act's review provision does not mention the Corps and Reclamation—neither does the Federal Power Act mention the Forest Service. *See Yeutter*, 887 F.2d at 911-12.

The district court erred in concluding it had jurisdiction. 1-ER-16-22. First, the district court created an arbitrary distinction between the Action Agencies' joint NEPA process and their substantive statutory authorities. Indeed, this Court rejected the district court's first distinction—between NEPA compliance and substantive actions—in *Yeutter*. The "attempt to style th[e case] as an independent claim against the Forest Service" failed because "the practical effect of the action in district court is an assault on an important ingredient of the FERC license." *Yeutter*, 887 F.2d at 912. So too here: BPA's decision depends on the Corps' and Reclamation's analyses and decisions, and vice versa. That NEPA is a procedural statute is irrelevant to the

22

question of jurisdiction; the practical effect of enjoined operations at the eight dams is a direct assault on BPA's decision.

Second, and assuming this distinction mattered, the court created another arbitrary distinction between the agencies' powers under the Northwest Power Act and their responsibilities, claiming that only overlapping statutory *authority* matters. 1-ER-16-22. These distinctions are meaningless to the jurisdictional analysis.

Courts are at least as emphatic in the ESA context: "the only means of challenging the substantive validity of [a] BiOp prepared in the course of a FERC licensing proceeding" "is on review of FERC's decision in the court of appeals." *Tacoma*, 460 F.3d at 76; *see also Am. Bird*, 545 F.3d at 1193 (FCC tower registration action "inextricably intertwined with the FCC's obligation to consult" under Section 7); *Me. Council of Atl. Salmon Fed'n v. NMFS*, 858 F.3d 690, 693 (1st Cir. 2017) (stating that appellants challenging BiOps on a FERC order "have nowhere else to go but to the courts of appeals"). More than half of Plaintiffs' claims concern ESA compliance and therefore belong in this Court.

Properly focusing on the "practical effect" of this suit, *Yeutter*, 887 F.2d at 911, also refutes the district court's second distinction—between BPA's authority and the other two Action Agencies', 1-ER-19-22. BPA's actions under the Northwest Power Act cannot proceed without the Corps and Reclamation, and Corps and Reclamation operations depend in part on BPA's actions under the Northwest Power Act. *See, e.g.*, 85 Fed. Reg. at 63835 (Corps' operations to meet needs of all three agencies); *id.* at

63850 (BPA reliability decisions based on Corps operational decisions). If this were not enough, as discussed above, *supra* at 17-19, the Action Agencies have overlapping statutory authority that is equally as intertwined as the Forest Service's role in *Yeutter*, or NMFS's role in *Tacoma*.

As these decisions demonstrate, a joint rulemaking is not required to trigger an exclusive review provision as the district court seemed to think when it relied on *Coeur Alaska, Inc. v. Southeast Conservation Council*, 557 U.S. 261 (2009). *Cf.* 1-ER-20 (concluding that "joint action" requires action under the same statutory authority). And though the court focused solely on 16 U.S.C. §§ 839 and 839b(h)(11)(A), those provisions confirm how inextricably intertwined the agencies' decision-making processes are here by directing that *all three* agencies "shall" manage and operate CRS "consistent with the purposes" of the Northwest Power Act and must consult NMFS along the way. *Id.*; *see also* 16 U.S.C. § 839b(h)(11)(B).

*Northwest Resource Information Center v. NMFS*, 25 F.3d 872 (9th Cir. 1994), is not to the contrary. *Cf.* 1-ER-22-23. There, only BPA moved to dismiss. Neither the parties nor the Court addressed whether the district court had jurisdiction over the remaining defendants. *NRIC*, 25 F.3d at 875. Courts "are not bound by a prior exercise of jurisdiction in a case where it was not questioned and it was passed sub silentio." *Minority Television Project v. FCC*, 736 F.3d 1192, 1211 (9th Cir. 2013) (en banc). And this Court's other Northwest Power Act decisions do not address a joint

24

decision like the one here. *See, e.g.*, *Pac. Power & Light Co. v. BPA*, 795 F.2d 810, 816 (9th Cir. 1986); *Aluminum Co. of Am. v. BPA*, 175 F.3d 1156, 1160 (9th Cir. 1999).

Finally, the straightforward application of the exclusive review provision would not, as the district court incorrectly opined, leave claims stranded or result in any other "perverse outcomes." 1-ER-23. As discussed, Plaintiffs' ESA claims against NMFS, and their ESA and NEPA claims against the Corps and Reclamation, could be brought in a timely petition for review in this Court. *See Me. Council of Atl. Salmon Fed'n*, 858 F.3d at 693 (noting "the scope of any court of appeals review of the BiOps will be what the APA would provide in a district court if [NMFS's] BiOps could be challenged directly there"). The Northwest Power Act confers the jurisdiction required to consider those claims because they are "inextricably intertwined" with BPA's action. *Tacoma*, 460 F.3d at 76; *see also Am. Bird*, 545 F.3d at 1193; *Defs. of Wildlife v. U.S. EPA*, 420 F.3d 946, 956 (9th Cir. 2005), *rev'd and remanded on other grounds sub nom. Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644 (2007). Faithfully applying the Northwest Power Act's exclusive jurisdiction provision is not a perverse outcome; the district court's assertion of jurisdiction is—it "resurrect[s] the very problems that Congress sought to eliminate" with the exclusive review provision. *Yeutter*, 887 F.2d at 912.

Because the district court lacked jurisdiction, the preliminary injunction should be reversed and this case should be remanded with an instruction to dismiss.

### B. The 2020 BiOp is not arbitrary and capricious.

In concluding that Plaintiffs are likely to succeed in showing NMFS's 2020 BiOp was arbitrary and capricious, the district court misapplied the highly deferential review required under the APA. "Under that standard, a court asks not whether it agrees with the agency decision, but rather only whether the agency action was reasonable and reasonably explained." *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colo.*, 605 U.S. 168, 180 (2025). The district court utterly failed to defer to the agency's informed decision-making and its reasonable choices about what constitutes the best science. And the court disregarded the agency's explicit reasoning and assumed the agencies repeated past actions from invalidated BiOps. The district court legally erred when it substituted its own judgment for that of the expert agencies.

### 1. The BiOp properly analyzed all the effects of the proposed action.

The district court incorrectly concluded that NMFS failed to adequately consider all the effects of the proposed action. NMFS's BiOp explicitly included future operations, maintenance, and management of the system as effects of the proposed action and excluded it from the baseline. 4-ER-1161–5-ER-1173. NMFS's approach here is fully consistent with *NMFS III*, where this Court held that while "the existence of the dams must be included in the environmental baseline, the operation of the dams is within the federal agencies' discretion under both the ESA and the Northwest Power Act" and are thus part of the "proposed agency action." 524 F.3d at

26

930-31. Over the course of its 20-page catalogue of the operational aspects of the Proposed Action (to say nothing of the BiOp's extensive discussion of conservation measures), NMFS summarized the Action Agencies' proposal "to continue operating and maintaining the 14 Federal CRS projects." 4-ER-1161–5-ER-1173. Critically, that catalogue of components of the Proposed Action includes *both* continuations of past practice *and* changes from past practices. *Id.*

For example, in describing spill operations benefiting juvenile fish passage in the spring and summer, the BiOp describes *all* "spill levels for . . . each project"—not just changes to spill levels from the past. 5-ER-1170-74. The BiOp sets out in detail "the flexible spill concept," which allows the Action Agencies to increase passage of juvenile fish downstream and increase adult returns while still allowing sufficient power production and operational feasibility. *Id.* The BiOp explains "performance spill blocks," "gas cap spill periods," and the process for adaptive management for adjusting operations. 5-ER-1171. And the BiOp catalogued the spill at each dam by season, duration, and, if applicable, week. 5-ER-1172, 1174 (charts setting out spill levels). The BiOp captures not just changes from previous operations but *all* forward-looking spill operations across all CRS projects. *See id.*

The district court incorrectly faulted the BiOp for "focus[ing] on the effects of *changes* in the proposed operations, thereby silently including existing operations as part of the baseline." 1-ER-104. To be sure, the BiOp discusses changes to past operations when describing the effects of CRS operations on certain species, *e.g.*, 5-

ER-1309, 1356, 1406, but it only does that in sections that describe how the "flexible spill operations" in the proposed action are an improvement over the status quo. The BiOp explains that those operational changes will have a beneficial impact on fish survival. 5-ER-1357; *see* 5-ER-1306 ("The intent of flexible spill operations is to improve the survival of spring-migrating juvenile salmon and steelhead through the dams and improve adult returns, while" recognizing power needs and operational constraints). Contrary to Plaintiffs' suggestion, 3-ER-725, these benefits are not viewed in "isolation." At the conclusion of the effects section, NMFS integrated all effects and incorporated this increased survival as a *part of* the jeopardy determination. 5-ER-1399-1407. Thus, NMFS's analysis evaluates all forward-looking operations of the CRS in determining whether the system causes jeopardy.

NMFS also considered the proposed action against an "unregulated flow" scenario that entirely removes the operational effects of all the dams on flows. *See, e.g.*, 5-ER-1243. The district court and Plaintiffs ignore this "unregulated flow" analysis, which describes the effects of operations on river flows under the environmental baseline and then describes how those effects continue under the proposed action. 5-ER-1303, 1394; 6-ER-1495, 1614, 1715; 7-ER-1828, 1941, 2050. Like the comparison between current conditions and changes to those conditions, the BiOp's various comparisons assist readability and understanding; they do not skew the jeopardy analysis.

Moreover, NMFS's comparison does not mean that the agencies limited the effects of the action to changes. In fact, in the effects of the action sections, the BiOp sets out flexible spill operations without reference to prior levels. *See, e.g.*, 5-ER-1307-08. And those sections discuss which past impacts will continue under the proposed action. For instance, the BiOp explains that "upstream water storage projects will continue under the proposed action," and thus "seasonal alterations of the hydrograph caused by CRS operations . . . described in the Environmental Baseline section will continue to affect the lower Snake and lower Columbia mainstem migration and rearing corridor, estuary, and plume." *E.g.,* 5-ER-1309. That is an explicit recognition that where past operations will continue, the effects of that continuation are analyzed as part of the proposal, not silently shifted to the baseline. That is hardly a "boilerplate" assurance that forward-looking operations are part of the Proposed Action, as the district court believed. 1-ER-104.

NMFS's approach makes sense given the CRS's complexity. All fourteen CRS dams were constructed before any salmon were listed under the ESA. As this Court explained in *NMFS III*, Congress directed the agencies "to achieve particular goals" with respect to the CRS, including flood control for public safety, irrigation, and power production, 524 F.3d at 928. These dams predate most scientific research on the myriad factors affecting these populations. NMFS drew a reasonable line—it considered *all* operations to be part of the proposed action rather than the baseline while still discussing changes from past operations to help place those operations in

29

context. It was thus not the BiOp that "focus[ed]" on changes from past practices, but Plaintiffs and the district court. *See* 1-ER-104. The district court erred in second-guessing the BiOp's reasoned analytical choices. *See San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 620 (9th Cir. 2014) (imperfect comparison model not arbitrary and capricious).

Nor does the ESA require NMFS to separately "identify[] what activities are and are not within the agency's discretion," as the district court believed, 1-ER-104, because NMFS simply followed this Court's holding in *NMFS III*. There, this Court held that "the operation of the dams is within the federal agencies' discretion" and must be considered as part of the proposed action for jeopardy. *NMFS III*, 524 F.3d at 930-31. As discussed, that is *exactly* what NMFS did. Unlike in *NMFS III*, the BiOp does not exclude any portion of forward-looking operations from the proposed action and it does not "use a hypothetical 'reference operation' in its jeopardy analysis." *Id.* NMFS followed its "usual practice applied in most (if not all) ESA consultations," relying on ESA Section 7(a)(2) and its implementing regulations. 4-ER-1160. The district court ignored the BiOp's explanations in concluding otherwise.

The BiOp correctly adds *all* forward-looking operations in the proposed action to the baseline, which properly includes the dams' existence and their past impacts on the environment, to determine whether the proposed action will cause jeopardy. The BiOp's description of changes from past practice had no bearing on that ultimate question. Even if it was error to reference changes from past practices, that was

30

harmless. *See City of Sausalito v. O'Neill*, 7103d 1186, 1220 (9th Cir. 2004); 5 U.S.C. § 706.

### 2. The BiOp appropriately evaluated mitigation measures included in the Proposed Action.

The district court likewise erred in concluding that the BiOp's consideration of mitigation was arbitrary and capricious because benefits from these mitigation measures were too uncertain and ill-defined. 1-ER-105-07. Under the ESA, action agency commitments to undertake mitigation measures that are included as part of the proposed action can be appropriately considered in the jeopardy analysis if they are reasonably certain to occur. *Ctr. for Biological Diversity v. Haaland*, 87 F.4th 980, 989 (9th Cir. 2023).[4] Planned measures are reasonably certain to occur so long as they are backed by deadlines or some other form of enforceable obligation. *Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 743 (9th Cir. 2020).

The BiOp contains a detailed discussion of mitigation measures and explains why they are reasonably certain to occur. The BiOp discusses "non-operational conservation measures to address uncertainty regarding the effects of further increases in spring spill, and to help offset any residual adverse effects of system management." 5-ER-1183; *see also* 5-ER-1183-99. These include hatchery production, predation

---

[4] A district court recently vacated some of the regulations applicable at the time of the 2020 BiOp. *Ctr. for Bio. Diversity v. U.S. Dep't of the Interior*, No. 24-CV-04651-JST, 2026 WL 898264, at *1 (N.D. Cal. Mar. 30, 2026). But the issues in this case do not turn on the precise language of these regulations as opposed to prior versions.

31

management, and, relevant here, improvements to estuary habitats to increase their capacity and quality and to tributary habitats to make them more useful to migrating juvenile salmon and steelhead. *Id.* The BiOp describes the parameters of estuary and tributary actions both in general terms, 5-ER-1190-1193, and for the specific species that will benefit, *see, e.g.*, 5-ER-1192, 1322-33; 6-ER-1516-28.

For estuary habitat conservation measures, the proposed action would "continue implementing the Columbia Estuary Ecosystem Restoration Program (CEERP)." 5-ER-1190. The CEERP targets estuary habitat—the final stretch of the Columbia River where all juvenile salmon and steelhead migrating out to the ocean first encounter saltwater. 10-ER-2784. When the BiOp was published in January 2020, the program had completed 64 projects resulting in over 8,500 acres of reconnected floodplains and 390 miles of restored channel networks. *Id.* "The Action Agencies propose to reconnect an average of 300 acres per year to the tidal regime for the duration of the proposed action." 5-ER-1190. Recognizing that there is uncertainty around finding suitable projects and that delays can occur, NMFS nonetheless accepted the Action Agencies' commitment to reconnect an average 300 acres through floodplain restoration per year because the agencies "have a record of meeting" this goal from 2008 to 2019. 5-ER-1190-91, 1322. NMFS also recognized that the proposed action includes a "5-year rolling review," annual restoration plans, and a three-level approach for monitoring project effectiveness and for conducting additional research. 5-ER-1190-91.

As both NMFS and the Action Agencies explain, defining "exactly what restoration actions will be performed, and when," is both infeasible and inadvisable during Section 7 consultation; the proposed action under consideration will last 15 years and because past experience and the best-available science point toward CEERP's "stepping stone approach," which allows projects to adapt to a dynamic environment and build on prior success. 5-ER-1190; 10-ER-2785-86. This stepping-stone approach relies on "a landscape framework to guide future restoration" developed by a panel of experts. 10-ER-2785; 5-ER-1190-91. The expert panel will meet once a month, continually evaluate completed projects to identify successful mitigation measures, and monitor future progress towards CEERP's priorities and goals. 10-ER-2786-87.

For tributary habitat conservation measures, the Action Agencies annually fund many improvement actions throughout the interior Columbia River Basin that are designed to improve habitat for listed salmon and steelhead. *See* 10-ER-2774. The decision-making process for specific projects is similar to the estuary habitat program just discussed, relying on a science committee to ensure that the program is implemented efficiently and consistent with the constantly growing body of evidence and experience both from previous projects and those that will occur over the next 15 years. 10-ER-2776-83; *see also* 5-ER-1192-93. To ensure these measures are effective, the Action Agencies committed to provide NMFS "with information sufficient to ensure that implementation is consistent with the level of effort committed to in the

33

proposed action." 5-ER-1192. The proposed action also established regular reporting intervals. 5-ER-1193. And, as with estuary habitat measures, past improvement actions and local expertise guide the Action Agencies' approach. 5-ER-1191-92. Both estuary and tributary actions are "included as part of the [action], and so [are] subject to the ESA's consultation and enforcement provisions." *Ctr. for Biological Diversity v. U.S. BLM*, 698 F.3d 1101, 1119 (9th Cir. 2012).

For these reasons, the Action Agencies' commitments, iterative deadlines, and specific, evidence-based processes are far more than "generalized contingencies or gesture[s] at hopeful plans." *CBD v. Bernhardt*, 982 F.3d at 743; *see also Rock Creek All. v. U.S. Fish & Wildlife Serv.*, 663 F.3d 439, 444 (9th Cir. 2011) (company "has already purchased approximately 273 acres of mitigation land, demonstrating its commitment of resources"). Rather, these actions are reasonably likely to occur and were correctly included in the proposed action.

The district court was wrong that the ESA requires that the BiOp evaluate specific projects. *See* 1-ER-108-09. As the agencies explained, ironing out what every project will look like for the next 15 years is not just impossible; it would hinder the very purpose of those projects. Doing so would undermine the program's "flexibility to adjust to climate change" even though making habitat more resilient to climate change is a primary goal of the Action Agency's mitigation plans. 5-ER-1193. The district court relied on 50 C.F.R. § 402.14(c)(1)(i)(D), 1-ER-108, but that regulation's reference to "specific components of the action and how they will be carried out" is

34

context-specific—for broad, program-wide actions, the "specific components" and "how they will be carried out" are necessarily broader than in smaller, more discrete actions. 50 C.F.R. § 402.14(c)(1)(i)(D). As discussed, those components here were specific quantitative restoration metrics, iterative deadlines, routine planning meetings, and mandatory processes that generate more definite projects over the life of the proposed action.

Finally, the district court was incorrect that the agencies did not define how "they intend to achieve" their habitat improvement goals. 1-ER-108. The BiOp explains exactly that: stream improvement projects involve "placement of large wood, boulders, and cover structures; gravel addition; floodplain reconnection; side channel and pond construction and reconnection; levee removal and setback; channel re-meandering; and, more recently, the construction of beaver enhancement structures." 5-ER-1327. Thus, the contours of the planned improvements are present, even if specific locations are not yet identified. *See Sw. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 518 (9th Cir. 1998) (upholding mitigation even though "FWS did not identify specific areas available and suitable for acquisition and restoration").

The BiOp's discussion of mitigation is plainly sufficient and the district court erred in concluding otherwise.

### 3. The BiOp adequately discussed climate change.

Likewise, NMFS adequately discussed climate change. Plaintiffs do not contend that CRS contributes to climate change. The only question is whether the agencies rationally judged the effects of the proposed action against the backdrop of climate change. And more specifically, the question for NMFS was whether the Proposed Action "deepens the jeopardy [by] causing additional harm." *NMFS III*, 524 F.3d at 930. After evaluating the best available evidence, the BiOp reasonably concluded it would not.

To evaluate the threats to the listed fish from climate change *in tandem with* those from the Proposed Action, the BiOp relied on quantitative life-cycle modeling and qualitative analyses, depending on the quality of information and science available for the species. *See* 5-ER-1213. NMFS's quantitative "climate sensitivity modeling" used data for Snake River spring/summer Chinook salmon, but NMFS determined that the results of that modeling "should generally be applicable to other 'stream type' Chinook salmon populations in the Columbia River Basin." 5-ER-1213-14.

The BiOp's modeling ran three scenarios relevant to its climate change analysis: a stable climate, a moderately worsening climate, and "a future that could be consistent with little or no climate change mitigation policies." 5-ER-1213. Even the stable climate scenario incorporated climate change effects that have already occurred, because it relied on data from the twenty years preceding the analysis and incorporated temperature changes that were already being reflected during that time.

36

*Id.* But the BiOp relied on the last—and most conservative—model when considering the potential effects of climate change. 5-ER-1213-14. NMFS ran 1,000 simulations per model to increase their reliability. *See* 5-ER-1342. Outliers were eliminated, and the center of the bell curve of results was considered "to be the most likely outcome." *Id.* Importantly, NMFS's climate-sensitivity modeling explicitly incorporated the effects of climate change by relying on the worsening-climate scenario just discussed. 5-ER-1358-60. To reduce uncertainty and flaws, NMFS aggregated results from "as many different models as possible," and projected a range of population responses to various warming scenarios. 5-ER-1359.

Evaluating the modeling results, NMFS made two key findings. First, because results from the various models did not diverge from one another in the short-term (i.e., during the 15-year life of the Proposed Action), "[t]he primary driver in the near-term climate is the amount of carbon already in the atmosphere." 5-ER-1360. As a result, *all* of NMFS's life-cycle modeling captures the "primary driver" of impacts from climate change that will be felt during the Proposed Action, because those models use climate data from the twenty preceding years. *See* 5-ER-1213. Second, "the dominant driver reducing abundance and productivity" under its models reflect that "losses in the marine life stage, above any other single factor, pose the biggest threat." 5-ER-1393. By contrast, there are "relatively small effects of climate change on . . . freshwater life stages." 5-ER-1393-94. As a result, NMFS determined that effects of climate change—and not effects from CRS operations—could result in substantial

declines of some Chinook salmon, but these conditions are not caused by "nor will they be exacerbated by, the continued operation and maintenance of the CRS" under the Proposed Action. 5-ER-1395. In fact, improvements in flexible spring spill and non-operational conservation measures are expected to *improve* survival levels and "contribute to resilience in the freshwater life history stages" for the fish. *Id.*

The district court erred in failing to defer to these reasonable, well-supported scientific findings. *See San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 610; 1-ER-109-11. Indeed, the court's cursory analysis on the subject utterly failed to grapple with this modeling and NMFS's reasoned explanations, instead faulting the analysis based on a hypothetical: "[I]f [CRS] operations kills more salmonids because they are weakened by the effects of climate change, or if the amount of salmonids killed by [CRS] operations is more of a threat to the sustainability of the species because they are dying in greater numbers due to climate change, that is the reality in which NMFS must assess the effects of the Proposed Action." 1-ER-110. But that is exactly what NMFS's modeling evaluated. For example, the BiOp readily acknowledges that CRS operations alter natural water temperatures. *See* 6-ER-1544. Those alterations are incorporated into temperature models used to predict future temperatures by the BiOp. Then, those predictions are fed into NMFS's "COMPASS" model, which estimates species survival through the system under the Proposed Action's operations, including the water temperature in the mainstem. 5-ER-1212-13; 2-ER-467-69. The COMPASS model is one of the inputs in NMFS's climate sensitivity modeling, so that

38

modeling quite literally added the effects from the dam's operations to those from a projected warming climate. *See* 5-ER-1393. And NMFS's analysis found that climate change impacts to the fish occurred predominantly in the ocean, and are not due to CRS operations. *See id.*

In concluding otherwise, the district court simply misread the record, instead accepting Plaintiffs' incorrect characterization of the modeling. But it is NMFS, not Plaintiffs or the district court, whose special expertise in making methodology and modeling choices warrants substantial deference. *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 610. Indeed, as the Supreme Court recently emphasized, "[b]lack-letter administrative law instructs that when an agency makes th[e]se kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its most deferential." *Seven Cnty.*, 605 U.S. at 182. The district court did not seriously apply this deferential standard, and the court erred in concluding NMFS's climate-change analysis was insufficient.

### 4. The BiOp reasonably considered species recovery.

NMFS adequately considered species recovery. In determining whether an agency action is likely to jeopardize the continued existence of a species, NMFS considers whether the proposed action will "reduce appreciably the likelihood of both the survival and recovery" of the listed species. 50 C.F.R. § 402.02. Survival and recovery are two parts of a "joint analysis" for jeopardy, but that analysis need only

"provide[] some reasonable assurance that the agency action in question will not appreciably reduce the odds of success for future recovery planning." *NMFS III*, 524 F.3d at 936.

Recovery requires improvements to species abundance, productivity, spatial structure, and diversity, *e.g.*, 5-ER-1219, and the BiOp considered each of these factors qualitatively and, where available, based on quantitative models. *See* 5-ER-1219-21. For example, for Snake River spring/summer Chinook, NMFS first considered the species' degraded status based on current population abundances and minimum abundance thresholds. 5-ER-1220-21. It catalogued recovery plan targets and the status for individual populations within each major population group. *Id.* And it discussed population-level risks and limiting factors relevant to recovery derived from the most recent recovery plan. 5-ER-1223-27. Then, considering this status, NMFS performed COMPASS and life-cycle modeling to quantitatively estimate population abundance and productivity under the proposed action. *E.g.*, 5-ER-1320-21, 1339-58. These modeling tools inform *both* survival and recovery. 5-ER-1356.

Finally, NMFS considered these data points in the context of the action as a whole—including habitat improvement actions, predator management, and the potential for significantly improved abundance and productivity. The agency then made a qualitative determination after weighing these several lines of evidence that the proposed action would not appreciably reduce the species' likelihood of survival and recovery. *See, e.g.*, 5-ER-1399-04 (discussing Proposed Action's likely result of

40

increasing population parameters and how those actions may "achieve recovery goals"), 5-ER-1406 (abundance improvements). In doing so, NMFS explicitly considered the species' recovery. And, taking a step back, the BiOp references recovery or applicable recovery plans over 800 times. *See generally* 4-ER-1112–10-ER-2741. There is simply no question that the BiOp considered the Proposed Action's "effects on recovery as well as effects on survival." *NMFS III*, 524 F.3d at 932.

The district court seemed to think that NMFS's analysis failed to adequately consider recovery because its "final analysis" supposedly "primarily focused on survival." 1-ER-1129. But that final analysis—called "Integration and Synthesis"—explicitly considered recovery. 5-ER-1399-1407. The district court incorrectly faulted NMFS for relying on positive trends in the "viable salmonid parameters" of abundance, productivity, spatial structure, and diversity, because it believed that these parameters do not tie population levels to some "rough understanding of what constitutes recovery." 1-ER-111-13. But there is no single population level that constitutes recovery, so tying recovery analyses to population targets would be artificial, if not arbitrary. For example, for Snake River Spring/Summer Chinook, recovery occurs when all major population groups are viable, and viability can occur in various ways—not just based on rote application of population size targets. 10-ER-2887-88. These recovery possibilities also "change over time based on fish response to recovery actions and natural factors, such as climate change," so it is important that recovery metrics "remain flexible." 10-ER-2888.

* * *

In sum, a common thread of error runs through the district court's merits analysis: rather than engage with the agencies' substantial administrative record and detailed explanations, the court relied on past rulings involving differing decisions, differing rationale, and differing evidence, incorrectly assuming that the agencies had made the same mistakes as in the past. But it was the district court, not the agencies, whose analysis was mistaken.

## C. The district court's injunction violates bedrock limits on equitable authority.

The district court's injunction continues the district court's longstanding usurpation of CRS operations—one of the most complex system of dams in the United States—of which the district court has essentially appointed itself superintendent. That is beyond the bounds of courts' equitable authority.

To start, the agencies cannot comply with the injunction here without violating the ESA. Courts lack authority for "amorphous general supervision of the operations of government." *Raines v. Byrd*, 521 U.S. 811, 828-29 (1997); *see also Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 383-84 (2024). And courts cannot grant an injunction under one statutory provision "if doing so would cause a violation of Section 7 of the ESA." *San Luis & Delta-Mendota Water Auth.*, 747 F.3d at 645 n.49; *see also INS v. Pangilinan*, 486 U.S. 875, 883 (1988).

42

ESA Section 7(a)(2) mandates a specific procedure—consultation—to ensure that the substantive requirement of avoiding jeopardy is met. *See San Luis & Delta Mendota Water Auth.*, 747 F.3d at 596. The best available science suggests that the levels of spill required by the injunction will likely *worsen* conditions for ESA-threatened bull trout in ways that may require further ESA consultation to ensure they are not jeopardized. 2-ER-343-46; 2-ER-419-28. The district court abused its discretion by discounting the importance of "the lone bull trout" versus species that may benefit from additional spill. 1-ER-118. Congress carefully set out the procedures that the government must follow to meet its substantive duty to avoid jeopardizing endangered species, and the injunction forces the agencies to violate that provision. That is beyond the court's equitable authority. *See Pangilinan*, 486 U.S. at 883.

By requiring the agencies to bypass this mandatory process, the district court essentially appointed itself in both roles envisioned under Section 7—both the action agency and consulting agency. Congress did not delegate those roles to courts, but to expert Executive Branch agencies. *Locke*, 776 F.3d at 1007 ("Congress delegated this type of balancing" to "administrative agencies when it passed the APA and ESA"). By usurping this authority, the district court exceeded the bounds of its own equitable authority.

The Supreme Court's landmark decision in *Tennessee Valley Authority v. Hill*, 437 U.S. 153 (1978) confirms as much. At the time of the Court's decision there, it was believed that a listed species of snail darter existed only in the area that the dam would

43

inundate, and FWS determined that completing the dam would jeopardize the species and its listed habitat. *Id.* at 161. This "irreconcilable conflict between operation of the Tellico Dam and the explicit provisions of [section] 7 of the [ESA]" meant that courts, lacking "expert knowledge on the subject of endangered species, much less . . . a mandate from the people to strike a balance of equities on the side of Tellico Dam," were required under separation of powers principles to enforce Congress's decision to strike the balance "in favor of affording endangered species the highest of priorities." *Id.* at 194.

Here, by contrast, NMFS has found that CRS operations will *not* jeopardize the listed species at issue. The district court's mandatory injunction (not a prohibitory injunction as in *Tennessee Valley Authority*) flips Congress's priorities on their head. A court's "individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside." *Id.* The district court's injunction does the opposite—it usurps the power delegated exclusively to the Executive Branch to administer Section 7 of the ESA and, indeed, mandates that statute's violation. That is an untenable invasion of a coequal branch's authority and exceeds the courts' equitable power.

Separately, the district court's injunction lacks the required nexus to the ESA claim at stake. Plaintiffs rely on their APA claim against NMFS, alleging flaws in the 2020 BiOp, to demonstrate they have a likelihood of success on the merits. BiOps are final agency actions that are separately challengeable under the APA (absent an

applicable specific judicial review provision like the Northwest Power Act, discussed above). *Bennett v. Spear*, 520 U.S. 154, 177 (1997). But Plaintiffs' request for a preliminary injunction is directed against operations managed by BPA, the Corps, and Reclamation, rather than NMFS. Plaintiffs' motion thus lacked the required close nexus between claims, harms, and injunctive relief, met with "exactitude." *Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). Here, there is a serious mismatch between the claimed violations of law—NMFS's supposedly inadequate analysis of jeopardy under Section 7(a)(2)—and the relief Plaintiffs seek, which runs against separate agencies. Any violation in the BiOp would result in a remand for further analysis, not the mandatory and drastic CRS operational changes the district court ordered.

The district court believed that the Action Agencies had not performed their own independent analysis, and thus the claims against them rose and fell with the claims against the BiOp. 1-ER-99-100. But the ROD contains independent analysis, as does the EIS. 85 Fed. Reg. at 63837-47, 63863-68. The court dismissed this analysis by ascribing it to non-party BPA, but, as discussed, the ROD and EIS were joint documents. *See supra* at 17-21. Plus, the Action Agencies extensively analyzed effects to both listed and non-listed species in the EIS. The district court erred in enjoining the Action Agencies based on an alleged legal violation that runs solely against NMFS.

45

## II. PLAINTIFFS WILL NOT SUFFER IRREPARABLE HARM.

The court's irreparable harm analysis is also flawed and should be reversed. A plaintiff must show that the irreparable harm is "likely" to occur before the court can decide the merits of the case, *Winter v. Natural Resources Def. Council*, 555 U.S. 7, 22 (2008), and that burden is "doubly demanding" in a mandatory injunction case like this one, *Garcia*, 786 F.3d at 740. The district court's analysis of irreparable harm to Plaintiffs failed to meet both the *Winter* standard and the *Garcia* standard.

### A. Plaintiffs presented only generalized and past harms that the district court erred in accepting.

For this preliminary injunction, the relevant question before the district court was whether Plaintiffs would suffer irreparable harm during the time it takes the court to review the merits. The district court relied on assumptions rather than evidence of present, immediate harm. For example, the court assumed that the proposed action "is largely a continuation of previous [CRS] operations found to be in violation of the ESA," so "it is reasonable to conclude that the listed species' prognosis is as bad as— or worse than—it has ever been." 1-ER-113. Similarly, the court invoked a 2018 decision from this Court that identified harm and then determined that "the same type of evidence" was submitted here. 1-ER-116 (discussing Declarations of Liz Hamilton and Joseph Bogaard). But "past wrongs do not in themselves amount to that real and immediate threat of injury necessary to make out a case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 103 (1983). And "there is no presumption of

46

irreparable injury where there has been a procedural violation in ESA cases," *Cottonwood Env't L. Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015), so assumptions based on stale evidence and past harms is not enough.

The court compounded this error by discounting the evolution of CRS operations over the last decade. The court incorrectly assumed that current CRS operations are similar to the operations that were reviewed in the 2018 decision, but in fact, spring spill under the proposed 2026 Fish Operations Plan is significantly higher than the rates implemented under the 2008 BiOp, and this means substantially fewer fish are passing through a powerhouse than a decade ago. 3-ER-645-47; 2-ER-367-68; 2-ER-379, 389 The court also ignored new data showing limited benefits from increased spill and unintended adverse consequences on adult salmon, steelhead, and bull trout. 3-ER-660-67; 2-ER-477, 493; 2-ER-431.

The court also erred by crediting allegations of generalized harm rather than identifying specific, irreparable harm over the short term. The thrust of its conclusion was that "[f]urther degradation of [salmon and steelhead] abundance is irreparable harm." 1-ER-117; *see* 1-ER-114 (finding generalized statements that "operations are harmful to the species" to be persuasive evidence). But that says nothing about the specific operations planned for the next twelve months. The lack of any analysis of specific harm is unsurprising, because Plaintiffs' declarants essentially relied on the presumption that they are harmed because the ESA-listed species at issue are not yet sufficiently abundant to have achieved recovery and delisting. Such overgeneralized

47

assertions do not prove that a change in status is likely to occur in the short term with sufficiently severe impact to Plaintiffs' asserted interests. *See Nat'l Wildlife Fed'n v. Burlington N. R.R.*, 23 F.3d 1508, 1512 n.8 (9th Cir. 1994) (stating that a plaintiff must show "a definitive threat of future harm to protected species, not mere speculation"). And that failure is even more pronounced when judged against the "doubly demanding" standard required here. *Garcia*, 786 F.3d at 740.

### B. The district court clearly erred in evaluating salmon and steelhead abundance and the effects of spill.

The district court also erred when it discounted Federal Defendants' evidence on salmon and steelhead abundance. *See* 1-ER-114. The increases in abundance in the record are hardly "slight" *Id.* Rather, abundance has generally increased for most stocks following the low return period of 2017-2019, with two stocks recently experiencing returns within the top three highest abundances since they were listed under the ESA. 2-ER-354-61, 366-69. That same data rebuts Plaintiffs' assertions that negative population trends have continued.

The district court wrongly accepted Oregon's assertion that "short term increases or decreases in abundance do not equate to improved status." 1-ER-113. In fact, certain species "have dramatically increased in abundance since" listing and there is no "clear decreasing trend in abundance since 2014." 2-ER-354-55. That is far more than the "slight increase" Plaintiffs and the court characterized it as. 1-ER-114. And a general statement about species making progress away from extinction does not alter

48

the analysis because there is no dispute that the goal of the ESA is conservation of listed species. *Contra* 1-ER-113-14 (quoting 4-ER-893). Simply put, Plaintiffs marshalled nothing more than "general statements regarding species status and the likelihood of extinction," 2-ER-354; those generalizations cannot stand in for specific, credible evidence. The burden is squarely on Plaintiffs to establish irreparable harm in the next twelve months, and for a mandatory injunction, that burden is a "doubly demanding." *Garcia*, 786 F.3d at 740. They failed to meet it here, and the court erred in finding that they had.

Plaintiffs' only contrary evidence is a declaration from Mr. Ed Bowles. *See* 1-ER-114. But the best available science "directly contradicts" Bowles' assertions. 2-ER-355. And the assertions are based on generalizations and are ultimately misleading. 2-ER-353. Relying on this faulty evidence was clear error. *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 944, 946 (9th Cir. 2013). Doubly so here, because the district court's opinion makes plain that even this evidence was not the primary source for its conclusions—previous decisions in this case were. 1-ER-114 (citing *NMFS VI*, *NMFS VIII*). That too was wrong.

Contrary to the best available scientific evidence, the district court misunderstood the relationship between spill and fish, assuming that more spill is always better. *See id.* ("absent a spill order, the recent operations changes and the concomitant benefits to fish will disappear"). But accounting for differences in juvenile transportation and the negative effects of higher levels of spill, the injunction

49

is worse for salmon and steelhead. 2-ER-480-93, 497; 3-ER-660-64, 664-66. Indeed, data shows that the high spill since 2020 has *not* resulted in a noticeable increase in smolt survival, compared to the decade before. 2-ER-379. Conversely, to take one example, higher spill volumes can result tailrace eddies—the turbulent, circular flow of water at the downstream side of projects—that are larger and more difficult for fish to escape because of this higher level of spill. 2-ER-526-28, 534-35. These eddies can also "misguide fish and obscure fish ladder entrances by masking the flow patterns that attract adult salmon," which can cause delays in the passage of adult fish or fallback over the dams leading to impaired ability of adult fish to migrate to their spawning grounds. 2-ER-526-28, 534-35; 3-ER-664-65.

Not only is the continuous spill to the levels requested by Plaintiffs *less beneficial* to salmon and steelhead, it may be *more harmful* to resident bull trout migration. *See infra* at 52-55. Of particular relevance is the elevated amount of total dissolved gas resulting from maximum spill and the associated risk of gas bubble trauma. 2-ER-442-43. The district court should not be permitted to issue a mandatory injunction that simultaneously harms salmon, steelhead, and bull trout based solely on the unsupported premise that more spill is better.

The district court also erred when it eliminated juvenile fish transportation at Lower Monumental Dam. 1-ER-34. NMFS's experts explained that empirical survival data and life-cycle modeling show that juvenile fish transportation is beneficial for survival. Transporting juvenile steelhead from Lower Monumental Dam, for example,

50

returned more adult steelhead to the Snake River basin. 3-ER-655-60; 2-ER-411-14. Lower smolt-to-adult returns means higher extinction probabilities, which further underscores the harm that will flow from the district court's erroneous injunction.

In sum, the district court clearly erred in accepting Plaintiffs' conclusory and flawed evidence about species abundance and harms to fish instead of deferring to agency expertise on the subject. In doing so, the district court made incorrect assumptions about what the record shows and assumed that elevated spill levels would help when the existing data show the opposite is true.

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN BALANCING THE EQUITIES IN PLAINTIFFS' FAVOR.

The district court erred in balancing the harms and equities in this case in two ways. The court's cursory dismissal of the injunction's effects on bull trout was incompatible with the ESA's mandate to ensure that agency action does not cause jeopardy to any listed species. The court's refusal to consider the injunction's harm to the public's safety and economic interests is also reversible error, as the cases relied on by the district court are distinguishable if not inconsistent with Supreme Court precedent. *See Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir.2003) (noting that where Supreme Court precedent is irreconcilable with prior circuit precedent, circuit precedent is no longer binding).

51

### A.    The district court erroneously discounted potential harm to bull trout from the injunction.

The court first erred in elevating the future viability of certain species over bull trout without considering *any* scientific information. *Cf. San Luis Obispo Coastkeeper v. Cnty. of San Luis Obispo*, 161 F.4th 590, 600 (9th Cir. 2025) (noting that a court must "consider the public interest as to the other listed species" lest the court "end up ordering relief that saves one species at the expense of another"). The court spent only *one paragraph* on the harm to bull trout. 1-ER-118-19. And that one paragraph of analysis is conclusory.

First, the court said that "weighing the number of species, the lone bull trout to the 14 listed species weighs in favor of protecting the many over the one." 1-ER-118. To start, that sentence demonstrates a fundamental misunderstanding of the case—bull trout *are one of* the 14 listed species. Additionally, the court's invocation of "many over the one" is not consistent with the ESA's mandate to prioritize viability. *See* 16 U.S.C. § 1531(b) (stating the purpose of the statute is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved, [and] to provide a program for the conservation of [] endangered and threatened species"). The court should have looked at the agencies' analyses in the record and the government's expert declarations submitted on the issue, which warned that the injunction would have uncertain effects on bull trout. *See* 4-ER-1110-11; 2-ER-431-48; 2-ER-340-47; 2-ER-534-35. It is expert agencies—not the courts—

52

tasked with evaluating jeopardy. *Tenn. Valley Auth.*, 437 U.S. at 194 (courts "have no expert knowledge on the subject of endangered species").

Furthermore, the court cited nothing for its related assertion that "[t]he record about the potential impacts to bull trout is limited, deeply contested, and less well-established." 1-ER-118. Ironically, one reason the record is limited on the subject is that the court's injunction forecloses the deliberative process envisioned by Section 7. 16 U.S.C. § 1536(a)(2). Indeed, even the effects of the district court's mandatory injunction elevating spill and extending it through the entire month of August, cannot be fully understood. 2-ER-445 (FWS's "assumptions in the FWS CRS Biological Opinion were based on no more than 16 hours per day of gas cap spill"); *see also* 2-ER-345-46. The court cannot issue an injunction that may harm bull trout based on its decision to simply ignore expert information.

Next, the court claims that it "can infer from the bull trout's current existence that it has survived past dam operations that are similar to those that Plaintiffs now want the Federal Defendants to implement." 1-ER-119. But that principle applies equally in reverse—listed salmonids currently exist and therefore survived past dam operations that did *not* involve this type of increased spill. More importantly, that conclusion ignores the best scientific evidence from the government's experts showing that bull trout population trends are declining. 4-ER-1095.

The court's final reason for valuing salmon and steelhead over bull trout was that the draft 2026 Fish Operations Plan "will threaten the continued existence of

53

many salmonid populations in the Columbia and Snake Rivers." 1-ER-119. Again, bull trout *are* one of the "salmonid populations in the Columbia and Snake Rivers." Moreover, the court cited no evidence for this proposition, and even if it had, it would be relying on speculation from Plaintiff-aligned declarants—not the actual 2026 Fish Operations Plan or FWS's and NMFS's comprehensive BiOps. As the record reflects, the 2026 operations plan is "within the operational range considered in the" BiOp, and thus, the agencies' expert judgment that the salmon and steelhead species at issue here will not be jeopardized holds. 2-ER-431; 2-ER-443-444.

In fact, increased spring and fall spill adversely affects bull trout in several ways. First, higher spill levels increase entrainment (involuntary downstream passage) and fallback. 2-ER-437, 439, 445. Second, during downstream migration, which may occur multiple times in a season, "bull trout may suffer physical and behavioral injuries from contact with dam structures, including scale loss, bruising, disorientation, and open wounds." 2-ER-439. Those injuries increase the risk of infection and mortality for bull trout. Id.

Third, increased spill affects the total dissolved gas in the tailrace and for miles downriver, which can cause gas bubble trauma in fish. 2-ER-441-42. Recent studies of gas bubble trauma "provide strong evidence that bull trout foraging habitat and the availability of prey may be measurably impacted by high levels of [total dissolved gas]." 2-ER-444. FWS told the court that increased spill under the injunction "would result in more bull trout mortality than the current estimate of five percent injury and

mortality." 2-ER-445. And the "long-term impacts could diminish bull trout fitness and impair the function of critical foraging and overwintering habitats." 2-ER-446. These adverse effects "would be amplified in low or declining populations." 2-ER-448. The district court failed to meaningfully weigh these harms against the potential harms to other species caused by the injunction.

The district court's cursory discussion of bull trout impacts shows that it utterly failed to "weigh the risks and benefits to all ESA-listed species in play" before ordering increased spill. *San Luis Obispo Coastkeeper*, 161 F.4th at 601.

### B. Harm to public health and safety outweighs the speculative risk to the listed salmon and steelhead.

The district court also erred in failing to consider the potential harm to human health and safety that may result from the mandatory injunction. In *Winter*, which involved ESA claims related to Navy sonar, the Supreme Court overturned a preliminary injunction where the court addressed the balance of equities and public interest "in only a cursory fashion." 555 U.S. at 17, 26. The Supreme Court faulted both the lower courts for failing to give "sufficient weight to the views of several top Navy officers" and "ignor[ing] key portions of [an admiral's] declaration." *Id.* at 28. In reversing, the Supreme Court was clear: "An injunction is a matter of equitable discretion; it does not follow from success on the merits as a matter of course." *Id.* at 32.

Despite this clear instruction from the Supreme Court, this Court has created exceptions to *Winter* that "virtually assures the grant of injunctive relief" in ESA cases. *Cottonwood Envtl. Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1091 (9th Cir. 2015); *see also NWF IX*, 886 F.3d at 817 n.9 ("When considering an injunction under the ESA, we presume that remedies at law are inadequate, that the balance of interests weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction."). This erroneous holding stems from a misreading of *Tennessee Valley Authority*, 437 U.S. at 153, which that preceded *Winter* by several decades. "*TVA* and its progeny dealt with injunctions halting disruptions to natural habitats—a quintessential conflict caused by the 'economic growth and development untempered by adequate concern and conservation' that Congress was specifically concerned about." *San Luis Obispo Coastkeeper*, 161 F.4th at 600.

These cases are distinguishable. First, it is speculative whether the injunction provides any material benefit to the listed populations. *See supra* 49-51. In fact, the degree to which an injunction would benefit a listed species is one of the factors that Congress, in enacting the ESA, has directed the courts to consider in weighing the equities. Second, the Court should be especially reluctant to dispense with balancing

56

or consideration of the public interest in granting the extraordinary relief of a mandatory injunction.[5]

Third, the public interest at issue here is not mere economics—it concerns human health and safety, which should strongly weigh against a preliminary injunction here. As established in the district court as well as in the government's motion for a stay pending appeal, the CRS supplies power to millions of Pacific Northwest residents and businesses, along with hospitals, airports, military bases, tribes, schools, and rural communities. *See* 2-ER-287-336 (also summarizing ECF Nos. 2582 and 2574). BPA expects the court's newly ordered spill levels to result in an average loss of generation of 1,000 average megawatts in the month of August, with an estimated cost of $95–100 million per year, or roughly $300 million for the FY 2026-2028 rate period. 2-ER-307-12. This will cause a substantial risk of blackouts in late summer: in August, the risk increases from 1.3-1.6% to 6.0-6.2%, and in September, the risk increases to about 13%. 2-ER-295-97. Blackouts in the areas served by the CRS present a serious threat to public safety and security. Hospitals, military bases, schools, and communities would be dependent on unreliable and time-limited back-up power, and indoor cooling would be severely hindered. 2-ER-291, 330-31, 335-36.

---

[5] The government preserves the argument that a categorial rule against considering the public interest and the balance of equities in the context of ESA preliminary injunctions is inconsistent with Supreme Court case law, including *Winter*.

In sum, Plaintiffs cannot meet the standard articulated in *Winter*, and the court erred in granting this mandatory injunction.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's orders granting a preliminary injunction and denying the government's motion to dismiss and remand with an instruction to dismiss.

Respectfully submitted,

/s/ *Emily Polachek*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

ROBERT STANDER
*Deputy Assistant Attorney General*

ROBERT LUNDMAN
JACOB D. ECKER
FREDERICK H. TURNER
EMILY A. POLACHEK
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
5600 American Blvd. W, Suite 650
Bloomington, MN 55437
(202) 598-9344
emily.polachek3@usdoj.gov

May 4, 2026
DJ # 90-8-6-05111

## STATEMENT OF RELATED CASES

Federal Appellants do not believe any other currently pending cases are related within the meaning of Circuit Rule 28-2.6, but Plaintiffs have moved, over BPA's objection, to reopen *Pacific Coast Federation of Fishermen's Associations v. BPA*, Case No. 20-73761(dismissed Feb. 23, 2024) (asserting the same underlying legal challenges against BPA).

**Form 8.  Certificate of Compliance for Briefs**

**9th Cir. Case Number(s)**      26-1899, 26-1997, 26-2139, 26-2232, 26-2240

I am the attorney or self-represented party.

**This brief contains 13,950 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[X] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
   [ ] it is a joint brief submitted by separately represented parties;
   [ ] a party or parties are filing a single brief in response to multiple briefs; or
   [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature**    s/*Emily Polachek*

**Date**       May 4, 2026

# ADDENDUM

16 U.S.C. § 839 ................................................................................................... 1a

16 U.S.C. § 839b ................................................................................................. 3a

16 U.S.C. § 839d-1 ............................................................................................ 17a

16 U.S.C. § 839f ................................................................................................ 18a

16 U.S.C. § 1536 ............................................................................................... 24a

50 C.F.R. § 402.14 ............................................................................................ 35a

85 Fed. Reg. 63834 (Oct. 8, 2020) .................................................................. 43a

United States Code Annotated
  Title 16. Conservation
    Chapter 12H. Pacific Northwest Electric Power Planning and Conservation (Refs & Annos)

16 U.S.C.A. § 839

§ 839. Congressional declaration of purpose

Currentness

The purposes of this chapter, together with the provisions of other laws applicable to the Federal Columbia River Power System, are all intended to be construed in a consistent manner. Such purposes are also intended to be construed in a manner consistent with applicable environmental laws. Such purposes are:

**(1)** to encourage, through the unique opportunity provided by the Federal Columbia River Power System--

**(A)** conservation and efficiency in the use of electric power, and

**(B)** the development of renewable resources within the Pacific Northwest;

**(2)** to assure the Pacific Northwest of an adequate, efficient, economical, and reliable power supply;

**(3)** to provide for the participation and consultation of the Pacific Northwest States, local governments, consumers, customers, users of the Columbia River System (including Federal and State fish and wildlife agencies and appropriate Indian tribes), and the public at large within the region in--

**(A)** the development of regional plans and programs related to energy conservation, renewable resources, other resources, and protecting, mitigating and enhancing fish and wildlife resources,

**(B)** facilitating the orderly planning of the region's power system, and

**(C)** providing environmental quality;

**(4)** to provide that the customers of the Bonneville Power Administration and their consumers continue to pay all costs necessary to produce, transmit, and conserve resources to meet the region's electric power requirements, including the amortization on a current basis of the Federal investment in the Federal Columbia River Power System;

**(5)** to insure, subject to the provisions of this chapter--

# Add.1a

**(A)** that the authorities and responsibilities of State and local governments, electric utility systems, water management agencies, and other non-Federal entities for the regulation, planning, conservation, supply, distribution, and use of electric power shall be construed to be maintained, and

**(B)** that Congress intends that this chapter not be construed to limit or restrict the ability of customers to take actions in accordance with other applicable provisions of Federal or State law, including, but not limited to, actions to plan, develop, and operate resources and to achieve conservation, without regard to this chapter; and

**(6)** to protect, mitigate and enhance the fish and wildlife, including related spawning grounds and habitat, of the Columbia River and its tributaries, particularly anadromous fish which are of significant importance to the social and economic well-being of the Pacific Northwest and the Nation and which are dependent on suitable environmental conditions substantially obtainable from the management and operation of the Federal Columbia River Power System and other power generating facilities on the Columbia River and its tributaries.

**CREDIT(S)**

(Pub.L. 96-501, § 2, Dec. 5, 1980, 94 Stat. 2697.)

Notes of Decisions (3)

16 U.S.C.A. § 839, 16 USCA § 839
Current through P.L. 119-84. Some statute sections may be more current, see credits for details.

**End of Document** © 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Add.2a

United States Code Annotated
    Title 16. Conservation
        Chapter 12H. Pacific Northwest Electric Power Planning and Conservation (Refs & Annos)

16 U.S.C.A. § 839b

§ 839b. Regional planning and participation

Effective: January 23, 2026
Currentness

**(a) Pacific Northwest Electric Power and Conservation Planning Council; establishment and operation as regional agency**

**(1)** The purposes of this section are to provide for the prompt establishment and effective operation of the Pacific Northwest Electric Power and Conservation Planning Council, to further the purposes of this chapter by the Council promptly preparing and adopting (A) a regional conservation and electric power plan and (B) a program to protect, mitigate, and enhance fish and wildlife, and to otherwise expeditiously and effectively carry out the Council's responsibilities and functions under this chapter.

**(2)** To achieve such purposes and facilitate cooperation among the States of Idaho, Montana, Oregon, and Washington, and with the Bonneville Power Administration, the consent of Congress is given for an agreement described in this paragraph and not in conflict with this chapter, pursuant to which--

**(A)** there shall be established a regional agency known as the "Pacific Northwest Electric Power and Conservation Planning Council" which (i) shall have its offices in the Pacific Northwest, (ii) shall carry out its functions and responsibilities in accordance with the provisions of this chapter, (iii) shall continue in force and effect in accordance with the provisions of this chapter, and (iv) except as otherwise provided in this chapter, shall not be considered an agency or instrumentality of the United States for the purpose of any Federal law; and

**(B)** two persons from each State may be appointed, subject to the applicable laws of each such State, to undertake the functions and duties of members of the Council.

The State may fill any vacancy occurring prior to the expiration of the term of any member. The appointment of six initial members, subject to applicable State law, by June 30, 1981, by at least three of such States shall constitute an agreement by the States establishing the Council and such agreement is hereby consented to by the Congress. Upon request of the Governors of two of the States, the Secretary shall extend the June 30, 1981, date for six additional months to provide more time for the States to make such appointments.

**(3)** Except as otherwise provided by State law, each member appointed to the Council shall serve for a term of three years, except that, with respect to members initially appointed, each Governor shall designate one member to serve a term of two years and one member to serve a term of three years. The members of the Council shall select from among themselves a chairman. The members and officers and employees of the Council shall not be deemed to be officers or employees of the United States for any purpose. The Council shall appoint, fix compensation, assign and delegate duties to such executive and additional personnel as the Council deems necessary to fulfill its functions under this chapter, taking into account such information and analyses as

# Add.3a

are, or are likely to be, available from other sources pursuant to provisions of this chapter. The compensation of the members shall be fixed by State law. The compensation of the members and the officers shall not exceed the rate prescribed for Federal officers and positions at step 1 of level GS-18 of the General Schedule.

**(4)** For the purpose of providing a uniform system of laws, in addition to this chapter, applicable to the Council relating to the making of contracts, conflicts-of-interest, financial disclosure, open meetings of the Council, advisory committees, disclosure of information, judicial review of Council functions and actions under this chapter, and related matters, the Federal laws applicable to such matters in the case of the Bonneville Power Administration shall apply to the Council to the extent appropriate, except that with respect to open meetings, the Federal laws applicable to open meetings in the case of the Federal Energy Regulatory Commission shall apply to the Council to the extent appropriate. In applying the Federal laws applicable to financial disclosure under the preceding sentence, such laws shall be applied to members of the Council without regard to the duration of their service on the Council or the amount of compensation received for such service. No contract, obligation, or other action of the Council shall be construed as an obligation of the United States or an obligation secured by the full faith and credit of the United States. For the purpose of judicial review of any action of the Council or challenging any provision of this chapter relating to functions and responsibilities of the Council, notwithstanding any other provision of law, the courts of the United States shall have exclusive jurisdiction of any such review.

**(b) Alternative establishment of Council as Federal agency**

**(1)** If the Council is not established and its members are not timely appointed in accordance with subsection (a) of this section, or if, at any time after such Council is established and its members are appointed in accordance with subsection (a)--

**(A)** any provision of this chapter relating to the establishment of the Council or to any substantial function or responsibility of the Council (including any function or responsibility under subsection (d) or (h) of this section or under section 839d(c) of this title) is held to be unlawful by a final determination of any Federal court, or

**(B)** the plan or any program adopted by such Council under this section is held by a final determination of such a court to be ineffective by reason of subsection (a)(2)(B),

the Secretary shall establish the Council pursuant to this subsection as a Federal agency. The Secretary shall promptly publish a notice thereof in the Federal Register and notify the Governors of each of the States referred to in subsection (a) of this section.

**(2)** As soon as practicable, but not more than thirty days after the publication of the notice referred to in paragraph (1) of this subsection, and thereafter within forty-five days after a vacancy occurs, the Governors of the States of Washington, Oregon, Idaho, and Montana may each (under applicable State laws, if any) provide to the Secretary a list of nominations from such State for each of the State's positions to be selected for such Council. The Secretary may extend this time an additional thirty days. The list shall include at least two persons for each such position. The list shall include such information about such nominees as the Secretary may request. The Secretary shall appoint the Council members from each Governor's list of nominations for each State's positions, except that the Secretary may decline to appoint for any reason any of a Governor's nominees for a position and shall so notify the Governor. The Governor may thereafter make successive nominations within forty-five days of receipt of such notice until nominees acceptable to the Secretary are appointed for each position. In the event the Governor of any such State fails to make the required nominations for any State position on such Council within the time specified for such nominations, the Secretary shall select from such State and appoint the Council member or members for such position. The members of the Council shall select from among themselves one member of the Council as Chairman.

# Add.4a

**(3)** The members of the Council established by this subsection who are not employed by the United States or a State shall receive compensation at a rate equal to the rate prescribed for offices and positions at level GS-18 of the General Schedule for each day such members are engaged in the actual performance of duties as members of such Council, except that no such member may be paid more in any calendar year than an officer or employee at step 1 of level GS-18 is paid during such year. Members of such Council shall be considered officers or employees of the United States for purposes of title II of the Ethics in Government Act of 1978 (5 U.S.C. app.) and shall also be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in Government service are allowed expenses under section 5703 of Title 5. Such Council may appoint, and assign duties to, an executive director who shall serve at the pleasure of such Council and who shall be compensated at the rate established for GS-18 of the General Schedule. The executive director shall exercise the powers and duties delegated to such director by such Council, including the power to appoint and fix compensation of additional personnel in accordance with applicable Federal law to carry out the functions and responsibilities of such Council.

**(4)** When a Council is established under this subsection after a Council was established pursuant to subsection (a) of this section, the Secretary shall provide, to the greatest extent feasible, for the transfer to the Council established by this subsection of all funds, books, papers, documents, equipment, and other matters in order to facilitate the Council's capability to achieve the requirements of subsections (d) and (h) of this section. In order to carry out its functions and responsibilities under this chapter expeditiously, the Council shall take into consideration any actions of the Council under subsection (a) and may review, modify, or confirm such actions without further proceedings.

**(5)(A)** At any time beginning one year after the plan referred to in such subsection (d) and the program referred to in such subsection (h) of this section are both finally adopted in accordance with this chapter, the Council established pursuant to this subsection shall be terminated by the Secretary 90 days after the Governors of three of the States referred to in this subsection jointly provide for any reason to the Secretary a written request for such termination. Except as provided in subparagraph (B), upon such termination all functions and responsibilities of the Council under this chapter shall also terminate.

**(B)** Upon such termination of the Council, the functions and responsibilities of the Council set forth in subsection (h) of this section shall be transferred to, and continue to be funded and carried out, jointly, by the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service, in the same manner and to the same extent as required by such subsection and in cooperation with the Federal and the region's State fish and wildlife agencies and Indian tribes referred to in subsection (h) of this section and the Secretary shall provide for the transfer to them of all records, books, documents, funds, and personnel of such Council that relate to subsection (h) matters. In order to carry out such functions and responsibilities expeditiously, the Administrator, the Secretary of the Interior, and the Administrator of the National Marine Fisheries Service shall take into consideration any actions of the Council under this subsection, and may review, modify, or confirm such actions without further proceedings. In the event the Council is terminated pursuant to this paragraph, whenever any action of the Administrator requires any approval or other action by the Council, the Administrator may take such action without such approval or action, except that the Administrator may not implement any proposal to acquire a major generating resource or to grant billing credits involving a major generating resource until the expenditure of funds for that purpose is specifically authorized by Act of Congress enacted after such termination.

**(c) Organization and operation of Council**

**(1)** The provisions of this subsection shall, except as specifically provided in this subsection, apply to the Council established pursuant to either subsection (a) or (b) of this section.

# Add.5a

**(2)** A majority of the members of the Council shall constitute a quorum. Except as otherwise provided specifically in this chapter, all actions and decisions of the Council shall be by majority vote of the members present and voting. The plan or any part thereof and any amendment thereto shall not be approved unless such plan or amendment receives the votes of--

**(A)** a majority of the members appointed to the Council, including the vote of at least one member from each State with members on the Council; or

**(B)** at least six members of the Council.

**(3)** The Council shall meet at the call of the Chairman or upon the request of any three members of the Council. If any member of the Council disagrees with respect to any matter transmitted to any Federal or State official or any other person or wishes to express additional views concerning such matter, such member may submit a statement to accompany such matter setting forth the reasons for such disagreement or views.

**(4)** The Council shall determine its organization and prescribe its practices and procedures for carrying out its functions and responsibilities under this chapter. The Council shall make available to the public a statement of its organization, practices, and procedures, and make available to the public its annual work program budget at the time the President submits his annual budget to Congress.

**(5)** Upon request of the Council established pursuant to subsection (b) of this section, the head of any Federal agency is authorized to detail or assign to the Council, on a reimbursable basis, any of the personnel of such agency to assist the Council in the performance of its functions under this chapter.

**(6)** At the Council's request the Administrator of the General Services Administration shall furnish the Council established pursuant to subsection (b) of this section with such offices, equipment, supplies, and services in the same manner and to the same extent as such Administrator is authorized to furnish to any other Federal agency or instrumentality such offices, supplies, equipment, and services.

**(7)** Upon the request of the Congress or any committee thereof, the Council shall promptly provide to the Congress, or to such committee, any record, report, document, material, and other information which is in the possession of the Council.

**(8)** To obtain such information and advice as the Council determines to be necessary or appropriate to carry out its functions and responsibilities pursuant to this chapter, the Council shall, to the greatest extent practicable, solicit engineering, economic, social, environmental, and other technical studies from customers of the Administrator and from other bodies or organizations in the region with particular expertise.

**(9)** The Administrator and other Federal agencies, to the extent authorized by other provisions of law, shall furnish the Council all information requested by the Council as necessary for performance of its functions, subject to such requirements of law concerning trade secrets and proprietary data as may be applicable.

# Add.6a

**(10)(A)** At the request of the Council, the Administrator shall pay from funds available to the Administrator the compensation and other expenses of the Council as are authorized by this chapter, including the reimbursement of those States with members on the Council for services and personnel to assist in preparing a plan pursuant to subsection (d) and a program pursuant to subsection (h) of this section, as the Council determines are necessary or appropriate for the performance of its functions and responsibilities. Such payments shall be included by the Administrator in his annual budgets submitted to Congress pursuant to the Federal Columbia River Transmission System Act and shall be subject to the requirements of that Act, including the audit requirements of section 11(d) of such Act. The records, reports, and other documents of the Council shall be available to the Comptroller General for review in connection with such audit or other review and examination by the Comptroller General pursuant to other provisions of law applicable to the Comptroller General. Funds provided by the Administrator for such payments shall not exceed annually an amount equal to 0.02 mill multiplied by the kilowatt hours of firm power forecast to be sold by the Administrator during the year to be funded. In order to assist the Council's initial organization, the Administrator after December 5, 1980, shall promptly prepare and propose an amended annual budget to expedite payment for Council activities.

**(B)** Notwithstanding the limitation contained in the fourth sentence of subparagraph (A) of this paragraph, upon an annual showing by the Council that such limitation will not permit the Council to carry out its functions and responsibilities under this chapter the Administrator may raise such limit up to any amount not in excess of 0.10 mill multiplied by the kilowatt hours of firm power forecast to be sold by the Administrator during the year to be funded, adjusted for inflation.

**(11)** The Council shall establish a voluntary scientific and statistical advisory committee to assist in the development, collection, and evaluation of such statistical, biological, economic, social, environmental, and other scientific information as is relevant to the Council's development and amendment of a regional conservation and electric power plan.

**(12)** The Council may establish such other voluntary advisory committees as it determines are necessary or appropriate to assist it in carrying out its functions and responsibilities under this chapter.

**(13)** The Council shall ensure that the membership for any advisory committee established or formed pursuant to this section shall, to the extent feasible, include representatives of, and seek the advice of, the Federal, and the various regional, State, local, and Indian Tribal Governments, consumer groups, and customers.

**(d) Regional conservation and electric power plan**

**(1)** Within two years after the Council is established and the members are appointed pursuant to subsection (a) or (b) of this section, the Council shall prepare, adopt, and promptly transmit to the Administrator a regional conservation and electric power plan. The adopted plan, or any portion thereof, may be amended from time to time, and shall be reviewed by the Council not less frequently than once every five years. Prior to such adoption, public hearings shall be held in each Council member's State on the plan or substantial, nontechnical amendments to the plan proposed by the Council for adoption. A public hearing shall also be held in any other State of the region on the plan or amendments thereto, if the Council determines that the plan or amendments would likely have a substantial impact on that State in terms of major resources which may be developed in that State and which the Administrator may seek to acquire. Action of the Council under this subsection concerning such hearings shall be subject to section 553 of Title 5 and such procedure as the Council shall adopt.

**(2)** Following adoption of the plan and any amendment thereto, all actions of the Administrator pursuant to section 839d of this title shall be consistent with the plan and any amendment thereto, except as otherwise specifically provided in this chapter.

# Add.7a

**(e) Plan priorities and requisite features; studies**

**(1)** The plan shall, as provided in this paragraph, give priority to resources which the Council determines to be cost-effective. Priority shall be given: first, to conservation; second, to renewable resources; third, to generating resources utilizing waste heat or generating resources of high fuel conversion efficiency; and fourth, to all other resources.

**(2)** The plan shall set forth a general scheme for implementing conservation measures and developing resources pursuant to section 839d of this title to reduce or meet the Administrator's obligations with due consideration by the Council for (A) environmental quality, (B) compatibility with the existing regional power system, (C) protection, mitigation, and enhancement of fish and wildlife and related spawning grounds and habitat, including sufficient quantities and qualities of flows for successful migration, survival, and propagation of anadromous fish, and (D) other criteria which may be set forth in the plan.

**(3)** To accomplish the priorities established by this subsection, the plan shall include the following elements which shall be set forth in such detail as the Council determines to be appropriate:

**(A)** an energy conservation program to be implemented under this chapter, including, but not limited to, model conservation standards;

**(B)** recommendation for research and development;

**(C)** a methodology for determining quantifiable environmental costs and benefits under section 839a(4) of this title;

**(D)** a demand forecast of at least twenty years (developed in consultation with the Administrator, the customers, the States, including State agencies with ratemaking authority over electric utilities, and the public, in such manner as the Council deems appropriate) and a forecast of power resources estimated by the Council to be required to meet the Administrator's obligations and the portion of such obligations the Council determines can be met by resources in each of the priority categories referred to in paragraph (1) of this subsection which forecast (i) shall include regional reliability and reserve requirements, (ii) shall take into account the effect, if any, of the requirements of subsection (h) on the availability of resources to the Administrator, and (iii) shall include the approximate amounts of power the Council recommends should be acquired by the Administrator on a long-term basis and may include, to the extent practicable, an estimate of the types of resources from which such power should be acquired;

**(E)** an analysis of reserve and reliability requirements and cost-effective methods of providing reserves designed to insure adequate electric power at the lowest probable cost;

**(F)** the program adopted pursuant to subsection (h); and

**(G)** if the Council recommends surcharges pursuant to subsection (f) of this section, a methodology for calculating such surcharges.

# Add.8a

**(4)** The Council, taking into consideration the requirement that it devote its principal efforts to carrying out its responsibilities under subsections (d) and (h) of this section, shall undertake studies of conservation measures reasonably available to direct service industrial customers and other major consumers of electric power within the region and make an analysis of the estimated reduction in energy use which would result from the implementation of such measures as rapidly as possible, consistent with sound business practices. The Council shall consult with such customers and consumers in the conduct of such studies.

**(f) Model conservation standards; surcharges**

**(1)** Model conservation standards to be included in the plan shall include, but not be limited to, standards applicable to (A) new and existing structures, (B) utility, customer, and governmental conservation programs, and (C) other consumer actions for achieving conservation. Model conservation standards shall reflect geographic and climatic differences within the region and other appropriate considerations, and shall be designed to produce all power savings that are cost-effective for the region and economically feasible for consumers, taking into account financial assistance made available to consumers under section 839d(a) of this title. These model conservation standards shall be adopted by the Council and included in the plan after consultation, in such manner as the Council deems appropriate, with the Administrator, States, and political subdivisions, customers of the Administrator, and the public.

**(2)** The Council by a majority vote of the members of the Council is authorized to recommend to the Administrator a surcharge and the Administrator may thereafter impose such a surcharge, in accordance with the methodology provided in the plan, on customers for those portions of their loads within the region that are within States or political subdivisions which have not, or on the Administrator's customers which have not, implemented conservation measures that achieve energy savings which the Administrator determines are comparable to those which would be obtained under such standards. Such surcharges shall be established to recover such additional costs as the Administrator determines will be incurred because such projected energy savings attributable to such conservation measures have not been achieved, but in no case may such surcharges be less than 10 per centum or more than 50 per centum of the Administrator's applicable rates for such load or portion thereof.

**(g) Public information; consultation; contracts and technical assistance**

**(1)** To insure widespread public involvement in the formulation of regional power policies, the Council and Administrator shall maintain comprehensive programs to--

  **(A)** inform the Pacific Northwest public of major regional power issues,

  **(B)** obtain public views concerning major regional power issues, and

  **(C)** secure advice and consultation from the Administrator's customers and others.

**(2)** In carrying out the provisions of this section, the Council and the Administrator shall--

  **(A)** consult with the Administrator's customers;

# Add.9a

**(B)** include the comments of such customers in the record of the Council's proceedings; and

**(C)** recognize and not abridge the authorities of State and local governments, electric utility systems, and other non-Federal entities responsible to the people of the Pacific Northwest for the planning, conservation, supply, distribution, and use of electric power and the operation of electric generating facilities.

**(3)** In the preparation, adoption, and implementation of the plan, the Council and the Administrator shall encourage the cooperation, participation, and assistance of appropriate Federal agencies, State entities, State political subdivisions, and Indian tribes. The Council and the Administrator are authorized to contract, in accordance with applicable law, with such agencies, entities, tribes, and subdivisions individually, in groups, or through associations thereof to (A) investigate possible measures to be included in the plan, (B) provide public involvement and information regarding a proposed plan or amendment thereto, and (C) provide services which will assist in the implementation of the plan. In order to assist in the implementation of the plan, particularly conservation, renewable resource, and fish and wildlife activities, the Administrator, when requested and subject to available funds, may provide technical assistance in establishing conservation, renewable resource, and fish and wildlife objectives by individual States or subdivisions thereof or Indian tribes. Such objectives, if adopted by a State or subdivision thereof or Indian tribes, may be submitted to the Council and the Administrator for review, and upon approval by the Council, may be incorporated as part of the plan.

**(h) Fish and wildlife**

**(1)(A)** The Council shall promptly develop and adopt, pursuant to this subsection, a program to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, on the Columbia River and its tributaries. Because of the unique history, problems, and opportunities presented by the development and operation of hydroelectric facilities on the Columbia River and its tributaries, the program, to the greatest extent possible, shall be designed to deal with that river and its tributaries as a system.

**(B)** This subsection shall be applicable solely to fish and wildlife, including related spawning grounds and habitat, located on the Columbia River and its tributaries. Nothing in this subsection shall alter, modify, or affect in any way the laws applicable to rivers or river systems, including electric power facilities related thereto, other than the Columbia River and its tributaries, or affect the rights and obligations of any agency, entity, or person under such laws.

**(2)** The Council shall request, in writing, promptly after the Council is established under either subsection (a) or (b) of this section and prior to the development or review of the plan, or any major revision thereto, from the Federal, and the region's State, fish and wildlife agencies and from the region's appropriate Indian tribes, recommendations for--

**(A)** measures which can be expected to be implemented by the Administrator, using authorities under this chapter and other laws, and other Federal agencies to protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by the development and operation of any hydroelectric project on the Columbia River and its tributaries;

**(B)** establishing objectives for the development and operation of such projects on the Columbia River and its tributaries in a manner designed to protect, mitigate, and enhance fish and wildlife; and

# Add.10a

**(C)** fish and wildlife management coordination and research and development (including funding) which, among other things, will assist protection, mitigation, and enhancement of anadromous fish at, and between, the region's hydroelectric dams.

**(3)** Such agencies and tribes shall have 90 days to respond to such request, unless the Council extends the time for making such recommendations. The Federal, and the region's, water management agencies, and the region's electric power producing agencies, customers, and public may submit recommendations of the type referred to in paragraph (2) of this subsection. All recommendations shall be accompanied by detailed information and data in support of the recommendations.

**(4)(A)** The Council shall give notice of all recommendations and shall make the recommendations and supporting documents available to the Administrator, to the Federal, and the region's, State fish and wildlife agencies, to the appropriate Indian tribes, to Federal agencies responsible for managing, operating, or regulating hydroelectric facilities located on the Columbia River or its tributaries, and to any customer or other electric utility which owns or operates any such facility. Notice shall also be given to the public. Copies of such recommendations and supporting documents shall be made available for review at the offices of the Council and shall be available for reproduction at reasonable cost.

**(B)** The Council shall provide for public participation and comment regarding the recommendations and supporting documents, including an opportunity for written and oral comments, within such reasonable time as the Council deems appropriate.

**(5)** The Council shall develop a program on the basis of such recommendations, supporting documents, and views and information obtained through public comment and participation, and consultation with the agencies, tribes, and customers referred to in subparagraph (A) of paragraph (4). The program shall consist of measures to protect, mitigate, and enhance fish and wildlife affected by the development, operation, and management of such facilities while assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply. Enhancement measures shall be included in the program to the extent such measures are designed to achieve improved protection and mitigation.

**(6)** The Council shall include in the program measures which it determines, on the basis set forth in paragraph (5), will--

**(A)** complement the existing and future activities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes;

**(B)** be based on, and supported by, the best available scientific knowledge;

**(C)** utilize, where equally effective alternative means of achieving the same sound biological objective exist, the alternative with the minimum economic cost;

**(D)** be consistent with the legal rights of appropriate Indian tribes in the region; and

**(E)** in the case of anadromous fish--

(i) provide for improved survival of such fish at hydroelectric facilities located on the Columbia River system; and

# Add.11a

**(ii)** provide flows of sufficient quality and quantity between such facilities to improve production, migration, and survival of such fish as necessary to meet sound biological objectives.

**(7)** The Council shall determine whether each recommendation received is consistent with the purposes of this chapter. In the event such recommendations are inconsistent with each other, the Council, in consultation with appropriate entities, shall resolve such inconsistency in the program giving due weight to the recommendations, expertise, and legal rights and responsibilities of the Federal and the region's State fish and wildlife agencies and appropriate Indian tribes. If the Council does not adopt any recommendation of the fish and wildlife agencies and Indian tribes as part of the program or any other recommendation, it shall explain in writing, as part of the program, the basis for its finding that the adoption of such recommendation would be--

**(A)** inconsistent with paragraph (5) of this subsection;

**(B)** inconsistent with paragraph (6) of this subsection; or

**(C)** less effective than the adopted recommendations for the protection, mitigation, and enhancement of fish and wildlife.

**(8)** The Council shall consider, in developing and adopting a program pursuant to this subsection, the following principles:

**(A)** Enhancement measures may be used, in appropriate circumstances, as a means of achieving offsite protection and mitigation with respect to compensation for losses arising from the development and operation of the hydroelectric facilities of the Columbia River and its tributaries as a system.

**(B)** Consumers of electric power shall bear the cost of measures designed to deal with adverse impacts caused by the development and operation of electric power facilities and programs only.

**(C)** To the extent the program provides for coordination of its measures with additional measures (including additional enhancement measures to deal with impacts caused by factors other than the development and operation of electric power facilities and programs), such additional measures are to be implemented in accordance with agreements among the appropriate parties providing for the administration and funding of such additional measures.

**(D)** Monetary costs and electric power losses resulting from the implementation of the program shall be allocated by the Administrator consistent with individual project impacts and system-wide objectives of this subsection.

**(9)** The Council shall adopt such program or amendments thereto within one year after the time provided for receipt of the recommendations. Such program shall also be included in the plan adopted by the Council under subsection (d).

**(10)(A)** The Administrator shall use the Bonneville Power Administration fund and the authorities available to the Administrator under this chapter and other laws administered by the Administrator to protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation of any hydroelectric project of the Columbia River and its tributaries in a manner consistent with the plan, if in existence, the program adopted by the Council under this subsection, and the purposes of

# Add.12a

this chapter. Expenditures of the Administrator pursuant to this paragraph shall be in addition to, not in lieu of, other expenditures authorized or required from other entities under other agreements or provisions of law.

**(B)** The Administrator may make expenditures from such fund which shall be included in the annual or supplementary budgets submitted to the Congress pursuant to the Federal Columbia River Transmission System Act. Any amounts included in such budget for the construction of capital facilities with an estimated life of greater than 15 years and an estimated cost of at least $2,500,000 shall be funded in the same manner and in accordance with the same procedures as major transmission facilities under the Federal Columbia River Transmission System Act.

**(C)** The amounts expended by the Administrator for each activity pursuant to this subsection shall be allocated as appropriate by the Administrator, in consultation with the Corps of Engineers and the Water and Power Resources Service, among the various hydroelectric projects of the Federal Columbia River Power System. Amounts so allocated shall be allocated to the various project purposes in accordance with existing accounting procedures for the Federal Columbia River Power System.

**(D) Independent Scientific Review Panel**

**(i)** The Northwest Power Planning Council (Council) shall appoint an Independent Scientific Review Panel (Panel), which shall be comprised of eleven members, to review projects proposed to be funded through that portion of the Bonneville Power Administration's (BPA) annual fish and wildlife budget that implements the Council's fish and wildlife program. Members shall be appointed from a list of no fewer than 20 scientists submitted by the National Academy of Sciences (Academy), provided that Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Panel. The Academy shall provide such nominations within 90 days of September 30, 1996, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

**(ii) Scientific Peer Review Groups**

The Council shall establish Scientific Peer Review Groups (Peer Review Groups), which shall be comprised of the appropriate number of scientists, from a list submitted by the Academy to assist the Panel in making its recommendations to the Council for projects to be funded through BPA's annual fish and wildlife budget, provided that Pacific Northwest scientists with expertise in Columbia River anadromous and non-anadromous fish and wildlife and ocean experts shall be among those represented on the Peer Review Groups. The Academy shall provide such nominations within 90 days of September 30, 1996, and in any case not later than December 31, 1996. If appointments are required in subsequent years, the Council shall request nominations from the Academy and the Academy shall provide nominations not later than 90 days after the date of this request. If the Academy does not provide nominations within these time requirements, the Council may appoint such members as the Council deems appropriate.

**(iii) Conflict of interest and compensation**

Panel and Peer Review Group members may be compensated and shall be considered subject to the conflict of interest standards that apply to scientists performing comparable work for the National Academy of Sciences; provided that a Panel or Peer Review Group members with a direct or indirect financial interest in a project, or projects, shall recuse himself or herself from review of, or recommendations associated with, such project or projects. All expenses of the Panel and the Peer Review Groups shall

## Add.13a

be paid by BPA as provided for under paragraph (vii). Neither the Panel nor the Peer Review Groups shall be deemed advisory committees within the meaning of chapter 10 of Title 5.

**(iv) Project criteria and review**

The Peer Groups, in conjunction with the Panel, shall review projects proposed to be funded through BPA's annual fish and wildlife budget and make recommendations on matters related to such projects to the Council no later than June 15 of each year. If the recommendations are not received by the Council by this date, the Council may proceed to make final recommendations on project funding to BPA, relying on the best information available. The Panel and Peer Review Groups shall review a sufficient number of projects to adequately ensure that the list of prioritized projects recommended is consistent with the Council's program. Project recommendations shall be based on a determination that projects: are based on sound science principles; benefit fish and wildlife; and have a clearly defined objective and outcome with provisions for monitoring and evaluation of results. The Panel, with assistance from the Peer Review Groups, shall review, on an annual basis, the results of prior year expenditures based upon these criteria and submit its findings to the Council for its review.

**(v) Public review**

Upon completion of the review of projects to be funded through BPA's annual fish and wildlife budget, the Peer Review Groups shall submit its findings to the Panel. The Panel shall analyze the information submitted by the Peer Review Groups and submit recommendations on project priorities to the Council. The Council shall make the Panel's findings available to the public and subject to public comment.

**(vi) Responsibilities of the Council**

The Council shall fully consider the recommendations of the Panel when making its final recommendations of projects to be funded through BPA's annual fish and wildlife budget, and if the Council does not incorporate a recommendation of the Panel, the Council shall explain in writing its reasons for not accepting Panel recommendations. In making its recommendations to BPA, the Council shall consider the impact of ocean conditions on fish and wildlife populations and shall determine whether the projects employ cost-effective measures to achieve program objectives. The Council, after consideration of the recommendations of the Panel and other appropriate entities, shall be responsible for making the final recommendations of projects to be funded through BPA's annual fish and wildlife budget.

**(vii) Cost limitation**

The annual cost of this provision shall not exceed $500,000 in 1997 dollars.

**(11)(A)** The Administrator and other Federal agencies responsible for managing, operating, or regulating Federal or non-Federal hydroelectric facilities located on the Columbia River or its tributaries shall--

(i) exercise such responsibilities consistent with the purposes of this chapter and other applicable laws, to adequately protect, mitigate, and enhance fish and wildlife, including related spawning grounds and habitat, affected by such projects or facilities in a manner that provides equitable treatment for such fish and wildlife with the other purposes for which such system and facilities are managed and operated;

# Add.14a

**(ii)** exercise such responsibilities, taking into account at each relevant stage of decisionmaking processes to the fullest extent practicable, the program adopted by the Council under this subsection. If, and to the extent that, such other Federal agencies as a result of such consideration impose upon any non-Federal electric power project measures to protect, mitigate, and enhance fish and wildlife which are not attributable to the development and operation of such project, then the resulting monetary costs and power losses (if any) shall be borne by the Administrator in accordance with this subsection.

**(B)** The Administrator and such Federal agencies shall consult with the Secretary of the Interior, the Administrator of the National Marine Fisheries Service, and the State fish and wildlife agencies of the region, appropriate Indian tribes, and affected project operators in carrying out the provisions of this paragraph and shall, to the greatest extent practicable, coordinate their actions.

**(12)(A)** Beginning on October 1 of the first fiscal year after all members to the Council are appointed initially, the Council shall submit annually a detailed report to the Committee on Energy and Natural Resources of the Senate and to the Committees on Energy and Commerce and on Natural Resources of the House of Representatives. The report shall describe the actions taken and to be taken by the Council under this chapter, including this subsection, the effectiveness of the fish and wildlife program, and potential revisions or modifications to the program to be included in the plan when adopted. At least ninety days prior to its submission of such report, the Council shall make available to such fish and wildlife agencies, and tribes, the Administrator and the customers a draft of such report. The Council shall establish procedures for timely comments thereon. The Council shall include as an appendix to such report such comments or a summary thereof.

**(B)** The Administrator shall keep such committees fully and currently informed of the actions taken and to be taken by the Administrator under this chapter, including this subsection.

**(i) Review**

The Council may from time to time review the actions of the Administrator pursuant to this section and section 839d of this title to determine whether such actions are consistent with the plan and programs, the extent to which the plan and programs is being implemented, and to assist the Council in preparing amendments to the plan and programs.

**(j) Requests by Council for action**

**(1)** The Council may request the Administrator to take an action under section 839d of this title to carry out the Administrator's responsibilities under the plan.

**(2)** To the greatest extent practicable within ninety days after the Council's request, the Administrator shall respond to the Council in writing specifying--

**(A)** the means by which the Administrator will undertake the action or any modification thereof requested by the Council, or

**(B)** the reasons why such action would not be consistent with the plan, or with the Administrator's legal obligations under this chapter, or other provisions of law, which the Administrator shall specifically identify.

# Add.15a

**(3)** If the Administrator determines not to undertake the requested action, the Council, within sixty days after notice of the Administrator's determination, may request the Administrator to hold an informal hearing and make a final decision.

**(k) Review and analysis of 5-year period of Council activities**

**(1)** Not later than October 1, 1987, or six years after the Council is established under this chapter, whichever is later, the Council shall complete a thorough analysis of conservation measures and conservation resources implemented pursuant to this chapter during the five-year period beginning on the date the Council is established under this chapter to determine if such measures or resources:

**(A)** have resulted or are likely to result in costs to consumers in the region greater than the costs of additional generating resources or additional fuel which the Council determines would be necessary in the absence of such measures or resources;

**(B)** have not been or are likely not to be generally equitable to all consumers in the region; or

**(C)** have impaired or are likely to impair the ability of the Administrator to carry out his obligations under this chapter and other laws, consistent with sound business practices.

**(2)** The Administrator may determine that section 839a(4)(D) of this title shall not apply to any proposed conservation measure or resource if the Administrator finds after receipt of such analysis from the Council that such measure or resource would have any result or effect described in subparagraph (A), (B) or (C) of paragraph (1).

### CREDIT(S)

(Pub.L. 96-501, § 4, Dec. 5, 1980, 94 Stat. 2700; Pub.L. 103-437, § 6(u), Nov. 2, 1994, 108 Stat. 4587; Pub.L. 104-206, Title V, § 512, Sept. 30, 1996, 110 Stat. 3005; Pub.L. 106-60, Title VI, § 610, Sept. 29, 1999, 113 Stat. 502; Pub.L. 112-74, Div. B, Title III, § 307, Dec. 23, 2011, 125 Stat. 877; Pub.L. 117-286, § 4(a)(104), Dec. 27, 2022, 136 Stat. 4317; Pub.L. 119-74, Div. B, Title III, § 312, Jan. 23, 2026, 140 Stat. 89.)

Notes of Decisions (19)

16 U.S.C.A. § 839b, 16 USCA § 839b
Current through P.L. 119-84. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Add.16a

United States Code Annotated
  Title 16. Conservation
    Chapter 12H. Pacific Northwest Electric Power Planning and Conservation (Refs & Annos)

16 U.S.C.A. § 839d-1

§ 839d-1. Federal projects in Pacific Northwest

Currentness

Without further appropriation and without fiscal year limitation, the Secretaries of the Interior and Army are authorized to plan, design, construct, operate and maintain generation additions, improvements and replacements, at their respective Federal projects in the Pacific Northwest Region as defined in the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), Public Law 96-501 (16 U.S.C. 839a(14)), and to operate and maintain the respective Secretary's power facilities in the Region, that the respective Secretary determines necessary or appropriate and that the Bonneville Power Administrator subsequently determines necessary or appropriate, with any funds that the Administrator determines to make available to the respective Secretary for such purposes. Each Secretary is authorized, without further appropriation, to accept and use such funds for such purposes: *Provided,* That, such funds shall continue to be exempt from sequestration pursuant to section 905(g)(1) of Title 2: *Provided further,* That this section shall not modify or affect the applicability of any provision of the Northwest Power Act. This provision shall be effective on October 1, 1993.

**CREDIT(S)**

(Pub.L. 102-486, Title XXIV, § 2406, Oct. 24, 1992, 106 Stat. 3099.)

16 U.S.C.A. § 839d-1, 16 USCA § 839d-1
Current through P.L. 119-84. Some statute sections may be more current, see credits for details.

**End of Document**
© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Add.17a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

United States Code Annotated
    Title 16. Conservation
        Chapter 12H. Pacific Northwest Electric Power Planning and Conservation (Refs & Annos)

16 U.S.C.A. § 839f

§ 839f. Administrative provisions

Currentness

**(a) Contract authority**

Subject to the provisions of this chapter, the Administrator is authorized to contract in accordance with section 2(f) of the Bonneville Project Act of 1937 (16 U.S.C. 832a(f)). Other provisions of law applicable to such contracts on December 5, 1980, shall continue to be applicable.

**(b) Executive and administrative functions of Administrator of Bonneville Power Administration; sound and businesslike implementation of chapter**

The Administrator shall discharge the executive and administrative functions of his office in accordance with the policy established by the Bonneville Project Act of 1937 (16 U.S.C. 832 and following), section 7152(a)(2) and (3) of Title 42, and this chapter. The Secretary of Energy, the Council, and the Administrator shall take such steps as are necessary to assure the timely implementation of this chapter in a sound and businesslike manner. Nothing in this chapter shall be construed by the Secretary, the Administrator, or any other official of the Department of Energy to modify, alter, or otherwise affect the requirements and directives expressed by the Congress in section 7152(a)(2) and (3) of Title 42 or the operations of such officials as they existed prior to December 5, 1980.

**(c) Limitations and conditions on contracts for sale or exchange of electric power for use outside Pacific Northwest**

Any contract of the Administrator for the sale or exchange of electric power for use outside the Pacific Northwest shall be subject to limitations and conditions corresponding to those provided in sections 2 and 3 of the Act of August 31, 1964 (16 U.S.C. 837a and 837b) for any contract for the sale, delivery, or exchange of hydroelectric energy or peaking capacity generated within the Pacific Northwest for use outside the Pacific Northwest. In applying such sections for the purposes of this subsection, the term "surplus energy" shall mean electric energy for which there is no market in the Pacific Northwest at any rate established for the disposition of such energy, and the term "surplus peaking capacity" shall mean electric peaking capacity for which there is no demand in the Pacific Northwest at the rate established for the disposition of such capacity. The authority granted, and duties imposed upon, the Secretary by sections 5 and 7 of such Act (16 U.S.C. 837e and 837f) shall also apply to the Administrator in connection with resources acquired by the Administrator pursuant to this chapter. The Administrator shall, in making any determination, under any contract executed pursuant to section 839c of this title, of the electric power requirements of any Pacific Northwest customer, which is a non-Federal entity having its own generation, exclude, in addition to hydroelectric generated energy excluded from such requirements pursuant to section 3(d) of such Act (16 U.S.C. 837b(d)), any amount of energy included in the resources of such customer for service to firm loads in the region if (1) such amount was disposed of by such customer outside the region, and (2) as a result of such disposition, the firm energy requirements of such customer or other customers of the Administrator are increased. Such amount of energy shall not be excluded, if the Administrator determines that through reasonable measures such amount of energy could not be conserved or otherwise retained for service to regional loads. The Administrator may sell as replacement for any amount of energy so excluded only energy that would otherwise be surplus.

# Add.18a

**(d) Disposition of power which does not increase amount of firm power Administrator is obligated to provide to any customer**

No restrictions contained in subsection (c) shall limit or interfere with the sale, exchange or other disposition of any power by any utility or group thereof from any existing or new non-Federal resource if such sale, exchange or disposition does not increase the amount of firm power the Administrator would be obligated to provide to any customer. In addition to the directives contained in subsections (i)(1)(B) and (i)(3) and subject to:

**(1)** any contractual obligations of the Administrator,

**(2)** any other obligations under existing law, and

**(3)** the availability of capacity in the Federal transmission system,

the Administrator shall provide transmission access, load factoring, storage and other services normally attendant thereto to such utilities and shall not discriminate against any utility or group thereof on the basis of independent development of such resource in providing such services.

**(e) Judicial review; suits**

**(1)** For purposes of sections 701 through 706 of Title 5, the following actions shall be final actions subject to judicial review--

**(A)** adoption of the plan or amendments thereto by the Council under section 839b of this title, adoption of the program by the Council, and any determination by the Council under section 839b(h) of this title;

**(B)** sales, exchanges, and purchases of electric power under section 839c of this title;

**(C)** the Administrator's acquisition of resources under section 839d of this title;

**(D)** implementation of conservation measures under section 839d of this title;

**(E)** execution of contracts for assistance to sponsors under section 839d(f) of this title;

**(F)** granting of credits under section 839d(h) of this title;

**(G)** final rate determinations under section 839e of this title; and

**(H)** any rule prescribed by the Administrator under section 839e(m)(2) of this title.

## Add.19a

**(2)** The record upon review of such final actions shall be limited to the administrative record compiled in accordance with this chapter. The scope of review of such actions without a hearing or after a hearing shall be governed by section 706 of Title 5, except that final determinations regarding rates under section 839e of this title shall be supported by substantial evidence in the rulemaking record required by section 839e(i) of this title considered as a whole. The scope of review of an action under section 839d(c) of this title shall be governed by section 706 of Title 5. Nothing in this section shall be construed to require a hearing pursuant to section 554, 556, or 557 of Title 5.

**(3)** Nothing in this section shall be construed to preclude judicial review of other final actions and decisions by the Council or Administrator.

**(4)** For purposes of this subsection--

**(A)** major resources shall be deemed to be acquired upon publication in the Federal Register pursuant to section 839d(c)(4)(B) of this title;

**(B)** resources, other than major resources, shall be deemed to be acquired upon execution of the contract therefor;

**(C)** conservation measures shall be deemed to be implemented upon execution of the contract or grant therefor; and

**(D)** rate determinations pursuant to section 839e of this title shall be deemed final upon confirmation and approval by the Federal Energy Regulatory Commission.

**(5)** Suits to challenge the constitutionality of this chapter, or any action thereunder, final actions and decisions taken pursuant to this chapter by the Administrator or the Council, or the implementation of such final actions, whether brought pursuant to this chapter, the Bonneville Project Act, the Act of August 31, 1964 (16 U.S.C. 837-837h), or the Federal Columbia River Transmission System Act (16 U.S.C. 838 and following), shall be filed in the United States court of appeals for the region. Such suits shall be filed within ninety days of the time such action or decision is deemed final, or, if notice of the action is required by this chapter to be published in the Federal Register, within ninety days from such notice, or be barred. In the case of a challenge of the plan or programs or amendments thereto, such suit shall be filed within sixty days after publication of a notice of such final action in the Federal Register. Such court shall have jurisdiction to hear and determine any suit brought as provided in this section. The plan and program, as finally adopted or portions thereof, or amendments thereto, shall not thereafter be reviewable as a part of any other action under this chapter or any other law. Suits challenging any other actions under this chapter shall be filed in the appropriate court.

**(f) Tax treatment of interest on governmental obligations**

For purposes of enabling the Administrator to acquire resources necessary to meet the firm load of public bodies, cooperatives, and Federal agencies from a governmental unit at a cost no greater than the cost which would be applicable in the absence of such acquisition, the exemption from gross income of interest on certain governmental obligations provided in section 103(a)(1) of Title 26 shall not be affected by the Administrator's acquisition of such resources if--

# Add.20a

**(1)** the Administrator, prior to contracting for such acquisition, certifies to his reasonable belief, that the persons for whom the Administrator is acquiring such resources for sale pursuant to section 839c of this title are public bodies, cooperatives, and Federal agencies, unless the Administrator also certifies that he is unable to acquire such resources without selling a portion thereof to persons who are not exempt persons (as defined in section 103(b) of Title 26), and

**(2)** based upon such certification, the Secretary of the Treasury determines in accordance with applicable regulations that less than a major portion of the resource is to be furnished to persons who are not exempt persons (as defined in section 103(b) of Title 26).

The certification under paragraph (1) shall be made in accordance with this subsection and a procedure and methodology approved by the Secretary of the Treasury. For purposes of this subsection, the term "major portion" shall have the meaning provided by regulations issued by the Secretary of the Treasury.

**(g) Review of rates for sale of power to Administrator by investor-owned utility customers**

When reviewing rates for the sale of power to the Administrator by an investor-owned utility customer under section 839c(c) or 839d of this title, the Federal Energy Regulatory Commission shall, in accordance with section 824h of this title--

**(1)** convene a joint State board, and

**(2)** invest such board with such duties and authority as will assist the Commission in its review of such rates.

**(h) Companies which own or operate facilities for the generation of electricity primarily for sale to Administrator**

**(1)** No "company" (as defined in section 79b(a)(2) of Title 15), which owns or operates facilities for the generation of electricity (together with associated transmission and other facilities) primarily for sale to the Administrator under section 839d of this title shall be deemed an "electric utility company" (as defined in section 79b(a)(3) of Title 15), within the meaning of any provision or provisions of chapter 2C of Title 15, if at least 90 per centum of the electricity generated by such company is sold to the Administrator under section 839d of this title, and if--

**(A)** the organization of such company is consistent with the policies of section 79a(b) and (c) of Title 15, as determined by the Securities and Exchange Commission, with the concurrence of the Administrator, at the time of such organization; and

**(B)** participation in any facilities of such "company" has been offered to public bodies and cooperatives in the region pursuant to section 839d(m) of this title.

**(2)** The Administrator shall include in any contract for the acquisition of a major resource from such "company" provisions limiting the amount of equity investment, if any, in such "company" to that which the Administrator determines will be consistent with achieving the lowest attainable power costs attributable to such major resource.

# Add.21a

**(3)** In the case of any "company" which meets the requirements of paragraph (1), the Administrator, with the concurrence of such Commission, shall approve all significant contracts entered into by, and between, such "company" and any sponsor company or any subsidiary of such sponsor company which are determined to be consistent with the policies of section 79a(b) and (c) of Title 15 at the time such contracts are entered into. The Administrator and the Securities and Exchange Commission shall exercise such approval authority within sixty days after receipt of such contracts. Such contracts shall not be effective without such approval.

**(4)** Paragraph (1) of this subsection shall continue to apply to any such "company" unless the Administrator or the Securities and Exchange Commission, or both, through periodic review, (A) determine at any time that the "company" no longer operates in a manner consistent with the policies of section 79a(b) and (c) of Title 15 and in accordance with this subsection, and (B) notify the "company" in writing of such preliminary determination. This subsection shall cease to apply to such "company" thirty days after receipt of notification of a final determination thereof. A final determination shall be made only after public notice of the preliminary determination and after a hearing completed not later than sixty days from the date of publication of such notice. Such final determination shall be made within thirty days after the date of completion of such hearing.

**(i) Electric power acquisition or disposition**

**(1)** At the request and expense of any customer or group of customers of the Administrator within the Pacific Northwest, the Administrator shall, to the extent practicable--

**(A)** acquire any electric power required by (i) any customer or group of customers to enable them to replace resources determined to serve firm load under section 839c(b) of this title, or (ii) direct service industrial customers to replace electric power that is or may be curtailed or interrupted by the Administrator (other than power the Administrator is obligated to replace), with the cost of such replacement power to be distributed among the direct service industrial customers requesting such power; and

**(B)** dispose of, or assist in the disposal of, any electric power that a customer or group of customers proposes to sell within or without the region at rates and upon terms specified by such customer or group of customers, if such disposition is not in conflict with the Administrator's other marketing obligations and the policies of this chapter and other applicable laws.

**(2)** In implementing the provisions of subparagraphs (A) and (B) of paragraph (1), the Administrator may prescribe policies and conditions for the independent acquisition or disposition of electric power by any direct service industrial customer or group of such customers for the purpose of assuring each direct service industrial customer an opportunity to participate in such acquisition or disposition.

**(3)** The Administrator shall furnish services including transmission, storage, and load factoring unless he determines such services cannot be furnished without substantial interference with his power marketing program, applicable operating limitations or existing contractual obligations. The Administrator shall, to the extent practicable, give priority in making such services available for the marketing, within and without the Pacific Northwest, of capability from projects under construction on December 5, 1980, if such capability has been offered for sale at cost, including a reasonable rate of return, to the Administrator pursuant to this chapter and such offer is not accepted within one year.

# Add.22a

**(j) Retail rate designs which encourage conservation and efficient use of electric energy, installation of consumer-owned renewable resources, and rate research and development**

**(1)** The Council, as soon as practicable after December 5, 1980, shall prepare, in consultation with the Administrator, the customers, appropriate State regulatory bodies, and the public, a report and shall make recommendations with respect to the various retail rate designs which will encourage conservation and efficient use of electric energy and the installation of consumer-owned renewable resources on a cost-effective basis, as well as areas for research and development for possible application to retail utility rates within the region. Studies undertaken pursuant to this subsection shall not affect the responsibilities of any customer or the Administrator which may exist under the Public Utility Regulatory Policies Act of 1978.

**(2)** Upon request, and solely on behalf of customers so requesting, the Administrator is authorized to (A) provide assistance in analyzing and developing retail rate structures that will encourage cost-effective conservation and the installation of cost-effective consumer-owned renewable resources; (B) provide estimates of the probable power savings and the probable amount of billing credits under section 839d(h) of this title that might be realized by such customers as a result of adopting and implementing such retail rate structures; and (C) solicit additional information and analytical assistance from appropriate State regulatory bodies and the Administrator's other customers.

**(k) Executive position for conservation and renewable resources**

There is hereby established within the administration an executive position for conservation and renewable resources. Such executive shall be appointed by the Administrator and shall be assigned responsibility for conservation and direct-application renewable resource programs (including the administration of financial assistance for such programs). Such position is hereby established in the senior executive service in addition to the number of such positions heretofore established in accordance with other provisions of law applicable to such positions.

**CREDIT(S)**

(Pub.L. 96-501, § 9, Dec. 5, 1980, 94 Stat. 2729; Pub.L. 99-514, § 2, Oct. 22, 1986, 100 Stat. 2095.)

Notes of Decisions (71)

16 U.S.C.A. § 839f, 16 USCA § 839f
Current through P.L. 119-84. Some statute sections may be more current, see credits for details.

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add.23a

United States Code Annotated
Title 16. Conservation
Chapter 35. Endangered Species (Refs & Annos)

16 U.S.C.A. § 1536

§ 1536. Interagency cooperation

Currentness

**(a) Federal agency actions and consultations**

**(1)** The Secretary shall review other programs administered by him and utilize such programs in furtherance of the purposes of this chapter. All other Federal agencies shall, in consultation with and with the assistance of the Secretary, utilize their authorities in furtherance of the purposes of this chapter by carrying out programs for the conservation of endangered species and threatened species listed pursuant to section 1533 of this title.

**(2)** Each Federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency (hereinafter in this section referred to as an "agency action") is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary, after consultation as appropriate with affected States, to be critical, unless such agency has been granted an exemption for such action by the Committee pursuant to subsection (h) of this section. In fulfilling the requirements of this paragraph each agency shall use the best scientific and commercial data available.

**(3)** Subject to such guidelines as the Secretary may establish, a Federal agency shall consult with the Secretary on any prospective agency action at the request of, and in cooperation with, the prospective permit or license applicant if the applicant has reason to believe that an endangered species or a threatened species may be present in the area affected by his project and that implementation of such action will likely affect such species.

**(4)** Each Federal agency shall confer with the Secretary on any agency action which is likely to jeopardize the continued existence of any species proposed to be listed under section 1533 of this title or result in the destruction or adverse modification of critical habitat proposed to be designated for such species. This paragraph does not require a limitation on the commitment of resources as described in subsection (d).

**(b) Opinion of Secretary**

**(1)(A)** Consultation under subsection (a)(2) with respect to any agency action shall be concluded within the 90-day period beginning on the date on which initiated or, subject to subparagraph (B), within such other period of time as is mutually agreeable to the Secretary and the Federal agency.

# Add.24a

**(B)** In the case of an agency action involving a permit or license applicant, the Secretary and the Federal agency may not mutually agree to conclude consultation within a period exceeding 90 days unless the Secretary, before the close of the 90th day referred to in subparagraph (A)--

**(i)** if the consultation period proposed to be agreed to will end before the 150th day after the date on which consultation was initiated, submits to the applicant a written statement setting forth--

**(I)** the reasons why a longer period is required,

**(II)** the information that is required to complete the consultation, and

**(III)** the estimated date on which consultation will be completed; or

**(ii)** if the consultation period proposed to be agreed to will end 150 or more days after the date on which consultation was initiated, obtains the consent of the applicant to such period.

The Secretary and the Federal agency may mutually agree to extend a consultation period established under the preceding sentence if the Secretary, before the close of such period, obtains the consent of the applicant to the extension.

**(2)** Consultation under subsection (a)(3) shall be concluded within such period as is agreeable to the Secretary, the Federal agency, and the applicant concerned.

**(3)(A)** Promptly after conclusion of consultation under paragraph (2) or (3) of subsection (a), the Secretary shall provide to the Federal agency and the applicant, if any, a written statement setting forth the Secretary's opinion, and a summary of the information on which the opinion is based, detailing how the agency action affects the species or its critical habitat. If jeopardy or adverse modification is found, the Secretary shall suggest those reasonable and prudent alternatives which he believes would not violate subsection (a)(2) and can be taken by the Federal agency or applicant in implementing the agency action.

**(B)** Consultation under subsection (a)(3), and an opinion issued by the Secretary incident to such consultation, regarding an agency action shall be treated respectively as a consultation under subsection (a)(2), and as an opinion issued after consultation under such subsection, regarding that action if the Secretary reviews the action before it is commenced by the Federal agency and finds, and notifies such agency, that no significant changes have been made with respect to the action and that no significant change has occurred regarding the information used during the initial consultation.

**(4)** If after consultation under subsection (a)(2), the Secretary concludes that--

**(A)** the agency action will not violate such subsection, or offers reasonable and prudent alternatives which the Secretary believes would not violate such subsection;

**(B)** the taking of an endangered species or a threatened species incidental to the agency action will not violate such subsection; and

# Add.25a

**(C)** if an endangered species or threatened species of a marine mammal is involved, the taking is authorized pursuant to section 1371(a)(5) of this title;

the Secretary shall provide the Federal agency and the applicant concerned, if any, with a written statement that--

**(i)** specifies the impact of such incidental taking on the species,

**(ii)** specifies those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact,

**(iii)** in the case of marine mammals, specifies those measures that are necessary to comply with section 1371(a)(5) of this title with regard to such taking, and

**(iv)** sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or applicant (if any), or both, to implement the measures specified under clauses (ii) and (iii).

**(c) Biological assessment**

**(1)** To facilitate compliance with the requirements of subsection (a)(2), each Federal agency shall, with respect to any agency action of such agency for which no contract for construction has been entered into and for which no construction has begun on November 10, 1978, request of the Secretary information whether any species which is listed or proposed to be listed may be present in the area of such proposed action. If the Secretary advises, based on the best scientific and commercial data available, that such species may be present, such agency shall conduct a biological assessment for the purpose of identifying any endangered species or threatened species which is likely to be affected by such action. Such assessment shall be completed within 180 days after the date on which initiated (or within such other period as is mutually agreed to by the Secretary and such agency, except that if a permit or license applicant is involved, the 180-day period may not be extended unless such agency provides the applicant, before the close of such period, with a written statement setting forth the estimated length of the proposed extension and the reasons therefor) and, before any contract for construction is entered into and before construction is begun with respect to such action. Such assessment may be undertaken as part of a Federal agency's compliance with the requirements of section 102 of the National Environmental Policy Act of 1969 (42 U.S.C. 4332).

**(2)** Any person who may wish to apply for an exemption under subsection (g) of this section for that action may conduct a biological assessment to identify any endangered species or threatened species which is likely to be affected by such action. Any such biological assessment must, however, be conducted in cooperation with the Secretary and under the supervision of the appropriate Federal agency.

**(d) Limitation on commitment of resources**

After initiation of consultation required under subsection (a)(2), the Federal agency and the permit or license applicant shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate subsection (a)(2) of this section.

# Add.26a

**(e) Endangered Species Committee**

**(1)** There is established a committee to be known as the Endangered Species Committee (hereinafter in this section referred to as the "Committee").

**(2)** The Committee shall review any application submitted to it pursuant to this section and determine in accordance with subsection (h) of this section whether or not to grant an exemption from the requirements of subsection (a)(2) of this section for the action set forth in such application.

**(3)** The Committee shall be composed of seven members as follows:

**(A)** The Secretary of Agriculture.

**(B)** The Secretary of the Army.

**(C)** The Chairman of the Council of Economic Advisors.

**(D)** The Administrator of the Environmental Protection Agency.

**(E)** The Secretary of the Interior.

**(F)** The Administrator of the National Oceanic and Atmospheric Administration.

**(G)** The President, after consideration of any recommendations received pursuant to subsection (g)(2)(B) shall appoint one individual from each affected State, as determined by the Secretary, to be a member of the Committee for the consideration of the application for exemption for an agency action with respect to which such recommendations are made, not later than 30 days after an application is submitted pursuant to this section.

**(4)(A)** Members of the Committee shall receive no additional pay on account of their service on the Committee.

**(B)** While away from their homes or regular places of business in the performance of services for the Committee, members of the Committee shall be allowed travel expenses, including per diem in lieu of subsistence, in the same manner as persons employed intermittently in the Government service are allowed expenses under section 5703 of Title 5.

**(5)(A)** Five members of the Committee or their representatives shall constitute a quorum for the transaction of any function of the Committee, except that, in no case shall any representative be considered in determining the existence of a quorum for the transaction of any function of the Committee if that function involves a vote by the Committee on any matter before the Committee.

# Add.27a

**(B)** The Secretary of the Interior shall be the Chairman of the Committee.

**(C)** The Committee shall meet at the call of the Chairman or five of its members.

**(D)** All meetings and records of the Committee shall be open to the public.

**(6)** Upon request of the Committee, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Committee to assist it in carrying out its duties under this section.

**(7)(A)** The Committee may for the purpose of carrying out its duties under this section hold such hearings, sit and act at such times and places, take such testimony, and receive such evidence, as the Committee deems advisable.

**(B)** When so authorized by the Committee, any member or agent of the Committee may take any action which the Committee is authorized to take by this paragraph.

**(C)** Subject to the Privacy Act, the Committee may secure directly from any Federal agency information necessary to enable it to carry out its duties under this section. Upon request of the Chairman of the Committee, the head of such Federal agency shall furnish such information to the Committee.

**(D)** The Committee may use the United States mails in the same manner and upon the same conditions as a Federal agency.

**(E)** The Administrator of General Services shall provide to the Committee on a reimbursable basis such administrative support services as the Committee may request.

**(8)** In carrying out its duties under this section, the Committee may promulgate and amend such rules, regulations, and procedures, and issue and amend such orders as it deems necessary.

**(9)** For the purpose of obtaining information necessary for the consideration of an application for an exemption under this section the Committee may issue subpenas for the attendance and testimony of witnesses and the production of relevant papers, books, and documents.

**(10)** In no case shall any representative, including a representative of a member designated pursuant to paragraph (3)(G) of this subsection, be eligible to cast a vote on behalf of any member.

**(f) Promulgation of regulations; form and contents of exemption application**

Not later than 90 days after November 10, 1978, the Secretary shall promulgate regulations which set forth the form and manner in which applications for exemption shall be submitted to the Secretary and the information to be contained in such applications.

# Add.28a

Such regulations shall require that information submitted in an application by the head of any Federal agency with respect to any agency action include, but not be limited to--

**(1)** a description of the consultation process carried out pursuant to subsection (a)(2) of this section between the head of the Federal agency and the Secretary; and

**(2)** a statement describing why such action cannot be altered or modified to conform with the requirements of subsection (a)(2) of this section.

**(g) Application for exemption; report to Committee**

**(1)** A Federal agency, the Governor of the State in which an agency action will occur, if any, or a permit or license applicant may apply to the Secretary for an exemption for an agency action of such agency if, after consultation under subsection (a)(2), the Secretary's opinion under subsection (b) indicates that the agency action would violate subsection (a)(2). An application for an exemption shall be considered initially by the Secretary in the manner provided for in this subsection, and shall be considered by the Committee for a final determination under subsection (h) after a report is made pursuant to paragraph (5). The applicant for an exemption shall be referred to as the "exemption applicant" in this section.

**(2)(A)** An exemption applicant shall submit a written application to the Secretary, in a form prescribed under subsection (f), not later than 90 days after the completion of the consultation process; except that, in the case of any agency action involving a permit or license applicant, such application shall be submitted not later than 90 days after the date on which the Federal agency concerned takes final agency action with respect to the issuance of the permit or license. For purposes of the preceding sentence, the term "final agency action" means (i) a disposition by an agency with respect to the issuance of a permit or license that is subject to administrative review, whether or not such disposition is subject to judicial review; or (ii) if administrative review is sought with respect to such disposition, the decision resulting after such review. Such application shall set forth the reasons why the exemption applicant considers that the agency action meets the requirements for an exemption under this subsection.

**(B)** Upon receipt of an application for exemption for an agency action under paragraph (1), the Secretary shall promptly (i) notify the Governor of each affected State, if any, as determined by the Secretary, and request the Governors so notified to recommend individuals to be appointed to the Endangered Species Committee for consideration of such application; and (ii) publish notice of receipt of the application in the Federal Register, including a summary of the information contained in the application and a description of the agency action with respect to which the application for exemption has been filed.

**(3)** The Secretary shall within 20 days after the receipt of an application for exemption, or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary--

**(A)** determine that the Federal agency concerned and the exemption applicant have--

**(i)** carried out the consultation responsibilities described in subsection (a) in good faith and made a reasonable and responsible effort to develop and fairly consider modifications or reasonable and prudent alternatives to the proposed agency action which would not violate subsection (a)(2);

# Add.29a

**(ii)** conducted any biological assessment required by subsection (c); and

**(iii)** to the extent determinable within the time provided herein, refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d); or

**(B)** deny the application for exemption because the Federal agency concerned or the exemption applicant have not met the requirements set forth in subparagraph (A)(i), (ii), and (iii).

The denial of an application under subparagraph (B) shall be considered final agency action for purposes of chapter 7 of Title 5.

**(4)** If the Secretary determines that the Federal agency concerned and the exemption applicant have met the requirements set forth in paragraph (3)(A)(i), (ii), and (iii) he shall, in consultation with the Members of the Committee, hold a hearing on the application for exemption in accordance with sections 554, 555, and 556 (other than subsection (b)(1) and (2) thereof) of Title 5 and prepare the report to be submitted pursuant to paragraph (5).

**(5)** Within 140 days after making the determinations under paragraph (3) or within such other period of time as is mutually agreeable to the exemption applicant and the Secretary, the Secretary shall submit to the Committee a report discussing--

**(A)** the availability of reasonable and prudent alternatives to the agency action, and the nature and extent of the benefits of the agency action and of alternative courses of action consistent with conserving the species or the critical habitat;

**(B)** a summary of the evidence concerning whether or not the agency action is in the public interest and is of national or regional significance;

**(C)** appropriate reasonable mitigation and enhancement measures which should be considered by the Committee; and

**(D)** whether the Federal agency concerned and the exemption applicant refrained from making any irreversible or irretrievable commitment of resources prohibited by subsection (d).

**(6)** To the extent practicable within the time required for action under subsection (g) of this section, and except to the extent inconsistent with the requirements of this section, the consideration of any application for an exemption under this section and the conduct of any hearing under this subsection shall be in accordance with sections 554, 555, and 556 (other than subsection (b)(3) of section 556) of Title 5.

**(7)** Upon request of the Secretary, the head of any Federal agency is authorized to detail, on a nonreimbursable basis, any of the personnel of such agency to the Secretary to assist him in carrying out his duties under this section.

**(8)** All meetings and records resulting from activities pursuant to this subsection shall be open to the public.

**(h) Grant of exemption**

# Add.30a

**(1)** The Committee shall make a final determination whether or not to grant an exemption within 30 days after receiving the report of the Secretary pursuant to subsection (g)(5). The Committee shall grant an exemption from the requirements of subsection (a)(2) for an agency action if, by a vote of not less than five of its members voting in person--

**(A)** it determines on the record, based on the report of the Secretary, the record of the hearing held under subsection (g)(4) and on such other testimony or evidence as it may receive, that--

**(i)** there are no reasonable and prudent alternatives to the agency action;

**(ii)** the benefits of such action clearly outweigh the benefits of alternative courses of action consistent with conserving the species or its critical habitat, and such action is in the public interest;

**(iii)** the action is of regional or national significance; and

**(iv)** neither the Federal agency concerned nor the exemption applicant made any irreversible or irretrievable commitment of resources prohibited by subsection (d); and

**(B)** it establishes such reasonable mitigation and enhancement measures, including, but not limited to, live propagation, transplantation, and habitat acquisition and improvement, as are necessary and appropriate to minimize the adverse effects of the agency action upon the endangered species, threatened species, or critical habitat concerned.

Any final determination by the Committee under this subsection shall be considered final agency action for purposes of chapter 7 of Title 5.

**(2)(A)** Except as provided in subparagraph (B), an exemption for an agency action granted under paragraph (1) shall constitute a permanent exemption with respect to all endangered or threatened species for the purposes of completing such agency action--

**(i)** regardless whether the species was identified in the biological assessment; and

**(ii)** only if a biological assessment has been conducted under subsection (c) with respect to such agency action.

**(B)** An exemption shall be permanent under subparagraph (A) unless--

**(i)** the Secretary finds, based on the best scientific and commercial data available, that such exemption would result in the extinction of a species that was not the subject of consultation under subsection (a)(2) or was not identified in any biological assessment conducted under subsection (c), and

**(ii)** the Committee determines within 60 days after the date of the Secretary's finding that the exemption should not be permanent.

# Add.31a

If the Secretary makes a finding described in clause (i), the Committee shall meet with respect to the matter within 30 days after the date of the finding.

**(i) Review by Secretary of State; violation of international treaty or other international obligation of United States**

Notwithstanding any other provision of this chapter, the Committee shall be prohibited from considering for exemption any application made to it, if the Secretary of State, after a review of the proposed agency action and its potential implications, and after hearing, certifies, in writing, to the Committee within 60 days of any application made under this section that the granting of any such exemption and the carrying out of such action would be in violation of an international treaty obligation or other international obligation of the United States. The Secretary of State shall, at the time of such certification, publish a copy thereof in the Federal Register.

**(j) Exemption for national security reasons**

Notwithstanding any other provision of this chapter, the Committee shall grant an exemption for any agency action if the Secretary of Defense finds that such exemption is necessary for reasons of national security.

**(k) Exemption decision not considered major Federal action; environmental impact statement**

An exemption decision by the Committee under this section shall not be a major Federal action for purposes of the National Environmental Policy Act of 1969: *Provided*, That an environmental impact statement which discusses the impacts upon endangered species or threatened species or their critical habitats shall have been previously prepared with respect to any agency action exempted by such order.

**(l) Committee order granting exemption; cost of mitigation and enhancement measures; report by applicant to Council on Environmental Quality**

**(1)** If the Committee determines under subsection (h) that an exemption should be granted with respect to any agency action, the Committee shall issue an order granting the exemption and specifying the mitigation and enhancement measures established pursuant to subsection (h) which shall be carried out and paid for by the exemption applicant in implementing the agency action. All necessary mitigation and enhancement measures shall be authorized prior to the implementing of the agency action and funded concurrently with all other project features.

**(2)** The applicant receiving such exemption shall include the costs of such mitigation and enhancement measures within the overall costs of continuing the proposed action. Notwithstanding the preceding sentence the costs of such measures shall not be treated as project costs for the purpose of computing benefit-cost or other ratios for the proposed action. Any applicant may request the Secretary to carry out such mitigation and enhancement measures. The costs incurred by the Secretary in carrying out any such measures shall be paid by the applicant receiving the exemption. No later than one year after the granting of an exemption, the exemption applicant shall submit to the Council on Environmental Quality a report describing its compliance with the mitigation and enhancement measures prescribed by this section. Such a report shall be submitted annually until all such mitigation and enhancement measures have been completed. Notice of the public availability of such reports shall be published in the Federal Register by the Council on Environmental Quality.

# Add.32a

**(m) Notice requirement for citizen suits not applicable**

The 60-day notice requirement of section 1540(g) of this title shall not apply with respect to review of any final determination of the Committee under subsection (h) of this section granting an exemption from the requirements of subsection (a)(2) of this section.

**(n) Judicial review**

Any person, as defined by section 1532(13) of this title, may obtain judicial review, under chapter 7 of Title 5, of any decision of the Endangered Species Committee under subsection (h) in the United States Court of Appeals for (1) any circuit wherein the agency action concerned will be, or is being, carried out, or (2) in any case in which the agency action will be, or is being, carried out outside of any circuit, the District of Columbia, by filing in such court within 90 days after the date of issuance of the decision, a written petition for review. A copy of such petition shall be transmitted by the clerk of the court to the Committee and the Committee shall file in the court the record in the proceeding, as provided in section 2112 of Title 28. Attorneys designated by the Endangered Species Committee may appear for, and represent the Committee in any action for review under this subsection.

**(o) Exemption as providing exception on taking of endangered species**

Notwithstanding sections 1533(d) and 1538(a)(1)(B) and (C) of this title, sections 1371 and 1372 of this title, or any regulation promulgated to implement any such section--

   **(1)** any action for which an exemption is granted under subsection (h) shall not be considered to be a taking of any endangered species or threatened species with respect to any activity which is necessary to carry out such action; and

   **(2)** any taking that is in compliance with the terms and conditions specified in a written statement provided under subsection (b)(4)(iv) shall not be considered to be a prohibited taking of the species concerned.

**(p) Exemptions in Presidentially declared disaster areas**

In any area which has been declared by the President to be a major disaster area under the Disaster Relief and Emergency Assistance Act, the President is authorized to make the determinations required by subsections (g) and (h) of this section for any project for the repair or replacement of a public facility substantially as it existed prior to the disaster under section 405 or 406 of the Disaster Relief and Emergency Assistance Act, and which the President determines (1) is necessary to prevent the recurrence of such a natural disaster and to reduce the potential loss of human life, and (2) to involve an emergency situation which does not allow the ordinary procedures of this section to be followed. Notwithstanding any other provision of this section, the Committee shall accept the determinations of the President under this subsection.

**CREDIT(S)**

   (Pub.L. 93-205, § 7, Dec. 28, 1973, 87 Stat. 892; Pub.L. 95-632, § 3, Nov. 10, 1978, 92 Stat. 3752; Pub.L. 96-159, § 4, Dec. 28, 1979, 93 Stat. 1226; Pub.L. 97-304, §§ 4(a), 8(b), Oct. 13, 1982, 96 Stat. 1417, 1426; Pub.L. 99-659, Title IV, § 411(b), (c), Nov. 14, 1986, 100 Stat. 3742; Pub.L. 100-707, Title I, § 109(g), Nov. 23, 1988, 102 Stat. 4709.)

# Add.33a

Notes of Decisions (962)

16 U.S.C.A. § 1536, 16 USCA § 1536

Current through P.L. 119-84. Some statute sections may be more current, see credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Add.34a

Code of Federal Regulations
    Title 50. Wildlife and Fisheries
        Chapter IV. Joint Regulations (United States Fish and Wildlife Service, Department of the Interior and National Marine Fisheries Service, National Oceanic and Atmospheric Administration, Department of Commerce); Endangered Species Committee Regulations
            Subchapter A
                Part 402. Interagency Cooperation—Endangered Species Act of 1973, as Amended (Refs & Annos)
                    Subpart B. Consultation Procedures

50 C.F.R. § 402.14

§ 402.14 Formal consultation.

Effective: May 6, 2024
Currentness

<In CENTER FOR BIOLOGICAL DIVERSITY v. U.S. DEPARTMENT OF THE INTERIOR, et al., 2026 WL 898264 (N.D. Cal. Mar. 30, 2026), the Court vacated "50 C.F.R. § 402.14(g)(8), concerning the Services' consideration of mitigation measures, and reinstate[d] the version in effect before the 2019 rulemaking." For discussion of forthcoming rulemaking related to amendments in Endangered and Threatened Wildlife and Plants; Regulations for Interagency Cooperation, 89 Fed. Reg. 24,268 (Apr. 5, 2024), see Nat'l Hydropower Ass'n v. U.S. Fish & Wildlife Serv., 2025 WL 1555156 (D.D.C. June 2, 2025).>

(a) Requirement for formal consultation. Each Federal agency shall review its actions at the earliest possible time to determine whether any action may affect listed species or critical habitat. If such a determination is made, formal consultation is required, except as noted in paragraph (b) of this section. The Director may request a Federal agency to enter into consultation if he identifies any action of that agency that may affect listed species or critical habitat and for which there has been no consultation. When such a request is made, the Director shall forward to the Federal agency a written explanation of the basis for the request.

(b) Exceptions.

(1) A Federal agency need not initiate formal consultation if, as a result of the preparation of a biological assessment under § 402.12 or as a result of informal consultation with the Service under § 402.13, the Federal agency determines, with the written concurrence of the Director, that the proposed action is not likely to adversely affect any listed species or critical habitat.

(2) A Federal agency need not initiate formal consultation if a preliminary biological opinion, issued after early consultation under § 402.11, is confirmed as the final biological opinion.

(c) Initiation of formal consultation.

(1) A written request to initiate formal consultation shall be submitted to the Director and shall include:

# Add.35a

(i) A description of the proposed action, including any measures intended to avoid, minimize, or offset effects of the action. Consistent with the nature and scope of the proposed action, the description shall provide sufficient detail to assess the effects of the action on listed species and critical habitat, including:

(A) The purpose of the action;

(B) The duration and timing of the action;

(C) The location of the action;

(D) The specific components of the action and how they will be carried out;

(E) Maps, drawings, blueprints, or similar schematics of the action; and

(F) Any other available information related to the nature and scope of the proposed action relevant to its effects on listed species or designated critical habitat.

(ii) A map or description of all areas to be affected directly or indirectly by the Federal action, and not merely the immediate area involved in the action (i.e., the action area as defined at § 402.02).

(iii) Information obtained by or in the possession of the Federal agency and any applicant on the listed species and designated critical habitat in the action area (as required by paragraph (c)(1)(ii) of this section), including available information such as the presence, abundance, density, or periodic occurrence of listed species and the condition and location of the species' habitat, including any critical habitat.

(iv) A description of the effects of the action and an analysis of any cumulative effects.

(v) A summary of any relevant information provided by the applicant, if available.

(vi) Any other relevant available information on the effects of the proposed action on listed species or designated critical habitat, including any relevant reports such as environmental impact statements and environmental assessments.

(2) A Federal agency may submit existing documents prepared for the proposed action such as NEPA analyses or other reports in substitution for the initiation package outlined in this paragraph (c). However, any such substitution shall be accompanied by a written summary specifying the location of the information that satisfies the elements above in the submitted document(s).

# Add.36a

(3) Formal consultation shall not be initiated by the Federal agency until any required biological assessment has been completed and submitted to the Director in accordance with § 402.12.

(4) Any request for formal consultation may encompass, subject to the approval of the Director, a number of similar individual actions within a given geographical area, a programmatic consultation, or a segment of a comprehensive plan. The provision in this paragraph (c)(4) does not relieve the Federal agency of the requirements for considering the effects of the action or actions as a whole.

(d) Responsibility to provide best scientific and commercial data available. The Federal agency requesting formal consultation shall provide the Service with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat. This information may include the results of studies or surveys conducted by the Federal agency or the designated non-Federal representative. The Federal agency shall provide any applicant with the opportunity to submit information for consideration during the consultation.

(e) Duration and extension of formal consultation. Formal consultation concludes within 90 days after its initiation unless extended as provided below. If an applicant is not involved, the Service and the Federal agency may mutually agree to extend the consultation for a specific time period. If an applicant is involved, the Service and the Federal agency may mutually agree to extend the consultation provided that the Service submits to the applicant, before the close of the 90 days, a written statement setting forth:

(1) The reasons why a longer period is required,

(2) The information that is required to complete the consultation, and

(3) The estimated date on which the consultation will be completed.

A consultation involving an applicant cannot be extended for more than 60 days without the consent of the applicant. Within 45 days after concluding formal consultation, the Service shall deliver a biological opinion to the Federal agency and any applicant.

(f) Additional data. When the Service determines that additional data would provide a better information base from which to formulate a biological opinion, the Director may request an extension of formal consultation and request that the Federal agency obtain additional data to determine how or to what extent the action may affect listed species or critical habitat. If formal consultation is extended by mutual agreement according to § 402.14(e), the Federal agency shall obtain, to the extent practicable, that data which can be developed within the scope of the extension. The responsibility for conducting and funding any studies belongs to the Federal agency and the applicant, not the Service. The Service's request for additional data is not to be construed as the Service's opinion that the Federal agency has failed to satisfy the information standard of section 7(a)(2) of the Act. If no extension of formal consultation is agreed to, the Director will issue a biological opinion using the best scientific and commercial data available.

(g) Service responsibilities. Service responsibilities during formal consultation are as follows:

# Add.37a

(1) Review all relevant information provided by the Federal agency or otherwise available. Such review may include an on-site inspection of the action area with representatives of the Federal agency and the applicant.

(2) Evaluate the current status and environmental baseline of the listed species or critical habitat.

(3) Evaluate the effects of the action and cumulative effects on the listed species or critical habitat.

(4) Add the effects of the action and cumulative effects to the environmental baseline and in light of the status of the species and critical habitat, formulate the Service's opinion as to whether the action is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat.

(5) Discuss with the Federal agency and any applicant the Service's review and evaluation conducted under paragraphs (g) (1)–(3) of this section, the basis for any finding in the biological opinion, and the availability of reasonable and prudent alternatives (if a jeopardy opinion is to be issued) that the agency and the applicant can take to avoid violation of section 7(a)(2). The Service will utilize the expertise of the Federal agency and any applicant in identifying these alternatives. If requested, the Service shall make available to the Federal agency the draft biological opinion for the purpose of analyzing the reasonable and prudent alternatives. The 45–day period in which the biological opinion must be delivered will not be suspended unless the Federal agency secures the written consent of the applicant to an extension to a specific date. The applicant may request a copy of the draft opinion from the Federal agency. All comments on the draft biological opinion must be submitted to the Service through the Federal agency, although the applicant may send a copy of its comments directly to the Service. The Service will not issue its biological opinion prior to the 45–day or extended deadline while the draft is under review by the Federal agency. However, if the Federal agency submits comments to the Service regarding the draft biological opinion within 10 days of the deadline for issuing the opinion, the Service is entitled to an automatic 10–day extension on the deadline.

(6) Formulate discretionary conservation recommendations, if any, which will assist the Federal agency in reducing or eliminating the impacts that its proposed action may have on listed species or critical habitat.

(7) Formulate a statement concerning incidental take, if such take is reasonably certain to occur.

(8) In formulating its biological opinion, any reasonable and prudent alternatives, and any reasonable and prudent measures, the Service will use the best scientific and commercial data available and will give appropriate consideration to any beneficial actions as proposed or taken by the Federal agency or applicant, including any actions taken prior to the initiation of consultation. Measures included in the proposed action or a reasonable and prudent alternative that are intended to avoid, minimize, or offset the effects of an action are considered like other portions of the action and do not require any additional demonstration of binding plans.

(h) Biological opinions.

(1) The biological opinion shall include:

# Add.38a

(i) A summary of the information on which the opinion is based;

(ii) A detailed discussion of the environmental baseline of the listed species and critical habitat;

(iii) A detailed discussion of the effects of the action on listed species or critical habitat; and

(iv) The Service's opinion on whether the action is:

(A) Likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "jeopardy" biological opinion); or

(B) Not likely to jeopardize the continued existence of a listed species or result in the destruction or adverse modification of critical habitat (a "no jeopardy" biological opinion).

(2) A "jeopardy" biological opinion shall include reasonable and prudent alternatives, if any. If the Service is unable to develop such alternatives, the Service will indicate that to the best of its knowledge there are no reasonable and prudent alternatives.

(3) The Service may adopt all or part of:

(i) A Federal agency's initiation package; or

(ii) The Service's analysis required to issue a permit under section 10(a) of the Act in its biological opinion.

(4) A Federal agency and the Service may agree to follow an optional collaborative process that would further the ability of the Service to adopt the information and analysis provided by the Federal agency during consultation in the development of the Service's biological opinion to improve efficiency in the consultation process and reduce duplicative efforts. The Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat, and other relevant factors to determine whether an action or a class of actions is appropriate for this process. The Federal agency and the Service may develop coordination procedures that would facilitate adoption of the initiation package with any necessary supplementary analyses and incidental take statement to be added by the Service, if appropriate, as the Service's biological opinion in fulfillment of section 7(b) of the Act.

(i) Incidental take.

(1) In those cases where the Service concludes that an action (or the implementation of any reasonable and prudent alternatives) and the resultant incidental take of listed species will not violate section 7(a)(2), and, in the case of marine mammals, where the taking is authorized pursuant to section 101(a)(5) of the Marine Mammal Protection Act of 1972, the Service will provide with the biological opinion a statement concerning incidental take that:

## Add.39a

(i) Specifies the impact of incidental taking as the amount or extent of such taking. A surrogate (e.g., similarly affected species or habitat or ecological conditions) may be used to express the amount or extent of anticipated take, provided that the biological opinion or incidental take statement: Describes the causal link between the surrogate and take of the listed species, explains why it is not practical to express the amount or extent of anticipated take or to monitor take-related impacts in terms of individuals of the listed species, and sets a clear standard for determining when the level of anticipated take has been exceeded;

(ii) Specifies those reasonable and prudent measures that the Director considers necessary or appropriate to minimize such impact of incidental taking on the species;

(iii) In the case of marine mammals, specifies those measures that are necessary to comply with section 101(a)(5) of the Marine Mammal Protection Act of 1972 and applicable regulations with regard to such taking;

(iv) Sets forth the terms and conditions (including, but not limited to, reporting requirements) that must be complied with by the Federal agency or any applicant to implement the measures specified under paragraphs (i)(1)(ii) and (iii) of this section; and

(v) Specifies the procedures to be used to handle or dispose of any individuals of a species actually taken.

(2) Reasonable and prudent measures, along with the terms and conditions that implement them, cannot alter the basic design, location, scope, duration, or timing of the action, may involve only minor changes, and may include measures implemented inside or outside of the action area that avoid, reduce, or offset the impact of incidental take.

(3) Priority should be given to developing reasonable and prudent measures and terms and conditions that avoid or reduce the amount or extent of incidental taking anticipated to occur within the action area. To the extent it is anticipated that the action will cause incidental take that cannot feasibly be avoided or reduced in the action area, the Services may set forth additional reasonable and prudent measures and terms and conditions that serve to minimize the impact of such taking on the species inside or outside the action area.

(4) In order to monitor the impacts of incidental take, the Federal agency or any applicant must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. The reporting requirements will be established in accordance with 50 CFR 13.45 and 18.27 for FWS and 50 CFR 216.105 and 222.301(h) for NMFS.

(5) If during the course of the action the amount or extent of incidental taking, as specified under paragraph (i)(1)(i) of this section, is exceeded, the Federal agency must reinitiate consultation immediately.

(6) Any taking that is subject to a statement as specified in paragraph (i)(1) of this section and that is in compliance with the terms and conditions of that statement is not a prohibited taking under the Act, and no other authorization or permit under the Act is required.

# Add.40a

(7) For a framework programmatic action, an incidental take statement is not required at the programmatic level; any incidental take resulting from any action subsequently authorized, funded, or carried out under the program will be addressed in subsequent section 7 consultation, as appropriate. For a mixed programmatic action, an incidental take statement is required at the programmatic level only for those program actions that are reasonably certain to cause take and are not subject to further section 7 consultation.

(j) Conservation recommendations. The Service may provide with the biological opinion a statement containing discretionary conservation recommendations. Conservation recommendations are advisory and are not intended to carry any binding legal force.

(k) Incremental steps. When the action is authorized by a statute that allows the agency to take incremental steps toward the completion of the action, the Service shall, if requested by the Federal agency, issue a biological opinion on the incremental step being considered, including its views on the entire action. Upon the issuance of such a biological opinion, the Federal agency may proceed with or authorize the incremental steps of the action if:

(1) The biological opinion does not conclude that the incremental step would violate section 7(a)(2);

(2) The Federal agency continues consultation with respect to the entire action and obtains biological opinions, as required, for each incremental step;

(3) The Federal agency fulfills its continuing obligation to obtain sufficient data upon which to base the final biological opinion on the entire action;

(4) The incremental step does not violate section 7(d) of the Act concerning irreversible or irretrievable commitment of resources; and

(5) There is a reasonable likelihood that the entire action will not violate section 7(a)(2) of the Act.

(l) Expedited consultations. Expedited consultation is an optional formal consultation process that a Federal agency and the Service may enter into upon mutual agreement. To determine whether an action or a class of actions is appropriate for this type of consultation, the Federal agency and the Service shall consider the nature, size, and scope of the action or its anticipated effects on listed species or critical habitat and other relevant factors. Conservation actions whose primary purpose is to have beneficial effects on listed species will likely be considered appropriate for expedited consultation.

(1) Expedited timelines. Upon agreement to use this expedited consultation process, the Federal agency and the Service shall establish the expedited timelines for the completion of this consultation process.

(2) Federal agency responsibilities. To request initiation of expedited consultation, the Federal agency shall provide all the information required to initiate consultation under paragraph (c) of this section. To maximize efficiency and ensure that it develops the appropriate level of information, the Federal agency is encouraged to develop its initiation package in coordination with the Service.

## Add.41a

(3) Service responsibilities. In addition to the Service's responsibilities under the provisions of this section, the Service will:

(i) Provide relevant species information to the Federal agency and guidance to assist the Federal agency in completing its effects analysis in the initiation package; and

(ii) Conclude the consultation and issue a biological opinion within the agreed-upon timeframes.

(m) Termination of consultation.

(1) Formal consultation is terminated with the issuance of the biological opinion.

(2) If during any stage of consultation a Federal agency determines that its proposed action is not likely to occur, the consultation may be terminated by written notice to the Service.

(3) If during any stage of consultation a Federal agency determines, with the concurrence of the Director, that its proposed action is not likely to adversely affect any listed species or critical habitat, the consultation is terminated.

**Credits**
[54 FR 40350, Sept. 29, 1989; 73 FR 76287, Dec. 16, 2008; 74 FR 20423, May 4, 2009; 80 FR 26844, May 11, 2015; 84 FR 45016, Aug. 27, 2019; 84 FR 50333, Sept. 25, 2019; 89 FR 24297, April 5, 2024]

SOURCE: 51 FR 19957, June 3, 1986, unless otherwise noted.

AUTHORITY: 16 U.S.C. 1531 et seq.

Notes of Decisions (351)

Current through April 30, 2026, 91 FR 23184. Some sections may be more current. See credits for details.

---

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

# Add.42a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.

85 FR 63834-01, 2020 WL 5947462(F.R.)

NOTICES

DEPARTMENT OF ENERGY

Bonneville Power Administration

Record of Decision; Columbia River System Operations Environmental Impact Statement

Thursday, October 8, 2020

AGENCY: Bonneville Power Administration (BPA), Department of Energy (DOE).

**\*63834** ACTION: Record of decision (ROD).

SUMMARY:

**Section 1. Introduction**

The Columbia River System Operations Environmental Impact Statement (CRSO EIS) dated July 2020 addresses the ongoing operations, maintenance, and configuration of the 14 federal Columbia River System (CRS) projects on the Columbia and Snake rivers. The 14 projects are Libby, Hungry Horse, Albeni Falls, Grand Coulee, Chief Joseph, Dworshak, Lower Granite, Little Goose, Lower Monumental, Ice Harbor, McNary, John Day, The Dalles, and Bonneville. The co-lead agencies (the U.S. Army Corps of Engineers [Corps], Bureau of Reclamation [Reclamation], and Bonneville Power Administration [Bonneville]) share responsibility and legal authority for managing the Federal elements of the CRS. These three co-lead agencies coordinate the operation of the CRS and have worked together to develop this EIS.

ADDRESSES: This Record of Decision will be available to all interested parties and affected persons and agencies and is being sent to all stakeholders who requested a copy. Copies of the Draft and Final CRSO EISs, and additional copies of this document can be obtained from Bonneville's Public Information Center, P.O. Box 3621, Portland, Oregon 97208-3621. Copies of these documents may also be obtained by calling Bonneville's nationwide toll-free request line at 1-800-622-4520, or by accessing the CRSO EIS project website at https://www.bpa.gov/efw/Analysis/NEPADocuments/Pages/Columbia-River-System-Operations-Project.aspx. Additional information is also available at www.crso.info.

FOR FURTHER INFORMATION CONTACT: Dave Kennedy, Environmental Planning and Analysis, Bonneville Power Administration—EC-4, P.O. Box 3621, Portland, Oregon, 97208-3621; or toll-free telephone number 1-800-622-4519; or email ECAdmin@bpa.gov.

SUPPLEMENTARY INFORMATION:

**Section 1. Introduction, Continued**

The Corps and Reclamation develop operating requirements for their projects. These are the limits within which a reservoir or dam must be operated. Some requirements are established by Congress when a project is authorized, while others are established by the agencies based on operating experience. Within these operating limits, Bonneville schedules and dispatches power. This process requires continuous communication and coordination among the three agencies. The co-lead agencies have identified the Preferred Alternative, as described in detail in Chapter 7 of the Final EIS, as the Selected Alternative in this Record of Decision (ROD).

This CRSO EIS and ROD represent the detailed work, evaluation, and decision-making of the three co-lead agencies. The CRSO EIS was completed considering the input and assistance of the multiple cooperating agencies with special expertise and

# Add.43a

authority over the resources evaluated. The co-lead agencies provided for robust public and stakeholder review beginning with scoping and continuing throughout the National Environmental Policy Act (NEPA) process.

As part of the CRSO EIS, the agencies considered six alternatives to Columbia River System operations, maintenance, and configuration. The agencies analyzed the effects of these alternatives on the human environment, including environmental, economic, and social impacts. On February 28, 2020, the co-lead agencies released for public comment the Draft CRSO EIS describing the effects of these alternatives and identifying the agencies' Preferred Alternative. The 45-day public comment period ended on April 13, 2020, and the agencies reviewed and responded to these comments in the Final CRSO EIS. The co-lead agencies released the Final EIS on July 28, 2020, and the agencies issued this joint Record of Decision on September 28, 2020.

All three co-lead agencies recognize selecting an alternative is a complex decision, and have identified the Preferred Alternative as the Selected Alternative to implement. The agencies' expertise, developed over decades of experience operating the projects, allowed for careful, comprehensive consideration of current, high quality technical and scientific information, as well as expert analysis for thorough evaluation of each alternative. The agencies conferred with tribes, public interest groups, the Northwest's Congressional delegation and governors, as well as stakeholder groups, and Federal, state and local public service agencies. The co-lead agencies also closely read, considered, and responded to the public comments which represented diverse voices with numerous perspectives. The agencies considered the effects of making this decision, and sought to provide a balanced approach and the flexibility needed to continue operations and maintenance of the CRS in this dynamic environment.

On March 20, 2018, Office of Management and Budget (OMB) and Council on Environmental Quality (CEQ) issued an OMB/CEQ Memorandum to Heads of Federal Departments and Agencies titled "One Federal Decision Framework for the Environmental Review and Authorization Process for Major Infrastructure Projects under Executive Order 13807" (OFD Framework), in accordance with Executive Order 13807 (82 FR 40,463 (Aug. 24, 2017)). This "One Federal Decision" policy has increased federal coordination on environmental processes and review, shortened previous timelines, and resulted in the utilization of a joint ROD for federal agencies. This CRSO EIS ROD is consistent with the One Federal Decision policy.

### 1.1 Decision Summary

### 1.1.1 Corps' Decision Summary

The information presented in this joint ROD is the Corps' determination of the Selected Alternative for implementation, the agencies' compliance with the NEPA policy and procedures, environmental regulations, and public and agency review. The NEPA process has produced sufficient and accurate assessments of the resources, needs, concerns, and other issues that relate to the evaluated alternatives and has undergone public and agency review as required by 33 CFR part 230 and 40 CFR parts 1500 through 1508. The conclusions additionally have been reviewed and evaluated by an independent review panel and found to be appropriate. Consultation on the Selected Alternative has been completed per Section 7(a)(2) of the Endangered Species Act (ESA) and incorporated into the Selected Alternative. The Corps has determined, and the National Marine Fisheries Service (NMFS) and U.S. Fish and Wildlife Service (USFWS) CRS Biological Opinions demonstrate, based on the best available commercial and scientific information, that the Corps' implementation of the Selected Alternative will not jeopardize listed **\*63835** species or adversely modify or destroy critical habitat.

Based on the analysis contained in the Draft and Final EIS (including review of a reasonable range of alternatives), the reviews by other Federal, State, and local agencies, Tribes, input of the public, and the review by my staff, I, D. Peter Helmlinger, P.E., Brigadier General, U.S. Army, Division Commander, select the alternative identified as the Preferred Alternative in the Final EIS as the Selected Alternative in this ROD. I find the Selected Alternative, along with the incorporation of the identified mitigation, and consistent with the requirements outlined in the Incidental Take Statements contained in the 2020 USFWS and NMFS CRS Biological Opinions, which were also incorporated in this decision, to be technically feasible, meets the Purpose and Need Statement and many of the objectives developed for the EIS, is in accordance with environmental statutes and in the public interest. Additionally, it best balances the human and natural environment in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and to

# Add.44a

fulfill the social, economic, and other requirements of present and future generations of Americans. I have also considered tribal treaty rights and the United States' trust responsibilities to the tribes in selecting this alternative. Actions that will be implemented by the co-lead agencies will improve salmonid survival, which will benefit tribal fisheries. Therefore, the Corps is deciding to operate its 12 CRS projects, and implement associated mitigation and conservation actions, according to the description of the Preferred Alternative in the Final EIS and the proposed action analyzed in the 2020 USFWS and NMFS CRS Biological Opinions.

### 1.1.2 Reclamation's Decision Summary

Reclamation is deciding in this ROD to operate its two CRS projects, Grand Coulee and Hungry Horse, and implement associated mitigation and conservation actions, according to the description of the Preferred Alternative in the Final EIS and the proposed action analyzed in the 2020 USFWS and NMFS CRS Biological Opinions. The Final EIS provides Reclamation a reasonable range of alternatives to implement, identifies key issues and significant effects of alternative actions, and complies with the procedural requirements of NEPA and its implementing regulations. The Final EIS shows that the Selected Alternative is feasible and satisfies Reclamation's statutory obligations. The NMFS and USFWS CRS Biological Opinions demonstrate, based on the best available commercial and scientific information, that Reclamation's implementation of the Selected Alternative will not jeopardize listed species or adversely modify or destroy critical habitat.

This decision improves upon multiple existing measures related to project operations, such as by limiting winter drafting of Reclamation reservoirs to conserve water for spring flow augmentation for migrating salmon and steelhead. Reclamation will also coordinate with the sovereign inter-agency Technical Management Team to solicit, review, comment, and make recommendations for consideration during preparation of the Water Management Plan and during in-season operational adjustments. Additionally, Reclamation's tributary habitat restoration program has improved salmonid and lamprey habitat across the basin since its inception in the early 2000s. It has matured significantly over that period, and this decision implements several advancements resulting from program maturation. In particular, this decision implements improvements in project prioritization, focused research and monitoring efforts to directly support implementation knowledge, and efficiency gains in the design process.

Reclamation's decision implements new measures, including several operations at Grand Coulee. One allows additional maintenance flexibility on generating units and spillways, which the Final EIS shows could result in small increases in spill and thus downstream total dissolved gas (TDG) concentrations. It also updates flood risk management calculations, which Corps and Reclamation will apply in a coordinated and adaptive manner consistent with the Final EIS. Reclamation is also deciding to utilize local water supply forecasts in its operation of Hungry Horse, which will better balance downstream flow augmentation with local resident fish needs.

Before reaching this decision, Reclamation reviewed a reasonable range of alternatives in the EIS; the results of the physical, environmental, economic, and human resources impact analyses; comments submitted by federal, state, and local agencies, tribes, interested parties, and the public; and applicable laws and regulations. The Selected Alternative meets the Purpose and Need of the action, balancing Reclamation's ability to meet its statutory project obligations while also complying with the requirements of the ESA, Clean Water Act (CWA), and other applicable laws.

### 1.1.3 Bonneville's Decision Summary

**Summary of the Decision**

Bonneville is deciding to implement its part of the Preferred Alternative identified in the CRSO EIS (DOE/EIS-0529, July 2020), which also constitutes the proposed action reviewed in the 2020 NMFS and USFWS CRS Biological Opinions. Under the Selected Alternative, Bonneville will market and transmit the power generated by the CRS projects as part of coordinated system operations. More specifically, Bonneville will use the CRSO EIS for any operational changes associated with power marketing. These operations will be coordinated with other operational, maintenance or configuration actions for flood risk

# Add.45a

management, irrigation, fish and wildlife conservation, water quality, navigation and other congressionally authorized purposes. Bonneville's implementation of the Selected Alternative will also comply with all applicable laws and regulations, including the NEPA, the ESA, the Pacific Northwest Electric Power Planning and Conservation Act and the CWA.

As part of the Selected Alternative, Bonneville will continue to mitigate for the effects of its power operational actions. Bonneville will fund non-operational conservation measures as part of implementation of the proposed action consulted upon in the NMFS and USFWS CRS Biological Opinions and mitigation actions associated with the CRSO EIS (see Section 7.6 of the CRSO EIS; Attachment 1, Mitigation Action Plan). These actions will be included in its existing Fish and Wildlife Program and are consistent with the Northwest Power and Conservation Council's Columbia River Basin Fish and Wildlife Program (see Chapters 2, 5, 7 of the CRSO EIS; Attachment 1, Mitigation Action Plan).

In addition to Bonneville's fish and wildlife mitigation commitments described above, there are fish and wildlife mitigation costs associated with fulfilling Bonneville's power share responsibilities that are direct funded by Bonneville to the Corps and Reclamation for mitigation activities, such as hatchery operations, fish stocking, elk habitat maintenance, and others. In addition to the hatchery operations that are funded through the Fish and Wildlife Program, Bonneville will continue to provide USFWS with annual operations and maintenance **\*63836** funding for the Lower Snake River Compensation Plan (LSRCP), in accordance with Bonneville's direct funding agreement with USFWS and any future renewals.

### Section 2. Background

#### *2.1 Purpose and Need*

The CRSO EIS evaluated the long-term coordinated operation and management of the CRS projects for the multiple authorized project purposes. An underlying need is to review and update the management of the CRS, including evaluating measures to avoid, offset, or minimize impacts to resources affected by managing the CRS in the context of new information and changed conditions in the Columbia River Basin subsequent to the 1995 System Operation Review EIS, with the RODs in 1997. In addition, the co-lead agencies responded to the Opinion and Order issued by the U.S. District Court for the District of Oregon (District Court), described in more detail in Section 2.3. This included evaluating mitigation and non-operational conservation measures to address impacts to ESA-listed species from CRS operations. The CRSO EIS evaluated actions within the current authorities of the co-lead agencies, as well as certain actions that are not within their authorities, based on the District Court's observations about alternatives that should be considered and comments received during the scoping process. The CRSO EIS also provided information and analyses that allowed the co-lead agencies and the region to evaluate the costs, benefits, and tradeoffs of various alternatives as part of reviewing and updating management of the CRS. The co-lead agencies will use the information garnered through this process to guide future decisions, and allow for a flexible approach to meeting multiple responsibilities including resource and legal and institutional purposes of the action. A full discussion of the Purpose and Need for the CRSO EIS is discussed in Section 1.2 of the Final CRSO EIS.

#### *2.2 Objectives*

The eight objectives presented below, along with the CRSO EIS Purpose and Need Statement (Section 1.2 of the Final CRSO EIS), guided the development of a reasonable range of alternatives. The co-lead agencies evaluated the alternatives to determine how effectively they met the objectives as described in Chapter 2. The specific objectives are as follows:

(1) Improve ESA-listed anadromous salmonid juvenile fish rearing, passage, and survival within the CRSO project area through actions including but not limited to project configuration, flow management, spill operations, and water quality management.

(2) Improve ESA-listed anadromous salmonid adult fish migration within the CRSO project area through actions including but not limited to project configuration, flow management, spill operations, and water quality management.

## Add.46a

(3) Improve ESA-listed resident fish survival and spawning success at CRSO projects through actions including but not limited to project configuration, flow management, improving connectivity, project operations, and water quality management.

(4) Provide an adequate, efficient, economical, and reliable power supply that supports the integrated Columbia River Power System.

(5) Minimize greenhouse gas emissions from power production in the Northwest by generating carbon-free power through a combination of hydropower and integration of other renewable energy sources.

(6) Maximize operating flexibility by implementing updated, adaptable water management strategies to be responsive to changing conditions, including hydrology, climate, and the environment.

(7) Meet existing contractual water supply obligations and provide for authorized additional regional water supply.

(8) Improve conditions for lamprey within the CRSO project areas through actions potentially including but not limited to project configurations, flow management, spill operations, and water quality management.

### *2.3 Recent Litigation History*

On May 4, 2016, the District Court issued an opinion invalidating NMFS' biological opinion evaluating the operation of the Columbia River System. The Court held that the 2014 biological opinion violated the ESA and remanded the biological opinion to NMFS and ordered it to complete a new biological opinion. In addition to its findings under the ESA, the District Court found the Corps and Reclamation did not comply with NEPA when they adopted the biological opinion. The District Court ordered that a new environmental impact statement under NEPA be prepared by March 26, 2021 and that the agencies' respective related Records of Decision be issued on or before September 24, 2021. The District Court further ordered the Corps and Reclamation to continue to implement the biological opinion until a new biological opinion is prepared and filed. On October 18, 2018, the Presidential Memorandum on Promoting the Reliable Supply and Delivery of Water in the West directed the co-lead agencies to develop a schedule to complete the CRSO EIS and the associated biological opinions by 2020.

On January 9, 2017, plaintiffs filed motions for injunction with the District Court requesting (1) increased spring spill at eight lower Snake and Columbia River Federal projects beginning with the spring 2017 fish migration season, (2) initiation of bypass operations on March 1, 2017, for smolt monitoring, and (3) a halt to spending by the Corps on certain ongoing and future capital projects at the four lower Snake River projects. On March 27, 2017, the District Court issued an Opinion and Order granting in part and denying in part the motions for injunction with respect to spill, smolt monitoring, and capital project funding.

In its spill ruling, the District Court indicated that it intended to order "increased spill" for the spring 2018 migration season. It ordered the Federal defendants[FN1] to work with regional experts to develop a plan for increased spill during the spring fish passage season at eight lower Snake and Columbia River projects beginning in the 2018 spring migration season.

1    The Federal defendants referred to in Section 2.3 are NMFS, Corps, and Reclamation.

In its capital project ruling, the Court concluded that capital spending at the four lower Snake River dams is "likely to cause irreparable harm" under NEPA by creating a significant risk of bias in the CRSO EIS process. The Court declined, however, to enjoin two specific projects at Ice Harbor because their primary benefit is increasing fish survival. On May 16, 2017, the Federal defendants filed a joint proposed notification process to disclose sufficient information to the plaintiffs on future capital spending projects at each dam during the NEPA remand period at appropriate and regular intervals, as directed by the District Court, which it adopted in an order dated May 25, 2017. On June 8, 2017, the Corps and Bonneville provided information to National Wildlife Federation as part of the notification process on 13 capital hydropower improvement projects. Since June 2017, the Corps and Bonneville have continued to provide information on certain capital hydropower improvement projects,

## Add.47a

Columbia River Fish Mitigation (CRFM) and Other Non-Power capital projects (primarily navigation) at the lower Snake River **\*63837** dams (Lower Granite, Little Goose, Lower Monumental, and Ice Harbor).

On October 30, 2017, the Federal defendants filed a status report with the Court addressing: (1) The appropriateness of the remaining NEPA schedule; and (2) how the agencies intend to integrate and coordinate the NEPA process and the ESA Section 7(a)(2) consultation. The Federal defendants reported they are on target to complete the NEPA process and will integrate the NEPA/ESA processes so the agencies can make informed decisions on the future management of the Federal Columbia River Power System (FCRPS).

On December 8, 2017, the Federal defendants and the plaintiffs filed a joint proposed order and spill implementation plan with the Court. On January 8, 2018, the District Court entered a final spill injunction order governing 2018 spring fish passage spill operations, in which the Court adopted the joint proposed order without modification.

In December 2018 the Federal defendants, the State of Washington (defendant-intervenor), the State of Oregon (plaintiff-intervenor), and the Nez Perce Tribe (amicus curiae) executed an agreement on spring operations (the 2019-2021 Spill Operation Agreement) in which these parties agreed to certain operations and also agreed not to litigate issues relating to the biological opinion until the CRSO EIS process is complete. On December 18, 2018, the parties filed a joint status report with the District Court[FN2] notifying the Court of this agreement and that the Federal defendants intended to complete consultation on a new biological opinion before spring operations began in April 2019. NMFS issued a new BiOp on March 29, 2019, incorporating the spring spill operations that were agreed upon in December 2018. The 2019 Columbia River System Biological Opinion went into effect on April 1, 2019.

2    Status Report RE: 2019-2021 Spill Operation Agreement During the NEPA Remand Period, Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., No. 3:01-CV-00640-SI (D. Or. Dec. 18, 2018). Footnote 3 stated: "The Confederated Tribes of the Umatilla Reservation, the Confederated Tribes of the Warm Springs, and the State of Idaho indicated that they support the Agreement. The Confederated Salish and Kootenai Tribes, the Kootenai Tribe of Idaho, and the State of Montana collectively do not oppose the Agreement so long as its implementation does not adversely affect or preclude the improvement of the Montana Operations. . .."

*2.4 Statutory Background*

The statutes defining how the agencies operate, maintain, and configure the CRS play a critical role in this decision. Those laws fall primarily into two categories: (1) Specific authorizations to construct and operate projects for particular purposes; and (2) general operation and maintenance authorities and responsibilities. Collectively, these statutes define the full extent of the agencies' abilities to operate, maintain, and configure the CRS.

Congress enacted numerous specific statutes authorizing the construction and operation of each CRS project. Congress authorized the first two projects, Bonneville and Grand Coulee, in the Rivers and Harbors Act of 1935, Public Law 74-409. [FN3] Congress then authorized Hungry Horse in 1944 under Public Law 78-329; McNary and the four lower Snake River dams (Ice Harbor, Lower Monumental, Little Goose and Lower Granite) in the River and Harbor Act of 1945, Public Law 79-14; and Chief Joseph in the Rivers and Harbors Act of 1946, Public Law 79-525. Congress authorized the remaining CRS projects in the Flood Control Act of 1950, Public Law 81-516, except for Dworshak, which Congress authorized in the Flood Control Act of 1962, Public Law 87-874.

3    Construction of Bonneville and Grand Coulee commenced under the 1933 National Industry Recovery Act, which authorized the Federal Emergency Administrator of Public Works to develop hydropower, transmit electricity, construct river improvements, and control floods. Public Law 73-67, 202 (June 16, 1933). After litigation concerning application

# Add.48a

of the Act to another project, Congress formally reauthorized both Bonneville and Grand Coulee in the 1935 Rivers and Harbors Act.

Each project's authorizing statute differs, identifying, among other things, the specific purposes for which Reclamation or the Corps must operate a project. Likewise, each project's authorization may vary in defining how that purpose is implemented at each specific project. Every CRS project's authorizing statute includes hydroelectric power generation, and most also include navigation. All of the Corps projects are authorized to support recreation and fish and wildlife conservation.[FN4] The storage projects—Grand Coulee, Dworshak, Albeni Falls, and Hungry Horse, John Day, and Libby—are authorized for flood risk management. The two Reclamation projects, Grand Coulee and Hungry Horse, as well as the Corps' John Day project, include in their authorizing statutes authority to operate for irrigation purposes. Congress also authorized irrigation as an incidental benefit at the Corps' projects on the lower Snake River and at The Dalles. Fish and wildlife mitigation at the lower Snake River projects was the result of negotiations under the Fish and Wildlife Coordination Act, Public Law 85-624.

4    Recreation as a Corps' project purpose was generally authorized under the Flood Control Act of 1944, Public Law 78-534.

Overlaying these specific project laws is the Pacific Northwest Electric Power Planning and Conservation Act, Public Law 96-501. Passed in 1980, the Act seeks to fulfill many objectives, including to provide "an adequate, efficient, economic, and reliable power supply" and "to protect, mitigate and enhance the fish and wildlife . . . of the Columbia River and its tributaries." In support of these goals, the Act requires federal agencies, including the co-lead agencies, to exercise their responsibilities for operating and maintaining CRS projects "to adequately protect, mitigate, and enhance fish and wildlife . . . affected by such projects or facilities in a manner that provides equitable treatment for such and fish and wildlife with the other purposes" of the projects. It also obligates the co-lead agencies to take into account, at the relevant stages of their decision-making and to the fullest extent practicable, the Columbia River Basin Fish and Wildlife Program adopted by the Northwest Power and Conservation Council.

As a backdrop to the foregoing legislation specific to the CRS, general agency statutes also guide the agencies' operation, maintenance, and configuration of the CRS. These include foundational laws, like the Bonneville Project Act of 1937, Public Law 75-329, which governs aspects of Bonneville's power marketing activities; the Reclamation Project Act of 1939, Public Law 76-260, which guides Reclamation's operation of its two CRS projects; and the Flood Control Act of 1944, Public Law 78-534, which authorizes the sale of power from Corps dams, defines the Corps' role in flood risk management at non-Corps dams, and establishes recreation as a purpose of Corps projects.

In addition to these statutes, requirements of the ESA heavily influence CRS operations. Still other laws, including the CWA and National Historic Preservation Act, are important considerations in how the agencies operate and maintain the CRS projects.

Fulfilling these many statutory responsibilities, some of which must be balanced with each other and often pose conflicts, is extremely complex, requiring consideration of multiple factors across an expansive geographic scale. Many additional factors impacting these responsibilities involve matters beyond the reach of the agencies' authorities, including incoming water **\*63838** quality, ocean conditions, and historical environmental degradation.

### 2.5 Alternatives Considered

The agencies used an iterative process to develop a range of alternatives for the future physical configuration, operation, and maintenance of the 14 projects of the CRS to achieve a reasonable balance of competing resource demands for the available water and for the multiple authorized purposes, including evaluating measures to avoid, offset, or minimize impacts to resources affected by managing the CRS in the context of new information and changed conditions in the Columbia River Basin since the System Operation Review EIS in 1997. This process began by identifying the EIS Purpose and Need Statement and objectives for future management of the CRS. A suite of eight preliminary draft alternatives were developed to focus on individual resources. These Single Objective Alternatives provided information regarding how well measures might perform

# Add.49a

when combined, and helped identify any conflicts between resources, actions, or locations. These alternatives informed the next iteration of alternatives development, resulting in a reasonable range of Multiple Objective Action Alternatives (MOs) suitable for analysis. Following analysis and identification of effects for the four MO alternatives, the co-lead agencies used these findings to develop a fifth action alternative, which was described as the agencies' Preferred Alternative.

### 2.5.1 No Action Alternative

The No Action Alternative includes all operations, maintenance, fish and wildlife programs, and mitigation in effect when the CRSO EIS was initiated in September 2016. Juvenile fish passage spill operations at the eight lower Columbia River and Snake River dams would follow the 2016 Fish Operations Plan developed by the Corps, which used performance standard spill provided under previous NMFS biological opinions. The co-lead agencies would also implement structural measures that were already budgeted and scheduled as of September 2016 that affected CRS operations. The majority of these structural measures are dam modifications to improve conditions for ESA-listed salmon and steelhead. For example, installation of Improved Fish Passage (IFP) turbines planned for Ice Harbor and McNary Dams would occur. Other ongoing habitat and mitigation programs would continue, as was planned at the time the CRSO EIS process started. A detailed description of measures included in the No Action Alternative is included in Section 2.4.2 of the CRSO EIS.

### 2.5.2 Multiple Objective Alternative 1

Multiple Objective Alternative 1 (MO1) was developed with the goal to avoid unreasonable effects—and if possible, achieve— congressionally authorized project purposes while also benefiting ESA-listed fish species relative to the No Action Alternative. MO1 differs from the other alternatives by carrying out a juvenile fish passage spill operation referred to as a block spill design. The block spill design alternates between two operations: A base operation that releases surface flow, where juvenile fish are most present, over the spillways using different flows at each project based on historical survival tests; and a fixed higher spill target at all projects. For the block that uses the same target at all projects, the operators would release flow through the spillways up to a target of 120 percent TDG in the tailrace of projects and 115 percent TDG in the forebay of those projects. The intent of these two spill operations is to demonstrate the benefit of different spill levels to fish passage. In addition, MO1 sets the duration of juvenile fish passage spill to end based on a fish count trigger, rather than a predetermined date. MO1 proposes to initiate transport operations for juvenile fish approximately two weeks earlier than under the No Action Alternative.

MO1 also incorporates measures to increase hydropower generation flexibility in the lower basin projects and alters the use of stored water at Dworshak for downstream water temperature control in the summer. MO1 includes measures similar to the other action alternatives, which include increased water management flexibility and water supply, and using local forecasts in whole-basin planning. MO1 also includes measures to disrupt predators of ESA-listed fish. A detailed description of the measures in MO1 is in Section 2.4.3 of the CRSO EIS.

### 2.5.3 Multiple Objective Alternative 2

Multiple Objective Alternative 2 (MO2) was developed with the goal to increase hydropower generation and reduce regional greenhouse gas emissions while avoiding or minimizing adverse effects to other congressionally authorized project purposes. MO2 would slightly relax the No Action Alternative's restrictions on operating ranges and ramping rates to evaluate the potential to increase hydropower generation efficiency and increase operators' flexibility to respond to changes in power demand and changes in generation of other renewable resources. The measures within MO2 would increase the ability to meet power demand with hydropower generation during the periods when it is most valuable (e.g., winter, summer, and daily peak demands). The upper basin storage projects would be allowed to draft slightly deeper, allowing more hydropower generation in the winter and less during the spring. MO2 also differs from the other alternatives by excluding the water supply measures and evaluating an expanded juvenile fish transportation operation season.

This alternative proposed to transport all collected ESA-listed juvenile fish for release downstream of the Bonneville project, by barge or truck, and to reduce juvenile fish passage spill operations to a target of up to 110 percent TDG. Inclusion of the

## Add.50a

target up to 110 percent TDG spill operation provided the lowest end of the range of juvenile fish passage spill operations evaluated in the CRSO EIS.

Structural measures of MO2 are aimed at benefits for ESA-listed fish and lamprey. These measures are similar to other alternatives and include making improvements to adult fish ladders, upgrading spillway weirs, adding powerhouse surface passage, and IFP turbine upgrades at John Day Dam. A detailed description of measures included in MO2 is in Section 2.4.4 of the CRSO EIS.

### 2.5.4 Multiple Objective Alternative 3

Multiple Objective Alternative 3 (MO3) was developed to integrate actions for water management flexibility, hydropower generation at the remaining CRS projects, and water supply with measures that would breach the four lower Snake River dams (Lower Granite, Little Goose, Lower Monumental, and Ice Harbor). In addition to breaching these four projects, MO3 differs from the other alternatives by carrying out a juvenile fish passage spill operation that sets flow through the spillways up to a target of 120 percent TDG in the tailrace of the four lower Columbia River projects (McNary, John Day, The Dalles, and Bonneville). This alternative also proposes an earlier end to summer juvenile fish passage spill operations than the No Action Alternative. Instead, flows would transition to increased hydropower generation when low numbers of juvenile fish are anticipated.

Structural measures in this alternative include breaching the four lower Snake River dams by removing the earthen embankments at each dam location, resulting in a controlled drawdown. A **\*63839** detailed description of measures included in MO3 is in Section 2.4.5 of the CRSO EIS.

### 2.5.5 Multiple Objective Alternative 4

Multiple Objective Alternative 4 (MO4) was developed to examine a combination of measures to benefit ESA-listed fish, integrated with measures for water management flexibility, hydropower production in certain areas of the basin, and additional water supply. This alternative included the highest fish passage spill level considered in this CRSO EIS, dry-year augmentation of spring flow with water stored in upper basin reservoirs, and annually drawing down the lower Snake River and lower Columbia River reservoirs to their minimum operating pools (MOP). This alternative also included spillway weir notch inserts, changes to the juvenile fish transportation operations, and spill through surface passage structures for kelts, overwintering steelhead and steelhead overshoots. In MO4, the juvenile fish transport program would operate only in the spring and fall, while juvenile fish passage spill is set up to 125 percent TDG during the spring and summer spill season. The alternative contains a measure for restricting winter flows from the Libby project to protect newly established downstream riparian vegetation to improve conditions for ESA-listed resident fish, bull trout, and Kootenai River white sturgeon (KRWS) in the upper Columbia River Basin.

The structural measures in this alternative are primarily focused on improving passage conditions for ESA-listed salmonids and Pacific lamprey. The inclusion of spillway weir notch inserts is the only structural measure unique from the other MO alternatives. A detailed description of measures that are included in MO4 is in Section 2.4.6 of the CRSO EIS.

### 2.5.6 Preferred Alternative

This alternative was developed using a combination of measures already described in one or more of the four MO alternatives, with some measures slightly refined based upon previous analysis during the EIS process. The Preferred Alternative also drew upon new information obtained from spill operations implemented in 2019 and 2020. The spill regime in this alternative includes a high rate of spill at six of the eight lower Columbia and lower Snake River projects (up to 125% TDG, consistent with the relevant state water quality standards) for up to 16 hours a day, then reduces spill for up to 8 hours, producing benefits for both out-migrating juvenile salmonids and hydropower. The Preferred Alternative also includes measures for lamprey and resident fish, and other measures intended to provide flexibility for water management and water supply operations over the foreseeable future. The Preferred Alternative also improves upon the actions committed to in the past to benefit ESA-listed fish

## Add.51a

species described in the No Action Alternative, ongoing routine maintenance of the 14 CRS projects, including maintenance of hydropower assets, navigation infrastructure, and fish facilities, continued management of invasive species, and management of avian and pinniped predators of ESA-listed salmonids.[FN5]

5    MO3 would provide the highest potential benefit to ESA-listed Snake River salmon and steelhead but would not address the full range of environmental resources to the same degree as the Preferred Alternative.

Structural measures in the Preferred Alternative are focused on improving and maintaining hydropower assets, and making changes at the dams to improve passage and conditions for ESA-listed salmonids, resident fish, and lamprey. These include power plant modernization projects at the Hungry Horse, Grand Coulee, and Ice Harbor projects. Fish passage improvement projects are planned at Lower Granite, Little Goose, John Day, and Bonneville. One new structural measure was added to this alternative—closeable floating gate orifices at Bonneville to benefit lamprey.

Operational measures would provide flexible water management across the basin to adjust to local conditions and ensure water availability to benefit resident fish in the upper basin and improve flow conditions for ESA-listed fish in the middle and lower basin. The Juvenile Fish Passage Spill measure would be implemented using adaptive management as more information on the effects of increased spill becomes available. The Preferred Alternative also includes a measure to ensure future flexibility for Reclamation to meet authorized water supply obligations.

The Preferred Alternative endeavors to provide the most balanced way to fulfill all of the CRS projects' congressionally authorized purposes, meets a majority of the CRSO EIS objectives, minimizes and avoids adverse impacts to the environment, benefits tribal interests and treaty resources, and provides additional improvements for ESA-listed species. The Preferred Alternative is described in detail in Chapter 7 of the CRSO EIS. The Preferred Alternative is selected in this ROD.

**2.5.7 Environmentally Preferable Alternative**

Federal agencies are required to identify the "environmentally preferable alternative" in their Record of Decision consistent with 40 CFR 1505.2. If the environmentally preferable alternative is not selected as the alternative for implementation, the agencies are to discuss the reasons for not selecting the environmentally preferable alternative. CEQ provided guidance on the "environmentally preferable alternative" in its Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations: "The environmentally preferable alternative is the alternative that will promote the national environmental policy as expressed in NEPA's Section 101." [FN6] As stated by CEQ, "Ordinarily, this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources." [FN7]

6    46 FR 18026 (Mar. 23, 1981), as amended (1986), available at https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.

7    Id.

To identify the environmentally preferable alternative, the co-lead agencies used the policies identified in 42 U.S.C. 4331(b) (Section 101 of NEPA), to compare the alternatives and determine which meets the environmental intent of the law.[FN8] **\*63840** Through this evaluation, the agencies determined the Preferred Alternative is the environmentally preferable alternative. Comparatively, it meets each of the policies of NEPA and achieves the widest range of environmental benefits, while minimizing adverse effects to the environment and avoiding hazards to human health and safety.

8    Section 101 of NEPA, 42 U.S.C. 4331, states the following:

# Add.52a

(a) The Congress, recognizing the profound impact of man's activity on the interrelations of all components of the natural environment, particularly the profound influences of population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances and recognizing further the critical importance of restoring and maintaining environmental quality to the overall welfare and development of man, declares that it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans.

(b) In order to carry out the policy set forth in this chapter, it is the continuing responsibility of the Federal Government to use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources to the end that the Nation may—

(1) Fulfill the responsibilities of each generation as trustee of the environment for succeeding generations;

(2) Assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings;

(3) Attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;

(4) Preserve important historic, cultural, and natural aspects of our national heritage, and maintain, wherever possible, an environment which supports diversity and variety of individual choice;

(5) Achieve a balance between population and resource use which will permit high standards of living and a wide sharing of life's amenities; and

(6) Enhance the quality of renewable resources and approach the maximum attainable recycling of depletable resources.

The Preferred Alternative assures safe, healthful, productive, and esthetically and culturally pleasing surroundings by maintaining current riparian habitat, for example, while providing safe and reliable power generation. The Preferred Alternative supports the widest range of beneficial uses of the environment, without appreciable degradation, risk to health or safety, or other undesirable or unintended consequences by providing flood risk management, power generation and reliability, navigation, and fish and wildlife conservation, including improvements to fish survival, water supply, and irrigation. Commercial and tribal fishing in the lower Columbia and lower Snake rivers would improve over the No Action Alternatives. There would be fewer effects to cultural resources and improvements to tribal fisheries. The Preferred Alternative includes fish passage improvements, creating some job loss and potential higher power rates, as compared to the No Action Alternative. The agencies would monitor for potential shoaling at projects for unintended effects to navigation, resident fish, and anadromous adult fish passage at certain fish passage projects; this is included as mitigation. Effects to cultural resources will continue, but would be mitigated through the FCRPS Cultural Resource Program. Viewed with respect to "the interrelations of all components of the natural environment," [FN9] the Preferred Alternative is deemed the environmentally preferable alternative based on its wide benefits to the environment, and the minor adverse effects compared to the other alternatives analyzed.

[9] 43 U.S.C. 101(a).

### 2.6 Summary of Potential Effects

For all alternatives, the potential effects were evaluated, as appropriate, and discussed in Chapters 3, 4, 6, and 7 of the CRSO EIS. A summary of the potential adverse effects of the Selected Alternative is listed in Table 1.

BILLING CODE 6450-01-P

# Add.53a

## Table 1. Summary of Potential Adverse Effects of Selected Alternative

| | Major adverse effect* | Minor or negligible effects due to mitigation** | Minor or negligible effects | Resource unaffected by action |
|---|---|---|---|---|
| Hydrology and Hydraulics | ☐ | ☒ | ☐ | ☐ |
| River Mechanics | ☐ | ☐ | ☒ | ☐ |
| Water Quality | ☐ | ☒ | ☐ | ☐ |
| Aquatic Habitat, Aquatic Invertebrates, and Fish | ☐ | ☒ | ☐ | ☐ |
| Vegetation, Wetlands, Wildlife, and Floodplains | ☐ | ☒ | ☐ | ☐ |
| Power Generation and Transmission | ☐ | ☐ | ☒ | ☐ |
| Air Quality and Greenhouse Gases | ☐ | ☐ | ☒ | ☐ |
| Flood Risk Management | ☐ | ☐ | ☐ | ☒ |

## Add.54a

| | | | | |
|---|---|---|---|---|
| Navigation and Transportation | ☐ | ☒ | ☐ | ☒ |
| Recreation | ☐ | ☐ | ☒ | ☐ |
| Water Supply | ☐ | ☐ | ☒ | ☐ |
| Visual | ☐ | ☐ | ☒ | ☐ |
| Noise | ☐ | ☐ | ☒ | ☐ |
| Fisheries and Passive Use | ☐ | ☒ | ☐ | ☐ |
| Cultural Resources | ☐ | ☒ | ☐ | ☐ |
| Indian Trust Assets, Tribal Perspectives and Tribal Interests | ☐ | ☐ | ☐ | ☒ |
| Environmental Justice | ☐ | ☐ | ☒ | ☐ |
| Invasive Species | ☐ | ☒ | ☐ | ☐ |
| Land Use | ☐ | ☐ | ☐ | ☒ |
| Socio-economics | ☐ | ☐ | ☒ | ☐ |

 **\*63842**  BILLING CODE 6450-01-C

There are some localized moderate hydrological changes at Libby and Dworshak projects, affecting storage reservoir elevations and flows immediately downstream. Mitigation was proposed for habitat and riparian stabilization, as wetlands and aquatic habitat are primarily affected. Lower Snake River and lower Columbia River projects have increases in spill, potentially adversely affecting tailrace conditions, increasing energy dynamics that could cause sediment movement and damage to federal infrastructure. Shoaling and navigation channel effects would be monitored and any adverse effects would be mitigated, including dredging and potential coffer cells. This increased spill operation also creates a moderate impact to water quality because it could increase TDG, especially on the lower Snake River projects, which could adversely affect aquatic life and fish. Additionally, the spill could create eddies and delay migrating juvenile and adult salmon. These adverse effects have associated mitigation components including monitoring, maintenance actions, and fish transport, as well as adaptively managing operations as needed. These actions are described in the Mitigation Measures, Section 2.7, below, Chapter 5 of the CRSO EIS and Appendix R of the CRSO EIS, which includes the description of monitoring and adaptive management.

# Add.55a

Modifications of reservoir operations could result in earlier and longer duration drafts of Lake Roosevelt in wet years, resulting in the Inchelium-Gifford Ferry being out of operation for on average four days per year more than under the No Action Alternative. This limits communities, primarily on the Confederated Tribes of the Colville Reservation, from accessing basic services such as medical and education services. Mitigation is proposed to extend the ramp for the Ferry to improve access and allow operation of the ferry under a wider range of reservoir elevations.

The Selected Alternative will negligibly affect cultural resources. The ongoing FCRPS Cultural Resource Program manages and treats cultural resources affected by operations and maintenance in the region, under a Programmatic Agreement between the agencies and consulting parties, and will continue with implementation of the Selected Alternative. There is the additional potential for impacts to built resources, such as modifications of the federal projects themselves, which could affect their historic value.

Under the Selected Alternative, hydropower generation will decrease and the CRS will lose 330 average megawatts (aMW) of firm power during critical water conditions (roughly the **\*63843** amount of power consumed by about 250,000 Northwest homes in a year) and lose an average of 210 aMW across all historical water conditions modeled. The decrease in hydropower generation across the Pacific Northwest (an average decrease of 230 aMW regionally, including Federal and non-Federal projects) results in social welfare costs ranging between $12 million and $17 million. In addition, the Selected Alternative will result in additional costs of compliance with greenhouse gas emission reduction programs in the region of between $16 and $83 million per year. Residential, commercial, and industrial end users will experience slight upward retail rate pressure as a result.

The potential effects to commercial and tribal fisheries relative to the No Action Alternative vary from moderately adverse to majorly beneficial. Migrating juvenile anadromous fish could be affected by the Juvenile Fish Passage Spill Operations measure. In addition to the mitigation measures, the Preferred Alternative will be implemented using a robust monitoring plan, which is detailed in the CRSO EIS, Appendix R, part 2, Process for Adaptive Implementation of the Flexible Spill Operational Component of the Columbia River System Operations EIS.

The EIS included a discussion of practicable mitigation measures to avoid or minimize adverse environmental effects that were analyzed and incorporated into the Selected Alternative. Best management practices will be implemented to minimize impacts during operations of the projects.

*2.7 Mitigation Measures*

To mitigate for the unavoidable adverse impacts discussed in the previous section, the co-lead agencies will implement the mitigation actions described below. The descriptions also identify which agency is proposing to adopt each action. Each such measure is discussed in detail in Section 7.6 of the CRSO EIS, as well as the Monitoring and Adaptive Management Plan and the Process for Adaptive Implementation of the Flexible Spill Operational Component of the Columbia River System Operations Environmental Impact Statement in Appendix R of the CRSO EIS. A Mitigation Action Plan, consistent with Department of Energy's NEPA regulations, is included as Attachment 1 to this ROD. This Mitigation Action Plan identifies the mitigation actions Bonneville is adopting as part of this NEPA process.

### 2.7.1 Plant Cottonwood Trees (Up to 100 Acres) Near Bonners Ferry

The flow regime at Libby makes natural establishment of riparian vegetation downstream of the dam challenging. Higher winter flows make it difficult to sustain young stands of cottonwoods to maturity. The co-lead agencies would plant up to 100 acres of riparian forest along the Braided and Meander reaches of the Kootenai River near Bonners Ferry, using 1- to 2-gallon cottonwood trees, with the expectation that the larger size trees would be better suited to withstand the higher winter flows. This would improve habitat and floodplain connectivity to benefit ESA-listed KRWS, and complement other actions already being taken in the region to benefit their habitat. To the extent possible, this work will be completed through ongoing projects under Bonneville's Fish and Wildlife Program, such as the Kootenai Tribe of Idaho's Kootenai River White Sturgeon Habitat Restoration Program.

## Add.56a

**2.7.2 Plant Native Wetland and Riparian Vegetation (Up to 100 Acres) on the Kootenai River Downstream of Libby**

The co-lead agencies would plant up to 100 acres of native forested and scrub-shrub wetland vegetation at a lower river elevation in Region A (see CRSO EIS, Section 3.2.2.1, for descriptions of the regions). This would offset effects to existing wetlands and riparian forests downstream of Libby, which would be caused by the Modified Draft at Libby measure, and result in lower water levels on the Kootenai River. To the extent possible, this work will be completed through ongoing projects under Bonneville's Fish and Wildlife Program, such as the Kootenai Tribe of Idaho's Kootenai River White Sturgeon Habitat Restoration Program.

**2.7.3 Temporary Extension of Performance Standard Spill Operations**

It is expected that higher spill levels and the resultant TDG associated with the Juvenile Fish Passage Spill measure could result in delays to adult passage. Eddies created by a high spill operation may confound upstream passage by salmonids. If a delay in adult salmon and steelhead upstream passage is observed, operations would revert to performance standard spill until the adult fish pass the dam, and this would be managed adaptively, through the established Regional Forum process and as described in the CRSO EIS, Appendix R, Part 2. This work would be carried out by the Corps.

**2.7.4 Update and Implement Invasive Species Management Plans**

Deeper drafts at Libby would result in lower lake elevations in spring, exposing previously submerged lands during the growing season and potentially allowing establishment of invasive weeds. The Corps would update and implement an invasive species management plan to combat the establishment and proliferation of invasive species, as required by Executive Order 13751.

**2.7.5 Spawning Habitat Augmentation at Lake Roosevelt**

In Lake Roosevelt, changes in elevation would result in higher rates of kokanee and burbot egg dewatering in winter, and lower reservoir levels in spring would decrease access to tributary spawning habitat for redband rainbow trout. Increased flexibility of refilling Lake Roosevelt through the month of October, depending on the annual water conditions, may affect the spawning success of kokanee, burbot and redband rainbow trout. In 2019, Bonneville funded year one of a three-year study to determine potential effects of modifications in Lake Roosevelt refill to resident fish spawning habitat access. Other evaluations will be conducted to determine potentially affected areas. If study evaluations and other available data indicate resident fish spawning habitat areas are affected by changes in reservoir elevations, the co-lead agencies will work with regional partners to determine where to augment spawning habitat at locations along the reservoir and in the tributaries (up to 100 acres). This mitigation action, when combined with the existing study funded by Bonneville, would evaluate existing effects to reservoir elevation changes from fall operations in Lake Roosevelt and would mitigate for additional effects of the new action. Exact sites and acreage would be determined post-alternative implementation. The Bureau of Reclamation commits to provide staff time and to seek technical assistance and funding to support collaboration with the Confederated Tribes of the Colville Reservation, the Spokane Tribe of Indians, and other interested parties to better understand the effects of Grand Coulee operations on the life history requirements of fish and wildlife resources in the Lake Roosevelt area.

**2.7.6 Extension of the Boat Ramp for the Inchelium-Gifford Ferry in Lake Roosevelt**

Earlier and longer drafts at Grand Coulee would affect water levels, **\*63844** making the Inchelium-Gifford Ferry on Lake Roosevelt unavailable on average four days per year more than under the No Action Alternative. Reclamation would work with the Bureau of Indian Affairs to extend the ramp at the Gifford-Inchelium Ferry on Lake Roosevelt so that it would be available at lower water elevations. This work would be subject to available appropriations.

**2.7.7 Monitoring at Lower Granite, Lower Monumental, and McNary To Evaluate Effects of Shoaling From Increased Spill, and if Warranted, Install Coffer Cells To Dissipate Energy**

# Add.57a

It is expected that higher spill and variable timing of the spill over the course of a day could result in changes to the tailraces at Lower Granite, Lower Monumental and McNary. The Corps would monitor the tailrace at each project to track changes that could affect safe navigation or conditions for ESA-listed fish. If changes to the tailrace warrant action, the Corps would construct coffer cells to dissipate energy.

**2.7.8 Increased Dredging at McNary, Ice Harbor, Lower Monumental, and Lower Granite Projects**

In Regions C and D, the increased spill operations and lower tailwater would increase shoaling in the navigation channel due to increased spill operations in the lower Snake and Columbia rivers, adversely affecting navigation. In order to maintain the navigation channel and reduce effects to negligible, effects would be mitigated by increasing the frequency and total volume of dredging at McNary, Ice Harbor, Lower Monumental, and Lower Granite at a four- to seven-year interval. As discussed above, shoaling would be monitored to determine if additional installation of coffer cells at Lower Monumental, Little Goose, and McNary could reduce dredging needs and further maintain the channel. Coffer cells would dissipate energy during high spill operations, which would support movement of sediment in the navigation channel, thereby maintaining navigational capacity and river transportation. This would increase overall maintenance costs for the projects, but would reduce the adverse effects to negligible. This work would be carried out by the Corps.

**2.7.9 Federal Columbia River Power System Cultural Resource Program and Systemwide Programmatic Agreement**

For new effects to archaeological resources, traditional cultural properties, and the built environment at storage projects caused by implementation of the Preferred Alternative relative to the No Action Alternative, the co-lead agencies would use the existing FCRPS Cultural Resource Program and the Systemwide Programmatic Agreement to implement mitigation actions, as warranted and appropriate.

**Section 3. Key Considerations for the Decision**

*3.1 Introduction*

The agencies considered several factors when making their decisions in this ROD. These considerations are described in detail below, and are in addition to considering the overall Purpose and Need Statement. The agencies also considered the authorized purposes for which the co-lead agencies operate the Federal projects, including how the purposes complement or conflict with each other, as briefly summarized in Section 2.4.

**3.1.1 Alternatives Not Fully Meeting the Purpose and Need**

The co-lead agencies considered whether an alternative met the Purpose and Need Statement in making their decisions. Initially, eight single objective alternatives were developed to maximize certain project purposes and emphasize specific resources, utilizing the analytical assumption that other purposes did not constrain the actions that could possibly be taken. These single objective alternatives provided the framework for comparing the tradeoffs associated with different objectives throughout the Columbia River Basin. None of the single-objective alternatives were found to fully meet the Purpose and Need, and they were screened from further consideration; however, many of the measures in these alternatives were integrated into the MOs. In comparing the multiple objective alternatives, MO3 and MO4 did not meet, or did not fully meet, the Purpose and Need (see Table 7-1 in the Final EIS).

*3.2 Responding to the U.S. District Court for the District of Oregon's Opinion and Order*

As outlined in the Purpose and Need Statement, the co-lead agencies responded to the Opinion and Order issued by the District Court [FN10] by updating the long-term system operating strategy for the CRS projects with updated information, including information on ESA-listed species and their critical habitat and climate change. The co-lead agencies also responded to the Opinion and Order by evaluating actions that ensure CRS operations, maintenance and configuration are not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of

**Add.58a**

designated critical habitat. To begin, the co-lead agencies, in coordination with the cooperating agencies, proposed measures as part of the alternatives development process to benefit ESA-listed juvenile and adult anadromous and resident fish species. Through this process, the agencies evaluated actions within their current authorities, as well as certain actions that are not within the co-lead agencies' authorities, based on the District Court's observations about alternatives that could be considered and comments received during the scoping process. This analysis included evaluating breaching the four lower Snake River dams. Based on the proposed alternatives' effects analysis, the agencies then developed additional mitigation measures as part of the CRSO EIS process for affected resources. The analysis from the No Action and Multiple Objective Alternatives, including the mitigation measures, climate effects and cumulative effects analysis informed the development of the Preferred Alternative. The co-lead agencies then proposed non-operational conservation measures through the ESA consultations for the Preferred Alternative that are responsive to uncertainty from the effects of the proposed action and from climate change to ESA-listed species. These same measures were analyzed in Chapter 7 of the EIS to evaluate the direct, indirect and cumulative effects as well as climate change effects and unavoidable adverse effects of the Preferred Alternative. Finally, the co-lead agencies committed to continue funding their ongoing programs that benefit fish and wildlife and other resources affected by the CRS projects (see Chapters, 2, 5 and 7 of the CRSO EIS for more information).

10    Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., 184 F. Supp. 3d 861 (D. Or. 2016).

*3.3. ESA-Listed Species*

Based on input received during development of the EIS, and in response to the Order and Opinion issued by the District Court, the agencies focused on developing a Preferred Alternative that maintained and improved on their existing commitments for fish improvements in the region. As reflected in both the Purpose and Need Statement and EIS objectives, a key consideration for the co-lead agencies in their decision-making is how the alternatives could affect ESA-listed and **\*63845** non-listed species. The effects analysis is available in Chapters 3, 4, 6 and 7 of the CRSO EIS.

In addition to routine operations and maintenance of the CRS, the co-lead agencies implement a number of actions and programs to benefit ESA-listed species in the Columbia River Basin. Examples of these actions include habitat measures (e.g., tributary habitat improvements for salmon, steelhead, KRWS, and in consideration of bull trout), operational measures at storage and run-of-river projects (e.g., flow management and fish passage), conservation and safety-net hatcheries (funding, support, design, construction), and predation management (avian, piscivorous, pinnipeds). See Table 7-5 of the CRSO EIS, and, for greater detail, reference the associated Biological Opinions (BiOps) and Chapters 2, 5, and 7 of the CRSO EIS.

**3.3.1 Anadromous Adult and Juvenile ESA-listed Species**

The Selected Alternative provides a balanced approach between spring and summer flow and spill operations to benefit ESA-listed juvenile and adult salmonids, while also providing benefits to ESA-listed resident fish in the upper Columbia River Basin. It includes measures that benefit adult and juvenile salmonids and continues commitments for ongoing actions to improve conditions for ESA-listed species through habitat improvements. The Selected Alternative is predicted to benefit survival of ESA-listed juvenile salmonids by improving fish passage conditions through reductions in juvenile travel times and instances of powerhouse and juvenile bypass system passage, as detailed in Section 7.7.4 of the CRSO EIS.

The Selected Alternative is also designed to evaluate return rates to the Columbia River Basin of ESA-listed salmonid will increase due to the improvements in the juvenile migration as detailed in Section 7.7.4 of the CRSO EIS. Improved adult abundance is predicted to increase as a result of improved juvenile survival and decreases in latent mortality, (i.e., the delayed death of salmonids), associated with juvenile passage through the CRS projects as discussed in Section 3.5 of the CRSO EIS.

The co-lead agencies will monitor fish passage at the projects and utilize adaptive management principles in implementing the Selected Alternative based on results of biological studies and monitoring information.[FN11] These results will be discussed and operations modified in collaboration with Federal, state, and tribal sovereigns to ensure expected benefits to salmon and

# Add.59a

steelhead are being realized based on the best available scientific information. The adaptive implementation plan is discussed in the CRSO EIS, Appendix R, Part 2, Process for Adaptive Implementation of the Flexible Spill Operational Component of the Columbia River System Operations EIS.

11      Biological Assessment of Effects of the Operations and Maintenance of the Federal Columbia River System (January 2020) (2020 CRS Biological Assessment), at 2-1 to 2-6.

### 3.3.2 Resident ESA-Listed Species

The Selected Alternative is predicted to benefit ESA-listed bull trout and KRWS, as well as other resident fish through both operational and mitigation measures as detailed in Section 7.7.5 of the CRSO EIS. The Selected Alternative benefits resident fish by improving productivity and food resources in storage reservoirs and by including additional mitigation measures to improve habitat. Structural and operational measures developed for anadromous fish that regulate reservoir levels and remove predators may also provide beneficial effects to resident fish, especially in the lower Columbia River. The co-lead agencies would continue to utilize the Kootenai River Regional Coordination workgroups to guide adaptive management of operations and address technical issues related to KRWS.

### 3.3.3 Other Considerations Under the ESA

In their analysis of the Selected Alternative under Section 7 of the ESA and its implementing regulations, the co-lead agencies conclude that the benefits to ESA-listed species' survival and recovery and to the conservation function of designated critical habitat are sufficient to outweigh and offset the Selective Alternative's adverse effects on ESA-listed species and designated critical habitat. As such, the Selected Alternative as a whole is not likely to contribute to any reductions in reproduction, numbers, or distribution of ESA-listed species that could appreciably reduce their survival and recovery, nor is the action as a whole likely to diminish the conservation function of designated critical habitat. For these reasons, the Selected Alternative is not an action that is likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify their designated critical habitat. Because of this, the co-lead agencies agree with the determinations of the USFWS and NMFS (together referred to as the Services) in the 2020 USFWS and NMFS CRS BiOps (together referred to as the 2020 CRS BiOps) that implementation of the Selected Alternative and the actions described in the Incidental Take Statements are not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify their designated critical habitat. The jeopardy and destruction or adverse modification analyses in the 2020 CRS BiOps that facilitated the Services' determinations are based on the regulatory definitions for both "jeopardize the continued existence of" and "destruction or adverse modification" of designated critical habitat. The ESA regulations define "to jeopardize the continued existence of" a listed species, which is "to engage in an action that would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species." [FN12] Therefore, the analyses considered both survival and recovery of the species. The critical habitat analysis is based upon the regulatory definition of "destruction or adverse modification," which "means a direct or indirect alteration that appreciably diminishes the value of critical habitat as a whole for the conservation of a listed species." [FN13]

12      50 CFR 402.02.

13      Id.

The analysis under these regulatory definitions must always consider whether the effects of the Selected Alternative's effects cause appreciable reductions to survival and recovery or cause appreciable diminishment of the conservation function of critical habitat. This analysis is separate from the analysis of the environmental baseline [FN14] or a characterization of the condition of the species prior to implementation of the proposed **\*63846** action,[FN15] even where the proposed action is a continuation of a prior federal action. "Effects of the action" is defined as "all consequences to listed species or designated critical habitat that are caused by the proposed action, including the consequences of other activities that are caused by the proposed action.

## Add.60a

A consequence is caused by the proposed action if it would not occur but for the proposed action, and it is reasonably certain to occur. Effects of the action may occur later in time and may include consequences occurring outside the immediate area involved in the action." [FN16] The Services and the co-lead agencies analyzed the Selected Alternative's consistency with the ESA's substantive mandates by using these applicable statutory and regulatory standards.

14  Id. ("Environmental baseline refers to the condition of the listed species or its designated critical habitat in the action area, without the consequences to the listed species or designated critical habitat caused by the proposed action. The environmental baseline includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process. The consequences to listed species or designated critical habitat from ongoing agency activities or existing agency facilities that are not within the agency's discretion to modify are part of the environmental baseline.").

15  The ESA utilizes the term "proposed action" in its implementing regulations to describe the agency action that is subject to consultation under Section 7(a)(2) of the ESA. Proposed action is not a term that is used in NEPA. In order to avoid confusion in this ROD, the co-lead agencies have consistently referred to the agency action subject to decision in this ROD as the Selected Alternative.

16  See 50 CFR 402.17 (the preamble explains that the terms "effect" and "consequences" are generally used interchangeably. 84 FR 44976 (Aug. 27, 2019). The co-lead agencies use these terms in that manner in this document).

By maintaining or improving actions that arose through past consultations, along with significant additional actions through the CRSO EIS process, the co-lead agencies developed the Selected Alternative to, on the whole, benefit ESA-listed species' likelihood of survival and recovery and the conservation function of designated critical habitat. The co-lead agencies worked closely with the Services throughout this development process, as well as cooperating agencies contributing to the CRSO EIS, to ensure that continued operation and maintenance of the CRS and implementation of the non-operational conservation measures, is not likely to jeopardize the continued existence of listed species and is not likely to destroy or adversely modify designated critical habitat.

The co-lead agencies have ensured compliance with the ESA through improvements to system operations and fish passage, with resulting higher dam passage survival rates and faster fish travel times.[FN17] The co-lead agencies will continue to implement these operations, along with the Juvenile Fish Passage Spill Operation measure or Flexible Spill with Adaptive Management with spill levels that are higher than the co-lead agencies have discretionarily implemented prior to 2020. In order to determine the effects of this operation, the Action Agencies and NMFS considered results from lifecycle models created and implemented by state and Federal agencies, the Comparative Survival Study (CSS) managed by the Fish Passage Center, and the Comprehensive Passage Model (COMPASS) and Lifecycle models (LCM) conducted by NMFS' Northwest Fisheries Science Center.

17  U.S. Army Corps of Engineers, Bureau of Reclamation, and Bonneville Power Administration. 2017. Federal Columbia River Power System, 2016 Comprehensive Evaluation.

The CSS model predicts substantial juvenile survival increases for Snake River spring-summer Chinook salmon and steelhead, and further predicts that fewer powerhouse passage events (as a result of higher spill levels and higher proportions of juveniles passing the projects via spillbays) will increase adult returns. NMFS LCMs did not predict increases to the levels that the CSS model did, but did qualitatively predict improvements in adult abundance if reductions in latent mortality occurred. The differences resulting from these two models are due to a number of factors, including how latent mortality is addressed in each model. The Juvenile Fish Passage Spill Operation measure will be implemented with a robust monitoring plan for salmon and steelhead that will help narrow the uncertainty between these two models and determine how effective additional spill can increase salmon and steelhead returns to the Columbia Basin.[FN18] Despite the differences in the predictions from these

# Add.61a

models, the co-lead agencies have determined that implementation of the Juvenile Fish Passage Spill Operation measure is anticipated to substantially contribute to offsetting the adverse effects resulting from other measures in the Selected Alternative in a manner that will not reduce appreciably the likelihood of survival and recovery.

18   See CRSO EIS, Appendix R, Part 2, Process for Adaptive Implementation of the Flexible Spill Operational Component of the Columbia River System Operations Environmental Impact Statement.

In addition, the co-lead agencies have included other operational measures that are intended to offset the adverse effects of the operation and maintenance of the CRS. These measures include Providing Surface Spill to Reduce Adverse Effects to Overshooting Adult Steelhead and John Day Reservoir Spring Operations for Caspian Tern Nesting Dissuasion. Details of these operational measures can be found in the CRSO EIS. These operational measures, among others, will not appreciably reduce the likelihood of survival and recovery of ESA-listed species.

The Selected Alternative also includes structural improvements for both juvenile and adult fish, as well as maintaining or improving implementation of non-operational conservation measures to help address uncertainty related to residual adverse effects of system operations and maintenance and the uncertainty related to effects of climate change, including habitat improvement and restoration actions in the tributaries and estuary, nutrient enhancement, continued support for conservation and safety net hatcheries, and predation management. In addition, the Selected Alternative and the Incidental Take Statements in the Services' 2020 CRS BiOps call for the co-lead agencies to submit regular reports to the Services on implementation progress, to conduct ongoing research, monitoring and evaluation (RM&E) of the biological effectiveness of conservation measures, and to manage implementation of the conservation measures adaptively as new information about mitigation action effectiveness emerges. Regular reporting facilitates transparency and co-lead agency accountability for implementing the Selected Alternative and Terms and Conditions. Taken together, the effects of the measures in the Selected Alternative will not appreciably reduce the likelihood of survival and recovery for ESA-listed species.

### 3.3.4 Southern Resident Killer Whales

The overall health and condition of the Southern Resident Killer Whale (SRKW) depends on the availability of a variety of fish populations throughout their range. SRKW are Chinook specialists, but also consume other available prey populations while they move through various areas of their range in search of prey. There is no evidence that SRKW feed or benefit differentially between wild and hatchery Chinook salmon.[FN19] Snake River spring/summer Chinook salmon is a small portion of SRKW overall diet, but can be an important forage species during late winter and early spring months near the mouth of the Columbia River.[FN20]

19   Southern Resident Killer Whale and the Snake River Dams, NOAA Fisheries Service West Coast Region (March 16, 2016).

20   Ford, M. J., J. Hempelmann, M. B. Hanson, K. L. Ayres, R. W. Baird, C. K. Emmons, et al. 2016. Estimation of a killer whale (Orcinus orca) population's diet using sequencing analysis of DNA from feces. PLoS ONE 11(1):e0144956.

The co-lead agencies would continue to fund the operations and maintenance of safety-net and conservation hatchery **\*63847** programs with implementation of the Selected Alternative. The agencies would also continue to fund certain independent congressionally-authorized hatchery mitigation responsibilities [FN21] over the 15-year implementation period of the 2020 NMFS CRS BiOp. This continued funding was an important consideration in the analysis of effects to SRKWs because production from these hatchery programs is expected to offset any adverse effects from the Selected Alternative. For this reason, NMFS concurred with the co-lead agencies' conclusion that the Selected Alternative is not likely to adversely affect the SRKW.

# Add.62a

21     See Clarification and Additional Information to the Biological Assessment of Effects of the Operations and Maintenance of the Columbia River System on ESA-listed Species Transmitted to the Services on January 23, 2020 (April 1, 2020). These independent congressionally-authorized hatchery mitigation responsibilities are consulted upon separately and are considered part of the environmental baseline for purposes of this consultation.

### 3.4 Lamprey

The Selected Alternative addresses adult and juvenile lamprey passage through specific structural modifications to the projects. These measures provide benefits to lamprey through reducing impingements and incidences of lamprey falling out of the Washington Shore Fish Ladder. The Selected Alternative also includes other measures that are expected to further benefit lamprey passage conditions. These measures are described in Chapter 7 of the CRSO EIS.

### 3.5 Tribal Viewpoints

Input from the tribes was a key consideration in the co-lead agencies' decision to select the Preferred Alternative. The tribes of the Columbia River Basin represent distinct cultures, each unique. Most of the 19 tribes identified as being affected by the operations of the CRS provided extensive input into the CRSO EIS either as cooperating agencies or through their comments, or both.

Many upper basin tribes were concerned there was an inequity in the analysis resulting from a historical continuation of focusing on lower river issues at the expense of others in the region. They expressed their perception that the co-lead agencies prioritize resources on the lower rivers over upper basin needs and problems. This group was very interested in the construction of fish passage facilities and reintroduction above Grand Coulee and Chief Joseph dams, which had been eliminated from further detailed analysis in the CRSO EIS. Many upper basin tribes commented that the co-lead agencies failed to adequately engage or consider their concerns as a cooperating agency in the process. In response, the co-lead agencies worked closely to keep a balance in the Selected Alternative to benefit the entire Columbia Basin, and not disproportionately affect upper basin cultural or tribal resources. They also committed to ongoing regional collaboration to discuss future studies and initiatives for fish management in blocked areas above Chief Joseph and Grand Coulee dams.

Lower basin tribes engaged in CRSO EIS cooperating agency teams; however, these tribes expressed that the EIS failed to analyze a broad range of alternatives and inadequately considered climate change. Most tribes also were concerned whether the co-lead agencies complied with several laws, including the ESA, NEPA, and the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act). Generally, their comments expressed that consideration of breaching the four lower Snake River dams was completed without a thorough analysis and with biased methods. They expressed that the co-lead agencies fell short of regional salmon and steelhead recovery goals, and did not prioritize or place ESA-listed species recovery on equal footing with other resource improvements. They expressed their belief that there was bias in the methods and analysis conducted by the co-lead agencies against fish and for power and other project purposes. Throughout the process, the co-lead agencies discussed with the Tribes their concerns and preferences in alternatives, and many Tribes, as cooperators, participated in the analysis of alternatives. This was important in having a shared understanding of the resource effects and ultimately in determining the effects of implementing the Selected Alternative.

A few tribes around Libby and Hungry Horse shared that they found the CRSO EIS to be thorough and balanced, and supported both the analysis and the Preferred Alternative. Their focus was primarily around the resident fish, wildlife, and cultural resources in this region, and provided the CRSO EIS cooperating agency teams with measures and assisted in effects analysis for this region.

### 3.6 Protect and Preserve Cultural Resources

As discussed in Chapters 3, 4, 5, 6 and 7 of the CRSO EIS, the co-lead agencies considered the effects the alternatives had on cultural resources. Ongoing major effects to cultural resources under the Preferred Alternative would be similar to the No

## Add.63a

Action Alternative. The co-lead agencies determined that cultural resources affected by the implementation of the Preferred Alternative would be addressed under the ongoing FCRPS Cultural Resource Program.

The FCRPS Cultural Resource Program implements the terms of the existing Systemwide Programmatic Agreement for the Management of Historic Properties Affected by the Multipurpose Operations of Fourteen Projects of the Federal Columbia River Power System for Compliance with Section 106 of the National Historic Preservation Act (Systemwide Programmatic Agreement).[FN22] The FCRPS Cultural Resource Program had its origins in the System Operation Review Environmental Impact Statement and Records of Decision in the 1990s. During that process, eight cooperating groups were eventually established to address the effects of operations and maintenance on cultural resources. The cooperating groups formed the basis of the FCRPS Cultural Resource Program then and continue to do so today.

22      A description of the FCRPS Cultural Resource Program can be found here: https://www.bpa.gov/efw/CulturalResources/ FCRPSCulturalResources/Pages/default.aspx.

The Systemwide Programmatic Agreement commits the co-lead agencies to work collaboratively with the cooperating group participating organizations including states, tribes, and other federal agencies. The agencies will continue to support the FCRPS Cultural Resource Program over the course of implementing the CRSO EIS ROD. The agencies will continue to collaborate with participants in prioritization of actions and implementing treatments for cultural resources that are eligible for inclusion in the National Register of Historic Places that are adversely affected by implementation of the CRSO EIS ROD. Treatments may include a variety of both on-site and off-site options including less conventional treatments sometimes referred to as creative or alternative treatments. All treatments will be consistent with the respective implementing agency's authorities.

*3.7 Protect Native American Treat and Reserved Rights and Trust Obligations for Natural and Cultural Resources Throughout the Environment Affected by System Operations*

The co-lead agencies also took into account Native American treaty and reserved right as well as their trust **\*63848** obligations in their decision-making. To the extent that the Preferred Alternative provides for protection and mitigation of natural and cultural resources, then it also helps protect and preserve Native American treaty and executive order rights and meet agency trust obligations. The Preferred Alternative includes operational measures designed to protect ESA-listed anadromous and resident species as identified by NMFS and USFWS, and to improve the quality of other natural resources through reservoir operation and management of natural streamflows. Operations at John Day, The Dalles, and Bonneville dams also facilitate tribal treaty fisheries.

The co-lead agencies' commitment to implement actions that benefit ESA-listed fish, their designated critical habitat, and other wildlife helps fulfill Federal tribal treaty and trust responsibilities. As part of the implementation of the Selected Alternative, the agencies committed to ongoing coordination and open dialogue through the established Regional Forum. The Regional Forum workgroups have consistent participation by regional tribal sovereigns and this participation is critical to informing management actions and policy decisions. The co-lead agencies will continue to fund actions that benefit tribal partners, including the implementation of hatchery programs, habitat improvement actions, and other projects. This funding provides jobs for tribal members and promotes broad opportunities for exercising natural resource management expertise. These opportunities help protect trust resources while supporting tribal sovereignty and the exercise of treaty and resource management rights both on reservations and in ceded areas throughout the Columbia River Basin.

The co-lead agencies also engaged tribes during the development of the CRSO EIS and made extensive fish and wildlife mitigation commitments to tribes through the Columbia Basin Fish Accords and the 2018 Accord Extensions. These commitments further tribal sovereignty by supporting the tribes' exercise of their rights as comanagers of the fisheries in coordination with other resource managers in the region.

# Add.64a

### 3.8 Indian Trust Assets

Reclamation, consistent with its requirements for decision-making under this ROD, has complied with its policy to evaluate potential impacts to Indian Trust Assets (ITAs) in the development of the EIS. ITAs are "trust lands, natural resources, trust funds, or other assets held by the federal government in trust for Indian tribes or individual Indians." [FN23] Although there are multiple federally recognized Indian tribes in the vicinity of the project area on the Columbia and Snake Rivers and associated tributaries, Reclamation did not identify any potential impacts to ITAs as a result of the Preferred Alternative. Potentially adverse effects to the interests of federally recognized tribes evaluated include erosion of land or sites of cultural importance, degradation of water quality, detrimental effects on salmonid populations, and impediments to access for tribes with fishing rights. The Preferred Alternative is expected to improve some conditions for salmonid populations while other conditions are not expected to vary greatly from the No Action Alternative.

23    25 CFR 115.002.

### 3.9 Water Quality

In Region A, the Preferred Alternative is expected to have negligible to minor effects to water temperatures and TDG conditions at the projects when compared to what would occur under the No Action Alternative. In Regions B and D, the Preferred Alternative is expected to have negligible effects on water temperatures and TDG when compared to the No Action Alternative. In Region C, the Preferred Alternative is expected to have negligible effects to water temperature at Dworshak and all four lower Snake River projects. For TDG, moderate increases in Regions C and D are anticipated due to the Juvenile Fish Passage Spill measure that would allow for spill up to 125 percent TDG 16 hours per day, from the beginning of April through the third week of June. Effects to other water quality parameters would be negligible.

Under the Selected Alternative, the co-lead agencies will continue to implement certain measures to improve water temperature, where practicable, to address potential effects from the dams and reservoirs. For example, the effects of the Dworshak Dam summer cool water releases are expected to continue to influence water temperatures in the lower Snake River. At the Lower Granite and Little Goose Projects, the forebay tends to stratify, with warm water near the surface and cool water from the Dworshak Project deeper in the water column. When temperatures in the fish ladders are equal to or greater than 68 degrees Fahrenheit, the Corps operates pumps to supply the fish ladders with cool water pumped from deep in the reservoir. The pumps are typically operated from mid- to late summer, depending on climatic conditions. From June 1 to September 30, water temperature data is collected at adult ladder entrances and exits at each Corps project in the lower Snake and lower Columbia Rivers. This serves to monitor for temperature differentials in the ladder that could act to block adult fish from ascending the fish ladders to migrate upstream of each dam.

Moreover, the Corps would continue several actions related to adult fish ladder water temperature differentials: (1) Continue monitoring all mainstem fish ladder temperatures and identifying ladders with substantial temperature differentials (>1.0 degree Celsius); (2) where beneficial and practicable, develop and implement operational and structural solutions to address high temperatures and temperature differentials in adult fish ladders at mainstem dams with identified temperature issues; (3) complete a study that evaluates alternatives to assess the potential to trap-and-haul adult sockeye salmon at lower Snake River dams after development of a contingency plan by NMFS and state and tribal fish managers; and (4) maintain or improve the adult trap at Ice Harbor Dam to allow for emergency trapping of adult salmonids as necessary. The Corps may refurbish the trap in the future to prepare for the implementation of emergency trap-and-haul activities (e.g., sockeye during high temperature water years similar to 2015).

In terms of impacts from TDG, measures under the Preferred Alternative would be implemented consistent with state water quality standards to manage TDG exposure to fish in the Clearwater River below Dworshak Dam as well as manage TDG at Ice Harbor, John Day and McNary dams. Juvenile fish passage spill operations would be implemented at the lower Snake River projects and the lower Columbia River projects. The spill would benefit salmon and steelhead through increased spring juvenile

## Add.65a

spill, while providing a degree of protection against unexpected or unintended consequences that may occur due to spilling up to the 125 percent TDG cap, such as adult migration delay, gas bubble trauma, or damage to infrastructure. These spill levels are slightly variable, depending on the project, and may be higher or lower, depending on river conditions and the opportunity to spill in the spring. Spring and summer juvenile spill operations would be managed adaptively, through the established Regional Forum processes and as described in the CRSO EIS, Appendix R, Part 2, to address anticipated and unexpected challenges, such as **\*63849** potential delays to adult migration, effects to navigation, and other challenges or opportunities that may require either a temporary or permanent change. Additionally, operations of the spill deflectors at Chief Joseph Dam would continue to decrease TDG saturations between the forebay and tailrace during high flow and high spill years, consistent with the Preferred Alternative.

### 3.10 Provide an Adequate, Efficient, Economical and Reliable Power Supply That Supports the Integrated Columbia River Power System

Bonneville, along with the Corps and Reclamation, evaluated whether the Preferred Alternative would continue to provide an adequate, efficient, economical and reliable power supply that supports the integrated Columbia River Power system. This purpose and objective holistically looks at maintaining the federal power system's ability to reliably produce power at a reasonable cost, while also balancing Bonneville's other statutory objectives and responsibilities. To assess whether the alternatives met this objective, the Final CRSO EIS measures the effects of the Alternatives on not only the federal system but also on broader regional reliability using the loss-of-load probability or LOLP metric.

LOLP is an electric industry reliability planning standard that measures the likelihood of an energy shortage in a given year. [FN24] In simple terms, the higher the LOLP percentage, the greater the chance that utilities supplying power in the region will have at least one blackout that year. The LOLP of the No Action Alternative is 6.6 percent, or roughly one or more blackouts in one of every 15 years.[FN25] This is the baseline from which all the Alternatives are measured.[FN26]

24      CRSO EIS, Appendix H, Power and Transmission, Section 2.1; id., Appendix J, Hydropower, Section 4.1. While not a mandatory standard, LOLP operates as an "early warning" of a potential resource shortage for the region. See id., Section 3.7.3.2 at 3-881, n. 58.

25      CRSO EIS, Appendix H, Power and Transmission, Section 2.1, tbl. 2-1. For context, the regional LOLP target adopted by the Northwest Power and Conservation Council (Council) in 2011 was 5 percent. Id., Section 3.7.2.2 at 3-823.

26      CRSO EIS, Section 3.7.3.2 at 3-880.

Using the effects analysis for CRS operations from the Alternatives, the Final CRSO EIS calculates an LOLP for each alternative and then compares this value to the LOLP of the No Action Alternative, (i.e., 6.6 percent).[FN27] If the Alternative's LOLP is higher than the LOLP of the No Action Alternative (i.e., higher than 6.6 percent), then additional resources would be needed until the LOLP of the alternative is equal to the LOLP of the No Action Alternative. The Final CRSO EIS identifies two resource groups that reduce LOLP cost effectively and presents these resources as a range of possible options that Bonneville or regional utilities would have when selecting specific resources to acquire.[FN28] The Final CRSO EIS then performs a rates analysis to estimate the incremental impact the alternative would have on Bonneville's wholesale power rate and regional retail consumers' rates as compared to the No Action Alternative.[FN29]

27      Id., Appendix J, Hydropower, Section 4.1 at J-4-1.

28      Id., Appendix H, 2.2.2.4.3, at H-2-15. The CRSO EIS does not identify whether Bonneville or regional utilities would acquire the resources necessary to return regional reliability to the level of the No Action Alternative. This follows from the uncertainty around the nature of Bonneville's future power obligation. In general, if the supply of power from the federal power system declines, leaving Bonneville with insufficient power to meet its customers' firm power needs,

## Add.66a

Bonneville's customers have a choice: they may elect to have Bonneville acquire resources to make up the difference or they may choose to acquire the resources themselves.

29      See id., Section 3.7.3.1.

After reviewing the Final CRSO EIS, public comments, and analysis, the co-lead agencies concur with the findings in the Final CRSO EIS that the Preferred Alternative meets this objective and, therefore, is the agencies' choice for the Selected Alternative for CRS operations, maintenance and configuration. The Selected Alternative would decrease CRS hydropower generation relative to the No Action Alternative by 330 aMW of firm power assuming critical water conditions (roughly the amount of power consumed by about 250,000 Northwest homes in a year).[FN30] This decrease, however, would have no adverse effect on regional reliability compared to the No Action Alternative. The LOLP of 6.4 percent under the Selected Alternative is slightly lower than the LOLP of 6.6 percent under the No Action Alternative, but is essentially the same for purposes of the risk to regional reliability.[FN31]

30      Id., Section 7.7.9.9.

31      Id., Section 7.7.9.2.

The LOLP does not increase even with the loss of generation because of the shape of the remaining generation in the Selected Alternative. The largest reductions in annual average hydropower generation occur in periods when the system generally has surplus (spring) and loads are easier to meet. The reduction in generation in the Selected Alternative during this period does lead to some risk of power shortages in June when there was none in the No Action Alternative, and increases the risk of power shortages in July and the first half of August compared to the No Action Alternative. Conversely, the Selected Alternative increases generation in late August and in the winter, periods when demand is often high and it is more difficult to meet load, reducing the risk of power shortages compared to the No Action Alternative. The net effect of the spring and early summer generation decreases combined with the late-summer and winter increases returns the LOLP to essentially the same level of the No Action Alternative.[FN32]

32      Id.

While the Selected Alternative maintains reliability at the No Action Alternative levels in the near term, the analysis shows that over the long term this alternative meaningfully reduces the region's risk of blackouts when taking into account likely retirement of regional coal-fired resources in the future. As described in Section 3.7 of the Final CRSO EIS, the LOLP estimates used in the EIS analysis rely on the assumption that 4,246 megawatts (MW) existing coal generating capacity would continue to serve loads in the region over the study period.[FN33] The risk of blackouts in the region increases significantly under the No Action Alternative if some or all of the existing coal plants are retired. The Final CRSO EIS evaluates the impact additional coal retirements could have on regional reliability through two scenarios: a "limited coal scenario" (which captures current and expected coal retirements) and a "no coal scenario" (which assumes all regional coal is retired).[FN34] Under the "limited coal scenario", the No Action Alternative LOLP increases to 27 percent (a one in four chance of one or more blackouts each year), while under the "no coal scenario", the No Action Alternative LOLP jumps to 63 percent (a two out of three chance of one or more blackouts each year).[FN35] While these LOLP numbers are indicative of a serious reliability problem facing the region, the Selected Alternative has a downward effect on these high LOLP values. Specifically, the Selected Alternative decreases the LOLP by 3 percentage points (to 24 percent) under a limited coal scenario, and decreases it by 4 percentage points under the no coal scenario (to 59 percent), compared to the No Action Alternative.[FN36] In this way, the Selected Alternative not only maintains current regional reliability, but also reduces the **\*63850** amount of additional resources that would likely be need if/when additional coal facilities are retired.

33      Id., Section 3.7.3.1, at 3-875 to 3-877.

# Add.67a

34    Id., Appendix H, Section 2.3, at H-2-24.

35    Id. at H-2-25.

36    Id., Section 7.7.9.2, at 7-163.

Because the Selected Alternative essentially maintains regional reliability at the No Action Alternative levels, the Final CRSO EIS concludes that no replacement resources are needed to replenish lost firm power from the CRS projects.[FN37] Similarly, with no additional resources entering the grid, no new transmission interconnections or reinforcements would be required under the Selected Alternative.[FN38] Both of these factors contribute to the Selected Alternative having a low overall effect on wholesale and retail rate pressure, which is an important consideration in selecting this alternative.

37    Id., Section 7.7.9.3, at 7-163.

38    Id., Section 7.7.9.4, at 7-166.

Under the Selected Alternative, Bonneville's average wholesale Priority Firm (PF) power rate would experience upward rate pressure of $0.94 per megawatt-hour (MWh) or a 2.7 percent increase relative to the No Action Alternative, which results in a PF power rate of $35.50/MWh.[FN39] This rate pressure occurs because of a combination of increased costs for structural measures and reduced firm power sales to Bonneville's public power customers.[FN40] The upward rate pressure on Bonneville's wholesale transmission rates would be smaller—around 0.09 percent annually, largely due to reduced short-term transmission sales.[FN41] This pressure is modest and within a range that is generally manageable within Bonneville's cost structure.

39    Id., Section 7.7.9.5, at 7-169, tbl. 7-33. It should be noted that the wholesale rates described here represent the average rates paid by Bonneville's customers as calculated for the Preferred Alternative using the methodology and assumptions established in the Final EIS and is a useful comparison to the calculated rate for the No Action Alternative. It does not represent the effective rate paid by a particular Bonneville customer and it is not an actual or forecasted rate in Bonneville rate cases. Further, this rate pressure does not account for potential offsetting cost reductions Bonneville may engage in to reduce this pressure.

40    Id.

41    Id., Section 7.7.9.5, at 7-173.

Regional average residential retail rates would experience slight upward rate pressure of +0.44 percent, though the effect would be larger for power customers of Bonneville and would range up to +1.2 percent in some counties.[FN42] Across the Pacific Northwest, changes to the average residential retail rate would range from an increase of less than of 0.01 cents per kilowatt-hour (kWh) to an increase of 0.11 cents/kWh (in percentage terms this represents an increase of less than 0.1 percent to an increase of 1.2 percent). For commercial end users, rate effects range from an increase of less than 0.01 cents/kWh to an increase of 0.11 cents/kWh (an increase of less than 0.1 percent to an increase of 1.4 percent). Moreover, for industrial customers, the rate effects range from an increase of less than 0.01 cents/kWh to an increase of 0.11 cents/kWh (an increase of less than 0.1 percent to an increase of 2.0 percent).[FN43] These increases are lower than the regional retail impacts created by MO1, MO3, and MO4. Moreover, they do not include potential offsetting reductions, which Bonneville may be able to achieve through cost management actions that could reduce the upward pressure on the PF rate paid by Bonneville's firm power customers.

42    Id., Section 7.14, at 7-236, tbl. 7-55; see also id., Section 7.7.9.6, at 7-175 to 7-178, tbls. 7-37, 7-38.

43    CRSO EIS, Section 7.9.7.5, at 7-173; see also id., Section 7.9.10, at 7-221.

# Add.68a

### 3.10.1 Alternatives Considered

The co-lead agencies considered, but ultimately chose not to select, the No Action Alternative, MO1, MO2, MO3, or MO4. CRS operations under MO1, MO3, and MO4, reduce federal power generation, which results in a corresponding reduction in power system reliability relative to the No Action Alternative, i.e., they increase the LOLP percentage. To return the region to the LOLP of the No Action Alternative, additional resources would need to be built or acquired at a substantial cost to regional ratepayers. As described more fully below, MO3 and MO4 result in long-term, major, adverse effects on power costs and rates. [FN44] Similarly, MO1 results in long-term, moderate, adverse effects on power costs and rates.[FN45] Furthermore, until replacement resources are built and operating, regional reliability would decline below the level of the No Action Alternative.

44    CRSO EIS, Section 7.14, at 7-236, tbl. 7-55.

45    Id.

### 3.10.1.1 No Action Alternative

The No Action Alternative met the Purpose and Need Statement of the CRSO EIS, but it did not meet all of the objectives developed for the CRSO EIS.[FN46] The No Action Alternative generally satisfied the Power Objective [FN47] as it resulted in no additional upward power rate pressure or potential regional reliability issues. However, it only partially met the objectives for water supply and adaptable water management because it did not provide the additional authorized regional water supply. Further, it did not include effects of the changes to CRS operations from important maintenance activities at Grand Coulee needed in the near term.

46    Id., Section 7.3.1, at 7-5 to 7-6.

47    The "Power Objective" refers to Objective 4, ("providing an adequate, efficient, economical, and reliable power supply that supports the integrated Columbia River Power System") described above in Section 2.2, and in the CRSO EIS, Section 2.2.1, at 2-3.

### 3.10.1.2 MO1

The Final CRSO EIS concludes that MO1 would not meet the Power Objective.[FN48] Under this alternative, hydropower generation from the CRS projects would decrease by 130 aMW (roughly enough to power 100,000 households annually).[FN49] The FCRPS, which includes the CRS, would lose 290 aMW of firm power under critical water conditions. This reduces the total amount of firm power available to Bonneville for supplying power customers under current long-term, firm power sales contracts. While the decrease in generation in MO1 is less than under the Preferred Alternative, MO1 had a greater impact on regional reliability because of the timing of when these declines occur. Specifically, MO1 changed the availability of generation in the summer months, when demand for electricity is relatively high and existing generating capacity is already relatively low. [FN50] As such, regional reliability would decline under this alternative, with LOLP increasing to 11.6 percent (or one or more blackouts in 1 in every 9 years) in MO1.[FN51]

48    CRSO EIS, Section 7.3.2, at pg. 7-7.

49    Id., Section 3.7.3.3; id., Section 3.1.3, tbl. 3-1.

50    CRSO EIS, Section 3.7.3.3, at 3-896.

51    Id.; id., Appendix H, at H-2-3, tbl. 2-1.

# Add.69a

The Final CRSO EIS concluded that additional resources would need to be built to maintain regional reliability at the same level as the No Action Alternative. It considered two resource portfolios that regional utilities could likely select from to replace the decrease in generation capability under MO1. Those portfolios include: (1) A conventional least-cost portfolio (natural gas); and (2) a zero-carbon portfolio (solar and demand response). Under the conventional least-cost portfolio, approximately 560 MW of natural gas fired generation would be needed at a cost of around $43 million per year to return regional reliability to the level of the No Action Alternative.[FN52] If the zero-carbon portfolio is selected, then 1,200 MW of solar produced power and 600 MW of demand response would **\*63851** be needed, for a cost of around $162 million a year.[FN53]

52    CRSO EIS, Section 3.7.3.3, at 3-899.

53    Id.

As noted above, the Final CRSO EIS included a rate analysis to estimate the impact of each MO on Bonneville's wholesale power and transmission rates. This analysis showed that MO1 placed upward pressure on Bonneville's PF power rate. Depending upon the type of resources acquired and the source of funding for those resources, MO1 placed upward pressure on Bonneville's PF rate of between 4.5 percent and 8.6 percent over the No Action Alternative.[FN54] Sensitivities performed in the Final CRSO EIS around these values showed the range of rate impacts widening from a low of 5.9 percent to a high of 14.3 percent (if Bonneville acquires the resources).[FN55] The upward transmission rate pressure under MO1 has annual increases between 0.62 and 0.74 percent depending on the resource replacement scenario.[FN56]

54    Id. at 3-904, tbl. 3-135, and 3-907, tbl. 3-136.

55    Id. at 3-904, tbl. 3-135.

56    Id. at 3-908.

The regional average residential retail electric rates would also see increases under MO1. Regional retail rates could see upward rate pressure from between +0.65 percent and +0.79 percent annually depending on the applicable scenario.[FN57] The retail impact would be even larger for power customers of Bonneville, with the retail increase ranging as high as +7.6 for residential consumers in some counties.[FN58] These effects could be greater if fossil fuel generation is reduced under the No Action Alternative, as is expected.

57    Id. at 3-909.

58    Id. at 3-918 to 3-919, tbl. 3-147.

### 3.10.1.3 MO2

MO2 best met the Power Objective.[FN59] MO2 was developed with the goal to increase hydropower production and reduce regional greenhouse gas emissions while avoiding or minimizing adverse effects to other authorized project purposes. MO2 would slightly relax the No Action Alternative's restrictions on operating ranges and ramping rates to evaluate the potential to increase hydropower production efficiency, and increase operators' flexibility to respond to changes in power demand and to integrate variable renewable resources.[FN60] Average CRS generation would increase under MO2 by 450 aMW or 5 percent.[FN61] Firm generation would increase by 380 aMW or 6 percent.[FN62] The LOLP improves under MO2 to 5 percent, which is below the No Action Alternative level of 6.6 percent and is consistent with the Northwest Power and Conservation Council's target for the region.[FN63]

59    Id., Section 7.3.3, at 7-8.

## Add.70a

60      Id. at 7-7.

61      Id., Section 3.7.3.4, at 3-920.

62      Id.

63      Id. at 3-922.

MO2 also has the smallest wholesale power and transmission rate pressure of the alternatives, with a base power rate impact of -0.8 percent and a range of between -3.2 percent to a high of 1.3 percent under the sensitivity analysis.[FN64] Transmission rate pressure was approximately 0.11 percent annually. MO2 also has long-term benefits to regional reliability if additional coal retirements occur.[FN65] Because MO2 increased CRS hydropower generation, fewer replacement resources would be needed to maintain regional reliability if existing plants serving load in the region are retired.[FN66] While MO2 provides the greatest benefits for the Power Objective, it generally produced minor to major adverse effects for anadromous fish except for minor beneficial effects for Snake River Chinook as modeled by NMFS. Thus, this alternative was not selected as the Preferred Alternative because of the adverse effects to anadromous and resident fish as well as cultural resources.

64      Id. at 3-927, tbl. 3-150.

65      Id., Section 3.7.3.4 at 3-922.

66      Id. at 3-923.

### 3.10.1.4 MO 3

The Final CRSO EIS concludes that MO3 would not meet the Purpose and Need Statement for the integrated FCRPS [FN67] or the Power Objective.[FN68] This is due primarily to the decline in reliability and the upward rate pressure resulting from breaching the four lower Snake River dams. Under MO3, FCRPS generation would decline by 1,100 aMW, or roughly 8 percent.[FN69] The firm power capability of the FCRPS—power that on a planning basis is made available to meet Bonneville's customers' firm power needs—would decrease by 750 aMW, or roughly 12 percent.[FN70] The risk of a regional shortage of power would more than double compared to the No Action Alternative to 14 percent under MO3, or one or more blackouts in one out of every 7 years.[FN71]

67      Id., Section 7.2, at 7-4.

68      Id., Section 7.3.4, at 7-10.

69      Id., Section 3.7.3.5, at 3-939 to 3-940.

70      Id. at 3-941.

71      Id., Section 3.7.3.5, at 3-942; id., Appendix H, Power and Transmission, Section 2.1, tbl. 2-1.

Additional generation resources would be needed to maintain regional reliability at the No Action Alternative level. As with other MOs, the Final CRSO EIS considered two replacement resource portfolios: (1) Conventional least-cost; and (2) zero-carbon.[FN72] The conventional least-cost portfolio required approximately 1,120 MW of natural gas generation for an annual cost of around $249 million.[FN73] The zero-carbon portfolio required 1,960 MW of solar generation supported by 980 MW of batteries and 600 MW of demand response to return regional reliability to the No Action Alternative levels.[FN74] This portfolio included battery storage to return some of the lost sustained peaking and ramping capability that would occur under MO3.[FN75] This feature of the MO3 resource portfolio recognized the important role that generation capacity (the ability of a generator to increase or decrease generation) plays in balancing solar resources. Without batteries, solar resources would need

# Add.71a

to rely on other regional resources to help balance their generation when the sun goes down or clouds roll in.[FN76] The cost of the zero carbon portfolio is about $416 million a year.[FN77]

72    CRSO EIS, Section 3.7.3.5, at 3-942.

73    Id. at 3-943.

74    Id.

75    Id.

76    Id.

77    Id. at 3-960, tbl. 3-168.

The "base case" evaluation in the Final EIS described the resources needed to return regional reliability to the level of the No Action Alternative (i.e., LOLP of 6.6 percent). These resources, however, would not return to the Federal system, or the region, the full functionality, flexibility, and capability provided by the four lower Snake River dams. The four lower Snake River dams provide many operational benefits to power system functionality, such as 2,000 MW of quickly responding up or down (i.e., ramping) generation capacity that can be deployed to meet fluctuations in load and generation.[FN78] This type of flexibility is crucially important during times of system stress, such as when generation goes offline or wind and solar generation fluctuate. To account for these additional operational benefits, the Final CRSO EIS performed a sensitivity analysis to estimate the amount of additional resources needed to replace the flexibility attributes of the four lower Snake River dams. The EIS concludes that to fully replace the capability of these projects, 3,306 MW of solar, 1,144 MW of wind, and 2,515 MW of batteries (at a cost of over $800 million a year) would be needed.[FN79]

78    Id. at 3-945 to 3-946.

79    Id. at 3-947 to 3-948, tbl. 3-164.

 *63852   The Final CRSO EIS rates analysis showed that MO3 would place substantial upward rate pressure on Bonneville's PF power rates. Under the least-cost conventional portfolio, Bonneville's power rates could see rate pressure in a range between 8.2 percent and 9.6 percent.[FN80] The rate sensitivity analysis for this portfolio shows this range expanding from a low of 4 percent to a high of 10.1 percent (if Bonneville acquires the resources).[FN81] The upward pressure to Bonneville's PF power rate under the zero carbon portfolio would range from 9.8 percent (if regional utilities acquire replacement resources) to 20.6 percent (if Bonneville acquires the resources).[FN82] The rate sensitivity analysis in the Final CRSO EIS shows these rate impacts potentially growing even larger under MO3, with the low end of that range at 11.8 percent to a high end of over 50 percent, if Bonneville acquires the resources.[FN83]

80    Id. at 3-960, tbl. 3-168 and at 3-964, tbl. 3-169.

81    Id. at 3-960, tbl. 3-168.

82    Id.

83    Id.

MO3 results in upward pressure on Bonneville's transmission rates as well. Upward transmission rate pressures would be 1.3 percent annually for the conventional least-cost portfolio and 1.6 percent annually under the zero-carbon portfolio, relative to the No Action Alternative.[FN84]

# Add.72a

84      Id. at 3-965.

The regional average residential retail rates for power would see substantial increases under MO3. Regional retail rates across all utilities (both Bonneville customers and non-Bonneville customers) could see upward rate pressure from between +1.7 percent and +2.8 percent depending on the applicable scenario.[FN85] The retail impact would be even larger for Bonneville's power customers, with the retail increase ranging as high as +14 percent for residential consumers in some counties and +28 percent for some industrial consumers.[FN86] These effects could be greater if fossil fuel generation is reduced under the No Action Alternative, as is expected.

85      Id. at 3-965 to 3-966.

86      Id. at 3-966.

While the high cost of MO3 is an important factor in the co-lead agencies' decision to not include breaching the four lower Snake River dams in the Preferred Alternative, other factors under MO3 also weigh against its selection. For example, the time involved to select, permit, and build the replacement resources and any associated transmission facilities is unknown. The Final CRSO EIS assumes breaching the four lower Snake River dams would occur starting in 2021. The Final CRSO EIS also assumes all replacement resources would be available to serve load beginning in 2023.[FN87] This is a methodological assumption designed to create a level playing field to measure the effects of the Alternatives compared to the No Action Alternative. While useful for the rates analysis (and other affected resources), this assumption does not take into account the elements of the planning required, and the time needed to site, permit, and build the replacement resources. In the case of MO3, the zero-carbon replacement resources would be on a level well above those currently operating in the region. For a sense of scale, the region has around 1,000 MW of installed solar capacity,[FN88] and the largest operating battery in the world is 100 MW, though several larger batteries are in development.[FN89] Installing 1,960 MW of solar would require roughly 12,000 acres of land or approximately 18 square miles.[FN90]

87      Id., Section 3.7.3.1, at 3-859.

88      Id., Section 3.7.3.2, at 3-882.

89      Id., Section 3.7.3.5, at 3-947.

90      Id. at 3-943.

The CRSO EIS acknowledges the timing issues with these large resource builds, noting that it would likely take years— perhaps decades—to complete the planning, environmental analysis, permitting, land acquisition, and physical construction of the transmission and generation resources needed in this alternative.[FN91] Moreover, the environmental effects from building this level of renewable resources would require its own evaluation. That evaluation would include, among other matters, impacts to the natural environment and methods to dispose of or recycle the metals and minerals used in large-scale solar, wind, and battery installations at the end of their useful life.[FN92] The feasibility of building thousands of megawatts of new resources, miles of new transmission infrastructure, upscaling emerging technologies (e.g., batteries) to unprecedented levels, and the associated environmental review of these actions, is a factor in the co-lead agencies' choice of an alternative. Until those resources are constructed and operating, actions to implement MO3 could not be undertaken without seriously undermining regional reliability.[FN93]

91      Id., Section 3.7.3.3 at 3-899; see also id., Appendix H, Section 2.2.4.

# Add.73a

92      CRSO EIS, Appendix H, Section 2.2.4, at H-2-24.

93      Id. at H-2-3, tbl. 2-1 (showing the region facing blackout/energy shortages in 1 out of every 7 years under MO3).

Another important consideration weighing against selection of this alternative is the long-term regional reliability impacts of reducing existing carbon-free, flexible resources. As discussed in the Preferred Alternative, the Final CRSO EIS analysis assumes that coal plants generating 4,246 MW would continue to serve loads in the region over the study period.[FN94] Several of these plants have already been slated for retirement, while others are likely to retire in the coming years as state policymakers continue to take actions to reduce the use of fossil fueled resources.[FN95] While the CRSO EIS focuses on selection of the operating strategy for the CRS projects, the Final CRSO EIS recognizes the effects that coal plant retirements can have on regional reliability.[FN96] The resource retirement choices that utilities make affect the reliability of the broader interconnected grid and markets, likely putting additional strain on the existing power system, particularly if the replacement resources are intermittent or variable renewable resources. If regional utilities retire their coal plants, the need for existing hydropower becomes greater.[FN97] A similar paradigm applies to hydropower generation. Breaching existing hydropower projects places additional strain on the existing power system, including thermal and renewable resources, compounding the reliability problems the region will already be facing with additional coal plant retirements. The end result is that regional utilities would need to fill the holes in reliability left by reductions in both resources (coal and hydropower), which may result in even more investments in resources by regional utilities.

94      Id., Section 3.7.3.1, at 3-875-77.

95      Id., Appendix H, Section 2.3.

96      Id., Section 6.3.1.7, at 6-68 to 6-69.

97      Id., Appendix J, Hydropower, Section 4.2.5, at J-4-19.

The Final CRSO EIS analyzed the effects of coal plant retirements plus reductions in hydropower generation in the "Other Regional Cost" pressure sensitivity.[FN98] In simple terms, this sensitivity asks whether the combination of (1) accelerated coal plant retirements, and (2) operations under the applicable alternative, would require regional utilities to build incremental zero carbon resources, above and beyond what would be needed if (1) and (2) were viewed **\*63853** separately. For MO1 and MO4, the Final CRSO EIS concludes in the Other Regional Cost pressure analysis that no incremental resources were needed to maintain regional reliability when viewing (1) and (2) together. For MO3, however, an effect is identified, with a range of between 660 MW to 3,460 MW of additional zero-carbon resources.[FN99] This effect shows that the combined effects of MO3 operations plus coal plant retirements would potentially lead the region to build even more resources than the sum of coal plant retirements and hydropower generation losses occurring in isolation. This analysis confirms that eliminating the generation of the four lower Snake River projects would exacerbate the existing resource adequacy issue already facing the region.

98      Id., Section 3.7.3.1, at 3-875 to 3-876.

99      Id., Section 3.7.3.5, at 3-952, tbl. 3-167.

### 3.10.1.5 MO4

The Final CRSO EIS concludes that MO4 would not meet the Power Objective.[FN100] This is primarily due to the large reductions in generating output resulting from CRS operations under MO4. Average CRS generation under MO4 would decline by 1,300 aMW, which is a 15 percent reduction.[FN101] The firm power capability of the CRS would decline by 890 aMW or 14 percent.[FN102] The risk of a regional shortage of power (LOLP) would increase to 30 percent, an almost fivefold increase to the No Action Alternative LOLP of 6.6 percent. This is equivalent to one or more blackouts every 3 years.[FN103]

# Add.74a

100   Id., Section 7.3.5, at 7-14.

101   Id., Section 3.7.3.6, at 3-978.

102   Id. at 3-979.

103   Id. at 3-980.

Returning regional reliability to the level of the No Action Alternative would require substantial investments in new resources. Using conventional least-cost resources, the Final CRSO EIS estimates that 3,240 MW of power produced by new natural gas plants would be needed to return regional reliability to the level of the No Action Alternative at an annual cost of approximately $242 million.[FN104] If zero-carbon resources are selected, then roughly 5,000 MW of power produced by solar resources and 600 MW of demand response would be needed at an annual cost of roughly $576 million.[FN105]

104   Id. at 3-981. Although MO4 requires more natural gas plant capacity than MO3, the cost of operating and running these plants is slightly less because they will be operated less frequently than in MO3, and a lower-cost technology (frame as opposed to combined cycle) was selected in the resource selection process for MO4.

105   Id. at 3-981 to 3-982.

MO4 would place substantial upward rate pressure on Bonneville's PF power rates. Under the least-cost conventional (natural gas) portfolio, Bonneville's PF power rates could see base case rate pressure in the range between 15.3 percent (if regional utilities acquire the resources) and 23.5 percent (if Bonneville acquires the resources).[FN106] The rate sensitivity analysis showed this rate pressure increasing, from a low of 18.6 percent to a high of 26.4 percent (if Bonneville acquires the resources). [FN107] The rate pressure to Bonneville's wholesale power rate under the zero-carbon portfolio ranges from 18.3 percent (if regional utilities acquire replacement resources) to 25.3 percent (if Bonneville acquires the resources).[FN108] The rate sensitivity analysis in the Final CRSO EIS shows these rate impacts potentially growing even larger under MO4, with the low end of that range at 20.2 percent to a high end of over 40 percent (if Bonneville acquires the resources).[FN109]

106   Id., Section 3.7.3.6, at 3-989, tbl. 3-184, and at 3-992, tbl. 3-185.

107   Id.

108   Id. at 3-989, tbl. 3-184.

109   Id.

MO4 resulted in the most substantial upward pressure on Bonneville's transmission rates as well. Upward transmission rate pressures would be 1.6 percent annually for the conventional least-cost portfolio, and 1.9 percent under the zero-carbon portfolio, relative to the No Action Alternative.[FN110]

110   Id. at 3-993.

Regional retail rates would also see significant upward rate pressure. On average, counties would experience a 2.9 to 3.3 percent upward rate pressure on their residential retail rate, depending on the replacement portfolio, relative to the No Action Alternative. [FN111] The largest effect for all end-user groups under MO4 is a 36 percent upward rate pressure in the industrial retail rate for some counties.[FN112]

# Add.75a

111    Id. at 3-994.

112    Id.

As with MO3, the co-lead agencies considered the long-term impacts on regional reliability and the feasibility of implementing this alternative. If the region selects a zero-carbon portfolio to replace the lost generation in MO4, then upwards of 30,000 acres of land or roughly 47 square miles would be needed to site a solar project capable of producing 5,000 MW.[FN113] These replacement resources, which would take years, if not decades to site, permit, construct, and acquire would need to be up and running before CRS operations under MO4 could be in place. Without these resources, regional reliability would decline to unprecedented low levels, with a 30 percent chance of a year with one or more blackouts, i.e. one year every three years, creating potential public safety and health effects from decreased power reliability. In addition, as with MO3, the mass buildup of resources called for in MO4 would involve environmental effects that would have to be evaluated and considered.

113    Id. at 3-981 to 3-982.

### 3.11 Minimize Greenhouse Gas Emissions From Power Production in the Northwest by Generating Carbon-Free Power Through a Combination of Hydropower and Integration of Other Renewable Energy Sources

Similar to MO1, MO3, and MO4, the Selected Alternative does not meet the CRSO EIS objective of minimizing greenhouse gases (GHG) emissions from power production in the Northwest. Hydropower generation will decrease, resulting in increased generation from existing gas and coal plants. The air quality analysis for the Selected Alternative concludes that power sector GHG emissions in the Northwest will increase by approximately 0.54 million metric tons per year, which is about 1.5 percent of total power sector emissions in the region. This increase is not as substantial as the increases for MO3 or MO4, but similar to the increase under MO1. For states that have established policies for reducing GHG emissions, such as Oregon and Washington, this could adversely impact the timeframe and costs associated with meeting these targets. Similarly, this could also increase the cost for utilities that need to comply with state policies that place a price on carbon or require use of a high percentage of renewables to meet retail load. For example, Washington's Clean Energy Transformation Act (2019) directs Washington retail utilities to serve loads with 100 percent carbon-neutral power by 2030 and 100 percent carbon-free power by 2045 (Revised Code of Washington 19.405). The CRSO EIS analysis indicates that in 2030 the approximately 0.54 million metric ton increase in GHG emissions could cost utilities—and ultimately ratepayers—across the region $15 to $77 million a year in compliance costs under these types of state programs (prices are stated in 2019 dollars).

Given the Selected Alternative's changes in hydropower generation largely occur in April through June,—a time of year when hydropower generation is typically surplus to Bonneville's preference customers' loads—it is more likely that increased **\*63854** fossil-fuel generation owned by the investor-owned utilities in the region would be serving investor-owned utility load, thus resulting in these GHG emissions costs being borne largely by investor-owned utilities. However, there could be conditions when some of these costs could also be borne by Bonneville and its preference customers depending on which entity is responsible under state programs for the GHG compliance costs associated with the increases in fossil-fuel generation. While the Selected Alternative results in increases in GHG emissions and likely additional costs to ratepayers, thus not meeting this CRSO EIS objective, this represents a trade-off to allow for potential benefits to ESA-listed salmonids.

### 3.12 Climate Change

Future climate projections indicate warming temperatures and changes in precipitation trends, which generally are likely to result in declining snowpack, higher average fall and winter flows, earlier peak spring runoff, and longer periods of low summer flows. These changes could lead to higher and more variable winter flows and lower flows during summer months across all regions in the basin. Water temperatures throughout the basin are likely to increase. Climate change is expected to affect nearly all purposes and uses of the CRS. These effects are not caused by the CRS (though changes in operations of the system evaluated in the CRSO EIS impact hydropower generation and in turn regional GHG emissions) and are expected to occur regardless of

## Add.76a

the alternative selected. However, certain measures could exacerbate or ameliorate the impacts of climate change, thus affecting the overall resiliency of a resource in response to these expected changes in climate.

The analysis concluded that climate change is expected to have negligible to moderate effects (beneficial or adverse) on resources and the effectiveness of the Preferred Alternative. The EIS analysis showed minor to moderate effects from climate change to these resources: Hydrology and Hydraulics; River Mechanics; Water Quality; Anadromous Fish; Resident Fish; Vegetation, Wildlife, Wetlands, and Floodplains; Power Generation and Transmission; Flood Risk Management; and Fisheries.

In the final biological opinion, NMFS states that climate change poses a substantial threat to anadromous fish species over the next twenty years. While climate change will affect anadromous fish in all stages of life, the impacts are largely driven by changes in ocean conditions that are projected to reduce survival during the marine life history stage. NMFS concluded that "these conditions are not caused by, nor will they be exacerbated by, the continued operation and maintenance of the CRS as proposed in the biological assessment." The USFWS concluded in its final biological opinion that the Preferred Alternative, in combination with other Federal and non-Federal actions, is likely to exacerbate the effects of climate change on resident fish by further diminishing habitat quality, decreasing forage availability, causing migration delays, and increasing the risk of injury and mortality. The USFWS recommended measures be taken where possible to increase instream flow to improve water quality, decrease stream temperatures, and otherwise reduce the impacts to resident fish from climate change. The Selected Alternative contains measures that are adaptive to emerging changes in climate and ensure there is flexibility to respond to future changes.

Operational measures for the Selected Alternative as well as non-operational conservation measures are expected to improve the existing survival levels of fish species and contribute to overall resiliency in light of climate change. For example, the co-lead agencies committed to continuing the tributary and estuary habitat improvement program for salmon and steelhead (with considerations for benefits to bull trout, where appropriate), habitat restoration actions for KRWS, and to evaluate and improve tributary habitat access for species such as bull trout which will give spawning fish access to additional habitat. These actions improve resilience to climate change by increasing access to more diverse spawning habitat. Another example of this is the tributary habitat restoration program that counters increased stream temperature with deeper pools and more shaded areas. These types of habitat improvement projects are examples of many actions that will be implemented throughout the Columbia Basin. The Selected Alternative also contains operational measures that are expected to contribute to species resiliency, such as the continued use of cool water stored behind Dworshak Dam and structures to address ladder temperature differentials to help to reduce water temperatures in the lower Snake River as fish approach and pass Lower Granite and Little Goose dams.

The Preferred Alternative also contains measures that provide additional flexibility for operations of the CRS, which may contribute to the resiliency of other resources to climate change. For example:

• The reduction in fish passage spill in the second half of August, which increases generation during a time when climate change is expected to increase demand for power while at the same time reducing the volume of water.

• The updated flood risk management drawdown operation at Dworshak, which will provide more planning certainty counteracting the increased uncertainty from climate change.

• Sliding scale operations for summer flow augmentation are staged to better respond to local water supply conditions by using local forecasts and to better balance anadromous and resident fish needs.

A full discussion of climate and evaluation of resources are included in Chapters 4 and 7 of the CRSO EIS.

### 3.13 Scientific Integrity and Commitments to Independent Review

Based on the nature of the CRSO EIS, the standards in the applicable statutes, and comments during scoping from the public, the co-lead agencies concurred that scientific integrity and independent review of both the analysis in the CRSO EIS and the methodologies used to conduct the evaluation were important parts of the process. Following the Corps and OMB guidance

Add.77a

described in Corps (2018) and OMB (2004), the agencies had independent technical review conducted in addition to agency and cooperator agency technical review. This helped assure the evaluations were sound and identified where materials need clarity or where the information had considerable risk and uncertainty. These findings were used by the decisionmakers in considering alternatives and making a final selection. Several of the tools used were not owned or operated by the co-lead agencies. The results of these peer reviews are discussed in the body of the CRSO EIS. The owners of these tools were provided the results from the peer review panel to help improve the tools in the future, should those entities choose to do so.

### *3.14 Comparable Benefits and Adverse Effects of the Alternatives*

In addition to the benefits that could be achieved by implementing each of the alternatives, the agencies closely reviewed the analysis of both benefits of implementing an alternative, and potential adverse impacts to the human and natural environment, including risk to human health or safety, changes to community culture and wellbeing, impacts to local and regional economies, and ability to access and enjoy the natural environment. The Northwest region has diverse tribal **\*63855** communities and a rich history of cultural resources; the co-lead agencies gave particular consideration to not exacerbate any effects to, or adversely or disproportionately impact, tribal resources or communities. The agencies also consider risk, potential undesirable and unintended consequences of alternatives, and how climate variability, such as conditions of both the short term and long term shifts in climate, including extended droughts, or wetter and warmer weather, may affect the system operations and the resources in the region.

The No Action Alternative would continue with the planned operations and mitigation components in place in September 2016. The No Action Alternative also would not include the additional water supply commitments from Lake Roosevelt, or the operations of Grand Coulee during planned maintenance activities over the next 25 years. The No Action Alternative also would not meet the Power, GHG, or water supply objectives of the EIS for balancing considerations of future operations.

All of the alternatives included measures to benefit ESA-listed anadromous and resident fish and lamprey. MO1 included several measures, which were carried forward or modified in the Preferred Alternative. MO1 included all lamprey structural measures included in the Preferred Alternative, except the Closeable Floating Orifice Gates measure, which was only added to the Preferred Alternative. Measures unique to MO1 for fish were the juvenile spill operation, the Predator Disruption Operations measure, and the Modified Dworshak Summer Draft measure. The Predator Disruption Operations measure (like the Preferred Alternative) could result in larval lamprey being stranded in shallow rearing areas, depending on dewatering rates. The Modified Dworshak Summer Draft measure was intended to provide cooler water for anadromous fish. The analyses showed it would actually increase temperatures and have an adverse effect on ESA-listed anadromous and resident fish as well as non-ESA-listed lamprey. This measure was not carried forward into the Preferred Alternative. Finally, MO1 did not meaningfully meet resident fish, power or GHG objectives.

MO2 included measures with less spill and spring flow compared to the No Action Alternative and generally had lower expected performance related to anadromous adult and juvenile fish. For some species, such as Snake River Chinook salmon, the analysis produced mixed results with the NMFS Lifecycle models predicting minor improvements and the CSS Lifecycle models predicting major declines. The MO2 resident fish results showed the measures to increase power generation and water supply would have moderate to localized major adverse effects to resident fish throughout the basin, especially at Hungry Horse Dam where increased winter flows and lower summer reservoir elevations would affect food productivity, tributary access, habitat suitability, and entrainment. Regions B and C would also experience adverse effects to resident fish from power generation and water management measures that were eliminated or modified for the Preferred Alternative. Finally, MO2 included the same lamprey structural measures as MO1. Relative to the Preferred Alternative, the overall shift to more powerhouse flow and passage makes this alternative less effective at improving conditions for lamprey. Greater numbers of lamprey would likely pass near fish bypass screens and would be at a higher risk of injury or impingement compared to the No Action Alternative. Thus, although MO2 met the power and GHG objectives, it did not meet the objectives for ESA-listed juvenile fish or resident fish and may not meet the ESA-listed adult anadromous fish objective. These adverse effects could impact tribal and commercial fishing. It also did not meet the water supply objective.

## Add.78a

MO3 included improvements to fish passage by structural modification with the Removal of the Earthen Embankments measure at the four lower Snake River dams. Model estimates for MO3 showed the highest predicted potential smolt-to-adult returns (SARs) for Snake River salmon and steelhead as compared to the other alternatives analyzed in the CRSO EIS. Quantitative model results from both the CSS and NMFS Lifecycle models were available and indicated a range of potential long-term benefits largely due to how the models address latent mortality. Quantitative predictions for improvements for Upper Columbia Chinook were not anticipated to be at the same magnitude as Snake River species since upper Columbia stocks do not pass the four lower Snake River dams. Moreover, resident fish would have major adverse short-term effects during construction followed by major long-term benefits to bull trout and white sturgeon (not ESA-listed in this reach) due to habitat connectivity. Other native fish in the Snake River would also benefit from the conversion of reservoir conditions to more riverine habitat. MO3 analyses showed similar effects as MO1 for resident fish in other regions. The primary benefit is anticipated to be for ESA-listed fish in the lower Snake River, which could improve commercial and tribal fishing and recreation. Finally, MO3 included the same lamprey structural measures as MO1. Relative to the Preferred Alternative, the most substantial change would be the breaching of the four Lower Snake River dams. This could reduce mortality to lamprey during the downstream migration phase and would substantially improve the ease of upstream migration. Finally, MO3 did not meet the power or GHG objectives.

Significant human health and safety concerns were identified for MO3. This alternative has the potential to temporarily contaminate water, used for both municipal and agricultural purposes. Indirect impacts included potential to contaminate fish and communities that may consume these fish. The uncertainty around remediation actions that would be required to clean hot spots and underground storage leaks elevates the risk. Much of the safety improvements needed to public and private infrastructure (roads, rails, water intakes, pipes) in the reach of the lower Snake River would be conducted by other entities. The method of dam breaching would be staged and water levels lowered to prevent shoreline slumping, but changes in river velocities on infrastructure could contribute to degradation that would need to be addressed. Water intakes for municipal water access would need to be extended in some areas, a concern for communities to have access to adequate water supply. Several communities currently use the lower Snake and McNary reservoirs for fire prevention and emergency services via boats and sea planes, and would need to adjust their emergency plans. Carbon emissions and traffic congestion would be elevated in some communities as commodities shift from shipping by navigation to truck or rail. As sediment is moved through the system, areas of the navigation channel and shorelines could capture sediment and create temporary shoaling areas, which could pose hazards to boaters.

MO3 additionally would have adverse effects to the communities along the lower Snake River and confluence with the Columbia River. This area would have to adjust to changes in agricultural and shipping practices, and jobs. While economically these shifts will pass from one type of service to another, the people involved are likely to change, and the composition of these communities with it. There would be **\*63856** higher cost for shipping in the region, as well as upward pressure on power and transmission rates and increased risks for power outages unless and until replacement resources are acquired. Additionally, there would be significant shifts in use of this region for recreational purposes, from a reservoir to river system. Most access points to the river will be inaccessible until regional entities provide local infrastructure. Over time, it is anticipated these communities would stabilize. In the interim, these communities would have limited and changed use of the river, shifts in community practices, and impacts to visual and aesthetic enjoyment of the natural environment.

There was significant short term risk to the natural environment with MO3 implementation. While mitigation and time could help offset those impacts to wetlands, floodplains and wildlife usage adversely affected by the breaching measure, there is significant uncertainty around responses to extended years of low dissolved oxygen. Significant die-off of aquatic organisms could occur. Long term risks include increases in ambient air temperature, which could exacerbate water temperatures in a post breach lower Snake River, which would be much shallower and narrower. It is anticipated it would be more sensitive to air temperatures, including getting hotter in the spring, and cooling earlier in the fall. The potential of unintended consequences is higher as there is greater uncertainty in multiple breaching scenarios, which could also implicate funding and associated production at mitigation hatcheries.

MO4, which had the highest juvenile fish passage spill levels and the most flow augmentation, also produced mixed results based on the two primary modeling approaches. NMFS Lifecycle models predicted that survival and abundance would decrease

# Add.79a

under MO4 while the CSS models predicted increases. MO4 incorporates a flow augmentation measure to benefit juvenile anadromous fish that would have major adverse effects to resident fish in the upper basin (Region A), and also in Lake Roosevelt (Region B), especially in dry years. Notably, this alternative is the only one that showed adverse effects to resident fish in the Pend Oreille River and Lake Pend Oreille. Additionally, MO4 included the same lamprey structural measures as MO1. Relative to the Preferred Alternative, the increased spill and flow augmentation under MO4 may result in minor beneficial effects for out-migrating juvenile lamprey. Adults migrating upstream in July would experience higher water temperatures in the Columbia River from Chief Joseph Dam to McNary Dam that would likely lower their survival and migration success relative to the Preferred Alternative. In MO4, drawdowns in late March could dewater sediment used for larval lamprey rearing, and this alternative could reduce the amount of habitat available for larval lamprey. MO4 has the potential to affect communities adversely along the upper storage reservoirs and rivers. The increase in water flows in the lower Columbia River would pull water from the upper basin projects, adversely affecting riparian and resident fish habitat. Many of these areas have tribal and commercial fishing, directly affecting the fish resources, economics, and community wellbeing. Additionally, these areas would have adverse visual effects. Several cultural sites would also be at risk of damage.

MO4 would remove flexibility for water discharge outlets at projects, and increase TDG in the water column. This has a known adverse impact to aquatic organisms, but uncertainty around the scale of adverse impacts at the project level. Additionally, the energy associated with the discharged spill could confuse and prevent migrating ESA-listed adult fish from passing the projects. There would be additional infrastructure maintenance and dredging of the navigation channel to sustain the higher spill, impacting the sediments and aquatic organisms more frequently. Finally, MO4 did not meet the ESA-listed resident fish, power or GHG objectives.

With these results, in concert with results relating to the other objectives in mind, the co-lead agencies developed the Preferred Alternative. A major difference from past operations is the Preferred Alternative includes a new spill operation to test balancing fish benefits and flexibility for hydropower production by spilling more water in the spring for juvenile fish passage. The Preferred Alternative did not carry forward some measures that were initially expected to provide a benefit to anadromous fish, including construction of additional powerhouse surface collectors because neither NMFS nor CSS Lifecycle modeling efforts predicted a measurable benefit to fish.

Relative to resident fish, the Preferred Alternative includes measures that provide benefits for resident fish, such as ramping rate restrictions, minimum downstream flow requirements, and temperature control, as well as ongoing non-operational conservation measures such as Kootenai River white sturgeon habitat restoration projects and leveraging benefits for bull trout where feasible when developing tributary habitat projects for salmon. Other measures allow for the summer draft from Libby and Hungry Horse Reservoirs for downstream flow augmentation to be determined based on local water supply forecast and to be sensitive to water supply conditions. As a result, water reservoir elevations would be a little higher in the summer, especially in dry years. This action is expected to affect resident fish by improving food production, tributary access, entrainment, and downstream habitat suitability. Finally, measures included in the Preferred Alternative should decrease susceptibility to physical stress and mortality for lamprey relative to the No Action Alternative. The Preferred Alternative is expected to contribute to improvements in spatial distribution and recruitment of Pacific lamprey in the Columbia Basin, though it remains difficult to quantify effects and benefits of some actions. Finally, the Preferred Alternative meets all EIS objectives except the GHG objective.

**Section 4. Public Review**

Public review of the Draft CRSO EIS was conducted February 28, 2020 through April 13, 2020 (85 FR 11986). All comments submitted during the public comment period were responded to in the Final CRSO EIS and can be found in Appendix T. A 30-day waiting period and state and agency review of the Final EIS was completed on August 31, 2020 (85 FR 46095).

*4.1 Comments Recevied on the Final EIS*

The co-lead agencies received two comment(s) after issuance of the Final EIS. Commenters, included the U.S. Environmental Protection Agency (EPA) and the Columbia-Snake River Irrigators Association.

# Add.80a

EPA provided comments pursuant to the National Environmental Policy Act, (40 CFR parts 1500-1508), and Section 309 of the Clean Air Act. The comments focused on appreciation for adding information requested during a meeting of the co-lead agencies with EPA; support for refining monitoring and adaptive management proposed in the EIS; and acknowledgement of modifications that were made in collaboration with Federal and non-Federal agencies, cooperating agencies, and tribes. EPA also expressed its willingness to continue support on wide-ranging water quality issues, where appropriate.

The Columbia-Snake River Irrigators Association submitted comments related to irrigation and navigation **\*63857** effects of MO3. In response to Draft EIS comments received regarding over-estimating transportation costs associated with dam breaching, the Final EIS included a sensitivity analysis that examined the potential use of the Great Northwest Railroad for transporting grain to export elevators on the Columbia River. The sensitivity analysis determined that the costs to upgrade the rail lines to meet Positive Train Control (PTC) requirements, add sufficient space to port facilities, and modify port facilities to load trains would likely be economically unfeasible when compared to other options. The co-lead agencies deemed that the sensitivity analysis was sufficient for informed decision-making and that a more detailed and costly analysis would not result in a significantly different estimate of impacts or ultimately change the Selected Alternative.

### 4.2 Cooperating Agencies, Tribes, and Stakeholders Review

### 4.2.1 Review from States

The four states—Oregon, Washington, Idaho, and Montana—all provided expertise and contributions to the CRSO EIS as cooperating agencies. The states were unified in calling for a continued commitment to improving conditions for the region's fish and wildlife. In support of requests for continued regional collaboration, the co-lead agencies support efforts to hold forums focused on improving salmonid populations. The co-lead agencies expect that this EIS will provide a useful foundation of information as the region works together on a shared vision for abundant fish runs and a clean, reliable, and affordable energy future for the Northwest.

### 4.2.2 Tribal Views Shared Prior to the Joint Record of Decision

The agencies engaged with regional tribes after the release of the Final CRSO EIS and had additional discussions with five tribes.[FN114] These were not typical consultations as they were held remotely using video conferencing due to the coronavirus pandemic. Nearly all tribes reiterated the dramatic impacts to their culture and way of life resulting from the construction, operations and maintenance of the CRS and the importance of salmon and other fish to their people. Some tribes were complimentary and supportive of the CRSO EIS process, citing the considerable effort put into regional coordination, soliciting input from tribes, and the comprehensive analysis resulting in a quality report. Some expressed concerns about the expedited schedule of the EIS and a perceived lack of tribal consideration and contribution to the EIS process and content.

114    These tribes included the Confederated Tribes of the Colville Reservation, the Coeur d'Alene Tribe, the Confederated Salish and Kootenai Tribes, the Confederated Tribes and Bands of the Yakama Nation, and the Nez Perce Tribe. Several informal meetings were also conducted with various tribes from the region, including an invitation to all regional tribes for a large virtual video conference.

There was uniform interest in next steps following the CRSO EIS and how the tribes would be included in regional forums, implementation of the CRSO EIS, and notably mitigation actions. All tribes inquired about how regional forums would be conducted, who the lead entities would be, goals of the forums, and what the agency roles would be. Frustration was expressed about the decision to not include fish reintroduction into blocked areas as part of the CRSO EIS alternatives. A strong interest was expressed for having fish reintroduction into blocked areas be the primary focus of upcoming forums. Many expressed a desire to collaborate on mitigation planning efforts (e.g., fish habitat studies) to contribute technical expertise and tribal perspectives.

# Add.81a

The pre-ROD tribal consultations were informative and provided helpful suggestions, some of which were included in this joint ROD. Tribal perspectives have and will always continue to improve our agency understanding of the CRS. Discussions about the future of managing the CRS does not end with this EIS and associated Tribal consultations. This EIS is part of the ongoing effort to manage the CRS.

### 4.2.3 Common Publicly-Held Views

Many members of the public through public comments, cooperating agencies throughout their participation in developing the EIS and in comments on the EIS, and tribes expressed a preference for the agencies to select an alternative that included the dam breaching measures in MO3, sometimes in combination with juvenile spill operations in MO4. Although MO3 potentially had the greatest benefits for some species of ESA-listed fish, it would achieve those benefits at the expense of not meeting the other components of the agencies' Purpose and Need Statement or certain EIS objectives. The agencies also received numerous comments expressing opposition to MO3.

The measure to breach the four lower Snake River dams in MO3 (a main component of this alternative) has been the topic of a large amount of public discourse for decades. Many environmental organizations and some tribes have been strong proponents of breaching the dams. They assert breaching the dams will result in large improvements to certain salmonid populations, and this in turn would have beneficial effects to the overall function of the Northwest ecosystem and for tribal ways of life. At the same time, many stakeholders within the navigation industry, and agricultural producers within the region that depend on the navigation industry to export grains to overseas markets, have expressed high concern with the potential regional socioeconomic effects from breaching the dams. This alternative would eliminate approximately 48,000 irrigated acres, hydropower generation flexibility and navigation on the lower Snake River which affects the ability of this alternative to meet the Purpose and Need Statement.

### Section 5. Environmental Compliance Summary

#### 5.1 Section 7 of the Federal ESA

Pursuant to Section 7 of the Endangered Species Act of 1973, as amended, NMFS and USFWS issued biological opinions, both dated July 24, 2020, that determined that the Selected Alternative will not jeopardize the continued existence of the following federally listed species or adversely modify designated critical habitat: Snake River (SR) spring/summer Chinook salmon, SR Basin steelhead, SR sockeye salmon, SR fall Chinook salmon, Upper Columbia River (UCR) spring-run Chinook salmon, UCR steelhead, Middle Columbia River steelhead, Columbia River chum salmon, Lower Columbia River (LCR) Chinook salmon, LCR steelhead, LCR coho salmon, Upper Willamette River (UWR) Chinook Salmon, UWR steelhead, the southern Distinct Population Segment of eulachon, bull trout, and KRWS. The agencies will implement the Selected Alternative reviewed in the consultations, as well as the Services' terms and conditions to both minimize take of ESA-listed species and avoid jeopardizing the continued existence of ESA-listed species or destroying or adversely modifying designated critical habitat.

Pursuant to Section 7 of the Endangered Species Act of 1973, as amended, the co-lead agencies determined that the recommended plan may affect but is not likely to adversely affect the following federally listed species or their designated critical habitat: Southern Resident killer whales, southern Distinct Population Segment of green sturgeon, streaked **\*63858** horned lark, Columbian white-tailed deer, grizzly bear, Ute ladies tresses, and the western yellow-billed cuckoo. NMFS and USFWS concurred with the co-lead agencies' determination on July 24, 2020.

In order to inform ongoing implementation of the Selected Alternative (with adaptive management principles), the co-lead agencies would continue to rely upon annual species status monitoring results to ascertain the need for contingency actions. The co-lead agencies do not propose to use specific abundance or trend triggers as previously set forth in the 2009 Adaptive Management Implementation Plan [FN115] because they have become outdated (e.g., they were based on adult returns through 2007 or 2008), because many identified contingency actions are already being implemented (e.g., substantially higher spill levels due to the proposed flexible spill operation, refined transportation operations, hatchery reform, etc.), and because several

# Add.82a

contingency actions (e.g., reducing harvest, some elements of predator control, etc.) are outside their authority to implement. Instead, the co-lead agencies would work with NMFS, USFWS, Federal, state and tribal sovereigns and other appropriate parties in any region-wide diagnostic efforts to determine the causes of declines in the abundance of naturally produced salmon and steelhead and to identify potential contingency actions should the need arise. The co-lead agencies proposed three specific actions in the proposed action: modification of the fish transportation program, reprogramming of safety-net hatchery programs, and kelt reconditioning in years of low steelhead returns.[FN116]

115      FCRPS Adaptive Management Implementation Plan. U.S. Army Corps of Engineers, U.S. Department of Interior, and U.S. Department of Energy, September 11, 2009, available athttps://www.salmonrecovery.gov/Files/ BiologicalOpinions/AMIP/AMIP_091009.pdf.

116      2020 CRS Biological Assessment at 2-120.

The co-lead agencies complete appropriate environmental analysis prior to implementing fish and wildlife protection, mitigation and enhancement actions, whether that analysis is programmatic or site-specific. These analyses include review under all applicable laws and regulations. During the course of the implementation of future actions associated with operations from the CRS projects and the other actions addressed in the 2020 CRS BiOps, actions would continue to undergo site-specific environmental analysis prior to implementation.

The current consultation in the 2020 CRS BiOps encompasses operations and maintenance of the CRS for a fifteen-year period. This decision to implement the 2020 CRS BiOps is therefore a decision to implement the action as described therein until the end of that fifteen-year period, subject to adaptive management. If the next consultation commences before the 2020 CRS BiOps are fully implemented, the co-lead agencies and the Services will consider adjustments in the timing and content of remaining implementation plans and reporting called for in the 2020 CRS BiOps.

### 5.2 Magnuson-Stevens Fishery Conservation and Management Act

Under Section 305 of the Magnuson-Stevens Fishery Conservation and Management Act (MSA), the agencies consulted with NMFS as part of the consultation that resulted in the 2020 NMFS CRS BiOp. NMFS considered essential fish habitat (EFH) designated by the Pacific Fisheries Management Council for Pacific Coast groundfish and salmon and coastal pelagic species. NMFS concluded that further consultation under the MSA was not required for these habitats because the operation and maintenance of the CRS as described in the 2020 NMFS CRS BiOp would not adversely affect EFH for these species. NMFS made four conservation recommendations to mitigate adverse effects on EFH of species. In accordance with MSA Section 305(b)(4)(B), the agencies confirmed to NMFS that the agencies will adopt and follow these conservation recommendations, which were consistent with the measures in the proposed action and Terms and Conditions in the 2020 NMFS CRS BiOp.

### 5.3 Cultural Resources

Cultural resources affected by the implementation of the Selected Alternative will be addressed under the ongoing FCRPS Cultural Resource Program. The FCRPS Cultural Resource Program implements the terms of the existing Systemwide Programmatic Agreement for the Management of Historic Properties Affected by the Multipurpose Operations of Fourteen Projects of the Federal Columbia River Power System for Compliance with Section 106 of the National Historic Preservation Act.

### 5.3.1 National Historic Preservation Act

After reviewing the changes in operations, maintenance, and configuration proposed as a part of the Selected Alternative, the co-lead agencies have determined that the existing Systemwide Programmatic Agreement would address the co-lead agencies' responsibilities under Section 106 of the National Historic Preservation Act for all proposed operations. If it is determined at a later date that any proposed structural measures are not covered by the Systemwide Programmatic Agreement, then separate

# Add.83a

Section 106 compliance would be completed prior to construction, when sufficient site-specific information on the undertaking becomes available.

### 5.3.2 Archaeological Resources Protection Act

Unlike the National Historic Preservation Act, consultation under the Archaeological Resources Protection Act (ARPA) is only applicable to issuance of a permit to conduct archaeological investigations. Therefore, there is nothing specifically that the co-lead agencies would need to do as a part of considering these changes in operations, maintenance, or configuration. Under the Selected Alternative, the land managing co-lead agencies (Reclamation and Corps) will continue to issue ARPA-related permits to external project proponents for archaeological investigations occurring on their respectively managed Federal land. The co-lead agencies will also continue efforts related to documenting destruction or alteration of archaeological resources in violation of ARPA.

### 5.3.3 Native American Graves Protection and Repatriation Act

There is not a general consultation requirement triggered under this act by changes in operations, maintenance, or configuration under the Selected Alternative. The existing FCRPS Cultural Resource Program maintained by the co-lead agencies addresses inadvertent discoveries of human remains that could result from system operations (43 CFR 10.4).

### 5.3.4 American Indian Religious Freedom Act

The co-lead agencies do not anticipate taking any actions under the Selected Alternative that would infringe upon the rights afforded under the American Indian Religious Freedom Act to Native American tribes. The co-lead agencies will continue to consult and work with area tribes to protect and provide access to sacred sites on CRS Federal lands, when possible and practicable to do so.

### *63859  5.3.5 Curation of Federally Owned and Administered Collections

Under the Selected Alternative, the co-lead agencies will continue to implement the existing FCRPS Cultural Resource Program which ensures the ongoing responsibility of managing Federal archaeological collections generated from Federal lands as a result of construction, operations, and maintenance.

### 5.4 Clean Water Act

Pursuant to the Federal Water Pollution Control Act of 1972 (33 U.S.C. 1251 et seq.), as amended, commonly referred to as the Clean Water Act (CWA). Section 401 water quality certifications would be obtained for project-specific structural measures, as appropriate, prior to construction. Section 402 of the CWA established the national pollutant discharge elimination system for permitting point source discharges to waters of the U.S. The Corps and Reclamation have filed applications for CWA Section 402 permits for discharges of pollutants at the CRS mainstem dams on the Columbia and Snake Rivers. These permits have not yet been issued by the U.S. Environmental Protection Agency (EPA) or Oregon Department of Environmental Quality.

For Section 404, the Corps prepared a Section 404(b)(1) evaluation to determine whether a project has unacceptable adverse impacts either individually or in combination with known or probable impacts of other activities that affect the aquatic resources in the project area. This evaluation can be found in Appendix W of the Final CRSO EIS.

Under the CWA, each state must develop a Total Maximum Daily Load (TMDL) for the waters identified on their Section 303(d) list of impaired waters, according to their priority ranking on that list. In May of 2020, EPA issued for public review and comment the TMDL for temperature on the Columbia and lower Snake Rivers to address portions of the rivers that Washington and Oregon have identified as impaired from temperatures that exceed the states' water quality standards.

## Add.84a

The co-lead agencies will continue to operate certain measures to improve water temperature, where practicable, to minimize or offset potential effects from the dams and reservoirs, as described in the Key Considerations for the Decision, Water Quality, Section 3.9.

In terms of impacts from TDG, measures under the Selected Alternative will be implemented consistently with state water quality standards to manage TDG exposure to fish in the Clearwater River below Dworshak Dam as well as manage TDG at Ice Harbor, John Day and McNary dams. Juvenile fish passage spill operations will be implemented at the lower Snake River projects and the lower Columbia River projects. These measures are described above in Key Considerations for the Decision, Water Quality, Section 3.9.

The Spill Prevention Control and Countermeasures Rule (40 CFR part 112) includes requirements to prevent discharges of oil and oil-related materials from reaching the navigable waters of the United States and adjoining shorelines, among others. It applies to facilities with total aboveground oil storage capacity (not actual gallons onsite) of greater than 1,320 gallons and facilities with belowground storage capacity of 42,000 gallons. Construction activities associated with the structural measures would comply with this rule in implementing the Selected Alternative, if needed.

### 5.5 Pacific Northwest Electric Power Planning and Conservation Act

Under the Pacific Northwest Electric Power Planning and Conservation Act (Northwest Power Act), 16 U.S.C. 839 et. seq., the co-lead agencies have certain responsibilities with respect to the operation, maintenance, and configuration of the 14 dams and reservoirs comprising the Columbia River System. In particular, the co-lead agencies share a mandate to exercise their responsibilities for management and operation of the CRS, consistent with the purposes of the Northwest Power Act and other applicable laws, to adequately protect, mitigate, and enhance affected fish and wildlife in a manner that provides such fish and wildlife equitable treatment with the other purposes for which the CRS is managed and operated.[FN117] Further, the co-lead agencies are to take into account, at the relevant stages of their decision-making and to the fullest extent practicable, the Columbia River Basin Fish and Wildlife Program adopted by the Northwest Power and Conservation Council (Council).[FN118]

117   16 U.S.C. 839b(h)(11)(A)(i).

118   Id. 16 U.S.C. 839b(h)(11)(A)(ii).

In addition, Bonneville has separate duties under the Northwest Power Act that the Corps and Reclamation do not share, as explained in Section 7.3 below. Specifically, Bonneville must use its authorities under the Northwest Power Act and other laws to "protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation" of the FCRPS, including the CRS.[FN119] Bonneville must fulfill this mandate "in a manner consistent with" the purposes of the Northwest Power Act and the Council's Power Plan and Columbia River Basin Fish and Wildlife Program.

119   Id. 16 U.S.C. 839b(h)(10)(A).

### 5.5.1 Equitable Treatment

The co-lead agencies must exercise their responsibilities for CRS projects, consistent with the purposes of the Northwest Power Act and other applicable laws, to adequately protect, mitigate, and enhance affected fish and wildlife in a manner that provides such fish and wildlife equitable treatment with the other purposes for which the CRS is managed and operated.[FN120]

120   Id. 16 U.S.C. 839b(h)(11)(A)(i).

The equitable treatment provision of the Act specifically applies to the co-lead agencies' responsibilities for (1) "managing [and] operating" (2) the federal dam and reservoir projects themselves, including the CRS.[FN121] The co-lead agencies may

## Add.85a

consider equitable treatment of fish and wildlife, in relation to the other purposes for which the CRS is managed and operated, on a system-wide basis, meaning that they may, for example, make certain decisions that place power above fish, so long as on the whole, they treat fish on par with power.[FN122]

121     Id. 16 U.S.C. 839b(h)(11)(A). The Northwest Power Act's equitable treatment provision pertains to "managing [and] operating," which in the context of the CRSO EIS includes the system operation, maintenance, and configuration actions analyzed by the co-lead agencies.

122     See Nw. Envtl. Defense Ctr v. Bonneville Power Admin., 117 F.3d 1520, 1533-34 (th Cir. 1997); see also Confederated Tribes of the Umatilla Indian Reservation, et al. v. Bonneville Power Admin., 342 F.3d 924 (9th Cir. 2003).

Further, the purposes of the Northwest Power Act also factor into the agencies' consideration of equitable treatment. In addition to protection, mitigation, and enhancement of fish and wildlife affected by the FCRPS, such statutory purposes include encouraging development of renewable generation resources and assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply.[FN123]

123     See 16 U.S.C. 839(1)-(2), (6).

The CRSO EIS process and the Preferred Alternative identified in the Final CRSO EIS demonstrate the co-lead agencies' continued equitable treatment of fish and wildlife in their operation and management of the CRS. Under the No Action Alternative, the co-lead agencies had provided equitable treatment for fish in part through annual **\*63860** fish operations planning and preparation of an annual Water Management Plan for biological opinion purposes.[FN124] New alternatives considered in the CRSO EIS included further operational and structural measures with a range of anticipated benefits and effects to fish in relation to other authorized system purposes. As a starting point, the Purpose and Need Statement and four of the eight CRSO EIS objectives pertain to improvements for fish through system operation, maintenance, and configuration actions. Some alternatives favored, for example, hydropower generation while others would maximize certain fish benefits to the detriment of other purposes—e.g., MO3, which the CSS model predicts would create the greatest benefits for anadromous fish, but that would curtail or, in specific portions of the Basin, effectively eliminate other system purposes such as navigation, hydropower generation and irrigation.

124     See generally CRSO EIS, Sections 1.9.4-1.9.7.

Ultimately, the operational and structural measures of the Selected Alternative strike a new equitable balance by expanding on the actions of the No Action Alternative that benefit fish while also accommodating continuation of all authorized system purposes.[FN125] The combination of new and existing actions that benefit fish in the Preferred Alternative incorporates consideration of the Northwest Power Act's statutory purposes. In particular, the purposes of (1) assuring an adequate, economic, and reliable power supply, when balancing the system's treatment of fish with other authorized purposes, and (2) protecting, mitigating, and enhancing fish and wildlife—"particularly anadromous fish"—including related spawning grounds and habitat, by providing suitable environmental conditions substantially obtainable from management and operation of the CRS and other power generating facilities on the Columbia River and its tributaries.

125     See generally id., Sections 7.6.1-7.6.3.

With respect to wildlife, the existing effects associated with the majority of the CRS projects relate to the reservoirs' inundation of wildlife habitat; that is, the effects are the result of the dams' construction, not their operation, maintenance, or configuration. Bonneville's historic wildlife mitigation for construction and inundation effects have focused on offsetting effects up to the full-pool inundation level, which covers operational impacts that might occur between full-pool and minimum operations.[FN126] Nevertheless, where appropriate Bonneville will continue to support CRS operations that benefit wildlife, such as operations

## Add.86a

that may support establishment of wetland vegetation and soil conditions or increase the overall quantity and quality of wetlands in the John Day pool area.[FN127]

126    See also Bonneville Power Admin., Comments on Recommendations to Amend the Council's Fish and Wildlife Program (Feb. 8, 2019), available at https://app.nwcouncil.org/uploads/2018amend/comments/1221/ BonnevilleCommentsonRecommendationstoAmendtheCouncilFishandWildlifeProgram2.8.2019.pdf (regarding scope of Bonneville's wildlife mitigation responsibilities under the Northwest Power Act).

127    See CRSO EIS, Section 7.7.7.4.

However, for the most part, the Northwest Power Act's equitable treatment provision tends to be more relevant in its application to fish rather than wildlife, particularly in light of the Act's stated emphasis on anadromous fish "which are dependent on suitable environmental conditions substantially obtainable from the management and operation of [the FCRPS]." [FN128] Even for storage projects, where operations can result in greater reservoir fluctuations and effects to wildlife can be more pronounced, the Final CRSO EIS generally found effects were minor, negligible, or not measurable for wildlife and vegetation.[FN129] Particular to wildlife, operations can lead to shoreline erosion and loss of terrestrial habitat. These effects are difficult to mitigate solely through operations because of the need to provide multipurpose operations for fish flows, power generation, and flood risk management among other purposes. When the nature of wildlife effects is impractical to address through management of operations themselves, wildlife managers have generally favored habitat enhancement actions as appropriate mitigation to address operational effects to wildlife.[FN130]

128    16 U.S.C. 839(6).

129    See CRSO EIS, Section 7.7.7; see also CRSO EIS, tbl. 7-55.

130    See, e.g., Northern Idaho Memorandum of Agreement between Bonneville Power Administration and the State of Idaho for Wildlife Habitat Stewardship and Restoration (2018) (providing in-place/in-kind habitat improvement funding to offset habitat losses from power operations).

The CRS operations, maintenance, and configuration actions reflected in the Preferred Alternative and selected in this ROD, demonstrate the extent to which equitable treatment of fish and wildlife will continue in the co-lead agencies' management and operation of the CRS.

**5.5.2 Consideration of Columbia River Basin Fish and Wildlife Program**

Under the Northwest Power Act, in their management and operation of the CRS, the co-lead agencies are to take into account, at the relevant stages of their decision-making and to the fullest extent practicable, the Columbia River Basin Fish and Wildlife Program ("Program") adopted by the Council.[FN131] An understanding of the statutory foundation, components, and requirements for the Council's Program itself is critical to inform and understand the co-lead agencies' responsibility to take this program into account during their decision-making.

131    16 U.S.C. 839b(h)(11)(A)(ii).

According to the Act, the content of the Council's Program is to consist of "measures"—i.e., actions that can be taken—"to protect, mitigate, and enhance fish and wildlife affected by development, operation, and management of [hydroelectric] facilities while assuring the Pacific Northwest an adequate, efficient, economical, and reliable power supply," [FN132] including off-site "enhancement" measures as appropriate in certain circumstances,[FN133] as well as "objectives for development and operation of such projects . . . in a manner designed to protect, mitigate, and enhance fish and wildlife." [FN134] With respect to anadromous fish, the Council Program's measures are to "provide for improved survival of such fish at hydroelectric facilities,"

# Add.87a

and "provide flows of sufficient quality and quantity between such facilities to improve production, migration, and survival of such fish . . . ." [FN135] The Council must review its Program at least once every five years, pursuant to specified statutory processes.[FN136]

132    Id. 16 U.S.C. 839b(h)(5).

133    See id., 16 U.S.C. 839b(h)(8)(A).

134    Id. 16 U.S.C. 839b(h)(2)(B).

135    Id. 16 U.S.C. 839b(h)(6)(E).

136    Id. 16 U.S.C. 839b(d)(1); see generally id. 16 U.S.C. 839b(h)(2)-16 U.S.C. 839b(h)(8).

In practice, the Council's Program has grown to include a substantial aggregate of content addressing general policy, a regional vision for the Columbia River Basin, fisheries management goals, perspectives and advice on federal agency implementation practices, and other additional components to those prescribed by the statute—that is, the mitigation measures themselves. To the extent that these supplemental Program components are extraneous to content mandated by the Northwest Power Act, such components still prove useful context for the co-lead agencies to consider, but they do not carry the same weight as, for instance, the Program **\*63861** provisions that adhere to the statutory criteria for "measures." Moreover, the Council's inclusion of such additional content as regional vision and implementation provisions does not make the co-lead agencies responsible for adhering to the proffered processes or ensuring the particular outcome of a Council goal, especially when it depends on factors beyond the co-lead agencies' influence such as the effects of hundreds of non-federal dams, not just the 14 CRS projects.[FN137] Therefore, when taking the Council's Program into account during decision-making, the co-lead agencies look primarily to statutory-based content in the Program—such as actionable measures.

137    See generally Letter from S. Armentrout, Bonneville Exec. Vice President Environment, Fish and Wildlife, to R. Devlin, Council Chair, (June 20, 2020); see also Letter from S. Armentrout, Bonneville Exec. Vice President Environment, Fish and Wildlife, to J. Anders, Council Chair, at 4-8 (Oct. 19, 2018). Both letters are available at: https://app.nwcouncil.org/uploads/2018amend/comments/1392/FinalCouncilAddendumPt1CoverLtrandComments2020.06.22.pdf. Many of the Program's broad regional goals are also challenging for the co-lead agencies to consider or apply given that the goals are affected by many factors outside of the co-lead agencies' control or responsibility while the Program's mitigation measures are narrowly focused almost exclusively on the FCRPS and mitigation funded or implemented by Bonneville, the Corps and Reclamation.

The Council's Program is, in large part, an off-site mitigation (or "enhancement") program that primarily recommends continued implementation of fish and wildlife projects such as habitat protection and improvements, artificial production (i.e. hatchery production), and research, monitoring, and evaluation. However, Program content directly relevant to the actions under consideration in the CRSO EIS—operation, maintenance, and configuration of the CRS—is limited.

In the various Program iterations since 2003—when it last provided comprehensive guidance on system operations in its "Mainstem Amendments"—the Council has for the most part amended its Program to follow or endorse the system management actions included in the current NMFS and USFWS biological opinions, Fish Accord agreements, and more recently the 2019-2021 Spill Operation Agreement.[FN138] Furthermore, the findings associated with the Council's recent Program amendment process do not indicate any substantive review of the 2003 Mainstem Amendments by the Council, which leaves considerable question as to the extent to which such amendments still apply, given the Council's statutory duty to review the Program at least once every five years and the fact that the Council has supported further changes to operations since the 2003 Mainstem Amendments were adopted. Therefore, few current Program provisions directly address system operations in a way that would provide meaningful additional guidance to consider. The co-lead agencies have nonetheless taken appropriate

## Add.88a

Council guidance into account. For example, the majority of the Libby and Hungry Horse operations discussed in part two of the Council's 2020 Addendum to its Program were considered in the CRSO EIS alternatives and were either incorporated or modified in the Preferred Alternative.[FN139]

138    See, e.g., Council, Findings on Recommendation and Response to Comments for the 2020 Addendum [Part II] to the 2014 Fish and Wildlife Program, at 48-50 (recognizing and incorporating the 2019 NMFS CRS BiOp, 2018 Fish Accord Extensions, and 2019-2021 Spill Operation Agreement); 57 (supporting ongoing estuary restoration work); and 69 (recognizing 2018 Accord Extension agreements) (March 2020).

139    See Northwest Power & Conservation Council, 2020 Addendum, Part II, Columbia River Basin Fish & Wildlife Program, at 7 (Jan. 14, 2020, pre-publication version).

In addition, another operational matter included in both the CRSO EIS and past Council Program guidance relates to the timing of Lake Roosevelt's refill to a particular elevation level in the fall. Under the Preferred Alternative, the date for the elevation refill target may be shifted to later in the fall than the date initially proposed as guidance in the Council's 2003 Mainstem Amendments. However, in considering this operational measure in the CRSO EIS, the co-lead agencies took into account the fish protection purpose associated with the Council's 2003 guidance (protecting access to kokanee spawning habitat) as well as subsequent mitigation work that was implemented to address the underlying concern.[FN140] And further, through the Mitigation Action Plan in Attachment 1, the co-lead agencies have agreed to additional mitigation for the potential effects of this operation after evaluation by supplementing spawning habitat at locations along the reservoir and tributaries, if appropriate.

140    See also Categorical Exclusion Determination, Bonneville Power Admin., Dept. of Energy, Grand Coulee Dam/Lake Roosevelt Fall 2019 Operations (Sep. 27, 2019), available at https://www.bpa.gov/efw/Analysis/CategoricalExclusions/cx/20190927_Grand_Coulee_Lake_Roosevelt_Fall_2019_Operations_CX_FINAL.pdf.

Another topic raised in both the CRSO EIS process and the Council's Program is passage and reintroduction of anadromous fish above Chief Joseph and Grand Coulee dams. The Council's 2020 Program amendments recommended "Bonneville and others are to continue to make progress on the program's phased approach to evaluating the possibility of reintroducing anadromous fish above Grand Coulee and Chief Joseph dams." It further said, "many others have a role to play—making progress on this effort is not the sole province of the program," and therefore not the sole effort of the co-lead agencies, the primary implementers of the program. The co-lead agencies took reintroduction into account during the preparation of the CRSO EIS, but decided not to analyze it in detail for the reasons discussed in Section 2.5.10 of the Final CRSO EIS.

Finally, certain other Council Program provisions relating to general policy, regional vision, or fisheries management goals, rather than actionable statutory measures per se, have nonetheless been taken into account. For example, the Council's Program has continually included a 5 million fish goal and 2-6% SAR objective. This goal and objective apply to the entire Columbia River Basin and all federal and non-federal hydroelectric dams, not simply the FCRPS or the CRS. This goal and objective is also influenced greatly by fisheries management, climate, and ocean conditions, as well as farming, logging, mining, and development practices—all of which are beyond the co-lead agencies' control or sole responsibility to manage. The CRSO EIS nonetheless, examined the alternatives in terms of the likely effect each would have on SARs, and CSS analysis of the Preferred Alternative selected in this ROD estimates the potential for SARs greater than 2% for both Snake River spring Chinook and Snake River steelhead,[FN141] thus falling within the range recommended by the Council.

141    See CRSO EIS, at 7-109, tbl. 7-28.

As described previously, relevant provisions of Council's Program were taken into account by the co-lead agencies in their consideration of the CRSO EIS alternatives and adoption of the Preferred Alternative. And as discussed in greater detail in

# Add.89a

Attachment 1, the Mitigation Action Plan included with this ROD likewise reflects Bonneville's consideration of the Council's Program with respect to relevant off-site mitigation aspects of the Program.

### 5.6 National Environmental Policy Act

In accordance with the National Environmental Policy Act (NEPA) of 1969, the co-lead agencies published a Notice of Intent to prepare an EIS in the Federal Register on September 30, 2016 (81 FR 67382), and held 16 public scoping meetings and two webinars. The 45-day public review period for the **\*63862** Draft EIS started February 28, 2020, and ended April 13, 2020. Six virtual public comment meetings and five virtual tribal meetings were held during the public review period. Appendix T of the CRSO EIS includes comments received during this EIS review and corresponding responses to substantive comments. Following the 30-day public review of the final EIS, the signing of this Record of Decision by co-lead agency decision makers, outlining the rationale for their decision, completes the NEPA process for the CRSO EIS.

The Selected Alternative provides flexibility to adjust to changing conditions by relying on adaptive management. However, the agencies may, if in the future they propose a new or altered measure, determine that it is appropriate to prepare a supplemental NEPA analysis or, if a site-specific analysis is needed, a tiered NEPA document. This situation may arise if there are substantial changes in the Selected Alternative that are relevant to environmental concerns or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts,[FN142] including, but not limited to, changes in natural conditions or actions outside of the control of the co-lead agencies. In such circumstances, the agencies may continue to rely on the CRSO EIS analysis and only focus on the new action, seeking public input on that action and notification of a final assessment and any changes to the agencies' decision outlined in the Record of Decision. A tiered document may look at multiple alternatives for that site-specific analysis, relying on the broader EIS for the impact analysis. If an action is being considered under a supplemental or tiered NEPA process, the subsequent NEPA analysis is only required to summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and will concentrate on the issues specific to the subsequent action,[FN143] not reconsider the action in its entirety.

142   40 CFR 1502.9(d) (since potential tiering or supplemental NEPA analysis may occur after CEQ updated its NEPA implementing regulations on July 15, 2020, this citation is to the revised NEPA regulations).

143   40 CFR 1501.11(b).

### 5.7 Fish and Wildlife Coordination Act

Pursuant to the Fish and Wildlife Coordination Act of 1934, as amended, the co-lead agencies received the final Coordination Act Report (CAR) on May 28, 2020. The co-lead agencies considered the findings and recommendations while finalizing the EIS. Eighty-four recommendations are included in the final CAR and, of those, the majority are either part of the Selected Alternative or existing programs. A few recommendations are outside the scope of the action and were not adopted. Two recommendations are being considered as part of monitoring and adaptive management plans. The co-lead agencies' response to the USFWS' recommendations can be found in Appendix U of the CRSO EIS.

### 5.8 Executive Order 12898, Environmental Justice

In accordance with provisions of Executive Order 12898 Environmental Justice, dated February 11, 1994, the Selected Alternative will not cause disproportionately high and adverse effects on any environmental justice populations.

### 5.9 Executive Order 13007, Indian Sacred Sites

In compliance with this order, the co-lead agencies contacted 19 tribes to request their assistance in identifying sacred sites within the study area. Kettle Falls and Bear Paw Rock have been identified as sacred sites. The effects to these sacred sites under the Selected Alternative are negligible, as described in Section 7.7.18 of the CRSO EIS.

# Add.90a

*5.10 Secretarial Order 3175, U.S. Department of the Interior Responsibilities for Indian Trust Assets*

In compliance with Secretarial Order 3175, this EIS has analyzed potential effects to Indian Trust Assets in Sections 3.17 and 7.7.19 of the CRSO EIS.

**Section 6. Final Agency Findings**

*6.1 Corps' Decision*

As summarized in Section 1.1.1, after reviewing the benefits, environmental effects, and unavoidable adverse impacts of the alternatives, as detailed in the Final EIS and this ROD, and thorough considerations of the views of Tribes, federal, state, and local agencies, and public comments, the Preferred Alternative described in the Final EIS is the Selected Alternative to be implemented for the ongoing operations, maintenance, and configuration of the Columbia River System. All applicable laws, regulations, executive orders, and local government plans were considered in evaluation of alternatives. Further, the Corps has determined, and the NMFS and USFWS Biological Opinions demonstrate, based on the best available commercial and scientific information that the Corps' implementation of the Selected Alternative will not jeopardize listed species or adversely modify or destroy critical habitat. This Record of Decision completes the National Environmental Policy Act process.

Date: September 28, 2020.

D. Peter Helmlinger, P.E.

Brigadier General, U.S. Army Division Commander.

*Section 6.2 Reclamation's Decision*

After reviewing the Purpose and Need Statement, EIS objectives and effects analysis for the alternatives, as detailed in the Final EIS, biological assessment, 2020 biological opinions, and this ROD, as well as input from the Tribes, federal, state, and local agencies, and public comments, Reclamation selects the Preferred Alternative described in the Final EIS as the Selected Alternative for the ongoing operations, maintenance, and configuration of the Columbia River System. All applicable laws, regulations, executive orders, and local government plans were considered in evaluation of alternatives. This Record of Decision completes the National Environmental Policy Act process.

Date: September 28, 2020.

Lorri J. Gray,

Regional Director, Bureau of Reclamation, Columbia-Pacific Northwest Region.

*Section 6.3 Bonneville's Decision*

Bonneville decided to implement its part of the Preferred Alternative identified in the Columbia River System Operations Final Environmental Impact Statement (DOE/EIS-0529, July 2020) and analyzed in the 2020 CRS BiOps, including the applicable terms and conditions set forth in these BiOps. This decision, as well as the evaluation of the alternatives is consistent with the authorities granted to it under existing statutes and complies with all applicable environmental laws and regulations and other applicable federal statutory and regulatory requirements. This Record of Decision completes the National Environmental Policy Act process. The Selected Alternative would have negligible to minor effects to floodplains and minor effects to wetlands. This decision continues to support an adequate, efficient, economical and reliable power supply that supports the integrated Columbia River Power system while providing for the conservation of fish and wildlife and protection and preservation of cultural resources affected by System operation. This decision helps protect and preserve Native American treaty and executive order

# Add.91a

rights and meet trust obligations. This decision also considers and plans for climate change effects on affected **\*63863** resources and on the management of the System. Bonneville, with the Corps and Reclamation, will continue to use the collaborative Regional Forum framework and continue to collaborate with the region in other forums to allow for flexibility and adaptive management of the Columbia River System.

All mitigation measures described in the Draft CRSO EIS and updated in the Final CRSO EIS have been adopted with the signing of this Record of Decision. A complete list of the mitigation measures Bonneville is adopting from the Draft and Final EISs can be found in the Mitigation Action Plan in Attachment 1. Additional mitigation measures are being adopted by the Corps and Reclamation as discussed previously and noted in their decision sections of this Record of Decision. The mitigation measures include additional commitments Bonneville agreed to as part of implementation of the proposed action analyzed in the 2020 CRS BiOps and Incidental Take Statements and the Final CRSO EIS (see Section 7.6 of the Final CRSO EIS; Attachment 1, Mitigation Action Plan).

Consistent with the factors considered in Section 3, Bonneville considered the Purpose and Need Statement, CRSO EIS Objectives, as well as the effects analysis, including direct, indirect and cumulative effects as well as the effects from climate and mitigation. As described below, Bonneville considered the ESA, NEPA and Northwest Power Act in making its decision.

### 6.3.1 ESA Compliance

Pursuant to Section 7 of the Endangered Species Act of 1973, as amended, Bonneville consulted with the Services on the operation and maintenance of the CRS for a fifteen-year period. The proposed action [FN144] consulted upon was consistent with the Preferred Alternative analyzed in the Final CRSO EIS.[FN145] NMFS issued a biological opinion (2020 NMFS CRS BiOp), dated July 24, 2020, and determined that the proposed action is not likely to jeopardize the continued existence of the federally listed species as listed in Section 6.1 of this ROD or destroy or adversely modify designated critical habitat. In addition, NMFS concurred with Bonneville's determination that the proposed action may affect, but is not likely to adversely affect the following federally listed species or their designated or proposed critical habitat: Southern Resident killer whales and the southern Distinct Population Segment of green sturgeon.

144 For purposes of Bonneville's Rationale for Decision, the term "proposed action" is utilized to refer to the Selected Alternative. Proposed action is the appropriate term for an action consulted upon with the Services under Section 7 of the ESA.

145 The co-lead agencies worked closely with the Services throughout the development of the CRSO EIS as the range of alternatives were developed and analyzed. The proposed action that underwent consultation with the Services was described in the draft and final CRSO EIS (February 2020 and July 2020); the Biological Assessment of Effects of the Operations and Maintenance of the Federal Columbia River System (January 2020) (2020 CRS Biological Assessment); Clarification and Additional Information to the Biological Assessment of Effects of the Operations and Maintenance of the Columbia River System on ESA-listed Species Transmitted to the Services on January 23, 2020 (April 1, 2020) (2020 BA Clarification Letter); and additional discussions throughout the formal consultation process.

USFWS issued a biological opinion (2020 USFWS CRS BiOp), dated July 24, 2020, and determined that the proposed action is not likely to jeopardize the continued existence of the following federally listed species or destroy adversely modify designated critical habitat: Kootenai River white sturgeon and bull trout. In addition, USFWS concurred with the agencies' determination that the recommended plan may affect but is not likely to adversely affect the federally listed species as listed in Section 6.1*of* this ROD or their designated critical habitat.

As described in further detail above and in Sections 3 and 5 of this ROD, and informed by the analysis in the 2020 Biological Assessment and the determinations in the Services' 2020 CRS BiOps, Bonneville has concluded that implementation of the proposed action and the actions described in the Incidental Take Statements are not likely to jeopardize the continued existence of

# Add.92a

ESA-listed species or destroy or adversely modify their designated critical habitat. Bonneville's analysis of the proposed action has led to the conclusion that the benefits to ESA-listed species' survival and recovery offset the adverse effects resulting from the proposed action in a manner that will not reduce appreciably the likelihood of survival and recovery or appreciably diminish the value of critical habitat as a whole. Bonneville also concludes that it has the authority and discretion to implement the proposed action and the actions described in the Incidental Take Statements in cooperation with the other co-lead agencies. Given these findings regarding the action proposed by Bonneville, this document records Bonneville's determination to operate and maintain the Columbia River System, in collaboration with the Corps and Reclamation, consistent with the action as described in the 2020 Biological Assessment, the 2020 Clarification Letter, and the Incidental Take Statements, including all terms and conditions and reasonable. This fulfills the regulatory requirements for ESA consultations, which provide that "[f]ollowing issuance of a biological opinion, the Federal agency shall determine whether and in what manner to proceed with the action in light of its [ESA] Section 7 obligations and [NMFS'] biological opinion." [FN146]

146    See 50 CFR 402.15(a).

### 6.3.1.1 Discussion of Actions Pertinent to the 2020 NMFS CRS BiOp

The following actions were proposed by Bonneville and analyzed by NMFS in its 2020 CRS BiOp. Bonneville believes that these actions are key to its finding under Section 7 of the ESA, either because of the associated benefits for ESA-listed salmonids or the lack of adverse effects from actions that benefit hydropower generation.

### 6.3.1.1.1 Spill Operations for ESA-Listed Salmon and Steelhead Juvenile Fish Passage Spill Operations

As described in more detail in Chapter 7 of the Final CRSO EIS and the 2020 Biological Assessment, the proposed action includes Flexible Spill that incorporates juvenile fish passage spill to levels that are much higher than the operations that have been implemented as part of a discretionary action [FN147] prior to 2020. Flexible Spill is an operation that will be implemented during the spring juvenile salmonid migration season at the lower Snake River and Columbia River projects. Flexible Spill is variable over a 24-hour period and takes advantage of peak and off-peak load hours for hydropower generation in order to provide flexibility. Flexible Spill is envisioned to incorporate a range of spring spill levels up to a 125% TDG spill cap during designated hours each day, consistent with the concepts tested as part of the 2019-2021 Spill Operations Agreement.[FN148]

147    Prior to 2020, spill levels at or above the 125% TDG only occurred during periods of high runoff that exceeded available turbine capacity.

148    2019-2021 Spill Operation Agreement, Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv., No. 3:01-cv-00640-SI (D. Or. Dec. 18, 2018).

The implementation of Flexible Spill is intended to increase overall survival of fish passing through the system and returning as adults by providing additional spill during periods of time when spill is expected to be most important. The increased spill is expected to decrease the number of juvenile fish that bypass the dams through non-spillway routes, improve fish travel through the forebays, gain scientific information on latent (delayed) mortality, and provide **\*63864** flexibility for hydropower generation. Under some conditions, and at some projects, high spill has been demonstrated to impede adult passage. Any potential delay for adult migration caused by high spill or impacts from elevated levels of TDG resulting from high spill are addressed through periods of reduced spill or adaptive management measures. These Flexible Spill spring operations will be implemented April 3-June 20 at the lower Snake River projects, and April 10-June 15 at the lower Columbia projects.[FN149] When Flexible Spill spring operations cease, the projects will transition to summer spill operations. Summer spill operations have been modified from past operations to include a reduction in spill in mid-August when few juveniles are migrating in the lower Snake and Columbia Rivers to offset CRS impacts to power.[FN150] Both spring and summer operations are subject to adaptive management.[FN151]

## Add.93a

149    See 2020 NMFS CRS BiOp Table 1.3-1 for initial spring spill levels.

150    See 2020 NMFS CRS BiOp Table 1.3-2 for initial summer spill levels.

151    See CRSO EIS, Appendix R, Part 2 Process for Adaptive Implementation of the Flexible Spill Operational Component of the Columbia River System Operations Environmental Impact Statement.

As described in Section 3.3.3, the CSS and NMFS Lifecycle modeling produced different results. In addition to differences in how latent mortality is addressed, the differences are also a result of a reduction in transportation rates as higher levels of spill resulting in fewer fish accessing the juvenile bypass systems where fish are collected for transportation. NMFS also qualitatively assessed potential improvements in adult abundance if reductions in latent mortality similar to those predicted by the CSS model were realized. Bonneville has included a robust monitoring plan for salmon and steelhead to help narrow the uncertainty between the biological models and help determine how effective increased spill can be in increasing salmon and steelhead returns to the Columbia Basin.[FN152] Despite the differences in the predictions from these models, Bonneville has determined that the monitoring and resulting data, as well as in-season management flexibility will reduce any risk of adverse consequences of higher levels of spill. Combined, this action is expected to materially benefit juvenile salmonids by increasing life-stage survival, thereby reducing risks to the species' survival and recovery.

152    See id.

### 6.3.1.1.2 Surface Spill To Reduce Adverse Effects To Overshooting Adult Steelhead

Adult steelhead can sometimes overshoot their natal streams, swimming above additional dams and then volitionally migrating back downstream past the dams to reach their natal streams in the fall, late winter, and early spring. In the CRS, substantial percentages of steelhead from some populations in the Middle Columbia River and Snake River Distinct Population Segments can exhibit this behavior. In order to reduce the adverse effects to overshooting adult Middle Columbia River and Snake River steelhead, in the fall of 2020, the Action Agencies will implement offseason surface spill as a means of providing safe and effective downstream passage for adult steelhead that overshoot and then migrate back downstream through McNary Dam and the lower Snake River dams during months when there is no scheduled spill for juvenile passage. The Action Agencies will implement this measure within the October 1 to November 15 and March 1 to March 30 timeframes, for a minimum of four hours per day, 3 times per week. The Action Agencies will utilize the information associated with these operations to investigate whether to refine the time period of spill based on benefits to steelhead through adaptive management.

### 6.3.1.1.3 John Day Reservoir Spring Operations for Caspian Tern Nesting Dissuasion

From April 10 to June 1 (or as feasible based on river flows), the John Day reservoir elevation will be held between 264.5 feet and 266.5 feet to deter Caspian terns from nesting in the Blalock Islands Complex. The Action Agencies intend to begin increasing the forebay elevation prior to initiation of nesting by Caspian terns to avoid take of tern eggs; operations may begin earlier than April 10 (when the reservoir is typically operated between 262.0 to 266.5 feet). The operation may be adaptively managed due to changing run timing; however, the intent of the operation is to begin returning to reservoir elevations of 262.5-264.5 feet on June 1, but no later than June 15, which generally captures 95% of the annual juvenile steelhead migration. The results of this action will be monitored and communicated with the Services. During the operation, safety-related restrictions will continue, including but not limited to maintaining ramp rates for minimizing project erosion and maintaining power grid reliability.

### 6.3.1.1.4 Operation of Turbines Above 1%

Operations of turbines within the ±1% peak efficiency of the turbine range is generally considered to be beneficial for juvenile fish passage. Based on an analysis of historic system operations, conditions that necessitate or call for consideration of operations above 1% from peak efficiency are relatively rare and are typically short in duration [FN153] and therefore the limited expansion of operations in the proposed action is not expected to affect ESA-listed species in a way that will appreciably reduce the

## Add.94a

likelihood of survival and recovery. The agencies will operate turbines as specified below during juvenile fish passage season in order to provide increased power generation flexibility and reliability or to assist with TDG management.

153     See 2020 BA Clarification Letter.

(a) Contingency Reserves—Bonneville deploys contingency reserves to meet energy demands caused by unexpected events such as transmission interruption or failure of a generator. These events are unpredictable in timing, magnitude, and location of the necessary deployment of contingency reserves, but occur approximately once per month and average 35 minutes. Bonneville will strive to cover contingencies without temporarily operating above 1% from peak efficiency and the use of contingency reserves is limited to no more than 90 minutes under reliability regulations;

(b) Balancing reserves—Bonneville is responsible for transmission system reliability, which requires the use of balancing reserves to respond to power demand and supply fluctuations (including the integration of renewable power sources). Operations will be set within ±1% of peak efficiency, but may exceed the upper end of this range for short durations of time; and,

(c) TDG management—during periods of high spring run-off, TDG levels can exceed 125% saturation. The Action Agencies may operate above 1% from peak efficiency to mitigate TDG production when flexible spill targets are met, all available turbines are operating, and additional power demand and market exists.

Operations above 1% from peak efficiency are likely to improve attraction to the adult fish ladders and have beneficial impacts on water quality by reducing TDG exposure for juveniles and adults migrating through the tailrace. NMFS did find that increasing **\*63865** powerhouse flows can have the effect of increasing juveniles that pass downstream through turbines or the bypass systems and adults may fall back over the dam.[FN154] The Action Agencies will monitor the magnitude and frequency of this operation; if the expected frequencies and magnitudes of this operation are exceeded, the Action Agencies will notify NMFS. [FN155]

154     2020 NMFS CRS BiOp, Section 2.2.5.2, at 292.

155     Id., Section 2.17, at 1398.

### 6.3.1.1.5 Zero Generation

Generating hydropower to meet demand in the winter in the Pacific Northwest can be a challenge when demand can increase dramatically and there is little additional electricity available due to adjustments in power generation in order to integrate variable renewable resources. Therefore, Bonneville has and will continue to use the capacity of the CRS to support the flexibility necessary for this integration and has proposed an expansion of that capacity under limited circumstances. Between October 15 and February 28, power generation may cease at the four lower Snake River projects and water may be stored during nighttime hours (2300 to 0500) when adult fish are typically not passing. This operation will end no later than 2 hours before dawn to facilitate adult upstream passage, which generally resumes as the sun rises. Between December 15 and February 28, a period of time when water temperatures are low and very few adult fish are still migrating in the river, daytime hours will no longer be excluded from this operation, and up to 3 hours of daytime cessation may occur. NMFS found that Passive Integrated Transponder (PIT)-tag data indicated that some adult Middle Columbia River steelhead will migrate through and overwinter in the lower Snake River during this operation (as will bull trout), but past zero generation operations have not produced observably negative impacts for Middle Columbia River steelhead.[FN156] It is expected that this operation will not appreciably reduce the likelihood of survival and recovery for these fish.

156     Id., Section 2.8.3.1.4, at 944.

# Add.95a

**6.3.1.1.2 Non-Operational Conservation Measures for ESA-Listed Salmonids**

The conclusion that the proposed action is not likely to jeopardize the continued existence of ESA-listed species or destroy or adversely modify designated critical habitat is further supported by the inclusion of non-operational conservation measures to assist in addressing any residual adverse effects of operation and maintenance of the CRS and uncertainties related to the impacts of climate change. These measures are further discussed.

**6.3.1.1.2.1 Structural Modifications**

The Action Agencies have constructed and operated many structural modifications to the dams and to fish passage facilities associated with the dams over the past couple of decades that have had marked improvements in fish survival including juvenile bypass systems, improved turbine technology, spillway weirs, and modifications to ice and trash sluiceways and other surface routes. The Action Agencies are continuing to construct structural modifications that will benefit ESA-listed fish.

**(1) Improved Fish Passage Turbines**

The first of these structural modifications is an ongoing effort to improve fish passage through the turbines by designing and constructing turbines (Improved Fish Passage or IFP Turbines) that will then be installed and tested for optimal configuration and to assess impacts to fish passage. The proposed action includes the completion of the efforts to design and install IFP turbines at Ice Harbor, McNary and John Day dams. Installation of the IFP turbines has the potential to improve fish passage conditions, improve hydropower efficiency and capacity, minimize greenhouse gas emissions, and indirectly improve water quality by reducing TDG. The proposed action also includes biological testing of the IFP turbines to determine whether the operation of the IFP turbines without fish screens would show a neutral or beneficial effect on ESA-listed fish survival metrics at each dam. The agencies will collaborate with the Services to develop a Turbine Intake Bypass Screen Management and Future Strategy process to monitor success of the IFP turbines and determine if and when it would be best to remove fish screens at these projects.

**(2) Adult Fish Ladder Differentials**

At Lower Granite and Little Goose dams, warm river surface temperatures in the forebay during late summer can create a temperature difference between the adult ladder exit and the entrance that can contribute to delays in adult passage. The Action Agencies have modified the juvenile bypass system to route excess water to the adult trap for cooling and installed intake chimneys that draw cooler water from deep in the forebay that is then released or sprayed in the fish ladder. These improvements were completed and installed during the winter of 2015-2016 and successfully tested to show that they effectively reduced near-surface water temperatures near the ladder exit.[FN157] The Action Agencies will continue operating these structures, while also monitoring and reporting all mainstem fish ladder temperatures, and identify ladders that have substantial temperature differentials (>1.0 °C). At fish ladders at mainstem lower Snake and Columbia River dams that are shown to have substantial temperature differentials, the Action Agencies will develop and implement operational or structural solutions to address these issues where beneficial and feasible.

157    2020 CRS Biological Assessment at E-57 (citing Anchor QEA. 2017. Lower Granite Adult Passage and Post-passage Evaluation Final Adult Passage and Post-passage Behavior Report. Prepared for Army Corps of Engineers. Project 161163-0201).

**6.3.1.1.2.2 Additional Improvements to Fish Migration and Survival**

The proposed action includes several other measures that will provide additional improvements to fish migration and survival. The Action Agencies will complete follow-on modifications to a new adult separator integrated into the Lower Granite Dam Juvenile Bypass System to reduce delay, injury, and stress to salmon and steelhead, bull trout, and non-target species. The Action Agencies will also design and implement structural modifications to the Lower Granite Dam adult fish trap gate to reduce

**Add.96a**

delay and stress for adult salmonids and non-target species such as Pacific Lamprey. The Action Agencies will also design and implement cost-effective solutions designed to minimize and reduce ESA-listed salmonid injury and mortality associated with debris accumulation at lower Snake River dams and McNary Dam.

### 6.3.1.1.2.3 Tributary and Estuary Habitat Actions

For over a decade, the agencies have implemented hundreds of projects to improve the quantity and quality of salmon habitat in the estuary [FN158] and tributaries [FN159] as non-operational conservation measures to address the residual adverse effects of operation and maintenance of the CRS and the uncertainties of the effects of climate change on migrating salmon and steelhead. These actions typically address impacts to fish not caused by the Columbia River System, but are things the agencies can do to improve the overall conditions for fish to help **\*63866** address uncertainty related to any residual adverse effects of the CRS on ESA-listed salmon and steelhead. Best available science indicates that these tributary spawning and rearing habitat improvements will result in benefits to distribution, abundance, and survival of these fish. The tributary habitat improvements implemented by Bonneville under previous CRS BiOps, as well as habitat improvement actions implemented by other federal agencies, form part of the environmental baseline. These completed actions will provide ongoing benefits into the future, which are expected to increase over time as natural processes are improved and fully realized.

158     See 2020 CRS Biological Assessment at 2-104.

159     See 2020 BA Clarification Letter.

Bonneville proposes to implement targeted tributary and estuary improvements during the term of this BiOp to provide meaningful biological benefits for ESA-listed species. Bonneville and Reclamation will implement tributary habitat actions in collaboration with local experts utilizing the best scientific and commercial data available to develop strategies, priorities, and specific actions. Bonneville, the Corps and NMFS will also continue to coordinate and implement the Columbia Estuary Ecosystem Restoration Program (CEERP). With an institutionalized adaptive management framework, CEERP will continue to provide forums to revisit the habitat improvement actions and pair them with action-effectiveness monitoring results. The agencies will continue to implement habitat actions that were identified by NMFS as priority actions [FN160] for restoring salmon habitat and for their ability to ameliorate climate change effects. Barrier removals, floodplain reconnection, incised channel restoration and improving stream flow regimes are the types of activities most effective at addressing increased temperatures, reduced base flow, increased peak flow and increasing salmon resilience. Through these efforts, the agencies will strategically evaluate the effectiveness of habitat improvement actions and inform any necessary adjustments to the current habitat improvement and monitoring strategies. The agencies have sufficient systems to track and assure progress on habitat improvement projects, which are designed to take future climate change effects into account.

160     Beechie, T., Imaki, H., Greene, J., Wade, A., Wu, H., Pess, G., Roni, P., Kimball, J., Stanford, J., Kiffney, P., Mantua, N. 2012. Restoring salmon habitat for a changing climate. River Research and Applications 29: 939-960.

### 6.3.1.1.2.4 Conservation and Safety-Net Hatcheries

To support ESA-listed salmon and steelhead species affected by CRS operations and maintenance, the Action Agencies will continue to fund the operations and maintenance of safety-net and conservation hatchery programs that preserve and rebuild the genetic resources of ESA-listed salmon and steelhead in the Columbia and Snake River Basins. These programs are helping to rebuild and enhance the naturally reproducing ESA-listed fish in their native habitats using locally adapted broodstocks, while maintaining genetic and ecologic integrity, and supporting harvest where and when consistent with conservation objectives. Safety-net programs are focused on preventing extinction and preserving the unique genetics of a population using captive broodstocks to increase the abundance of the species at risk. These programs have undergone separate, program-specific ESA consultations with NMFS, which have identified operations, best practices and associated monitoring to meet both production goals as well as reduce detrimental genetic and ecological effects on ESA-listed species. The programs will be operated in

### Add.97a

accordance with those BiOps. RM&E relevant to each hatchery program has been incorporated into the relevant hatchery program BiOp(s).[FN161] As discussed in Section 3.3.4, these programs were an important consideration for the conclusion that the proposed action is not likely to adversely affect SRKW.

161 The Action Agencies note the continued existence of their respective independent congressionally authorized hatchery mitigation responsibilities, including, but not limited to, Grand Coulee Dam mitigation, John Day Dam mitigation, and programs funded and administered by other entities, such as the Lower Snake River Compensation Plan, which is administered by USFWS. Similar to the conservation and safety-net programs, and where appropriate, the Action Agencies will conduct or have conducted separate consultations addressing effects to ESA-listed species from CRS operations and maintenance, as well as associated monitoring and evaluation (including tagging) for these programs.

### 6.3.1.1.2.5 Predation Management

The proposed action includes a suite of predation measures to reduce the impacts from avian, pinniped, and piscivorous predators. Maintaining avian wires in the tailrace of lower Columbia and Snake River dams, active hazing of gulls at the dams, and the pattern of operating the spillway gates all mitigate for predation at the dams by birds and fish. The Predator Disruption Operations measure at the John Day Reservoir will mitigate Caspian Tern predation on juvenile salmon and steelhead in the lower Columbia River. Management efforts are ongoing to reduce salmonid consumption by terns in the lower Columbia River, and similar efforts are in progress to reduce the nesting population of Double-crested cormorants in the estuary. The Action Agencies currently implement a Northern Pikeminnow Management Program which includes an ongoing base program and general increase in northern pikeminnow sport-reward fishery reward structure to reduce predation by these fish. The Action Agencies also will continue to implement measures to reduce pinniped predation in the tailraces of Bonneville and The Dalles dams. The agencies expect that these actions will reduce or maintain the levels of predation within the juvenile and adult migration corridors that were achieved in recent years.

### 6.3.1.1.2.6 Fish Status Monitoring Actions

The Action Agencies propose to continue monitoring and evaluation activities in coordination with other regional monitoring efforts that collectively track survival of ESA-listed species affected by the continued operation and maintenance of the CRS, including select PIT-tag marking, natural abundance monitoring, and selected fish status and trend monitoring in the Columbia and Snake River basins. The monitoring and evaluation efforts of the Action Agencies' tributary and estuary habitat programs have standardized and hierarchically organized the intensity of monitoring across sites. Collectively, these actions ensure a statistically sound sampling plan to inform adaptive management at the site and landscape levels.

These non-operational conservation measures, along with the continued operation and maintenance of the CRS, provide the basis for Bonneville to conclude that the action as described in the 2020 Biological Assessment and the Incidental Take Statement in the 2020 NMFS CRS BiOp is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat.

### 6.3.1.2 Discussion of Actions Pertinent to the 2020 USFWS CRS BiOp

The following actions were proposed by Bonneville and analyzed by USFWS in its 2020 CRS BiOp. Bonneville believes that these actions are key to its finding under Section 7 of the ESA. These actions offset the adverse effects **\*63867** of the proposed action such that the effects of the action as a whole will not appreciably reduce the likelihood of survival and recovery for KRWS or bull trout.

### 6.3.1.2.1 Actions for Kootenai River White Sturgeon

### 6.3.1.2.1.1 Operational Measures for Kootenai River White Sturgeon

# Add.98a

The Action Agencies have proposed a suite of actions that have been designed to benefit KRWS and its designated critical habitat. As described in the proposed action, the Action Agencies will manage river flow and water temperature from Libby Dam in a manner that is likely to create improved river depth and water velocities in areas important for sturgeon migration, spawning and rearing, as well as to provide stable water temperatures during sturgeon migration and spawning periods. The sturgeon flow operation is a combination of three approaches: (1) Releases from Libby Dam during the Kootenai sturgeon spawning season and in coordination with the Flow Plan Implementation Protocol (FPIP) process; (2) use of the selective withdrawal facilities to achieve appropriate downstream river temperatures; and (3) a tiered volume approach that varies the volume of water available for sturgeon conservation each year depending on the May 1 forecast of total volume into Koocanusa Reservoir expected during the April through August period. Based on this approach, there is no flow augmentation during low water years. These measures are specifically designed to improve the co-occurrence of the Primary Constituent Elements of designated critical habitat for KRWS during critical periods of sturgeon breeding (appropriate water depths, water temperature, flow velocities, rocky substrate, and inter-gravel spaces).

In addition, Libby Dam will be operated consistent with variable discharge (VARQ) and flood risk management (FRM) procedures, which provide greater assurance that Koocanusa Reservoir will refill in medium runoff years. The proposed action modifies the VARQ FRM procedure to incorporate local conditions in the draft rate and account for planned releases during refill, such as the Sturgeon Volume, in order to respond to local FRM conditions and increase the chances of refill.

**6.3.1.2.1.2 Non-Operational Conservation Measures for Kootenai River White Sturgeon**

**(1) Conservation Aquaculture**
The proposed action includes continued implementation of the conservation aquaculture program for KRWS. Over 300,000 hatchery-origin KRWS have been released into the Kootenai basin since 1990. Monitoring data indicate that these hatchery-origin sturgeon are surviving at high rates. The program has successfully captured between 70 and 80 percent of the genetic diversity in the wild population, which has and will continue to help reduce effects to KRWS from CRS operations.

**(2) Habitat Restoration Actions**
The proposed action includes implementation of a habitat restoration program, which is likely to increase spawning sturgeon access to river reaches that have sufficient amounts of rocky substrate, and is likely to address other habitat-related threats to Kootenai sturgeon. From 2011 to 2019, 12 habitat restoration projects have been successfully implemented in the Braided, Straight, and Meander reaches of the Kootenai River. Under the proposed action, the Action Agencies have committed to funding and implementing a minimum of one major habitat restoration project per year through at least 2025 (after 2025 additional projects may continue to be implemented, pending the results of an assessment of implemented restoration projects). Together, these projects have produced, and are expected to continue to produce, increased river depth and complexity, reduced bank erosion, increased available sturgeon spawning and rearing habitat, and enhanced fundamental ecosystem processes, which have and will continue to reduce effects to KRWS from CRS operations.

**(3) Nutrient Enhancement**
The proposed action includes nutrient additions in the Kootenai River and Kootenay Lake. Monitoring of these projects has shown increased beneficial algal production, increased abundance, biomass and diversity of invertebrate food items for fish, and improved overall biological productivity in the Kootenai River, which has and will continue to reduce effects to Kootenai sturgeon from CRS operations.

**6.3.1.2.2 Actions for Bull Trout**

**6.3.1.2.2.1 Operational Measures for Bull Trout**

# Add.99a

The Action Agencies have proposed a suite of actions that have been designed to benefit bull trout and its designated critical habitat. As described in the proposed action, Hungry Horse Dam is operated to meet minimum flows all year both below the dam on the South Fork Flathead River and at Columbia Falls, Montana on the mainstem Flathead River to benefit bull trout when not operating for FRM or releasing water for flow augmentation to benefit anadromous fish. Ramping rate limits were established below Hungry Horse Dam to reduce the likelihood of fish becoming stranded. Libby Dam is operated to provide minimum flows for bull trout and KRWS, including in September for bull trout habitat inundation. This action provides benefits that maintain water levels suitable for foraging and migrating throughout the Kootenai River. Libby's reservoir summer elevation is kept above 2,450 feet to improve primary production and zooplankton production. Providing surface spill to reduce adverse effects to overshooting adult steelhead at McNary and the lower Snake River dams is also expected to benefit bull trout during migration past the dams.

**6.3.1.2.2.2 Non-Operational Conservation Measures for Bull Trout**

The Action Agencies' proposed action includes three non-operational conservation measures: tributary restoration actions, particularly on the Kootenai River, funding of the operations and maintenance of conservation and safety-net hatcheries, and monitoring of impacts to bull trout that are expected to minimize the long-term impact to survival and recovery of all affected Core Areas of bull trout during the timeframe of this consultation. In addition, the nutrient additions proposed for the Kootenai River will benefit bull trout at this location. Further, once construction of upstream passage occurs at Albeni Falls Dam, substantial benefits to bull trout in this Core Area are anticipated to occur, and have been included in this analysis as part of the environmental baseline as it is subject to a separate planning and environmental compliance process. Many of the proposed structural improvements discussed above in the discussion of the 2020 NMFS CRS BiOp for salmon and steelhead are expected to benefit bull trout, including the new IFP turbines at Ice Harbor, McNary, and John Day dams.

**(1) Restoration Actions for Bull Trout**

Proposed habitat restoration projects will benefit bull trout both in tributaries and in mainstem river habitats. The proposed action includes an evaluation **\*63868** of delta formations at the mouths (confluences) of important bull trout spawning tributaries of the Kootenai River downstream of Libby Dam that may be causing upstream fish passage barriers to bull trout seeking spawning grounds in tributaries during summer months. In 2021, the Action Agencies will contribute funding for an initial assessment of blocked passage to bull trout key spawning tributaries identified by the USFWS. The assessment may cover a range of water year types but must include a dry water year to adequately understand the problem. Upon completion of the initial assessment, the Action Agencies, in collaboration with local stakeholders and USFWS, will develop an action plan and prioritization process for tributaries identified as having blocked passage. The Action Agencies will work with the USFWS and stakeholders to identify and initiate a process to address two restoration or improvement projects (or a combination of both) benefitting upstream passage over the period from 2021 to 2026. Any additional improvement opportunities to benefit bull trout passage in Kootenai River tributaries will be evaluated based on biological priorities and available funding.

Additionally, habitat enhancement actions on and adjacent to the Kootenai River may improve juvenile to adult survival of kokanee salmon that are an important prey species for both KRWS and bull trout. Further, the Action Agencies will work with USFWS to leverage benefits for bull trout where feasible when developing tributary habitat projects for ESA-listed salmon and steelhead.

**(2) Monitoring for Bull Trout in the Lower Columbia and Lower Snake River**

The Action Agencies will continue to monitor for bull trout at the lower Columbia and lower Snake River dams. The primary means of monitoring bull trout will be through the Corps' adult fish counts program, PIT detection arrays in fish ladders and juvenile bypass systems, and through the Smolt Monitoring Program (SMP). Monitoring objectives will be refined as priorities evolve and the state of knowledge advances. The Action Agencies will continue to emphasize monitoring that informs management needs.

# Add.100a

In consideration of this suite of proposed actions for KRWS and bull trout, Bonneville concludes that the action as described in the 2020 Biological Assessment and the Incidental Take Statement in the 2020 USFWS CRS BiOp is not likely to jeopardize the continued existence of ESA-listed species and is not likely to destroy or adversely modify designated critical habitat.

### 6.3.1.3 Climate Change Analysis

In the 2020 NMFS CRS BiOp, NMFS found that climate change poses a substantial threat to anadromous fish species over the next twenty years. While climate change will affect anadromous fish in all stages of life, the impacts are largely driven by changes in ocean conditions that are projected to reduce survival during the marine life history stage. NMFS concluded that "these conditions are not caused by, nor will they be exacerbated by, the continued operation and maintenance of the CRS as proposed in the biological assessment." USFWS concluded in the 2020 USFWS CRS BiOp that the proposed action, in combination with other Federal and non-Federal actions, is likely to exacerbate the effects of climate change on resident fish, but recognized the contributions that adaptive management and habitat improvement actions will have in supporting habitat and flexibility to respond to climate change.[FN162] Despite these impacts, Bonneville has concluded that the proposed action, particularly operational measures and non-operational conservation measures, is expected to offset adverse effects that may impact the survival and recovery of ESA-listed species such that the action will not appreciably reduce the likelihood of survival and recovery and will positively contribute to the overall resiliency of the ESA-listed species in light of climate change. The measure to use local water supply conditions in order to implement sliding scale operations for summer flow augmentation are staged to better balance anadromous and resident fish needs. The agencies have committed to continuing the tributary and estuary habitat improvement program for salmon and steelhead (with considerations for benefits to bull trout, where appropriate) and to evaluate and improve tributary habitat access for bull trout which will give spawning fish access to additional habitat. The continued use of cool water stored behind Dworshak Dam and structures to address ladder temperature differentials help to reduce water temperatures as fish approach and pass Lower Granite and Little Goose dams.

162    See 2020 USFWS CRS BiOp at 34 and 37.

### 6.3.1.4 Adaptive Management and RM&E

### 6.3.1.4.1 Regional Forum and Kootenai River Regional Coordination

The agencies will continue to utilize adaptive management principles in implementing the proposed action based on results of biological studies and monitoring information.[FN163] These results will be discussed, and operations modified in collaboration with federal, state and tribal sovereigns through the Regional Forum, to ensure expected benefits to salmon and steelhead are being met based on the best available scientific information. The Kootenai River Regional Coordination workgroups will continue to be utilized to provide recommendations regarding operations and address technical issues related to KRWS.

163    2020 CRS Biological Assessment at 2-1 to 2-6.

### 6.3.1.4.2 RM&E

Biological performance for system operations will be tracked through ongoing juvenile and adult fish monitoring at the lower Columbia and lower Snake River dams. Annual and in-season monitoring results are used to inform in-season operations decisions and through the Regional Forum, identify potential research or evaluation needs, and inform longer-term management decisions regarding system operations. Bonneville will assess a number of the proposed operations and structural modifications through action-effectiveness evaluations, including the deployment of IFP turbines, spill for steelhead overshoots, and Flexible Spill. The agencies will implement planning and progress reporting to the Services to inform and signal appropriate adaptations to changing circumstances.

### 6.3.2 NEPA Compliance

## Add.101a

Bonneville will use the CRSO EIS for operational changes associated with CRS power marketing activities. These operations will be coordinated with other operational, maintenance or configuration actions for flood risk management, irrigation, fish and wildlife conservation, water quality, navigation and other congressionally authorized purposes. For mitigation actions, Bonneville will use a combination of existing programmatic NEPA documents as well as site-specific NEPA documents to implement certain mitigation measures described in Section 7.6 of the Final CRSO EIS and the Mitigation Action Plan. Since these actions mitigate for impacts from the CRS projects, these actions will be **\*63869** conducted as part of Bonneville's Northwest Power Act commitments.

Generally, if new or existing projects change the status quo or directly impact the human environment in a manner not considered in an existing NEPA document, commensurate NEPA analysis will be conducted. More specifically, Bonneville could either supplement or develop new NEPA documents consistent with 40 CFR 1502.9 and 10 CFR 1021.314. Moreover, consistent with its existing practice for new projects, Bonneville will determine the appropriate level of NEPA compliance once projects are proposed for implementation and integrate compliance with other applicable environmental laws, including but not limited to the Northwest Power Act, ESA and the National Historic Preservation Act.

For habitat restoration actions in tributaries in the Columbia River Basin, Bonneville will continue to conduct site-specific NEPA compliance for these actions (e.g., Bird Track Springs Fish Habitat Enhancement Project (DOE/EA-2032)). Bonneville also plans to use programmatic NEPA documents analyzing habitat restoration actions, including the Aquatic Restoration Activities in and near Umatilla National Forest Environmental Assessment (DOE/EA-2119) and the Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process, where appropriate.

For habitat restoration actions in the estuary, Bonneville will continue to determine whether the project fits under the Columbia Estuary Ecosystem Restoration Program Environmental Assessment (DOE/EA-2006) or if site-specific NEPA compliance is needed.

For hatchery projects, Bonneville will continue to rely on existing hatchery NEPA documents, where appropriate (e.g., Springfield Sockeye Hatchery Project (DOE/EA-1913); Kootenai River White Sturgeon and Burbot Hatcheries Project (DOE/EA-1901)), and will continue to conduct site-specific NEPA compliance for changes to existing hatchery programs.

Finally, for research, monitoring and evaluation actions, Bonneville will either integrate these actions into applicable NEPA documents for other actions (e.g., with habitat or hatchery actions), as appropriate, or conduct site-specific NEPA actions if the projects are not tied to other actions.

Thus, by completing the CRSO EIS, the agencies are ensuring the Preferred Alternative analysis and associated ESA consultations take into account updated information and analysis on operational, structural and mitigation measures. Additionally, using the flexibility afforded by NEPA, Bonneville will use existing NEPA documents, where appropriate or complete new or supplemental environmental evaluation, if necessary.

**Table 2—Mitigation Measures and Existing or Planned NEPA Compliance**

| Mitigation measure | Existing or planned NEPA compliance |
| --- | --- |
| Part VI | |
| Implement tributary habitat improvements for both Chinook salmon and steelhead as well as other species through implementation of specified construction projects, research, monitoring and evaluation actions, and species status and trend data collection on habitat and survival improvement | Site-specific or other programmatic NEPA compliance or Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process. |

# Add.102a

| | |
|---|---|
| Implement Kootenai white sturgeon habitat restoration as included in the CRS Biological Assessment | Site-specific NEPA compliance, other programmatic NEPA documents or Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process. |
| Implement estuary habitat improvements through implementation of specified construction projects; research, monitoring and evaluation actions; and species status and trend data collection on habitat and survival improvement | Site-specific NEPA compliance or Columbia Estuary Ecosystem Restoration Program Environmental Assessment (DOE/EA-2006), if needed. |
| Continue support of the Kootenai River white sturgeon nutrient enhancement through FY 2025 | Kootenai River Ecosystem Environmental Assessment (DOE/EA-1518) and Supplement Analysis or site-specific NEPA Compliance, if necessary. |
| Continue to fund operations and maintenance of ongoing safety-net and conservation hatchery programs to provide benefits to ESA-listed stocks at high risk of extinction | Site-specific NEPA Compliance. |
| Continue Northern Pikeminnow Management Program | Northern Pike Suppression Project Categorical Exclusion. |
| Ongoing monitoring of East Sand Island Caspian tern and Double-crested cormorant colonies during nesting season through 2021 breeding season | Site-specific NEPA Compliance. |
| Sea Lion Non-Lethal Hazing and Monitoring | Site-specific NEPA Compliance. |
| Bull trout access to perched tributaries in Kootenai River: Contribute funding for an initial assessment of blocked passage to bull trout key spawning tributaries identified by the USFWS. Initiate two restoration or improvement projects benefitting upstream passage opportunities over the period of 2021-2026 | Site-specific NEPA compliance or Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process. |
| Supplement spawning habitat at Lake Roosevelt at locations along the reservoir and tributaries (up to 100 acres) | Site-specific NEPA compliance or Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process. |
| Plant cottonwood trees (up to 100 acres) near Bonners Ferry to improve habitat and floodplain connectivity | Site-specific NEPA compliance or Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process. |
| Plant native wetland and riparian vegetation (up to 100 acres) on the Kootenai River downstream of Libby | Site-specific NEPA compliance or Columbia River Basin Tributary Habitat Restoration Environmental Assessment (DOE/EA-2126), pending completion of that NEPA process. |

**\*63870  6.3.3 Bonneville's Duty Under the Northwest Power Act To Protect, Mitigate, and Enhance Fish and Wildlife**

Apart from the co-lead agencies' shared Northwest Power Act duties discussed above, Bonneville's Administrator has a separate responsibility to use the Bonneville fund to "protect, mitigate, and enhance fish and wildlife to the extent affected by the development and operation" of the Federal Columbia River Power System, including the CRS.[FN164] Bonneville must fulfill this mandate "in a manner consistent with" the purposes of the Northwest Power Act and the Council's Power Plan and Columbia River Basin Fish and Wildlife Program.[FN165] The Ninth Circuit Court of Appeals has original jurisdiction over suits to challenge final actions and decisions taken pursuant to the Northwest Power Act by the Bonneville Administrator, or the implementation of such final actions.[FN166]

# Add.103a

164 16 U.S.C. 839b(h)(10)(A).

165 Id.

166 Id. 16 U.S.C. 839f(e)(5).

In the context of the CRSO EIS, this responsibility applies to Bonneville's ongoing programs described in Chapters 2, 5 and 7 as well as the additional mitigation measures Bonneville is adopting in the Mitigation Action Plan. One of the ongoing programs described in Chapters 2, 5, and 7 is Bonneville's existing Fish and Wildlife Program. Mitigation actions and projects funded through Bonneville's Fish and Wildlife Program are the means by which Bonneville addresses its responsibility to "protect, mitigate, and enhance" fish and wildlife under 16 U.S.C. 839b(h)(10)(A).[FN167] Continuation of the actions and projects under Bonneville's existing Fish and Wildlife Program is consistent with the Council's Program because the existing Bonneville actions and projects have been subject to past Council review and have either been recommended for funding and implementation by the Council or have been incorporated into the Council's Program. Further, the Independent Scientific Review Panel periodically reviews the mitigation projects under certain statutory criteria—such as benefits to fish and wildlife.[FN168]

167 Bonneville's use of its Northwest Power Act authority and Fish and Wildlife Program as the tools for implementing actions from the Mitigation Action Plan should not be conflated with Bonneville's overall compliance with its Northwest Power Act mitigation responsibility under 16 U.S.C. 839b(h)(10)(A), which is fulfilled through a broader set of mitigation actions in addition to those described in the Mitigation Action Plan in this ROD.

168 16 U.S.C. 839b(h)(10)(D)(iv).

To the extent that the Mitigation Action Plan includes any new or expanded actions, those will likely be incorporated into existing fish and wildlife mitigation projects that are already funded consistent with the Council's Program, and can be designed for implementation in such a way that is consistent with appropriate Program measures or guidance. In addition, Bonneville's funding of these mitigation actions through its Fish and Wildlife Program projects will follow other applicable provisions of the Northwest Power Act, such as the in-lieu funding prohibition [FN169] and the congressional authorization requirement for construction of capital facilities.[FN170]

169 Id. 16 U.S.C. 839b(h)(10)(A).

170 Id. 16 U.S.C. 839b(h)(10)(B).

### 6.3.4 Summary

The Selected Alternative and associated ESA consultations take into account updated information and analysis on operational and non-operational conservation and mitigation measures. This alternative also provides for the conservation of fish and wildlife resources, including threatened, endangered, and sensitive species throughout the environment affected by CRS operations consistent with the NEPA, ESA and Northwest Power Act analysis. Thus, Bonneville is acting within its existing authorities and complying with applicable environmental laws and regulations and all other applicable federal statutory and regulatory requirements in making this decision.

### Signing Authority

This document of the Department of Energy was signed on September 28, 2020, by John L. Hairston, Acting Administrator and Chief Executive Officer, Bonneville Power Administration, pursuant to delegated authority from the Secretary of Energy. That document with the original signature and date is maintained by DOE. For administrative purposes only, and in compliance with requirements of the Office of the Federal Register, the undersigned DOE Federal Register Liaison Officer has been authorized

## Add.104a

to sign and submit the document in electronic format for publication, as an official document of the Department of Energy. This administrative process in no way alters the legal effect of this document upon publication in the Federal Register.

Signed in Washington, DC, on October 2, 2020.

Treena V. Garrett,

Federal Register Liaison Officer, U.S. Department of Energy.

[FR Doc. 2020-22147 Filed 10-7-20; 8:45 am]

BILLING CODE 6450-01-P

**End of Document**

© 2026 Thomson Reuters. No claim to original U.S. Government Works.

Add.105a

 © 2026 Thomson Reuters. No claim to original U.S. Government Works.